IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EDF INTERNATIONAL S.A.,   )
           )
    Petitioner,   )
           )  C.A. No.  08-167-JJF
   v.       )
           )
YPF S.A.       )
    Respondent.  )

## DECLARATION OF CARLOS MARÍA TOMBEUR

   Pursuant to 28 U.S.C. § 1746, Carlos María Tombeur declares as follows:

A.  INTRODUCTION

   1. I, Carlos María Tombeur, hereby submit this Declaration on behalf of YPF S.A. ("YPF"), in regards to the above-referenced matter.

   2. I am a member of the bar of the City of Buenos Aires, Argentina and currently a partner at the law firm of Severgnini, Robiola, Grinberg & Larrechea.  I graduated from the University of Buenos Aires in 1976 and was admitted to the bar of the City of Buenos Aires in 1977.  I am currently acting as counsel for YPF in the annulment proceeding in the Argentine courts described herein.

   3. The purpose of my Declaration is to describe the grounds upon which EDF International S.A. ("EDFI") and YPF, each a party to an arbitration in Argentina in *EDF Int'l S.A. v. ENDESA Internacional S.A., et al.*, Case No. 12231/KGA/CCO/JRF, sought annulment of the arbitral award (hereinafter the "Award") in Argentine courts, to explain why enforcement of the Award has been suspended in Argentina, and to describe the state of the proceedings in the Argentine courts.

4.    I make this declaration upon my own personal knowledge and upon records maintained by my law firm.

B.    THE ARBITRATION AND THE ARBITRAL AWARD

5.    The arbitration and the terms of the Award are set forth in the Argentine Arbitral Tribunal's Award, attached to EDFI's motion papers. *See* Decl. of Charles D. Reed, dated March 24, 2008 (hereinafter "Reed Decl."), Exs. C, D.  In brief, the arbitration arose out of a contract between EDFI, Astra Compañía Argentina de Petróleo S.A. ("Astra Capsa"), and ENDESA International S.A. ("ENDESA") for the purchase and sale of stock held by Astra Capsa (which later merged into YPF) and ENDESA in two other Argentine companies, under which two ancillary agreements, dated March 30 and March 31, 2001, provided for possible revisions of the purchase price in the event of either a future electricity tariff revision (scheduled for August 31, 2002) or the "*desvinculación*," de-linking, of the official one-to-one exchange rate of the Argentine peso and the U.S. dollar (if it occurred prior to December 31, 2001).

6.    The parties' contract provided for "any dispute that may arise with regard to the interpretation or performance of this AGREEMENT" to be decided by three arbitrators "who shall find in accordance with the substantive law of the Argentine Republic," with the seat of the arbitration in Buenos Aires. *See* Reed Decl., Exs. A, B at § 7.7.  EDFI brought claims against YPF (and ENDESA) arguing that the term "*desvinculación*" had a broader meaning than mere currency devaluation and that while the official devaluation of the Argentine currency did not occur until January 2002, the "*desvinculación*" was complete as of December 21, 2001, entitling EDFI to additional payment.  YPF filed a counterclaim jointly with ENDESA claiming payment from EDFI related to the tariff revision.

2

7.    The Argentine Arbitral Tribunal rendered its initial award on October 22, 2007, and subsequently modified it to correct certain errors on December 21, 2007 and February 14, 2008 (together, the "Award"). The Award found for EDFI on part of its claims, in the amount of $40 million, and for YPF on part of its counterclaims, in the amount of $11,066,150. The result was a net award to EDFI of $28,933,850 plus interest against YPF.

C.    THE PETITIONS FOR ANNULMENT OF THE AWARD

    1. *EDFI's Grounds For Annulment*

8.    On November 5, 2007, EDFI filed a request for partial annulment of the Award with the Chairman of the Arbitral Tribunal under Sections 759 and 760 of the Argentine National Civil and Commercial Procedure Code ("CPCCN"), which provides, *inter alia*, for appeals founded on a material fault in the proceeding. EDFI alleged error in the Tribunal's Award on YPF's counterclaim, and seeks to set aside, in its entirety, that portion of the award. A true and correct copy of EDFI's Annulment Petition, and a certified translation thereof, are attached to this declaration as Exhibits 1 and 2, respectively. A true and correct copy of the relevant sections of Argentine CPCCN, and a certified translation thereof, are attached to this declaration as Exhibits 3 and 4, respectively.

9.    EDFI cited the following grounds in its request for annulment:

    (i)    The Tribunal's holding on the counterclaim was contrary to public policy, unconstitutionally arbitrary and unreasonable, and violative of due process;

    (ii)    The Tribunal deliberately refused to apply the explicit text of the supplemental agreement in adjudicating the counterclaim and thus acted against the clear dictates of Argentine law concerning proper contract interpretation; and

3

(iii)    The Tribunal made arbitrary assertions about the intent of the parties at the time of contracting.

II. *YPF's Grounds for Annulment*

10.    On November 6, 2007, ENDESA and YPF also filed a petition for partial annulment of the Award with the Chairman of the Arbitral Tribunal under Sections 759 and 760 of the CPCCN. The two parties alleged error in the Tribunal's Award as to EDFI's claim, and seek to set aside in its entirety that portion of the Award. A true and correct copy of YPF's Annulment Petition, and a certified translation thereof, are attached to this declaration as Exhibits 5 and 6, respectively.

11.    On November 13, 2007, ENDESA and YPF filed a further extraordinary appeal against the Final Award to the Supreme National Justice Court under the terms of Section 14 of Law No. 48 and Sections 256 and 257 of the CPCCN, requesting the partial setting aside of the Award on the grounds of unconstitutionality. A true and correct copy of Section 14 of Law No. 48, and a certified translation thereof, are attached to this declaration as Exhibits 7 and 8, respectively.

12.    YPF (and ENDESA) have cited the following grounds in their requests for annulment:

(i)    The Award to EDFI was manifestly arbitrary and violated public policy;

(ii)    The arbitrators took the liberty to act as *amiables compositeurs* in "absolute disregard of the Argentine law applicable to the case" and in violation of the agreed-upon Terms of Reference, which specified arbitration under law;

4

(iii)    The Tribunal erroneously resolved the legal question of whether Section 1 of Law No. 23,928 ("the convertibility law"), establishing an official exchange rate in the Republic of Argentina, was in force on December 31, 2001, by holding it was not. However, Law No. 23,928 had not been repealed or declared unconstitutional at that time, but rather, it remained in force until the promulgation of Law No. 25,561 ("the public emergency law") in January 2002. The Tribunal based its decision not on the official exchange rate on December 31, 2001, as the contracting parties had stipulated, but rather based on the unofficial, market exchange rate prevailing on January 11, 2002, a date subsequent to the expiration of the contingency provision contained in the Letter Agreement; and

(iv)    The arbitrator nominated by EDFI, Mr. Jean-Paul Béraudo, lacked impartiality and independence as required by the ICC Rules, thus giving rise to a serious procedural error.

III. *The Arbitral Tribunal's Response*

13.    On February 6, 2008, the Arbitral Tribunal, in accordance with Sections 759 and 763 of the CPCCN, forwarded the record of the arbitral proceedings to the Court of Appeals in Commercial Matters in Buenos Aires (*Cámara Nacional de Apelaciones en lo Comercial*) and requested consideration of the parties' respective partial annulment appeals.

D.    THE SUSPENSION OF THE ENFORCEMENT OF THE AWARD

14.    The Arbitral Tribunal's decision of February 6, 2008 to send the proceedings to the Court of Appeals did not make explicit that the parties' appeals carried "suspensive effect."

15.    On March 18, 2008, YPF therefore filed a petition with the Court of Appeals asking that the Court declare that its appeal carried suspensive effect.

5

16.    On April 22, 2008, the Court of Appeals issued an Order that the parties'
appeals of the Award suspended the enforcement of the Award.  A true and correct copy of the
Court of Appeals' Order, dated April 22, 2008, and a certified translation thereof, are attached to
this declaration as Exhibits 9 and 10, respectively.

17.    In its Order, the Court of Appeals confirmed that it is a generally recognized
principle of Argentine law that an appeal produces suspensive effect and this general principle is
applicable to the appeal of arbitration awards and applies here.

18.    The Court of Appeals also noted that the fact that EDFI had itself also filed an
appeal for annulment of the arbitral Award reinforced its finding that a suspension should be
ordered.

19.    EDFI was notified of the Order by the Court of Appeals on May 5, 2008.
EDFI has not appealed or opposed the Order as of the date of this declaration.

E.    THE STATUS OF THE APPELLATE PROCEEDINGS

20.    The suspension of the enforcement of the Award by the Court of Appeals
remains in effect at the present time.

21.    The parties are presently engaged in establishing the contents of the record
before the Court of Appeals.  After this has been accomplished, while it is not required, in some
cases of this kind the Court of Appeals may require and receive submissions from both sides
commenting on the respective annulment petitions.  While it is not required to do so, the Court of
Appeals may also have a live conference with the representatives of the parties.  After this has
occurred, the Court of Appeals will issue its decision resolving the respective annulment
petitions.

22.    It is anticipated that the annulment proceedings will take no longer than approximately one year from the filing to be resolved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  July 8 , 2008, in Buenos Aires, Argentina.


CARLOS MARÍA TOMBEUR

## CERTIFICATE OF SERVICE

I, Peter J. Walsh, Jr., hereby certify that on July 16, 2008, the attached document was served via hand delivery and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

> Gregory J. Varallo, Esquire
> Steven J. Fineman , Esquire
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899

Peter J. Walsh, Jr. (DSBA No. 2437)

# EXHIBIT 1

**CORTE INTERNACIONAL DE ARBITRAJE
DE LA CÁMARA DE
COMERCIO INTERNACIONAL
ICC N°12231/KGA/CCO/JRF**

## RECURSO DE NULIDAD PARCIAL CONTRA EL LAUDO FINAL
## DEL 22 DE OCTUBRE DE 2007

presentado por

**EDF INTERNATIONAL, S.A.**
Demandante,
Demandada reconvencional

representada por

Hughes Hubbard & Reed LLP
47 avenue Georges Mandel
75116 PARIS
Francia

Estudio Beccar Varela
Cerrito 740 piso 16
1309 BUENOS AIRES
Argentina

5 de noviembre de 2007

# I. DEFINICIONES

Salvo que se aclare otra cosa, en el presente Recurso de Nulidad parcial (el "Recurso") se utilizan las siguientes definiciones:

**Acciones:** son las acciones de ELECTRICIDAD ARGENTINA S.A. ("EASA") y de EMPRESA DISTRIBUIDORA Y COMERCIALIZADORA NORTE SOCIEDAD ANÓNIMA ("Edenor"), cuya compraventa fue objeto del Contrato; y para cada parte vendedora, las acciones que vendió conforme al mismo.

**Argentina:** es la República Argentina.

**Acuerdo Complementario:** acuerdo firmado por las Partes el 30/03/01, y que prevé el reajuste del Precio del Contrato *"en función del resultado de la revisión tarifaria prevista para el 31 de agosto de 2002"*.

**Carta Acuerdo:** es la carta firmada por las Partes el 31/03/01, que integra el Contrato, y que establece el reajuste del Precio del Contrato en caso que se produzca la "Contingencia", definida en el párrafo 2 como la *"desvinculación del tipo de cambio oficial del peso argentino con el dólar USA, cualquiera que sea la causa que lo produzca"*.

**Contrato:** es el contrato celebrado entre ENDESA INTERNACIONAL S.A. y ASTRA COMPAÑÍA ARGENTINA DE PETROLEO S.A. (posteriormente absorbida por YPF S.A.), en carácter de Vendedoras, y EDF INTERNATIONAL S.A., en carácter de Compradora, el 30/03/01, para la compraventa de las participaciones directas e indirectas de las Vendedoras en EASA y Edenor. El Contrato se integra con el Acuerdo Complementario y la Carta Acuerdo.

**Contingencia:** es, según la definición del párrafo 2 de la Carta Acuerdo, *"la desvinculación del tipo de cambio oficial del peso argentino con el dólar USA, cualquiera que sea la causa que lo produzca"*.

**Corte Suprema:** es la Corte Suprema de Justicia de la Nación (Argentina).

**Demandadas:** son, en conjunto, ENDESA INTERNACIONAL S.A. e YPF S.A.

**Desvinculación:** es la *"desvinculación del tipo de cambio oficial del peso argentino con el dólar estadounidense, cualquiera que sea la causa que lo produzca"* (según la definición de Contingencia del párrafo 2 de la Carta Acuerdo).

**Dólar o US$:** es el dólar de los Estados Unidos de Norteamérica.

**Edenor:** es Empresa Distribuidora y Comercializadora Norte S.A.

**EDFI:** es EDF INTERNATIONAL S.A.

**Endesa:** es ENDESA INTERNACIONAL S.A.

**Partes:** son, en conjunto, EDFI, Endesa e YPF (partes del Contrato y del presente arbitraje).

**Peso o $:** es el peso de la República Argentina.

**Precio:** es el precio de compra de las Acciones pagado por EDFI, conforme la cláusula 2 del Contrato.

**YPF:** es YPF S.A.

## II. INTRODUCCIÓN

De conformidad con lo previsto por el art. 760, segundo párrafo, del Código Procesal Civil y Comercial de la Nación (Argentina) (el "CPCC"), EDFI presenta este Recurso contra el laudo final de fecha 22 de octubre de 2007 (el "Laudo"), en cuanto hace lugar a la reconvención deducida por las Demandadas (la "Reconvención") (en adelante, en este Recurso, las referencias al Laudo deben entenderse como dirigidas únicamente a aquella parte del mismo que hace lugar a la Reconvención); con base en que dicha decisión es inconstitucional, irrazonable y contraria al orden público, lo que obliga a declarar su nulidad parcial, conforme lo resuelto por la Corte Suprema, intérprete final del derecho sustantivo argentino que debe ser aplicado por el Tribunal Arbitral para la solución de este caso.[1]

En efecto, *"cada vez que la Constitución depara una competencia a un órgano del poder, impone que el ejercicio de la actividad consiguiente tenga un contenido razonable. (...) los jueces cuando dictan sentencia deben hacerlo en forma razonable; el acto irrazonable o arbitrario es defectuoso y es inconstitucional. La razonabilidad es, entonces, una regla sustancial a la que también se la ha denominado 'el principio o la garantía del debido proceso, sustantivo'"[2]* Y en este caso, como se demostrará, el Laudo, para resolver la Reconvención, deliberadamente omite la consideración de lo expresamente previsto por el texto del Acuerdo Complementario y en contra de las claras disposiciones del derecho sustantivo argentino, otorga un tratamiento distinto a EDFI del otorgado a las Demandadas, violando así el derecho de defensa en juicio de EDFI, y arriba a un resultado arbitrario, irrazonable y contrario al orden público.

En este sentido, la Corte Suprema ha sostenido reiteradamente[3] que la cláusula compromisoria no deja inerme al legitimado contra abusos en que pudiera incurrir el órgano arbitral, porque, dígalo o no la respectiva cláusula, el ejercicio que en cada caso se haga de la jurisdicción arbitral no comporta más atribución que la de juzgar legal y razonablemente dentro de los términos del conflicto; y que si bien la apreciación de los hechos y la aplicación regular del derecho es función del árbitro, no excluye que pueda ser impugnada judicialmente la inconstitucionalidad, la ilegalidad o la irrazonabilidad en que hubiese incurrido el laudar (Conf. arts. 787 y 788 del CPCC).

En tal sentido, Roque Caivano[4] explica que *"la situación que habilitaría la revisión judicial, podría resumirse utilizando en forma analógica la elaboración jurisprudencial de la propia Corte del concepto de arbitrariedad, con el que se ha abierto la vía del art. 14 de la ley 48 aun cuando no medie cuestión constitucional."*

Continúa Caivano explicando que *"se ha declarado que es arbitrario y debe ser dejado sin efecto el laudo arbitral que da por existentes pruebas que no lo son (...) y que prescindió de aplicar el derecho vigente; ya que si el laudo da por supuesto lo que debía estar ciertamente probado, la decisión pasa a apoyarse en conjeturas o*

---

[1] Punto 604 del Laudo.
[2] Bidart Campos, *Tratado elemental de Derecho Constitucional*, T. I-A, Tomo I-A, ed. 2000, pág. 805.
[3] Entre otros fallos de Corte: "Cooperativa Eléctrica y Anexos de General Acha Ltda.. s/ expediente administrativo n° 12.663/67 del Ministerio de Trabajo", 07/07/75; "José Cartellone Construcciones Civiles S.A. c. Hidroeléctrica Norpatagónica S.A. o Hidronor S.A.", 01/06/04; "Empresa de Navegación y Astilleros Bussio Hnos. v. Capitán, armador, propietario y/o agente del buque 'Del Oro' y Flota Argentina de Navegación Fluvial", 29/11/1965.
[4] Roque J Caivano, *Arbitraje*, 2da Edición, pág. 307.

*presunciones, convirtiendo el laudo en un acto judicialmente descalificable (Fallos, 290:458)"*

En consecuencia, EDFI solicita al Tribunal Arbitral que, una vez vencido el plazo para que las Partes presenten sus solicitudes de corrección e interpretación del Laudo de conformidad con el Artículo 29(2) del Reglamento de Arbitraje de la CCI, y resueltas las mismas, previo traslado del presente Recurso a las Demandadas, verifique que están cumplidos los requisitos formales para la procedencia del Recurso y, en consecuencia lo conceda y remita una copia del expediente arbitral a la Mesa de Entradas de la Cámara Nacional de Apelaciones en lo Comercial de la Ciudad Autónoma de Buenos Aires, con domicilio en la Av. Roque S. Peña 1211 (1035), Ciudad Autónoma de Buenos Aires, Argentina,[5] para que ésta proceda al sorteo de la Sala que resolverá el Recurso y a remitir el expediente a la que resulte sorteada.

De la Excma. Cámara se solicita que haga lugar al Recurso y así declare la nulidad parcial del Laudo con relación a la Reconvención de las Demandadas, en virtud de ser inconstitucional, por adolecer de arbitrariedad o irrazonabilidad manifiesta.

A este respecto, se señala que, según el CPCC, ley procesal aplicable en la ciudad sede del arbitraje, el recurso de nulidad contra un laudo arbitral es irrenunciable,[6] por lo que la presentación del presente Recurso no es contraria a la renuncia a presentar otros recursos efectuada por EDFI en virtud del artículo 28(6) del Reglamento de Arbitraje de la CCI.

En este sentido, se ha sostenido[7] *"que el considerando 14 del fallo Cartellone*[8] *contesta sin vacilación que el laudo será inapelable en caso de hacer una aplicación "regular" del derecho, pero que aun cuando las partes hayan renunciado a apelar el laudo, éste se podrá impugnar judicialmente cuando resulte inconstitucional, ilegal o irrazonable.*

*"Estos tres calificativos parece que cierran el debate: el control judicial de constitucionalidad del laudo arbitral siempre es viable y, por ende, no le alcanzan las renuncias que pudieran haberse pactado por las partes en el compromiso arbitral.*

*"Tal es el núcleo más duro que al día de hoy surge de la jurisprudencia de la Corte, y nos conduce a imaginar que la "exclusividad" del control constitucional ya no se recluye en los tribunales judiciales, sino que -a su modo- abre un espacio para ser alojado en la administración privada de justicia, esta vez ya al margen de las funciones estatales y de los órganos de poder."*

---

[5] EDFI asume los gastos de la producción de la copia del expediente y de su envío a la Mesa de Entradas de la Cámara Nacional en lo Comercial, los que serán adelantados o reembolsados según decida el Tribunal Arbitral.
[6] *"La renuncia de los recursos no obstará, sin embargo, a la admisibilidad del de (...) nulidad (...)"* (art. 760, segundo párrafo, del CPCC).
[7] Germán J. Bidart Campos, *"El control constitucional y el arbitraje"*, Sup.Const. 2004 (agosto), pág. 17 (resaltado y subrayado agregados).
[8] Se trata de un fallo de la Corte Suprema dictado en 2004 (citado en otras partes del presente Recurso), en el cual ésta declaró la nulidad parcial de un laudo arbitral, sentando así la doctrina según la cual todo laudo *"inconstitucional, ilegal o irrazonable"* es revisable judicialmente (Fallos: 292:223).

### III. LOS VICIOS DEL LAUDO

#### A) LA REVISION TARIFARIA COMO CONDICION DE LA APLICACIÓN DEL ACUERDO COMPLEMENTARIO

Si bien el Laudo comienza reconociendo que "*A diferencia de la Carta Acuerdo, las Partes presentaron escasa evidencia con respecto a las negociaciones del Acuerdo Complementario*",[9] luego afirma que "*En la opinión del Tribunal, partes en la posición de EDFI y ENDESA e YPF tenían poco interés en cómo se iba a realizar exactamente la revisión tarifaria o si en efecto se iba a realizar tal revisión. En realidad y en la práctica las partes estaban interesadas en lo qué iba a suceder con las tarifas y, más aún, con el elemento del Coste de Distribución*".[10] Esta decisiva conclusión del Tribunal Arbitral, que deja sin efecto el texto expreso del Acuerdo Complementario, no está respaldada por la identificación de prueba alguna (al contrario, descarta la prueba en contrario) y es en consecuencia tan sólo una afirmación arbitraria fundada en la desnuda voluntad de la mayoría del Tribunal Arbitral (a los efectos del presente Recurso debe entenderse, de aquí en adelante, que toda referencia al Tribunal Arbitral, lo es a la mayoría del Tribunal Arbitral que votó por hacer lugar a la Reconvención).

El Tribunal Arbitral expresamente reconoce que la posición de EDFI "*se basa antes que nada en una interpretación literal del Acuerdo Complementario*".[11] Basta con leer el texto del Acuerdo Complementario[12] para verificar que ello es cierto y que el Laudo resuelve en contra de lo pactado por las Partes en dicho Acuerdo, pues el mismo establece que "*el precio pagado por EDF de acuerdo a lo establecido en la cláusula 2 del citado Contrato será sometido a una revisión, en función del resultado de la revisión tarifaria prevista para el 31 de agosto de 2002 (...)*". El lenguaje es claro y simple: las Partes han establecido una condición, ya que han supeditado el ajuste del Precio del Contrato a que se produzca la revisión tarifaria "prevista" para una fecha determinada y esa revisión tarifaria no se produjo.[13] Con lo cual, y por aplicación del artículo 548 del Código Civil argentino, al no cumplirse la condición –la revisión tarifaria– "*la obligación es considerada como si nunca se hubiera formado (...)*"

¿En qué prueba y/o derecho sustantivo argentino se fundó el Tribunal Arbitral para concluir que las Partes no pactaron una condición necesaria para poner en marcha la revisión del precio de las Acciones cedidas a EDFI? No es posible saberlo, pues no lo dice; o, más bien, no lo dice el voto de la mayoría, pues el árbitro disidente con toda claridad refuta los razonamientos (por así denominarlos) y conclusiones del Tribunal Arbitral con base en consideraciones basadas de derecho argentino y de la realidad negocial que la mayoría ha preferido ignorar y que merecen ser transcriptas en su parte esencial por su claridad:

"*En presencia de un acto claro, la ley argentina no permite buscar una voluntad diferente de lo que las partes han correctamente expresado. Autoriza la búsqueda de*

---

[9] Punto 742 del Laudo.
[10] Punto 766 del Laudo (págs. 227/228)
[11] Punto 754 del Laudo (pág. 222).
[12] Cláusula 1 de Acuerdo Complementario, que está transcripta en el punto 88 del Laudo (pág. 17).
[13] Pese a que al comienzo de este procedimiento arbitral todavía parecía que la revisión tarifaria podría producirse, aunque con una demora, luego quedó en claro que el Gobierno argentino decidió no llevarla a cabo definitivamente.

*intención cuando aclara el sentido de un texto que es oscuro, ambiguo, que expresa aproximadamente o con torpeza la voluntad de las partes."*

*"No es el caso aquí: el Acuerdo Complementario pone en forma lógica - con una premisa (revisión por mecanismo administrativo), una segunda (nivel de las tarifas después de esa revisión) y una conclusión (cálculo del ajuste del precio de las acciones) - una voluntad económica también lógica."[14]*

*"No cabe duda que ninguna parte habría aceptado ni en el MOU, ni en el contrato, una cláusula parecida al motivo que fundamenta la parte del Laudo relativa a la reconvención"[15]*

*"Ese Principio [en referencia al artículo 535 del Código Civil argentino, que establece que el cumplimiento de las condiciones es indivisible] impide que se pueda considerar como el cumplimiento de la condición el mantenimiento de las tarifas en ausencia del procedimiento de revisión que es parte indivisible por afirmación de la ley, de la condición."[16]*

*"artículo 1350 [del Código Civil argentino]– Cuando la persona o personas determinadas para señalar el precio, no quisieren o no llegaren a determinarlo, la venta quedará sin efecto". // Aplicado a nuestro caso, ese texto tiene como consecuencia que no se puede dar efecto al Acuerdo Complementario que integra un elemento del precio de compraventa de las acciones."[17]*

*"Además, la lectura nominalista de la situación generada por la ausencia de revisión tarifaria tiene como consecuencia una paradoja: obligar a un pago de la parte que ha perdido dinero mientras que los contratantes habían establecido un vínculo entre beneficios más elevados y ajuste del precio de compraventa hacia arriba."[18]*

Lo único cierto y probado es que las Partes pactaron que la revisión del Precio (i) dependía del *"resultado de la revisión tarifaria prevista para el 31 de agosto de 2002";* y que (ii) dicha revisión tarifaria no se produjo en la fecha prevista ni se producirá.

La aplicación literal de las cláusulas contractuales claras y terminantes –como la analizada en el caso– ha sido reiteradamente exigida por la Corte Suprema, para la cual *"si los términos o expresiones empleados en un contrato son claros y terminantes, sólo cabe limitarse a su aplicación, sin que sea necesaria una labor de hermenéutica adicional."[19]* Es que *"no cabe a los jueces asignar a las cláusulas de un contrato un sentido reñido con la literalidad de sus términos y la clara intención de las partes, y lo decidido no se basa en explícitas razones suficientes de derecho cuando sus términos son claros y terminantes."[20]*

---

[14] Punto 794 del Laudo (pág. 241).
[15] Punto 794 del Laudo (pág. 242).
[16] Punto 794 del Laudo (pág. 242).
[17] Punto 794 del Laudo (pág. 242).
[18] Punto 794 del Laudo (pág. 243).
[19] CSJN, Fallos 314:363; 319:1648 y 3395; 322:1546; 324:606 y 466, entre otros.
[20] CSJN, Fallos 314:1358.

Lo afirmado en el Laudo respecto de "*la escasa evidencia con respecto a las negociaciones del Acuerdo Complementario*" es real si se considera como única evidencia a la prueba documental, pues sí existe importante evidencia respecto de dichas negociaciones en la prueba testimonial ofrecida. Pero a su respecto el Tribunal Arbitral actúa con una inexplicable ligereza, al desechar la prueba testimonial ofrecida por EDFI con un argumento meramente retórico, y aceptando en cambio la posición de las Demandadas, fundada solamente en las declaraciones de sus funcionarios, las que no han sido sometidas por el Tribunal Arbitral a la misma prueba crítica.

Veamos:

1. El razonamiento del Tribunal Arbitral en este punto, hasta donde es posible seguirlo, es tortuoso y contradictorio. Comienza por reconocer que "*Comenzando por una interpretación literal de la Carta Acuerdo, el Tribunal nota que ésta refleja la expectativa de las Partes sobre que la revisión tarifaria se efectuará el 31 de agosto de 2002.(...) tratando el ajuste del precio (...) para la compra de las acciones en función de los resultados de la revisión tarifaria prevista para el 31 de agosto de 2002.*"[21]

2. Pero luego sostiene que "*Sin embargo, el Acuerdo Complementario no dice que la ejecución de la revisión sea condición necesaria para que el Acuerdo Complementario entre en vigor. El principal enfoque del Acuerdo parece ser el cambio[22] del Coste de Distribución unitario. Aunque es cierto que el párrafo 1a del Acuerdo Complementario hace referencia al Contrato de Concesión y a la Ley N° 24.065, dicha referencia parece ser al Coste de Distribución según la definición en el Contrato de Concesión y no a una referencia específica al proceso adoptado para cambiar el Coste de Distribución como parte de la revisión tarifaria.*"[23]

No es necesaria una lectura muy detenida para detectar las ~~inconsistencias y falacias~~ de este razonamiento. En la primera frase, el Laudo indica que el texto del Acuerdo ~~Complementario no~~ utiliza el término "*condición necesaria*", pero no existe norma alguna en el derecho sustantivo argentino que requiera la utilización sacramental de dicho término[24] (y debe suponerse que es por tal razón que el Laudo no cita aquí norma alguna). Inmediatamente descarta lo que debería ser la conclusión evidente, para sostener que "*el enfoque del Acuerdo parece ser*" lo contrario de lo que dice el texto contractual, nuevamente sin indicar por qué "*parece ser*" lo que el Tribunal Arbitral afirma. Es más, en esta decisión el Tribunal Arbitral no aplica el mismo criterio que utilizó para descartar la posición de EDFI; y para aceptar la interpretación avanzada por las Demandadas no requiere que el Acuerdo Complementario lo "*diga*": es suficiente con que de una manera puramente subjetiva el Tribunal Arbitral concluya que "*parece ser*" como dicen las Demandadas que es.

---

[21] Punto 764 del Laudo (pág. 226).
[22] Subrayado en el original.
[23] Punto 765 del Laudo (pág. 227) (resaltado agregado).
[24] La doctrina argentina sostiene: "*La expresión de la condición obedece a los principios rectores de la declaración de la voluntad en los actos jurídicos (arts. 913, 973 y ss). No requiere de términos sacramentales, aunque participa de la forma del acto jurídico cuyo contenido integra*" (Código Civil y normas complementarias. Análisis doctrinario y jurisprudencial. Alberto Bueres y Elena I. Highton, T.2 A, pág. 255). También ha dicho la doctrina: "*La existencia de la condición no se halla sujeta al empleo de términos sacramentales, pudiendo convenirse tácitamente*" (Salas, Acdeel E., Código Civil anotado, Lexis Nexis, 1999, comentario al artículo 528 del Código Civil).

7

A continuación, el Tribunal Arbitral pasa a reconocer que, tal como sostiene EDFI, el Acuerdo Complementario hace expresa referencia al Contrato de Concesión y a la Ley 24.065, para luego volver a descartar la evidencia textual mediante un nuevo recurso a un argumento irrefutable: que el Tribunal Arbitral considera que *"parece ser"* que las Partes pactaron algo distinto y contrario al texto mismo del Acuerdo Complementario, sin que sea necesario para el Tribunal Arbitral tomarse el trabajo de identificar la prueba que respalda tal conclusión.

### B) EL SENTIDO DEL TERMINO "PESOS" Y LA OBTENCIÓN DE BENEFICIOS INESPERADOS

El único fundamento –no prueba– alegado en el Laudo es una hipótesis avanzada por las Demandadas, cuya falacia es tan evidente que no resulta creíble que el Tribunal Arbitral la haya siquiera considerado. El Laudo dice: *"A este respecto, el Tribunal encuentra que el ejemplo propuesto por las Demandadas es útil. En el caso de que la paridad entre el peso y el dólar se mantuviera y si, por cualquier motivo, el ENRE no realizara la revisión tarifaria, no habría ninguna reducción de las tarifas y EDFI hubiera obtenido un beneficio inesperado."*[25]

Esta concatenación de dos hipótesis no fue tenida en cuenta por las Partes; su plausibilidad no resulta apoyada por ninguna prueba, ni soporta la conclusión del Tribunal Arbitral en cuanto a que lo que importa es la existencia o inexistencia de un cambio del Coste de Distribución unitario a una fecha determinada (31 de agosto de 2002), sin importar la causa. ¿Qué habría resuelto el Tribunal Arbitral si dicho cambio hubiera ocurrido no el 31 de agosto de 2002, sino el 1 de septiembre de 2002, o el 2 de septiembre de 2002, o 20 días después, o tres o nueve meses después de dichas fechas, y con efecto retroactivo?[26] ¿Qué autoriza al Tribunal Arbitral a elegir una fecha con independencia de la revisión tarifaria? Nada.

Y si lo que interesa es el cambio –o la ausencia del mismo– del Coste de Distribución a una fecha determinada, independientemente de la causa que sea, para evitar que en la realidad económica se hubiera producido un *"beneficio inesperado"* para EDFI, lo que el Tribunal Arbitral debería haber hecho es atender a la realidad económica y verificar si al 31 de agosto de 2002 había ocurrido tal cambio y, en caso afirmativo, cuál era su magnitud, independientemente de la terminología más apropiada para designar a la moneda argentina en ambas fechas. No es razonable aplicar al mismo tiempo un criterio literal para interpretar el término *"pesos"* y no aplicarlo para interpretar (o más bien para descartar sin mayor análisis) el término *"revisión tarifaria"*, alegando que en una improbable hipótesis la realidad económica habría podido favorecer de manera imprevista a EDFI, alternativamente, para luego descartar ese criterio de realidad económica, cuando hay que analizar cuál es la situación al 31 de agosto de 2002. O,

---

[25] Punto 767 del Laudo (pág. 228).

[26] En su *Memoria de Contestación a la Memoria de Fundamentación de la Demanda Reconvencional*, presentada por EDFI el 21/07/05, EDFI explicó que la Ley de Emergencia instauró un nuevo *"marco regulatorio"* que reemplazó al vigente hasta ese momento y demostró ampliamente, con apoyo en los cuadros preparados por el Lic. Vicens, economista experto designado por EDFI, que muestran la evolución de las tarifas de Edenor a partir de noviembre de 2001 (Cuadro 1: valores en Pesos y Cuadro 2: valores en Dólares), que la reducción de las tarifas de Edenor (del margen unitario del Coste de Distribución en la terminología del Acuerdo Complementario) fue del 121% en términos reales (o sea medida en Dólares), al 31 de agosto de 2002 (ver Memoria mencionada, págs. 45/46 y cuadros anexos como Documento C-158).

más bien, como se verá a continuación, reconocer que dicha realidad económica está produciendo un *"beneficio inesperado"* para las Demandadas, y aun así otorgárselo. ¿Cuál es la razón por la que el Tribunal Arbitral se considera autorizado a generar un *"beneficio inesperado"* para las Demandadas, fundado únicamente en la posibilidad de un *"beneficio inesperado"* para EDFI que nunca ocurrió ni habría podido razonablemente ocurrir, dadas las circunstancias?

Por otro lado, lo que torna completamente arbitrario e irrazonable el Laudo es que se haya aplicado la fórmula matemática contenida en el párrafo I.a del Acuerdo Complementario que arroja un resultado que no tiene relación alguna con la realidad económica imperante en Argentina en ese momento, a pesar de que el Acuerdo Complementario fue pensado por las Partes para un contexto totalmente diferente. Así, por aplicación de dicha fórmula matemática, se condena a EDFI a abonar a las Demandadas un mayor Precio por las Acciones, no obstante que en la realidad económica estas Acciones habían perdido, a la sazón, gran parte del valor que tenían a la fecha de la venta (marzo de 2001). Ello así por las normas de emergencia que vinieron a congelar y pesificar las tarifas, mientras que varios conceptos del Coste de Distribución de Electricidad se mantuvieron y se mantienen aun en Dólares.

En otras palabras, antes de la normativa de emergencia, el margen de ganancia de Edenor que las Partes consideraron para comprar y vender las Acciones, era notablemente superior. Sin embargo, el Laudo condena a EDFI a pagar un "complemento" del Precio, a cambio de Acciones que han perdido gran parte de su valor en virtud de las medidas ordenadas por dicha normativa de emergencia!!! En otras palabras, de no declararse la nulidad parcial del Laudo, se permitiría el enriquecimiento sin causa de las Demandadas. Téngase presente que lo que el Acuerdo Complementario buscaba e intentaba garantizar era que la operación de compraventa de las Acciones reflejara el verdadero valor de las mismas dentro de un período determinado en el que las Partes habían decidido distribuir de esa forma el riesgo de la operación.

En este sentido, la Corte Suprema ha sostenido que cabe apartarse de fórmulas matemáticas *"si el resultado obtenido se vuelve objetivamente injusto por desproporcionado e irrazonable, superando ostensiblemente la pretensión del acreedor y produciendo un inequívoco e injustificado despojo del deudor, en detrimento de la moral y las buenas costumbres -arts. 21, 953 y 1071, Cód. Civil-, pues la realidad económica debe prevalecer sobre las fórmulas matemáticas abstractas."*[27]

Si la preocupación del Tribunal Arbitral era no otorgar *"beneficios inesperados"* a ninguna de las Partes, debió haber interpretado el Acuerdo Complementario conforme su texto y la intención común de las Partes, que la mayoría del Tribunal Arbitral reconoce que existía cuando dicho Acuerdo fue negociado,[28] y luego de haber

---

[27] In re *"José Cartallone Construcciones Civiles S.A. c. Hidroeléctrica Norpatagónica S.A. o Hidronor S.A."*, 01/06/04.

[28] En el punto 764 del Laudo, el Tribunal Arbitral nota que *"el lenguaje del Acuerdo refleja la expectativa que la revisión tarifaria dará los resultados que serían utilizados con el fin de realizar los cálculos contenidos en el párrafo I.a"* (pág. 226) e incluso califica dicha expectativa como "razonable" (idem, pág. 227). Luego, en el punto 765 del Laudo, el Tribunal Arbitral deduce en forma arbitraria que el enfoque del Acuerdo Complementario fue el cambio (o la ausencia del mismo, pero considerado de una manera puramente nominal) en el Coste de Distribución, independientemente de la realización de la revisión tarifaria.

verificado que (i) no se cumplió la condición prevista por las Partes para la aplicación del Acuerdo Complementario, y (ii) que no existió en la realidad económica un "*beneficio inesperado*" para EDFI, debió haber resuelto que no había lugar a la Reconvención y rechazarla en consecuencia.

Pero si, llevado por su peculiar interpretación literal, el Tribunal Arbitral concluía que lo único que importaba era la situación del Coste de Distribución al 31 de agosto de 2002, independientemente de si se había o no llevado a cabo la revisión tarifaria prevista, lo que tenía que hacer era verificar cuál era efectivamente la situación real del Coste de Distribución, aplicar la fórmula incluida en el Acuerdo Complementario y otorgar el máximo de revisión tarifaria a EDFI, una vez que hubiera comprobado la enorme reducción sufrida en términos reales por el margen unitario del Coste de Distribución al 31 de agosto de 2002.[29]

Luego de desechar el texto contractual sin mayores argumentos, el Tribunal Arbitral pasa a descartar la prueba testimonial aportada por EDFI sobre la intención común de las Partes y lo hace aplicando un criterio puramente subjetivo que —otra vez— no considera sin embargo necesario aplicar a las Demandadas. En efecto, "*El Tribunal encuentra difícil comprender cómo es que la motivación interna y la comprensión de EDFI pueden afectar la interpretación de la intención en común de las Partes expresada en el Acuerdo Complementario. No había ninguna indicación de que las Demandadas tuvieran la misma comprensión o que ésta hubiera sido comunicada a las Demandadas y que hubo algún acuerdo que reflejó tal comprensión o intención común de las Partes al referirse a "pesos" en el párrafo 1.a.*"[30]

Ya hemos visto cómo el Tribunal Arbitral determina la "*intención común de las Partes*": mediante el reemplazo de lo expresado en el texto por lo que la mayoría del Tribunal Arbitral considera que "*parece ser*", sin que sea necesario siquiera indicar prueba alguna que haga que lo concluido efectivamente "*parezca ser*". En el punto que estamos analizando, el Tribunal Arbitral requiere además a EDFI lo que sabe que no existe —una evidencia documental de lo que EDFI sostiene- y ante dicha inexistencia concluye que la interpretación afirmada por las Demandadas es la válida, sin que las Demandadas aporten ninguna prueba documental al respecto: ¿pero por qué ha olvidado el Tribunal Arbitral exigir a las Demandadas lo que ha exigido a EDFI?; es decir, una prueba documental de su propia interpretación. En efecto, la posición de las Demandadas se sustenta en la motivación interna y comprensión que sus funcionarios declararon —en el curso del procedimiento arbitral- haber tenido al tiempo de la celebración del Acuerdo Complementario, y si se utiliza el mismo parámetro que el utilizado para EDFI, es fácil concluir también que dicha interpretación debió haber sido descartada por el Tribunal Arbitral.

Queda pues, en tal caso, el recurso al texto contractual que se refiere a "*pesos*", tal como existían al momento de la firma del Acuerdo Complementario y que ambas Partes están de acuerdo en que no eran los mismos "*pesos*" que existían al 31 de agosto de 2002. ¿Sobre qué base legal, contractual, lógica o de sentido común puede afirmarse que donde el Acuerdo Complementario dice "*pesos*" en marzo de 2001, debe entenderse de

---

[29] Como hemos indicado más arriba, dicha reducción en términos reales (o valores constantes medidos en Dólares) ha sido ampliamente demostrada por EDFI en su Memoria de Contestación a la Memoria de Fundamentación de la Demanda Reconvencional (págs. 45/46).

[30] Punto 782 del Laudo (págs. 234/235).

que se tratan de los mismos *"pesos"* que existían en agosto de 2002, siendo que, como se acaba de decir, ambas Partes coinciden en que tales *"pesos"* no eran los mismos?[31]

Cuando el Tribunal Arbitral manifiesta que *"es difícil comprender por qué las Partes habían hecho expresa referencia a pesos en el párrafo 1.a del Acuerdo Complementario si no tenían intención de hacerlo"*, ignora deliberadamente lo obvio: que esa referencia se dirigía a la moneda argentina tal como era denominada (y con las características que tenía) al momento de la firma del Acuerdo Complementario y que las Partes no podían referirse en ese momento a la denominación (y características) que podría tener la moneda argentina al 31 de agosto de 2002, porque simplemente era imposible para ellas anticipar cómo podía llegar a estar denominada la moneda argentina en esa fecha futura. No hay nada que autorice al Tribunal Arbitral a hacer inferencias interpretativas sobre una presunta intención común de las Partes en función de lo que a la fecha del Acuerdo Complementario era un primer hecho futuro (pero incierto), como es el cambio de moneda, para contradecir la declarada manifestación de la intención común de las Partes –revisar el Precio pagado por EDFI por las Acciones– cuando sucediera un segundo hecho futuro, considerado cierto en cuanto a su ocurrencia, pero incierto en lo que hacía a la fecha exacta, como era la revisión tarifaria contractualmente pactada entre el Gobierno argentino y Edenor.[32]

Y si el Tribunal Arbitral se sintió obligado a *"dar un sentido útil a las palabras escogidas por las Partes cuando se refieren a 'pesos' en el párrafo 1.a del Acuerdo Complementario"*, también debió haberse sentido obligado a darle un *"sentido útil"* a las palabras *"revisión tarifaria prevista"* en el párrafo 1 del Acuerdo Complementario, y a la referencia a *"los términos definidos en el Contrato de Concesión según la ley n° 24.065"*, en el párrafo 1.a, frase que se encuentra entre paréntesis inmediatamente después de la mención del *"cambio del Coste de Distribución"*. Pero no puede el Laudo dar a ciertos términos del Acuerdo Complementario una interpretación que alega que es útil (como se ha visto, sólo es útil para otorgar un beneficio inesperado a las Demandadas) y al mismo tiempo no otorgarle ningún sentido (ni útil ni de otro tipo) a otros términos incluidos en la misma cláusula de dicho Acuerdo.

## C) LA TRANSFORMACIÓN DE UN CONVENIO DE REVISIÓN DE PRECIO EN UN CONTRATO DE APUESTA

La arbitraria y torturada interpretación que el Tribunal Arbitral hace del Acuerdo Complementario se complementa con un desconocimiento del objetivo de dicho Acuerdo, tal como lo expresa literalmente su texto. En efecto, el mismo *"se refiere al Contrato de Compraventa de Acciones"* y establece *"que el precio pagado por EDFI (...) será sometido a una revisión"*;[33] es decir que se trata de revisar el Precio pagado –o sea el valor– de las Acciones compradas por EDFI en función de los ingresos de Edenor, y así lo reconoce el Tribunal Arbitral cuando comienza su análisis.[34] Sin embargo, la

---

[31] Al respecto basta con remitirse al análisis efectuado por la mayoría del Tribunal Arbitral al tratar la Demanda, en el mismo Laudo.

[32] El Acuerdo Complementario expresamente sólo "preveía" que debía ocurrir en una fecha, sin afirmarlo categóricamente.

[33] Encabezamiento y cláusula 1, transcriptos en el punto 88 de Laudo (pág. 17).

[34] En el punto 742 del Laudo (pág. 217), la mayoría del Tribunal Arbitral refiere que la intención común de las Partes al negociar y firmar el Acuerdo Complementario era *"el ajuste del precio (...) para la compra de las acciones en función de los resultados de la revisión tarifaria prevista para el 31 de agosto de 2002"*.

conclusión del Tribunal Arbitral cuando resuelve la Reconvención es directamente contraria a lo que había reconocido que era la intención común de las Partes, cosa que la mayoría no tiene empacho alguno en reconocer, cuando escribe:

*"Aunque esto puede, a primera vista, parecer anómalo porque EDENOR y EASA, y por consiguiente, EDFI sufrieron perjuicios muy sustanciales como resultado de la declaración del feriado cambiario y la adopción de la Ley de Emergencia, la presente interpretación refleja las intenciones de las Partes con respecto a la asignación de riesgos entre ellas al tiempo de la venta de las acciones."*[35]

*"No se debe interpretar la decisión del Tribunal con respecto a la Reconvención como si el Tribunal haya concluido que EDFI no sufrió ningún perjuicio (...) Al contrario, todas las pruebas disponibles indican que EDENOR y EASA sufrieron considerablemente como resultado de dichas medidas. El presente Laudo trata solamente de las consecuencias de la definición y la distribución de ciertos riesgos por las partes en el contexto de la venta de las acciones de EDENOR y EASA. Como comprador y propietario de las acciones de dichas empresas EDFI debe cargar con las consecuencias de cualquier riesgo no cubierto conforme a los términos del Contrato, el Acuerdo Complementario y la Carta Acuerdo, y buscar donde pueda la compensación adicional por los perjuicios sufridos."*[36]

Es completamente anómalo que el Tribunal Arbitral otorgue al Acuerdo Complementario una interpretación contraria a lo que es –según declara ser la intención común de las Partes al celebrarlo, lo cual –a la luz de lo resuelto– cínicamente reconoce el Tribunal Arbitral. Este acepta que EDFI ha sufrido *"perjuicios muy sustanciales"*, lo que en el marco del Contrato y del Acuerdo Complementario sólo puede referirse a la relación entre el Precio pagado por las Acciones y su valor a la fecha elegida por el Tribunal Arbitral (con independencia de la revisión tarifaria), pero aún así decide agravar dichos perjuicios condenando a EDFI a pagar una suma adicional a las Demandadas, a pesar de reconocer expresamente que esa suma no tiene relación con el valor real de las Acciones.

Ahora bien, si lo que el Tribunal Arbitral ha intentado hacer es tratar las consecuencias de la distribución contractual de ciertos riesgos, nada le impide hacerlo. Pero no puede válidamente generarle una pérdida adicional a EDFI con el único fundamento de que, si se sigue la interpretación avanzada por EDFI –que el Tribunal Arbitral reconoce que es la que surge del texto del Acuerdo Complementario–, se podría haber producido –de ocurrir dos hipótesis, altamente imprevisibles, en forma concatenada– un hipotético *"beneficio inesperado"* para EDFI, para llegar a una solución que le otorga un real *"beneficio inesperado"* a las Demandadas. De esta forma, las Demandadas terminan recibiendo injustamente un suplemento del Precio, pese a que las Acciones se habían desvalorizado considerablemente ya al 31 de diciembre de 2001, dado que para esa época ya se había producido la Desvinculación, según lo decidido en el mismo Laudo; y valían menos aún al 31 de agosto de 2002, fecha elegida por el Tribunal Arbitral para tomar el Coste de Distribución y realizar el cálculo del ajuste del Precio que hace soportar a EDFI.

---

[35] Punto 778 del Laudo (págs. 232/233).
[36] Punto 793 del Laudo (págs 240/242).

12

El Tribunal Arbitral, al hacer lugar a la Reconvención por los fundamentos expresados, ha transformado el Acuerdo Complementario en un contrato de apuesta sobre juego de azar, puesto que ha independizado el pago de la suma que condena a pagar a EDFI del valor de las Acciones. En la interpretación del Tribunal Arbitral, el Acuerdo Complementario se ha transformado en un contrato mediante el cual las Partes no ajustan el Precio sobre la base del valor de las mismas, sino que acuerdan el pago de una suma de dinero, calculada sobre la base del Precio, en función de un evento futuro, aleatorio y ajeno a la destreza o habilidad de las Partes, que no tiene relación alguna con el valor de las Acciones, tal como expresamente reconoce el Laudo. "*El art. 2055 [del Código Civil argentino], establece, de manera adecuada, que el Derecho Civil no confiere acción judicial para reclamar el cumplimiento del contrato de juego o apuesta cuando no hay destreza o habilidad de las partes. (...) Cabe agregar, además, que también tienen naturaleza contractual los acuerdos de juego y de apuesta no tutelados y además prohibidos, porque reúnen los requisitos de esos actos jurídicos, pero son nulos de nulidad absoluta por objeto ilícito.*"[37] Asimismo, este tipo de contrato está vedado por la ley argentina a las empresas cuyo objeto social no es el de "organizar" loterías.

El Tribunal Arbitral ha negado al Acuerdo Complementario su función de pacto de revisión del Precio en función de la variación del valor de las Acciones a una fecha determinada o en caso de ocurrencia de un determinado evento, que fue lo realmente pactado por las Partes. Así, la interpretación arbitraria que realiza el Tribunal Arbitral de la verdadera naturaleza del Acuerdo Complementario convierte a este último en un contrato nulo de nulidad absoluta, contrario al orden público, y para cuya celebración las Partes carecían de capacidad. Es decir, el Tribunal Arbitral ha elegido la interpretación que le quita validez a dicho Acuerdo, violando así abiertamente la regla de interpretación de los contratos establecida en el art. 217, inciso 3, del Código de Comercio argentino, según la cual: "*Las cláusulas susceptibles de dos sentidos, del uno de los cuales resultaría la validez, y del otro la nulidad del acto, deben entenderse en el primero*".

El Laudo pues consagra la validez de un tipo de contrato que normalmente sería considerado, bajo el derecho argentino, sea nulo, por ser contrario al orden público y por falta de capacidad de las Partes; sea sin efecto, por tratarse de una "apuesta" no vinculada a una actividad personal de destreza de las Partes.[38] En consecuencia, si un tribunal judicial ordenara la ejecución del Laudo, en tanto hace lugar a la Reconvención, estaría violando normas de orden público del derecho argentino, que es la ley aplicable al fondo de la controversia. Es preciso concluir, en consecuencia, que no se trata este caso simplemente de que un tribunal judicial examine el grado de arbitrariedad manifestado por el Tribunal Arbitral en la interpretación que hace del Acuerdo Complementario, sino en definitiva también de que dicho tribunal judicial decida si es válido consagrar una solución abiertamente contraria a normas de orden público del derecho aplicable al fondo de la cuestión.

---

[37] Bueres y Highton, *Código Civil y otras normas complementarias. Análisis doctrinario y jurisprudencial.* T. 4 D, págs. 496 y 498.

[38] El Código Civil define la "apuesta" en su art. 2053: "*La apuesta sucederá, cuando dos personas que son de una opinión contraria sobre cualquier materia, convinieren que aquella cuya opinión resulte fundada, recibirá de la otra una suma de dinero o cualquier otro objeto determinado*". El Código Civil no reconoce fuerza legal a este tipo de actividad, al privar de toda acción judicial de cobro a quien participa en una apuesta (art. 2055) y generalmente, al no reconocer efectos jurídicos a la misma (art. 2057).

## IV. CONCLUSIONES

Habiendo analizado cómo el Tribunal Arbitral desechó el texto del Acuerdo Complementario y la prueba testimonial ofrecida por EDFI, para privilegiar la interpretación de las Demandadas, con base en la conclusión no fundamentada de la mayoría, en cada etapa de su razonamiento, que todo *"parece ser"* como las Demandadas lo han afirmado, sin someter a los mismos criterios hermenéuticos la posición y prueba testimonial ofrecidas por las Partes, podemos concluir, desde el punto de vista del derecho argentino, que es el derecho aplicable al fondo de la controversia entre las Partes, que el Laudo, en cuanto hace lugar a la Reconvención, viola el orden público de dicho derecho, la garantía de defensa en juicio de EDFI y es inconstitucional por irrazonable y arbitrario.

La falta de fundamentación, las contradicciones en el razonamiento y la clara violación de las reglas interpretativas del derecho argentino señaladas en el presente Recurso respecto de la decisión emitida por la mayoría del Tribunal Arbitral sobre la Reconvención, además de la violación en dicha decisión de las normas del derecho argentino apuntadas en el voto en disidencia y aquéllas que prohíben a las Partes la realización de contratos de apuesta o no reconocen fuerza legal a este tipo de contratos, hacen que el Laudo sea calificable como ilegal, irrazonable y arbitrario y lo privan de validez en cuanto decisión sobre los derechos de las Demandadas, habilitando así a EDFI a plantear el presente Recurso.

Además de ignorar pruebas aportadas por EDFI, la mayoría del Tribunal Arbitral ha consagrado una solución arbitraria desde todo punto de vista al hacer lugar a la Reconvención, solución que impone injustamente un pago adicional a una parte como EDFI, que ha sufrido graves pérdidas como resultado de la Desvinculación, reconocida por el Laudo. Todo ello en virtud del Acuerdo Complementario, cuya aplicación estaba claramente condicionada, como surge de su mismo texto, a la ocurrencia de diversos eventos[39] que no tuvieron lugar en la práctica, como lo reconoce el mismo Tribunal Arbitral, debido a que el régimen legal aplicable fue fundamentalmente transformado como consecuencia de la crisis argentina de fines del año 2001 y del dictado de la legislación de emergencia en 2002.[40] El Acuerdo Complementario ha dejado así de ser un instrumento de ajuste del Precio para convertirse en un contrato de apuesta mediante el cual una de las Partes gana un premio (u obtiene un "beneficio inesperado" en la terminología del Tribunal Arbitral), independientemente del valor de las Acciones cuya cesión constituía el objeto del Contrato, e independientemente de la realidad económica del Coste de Distribución o de cualquier otro parámetro vinculado a la situación real de Edenor en el momento en que el Tribunal Arbitral determina que debe hacerse efectivo lo pactado en dicho Acuerdo Complementario.

Corresponde que el Tribunal Arbitral declare admisible el presente Recurso de nulidad parcial presentado por EDFI, lo cual esta parte solicita respetuosamente, en virtud de las decisiones de la Corte Suprema en las que ésta ha sentado la doctrina de que un laudo

---

[39] Concretamente, una revisión tarifaria prevista, que debía ser realizada según los términos del Contrato de Concesión y del Marco Regulatorio Eléctrico, que diera como resultado una variación del margen unitario del Coste de Distribución que fuera diferente a la reducción de 5% prevista por las Partes al acordar el Precio de las Acciones en el Contrato, como surge del Acuerdo Complementario.

[40] Ver puntos 747/749 del Laudo.

14

arbitral es judicialmente revisable cuando es "inconstitucional, ilegal o irrazonable",[41] reconociendo así la posibilidad de que un tribunal judicial argentino declare la nulidad parcial del Laudo.

## V. RESERVA DEL CASO FEDERAL

Conforme se requiere bajo el derecho argentino para dejar abierta la vía del recurso extraordinario por inconstitucionalidad por ante la Corte Suprema, formulo expresa reserva del Caso Federal por violación de los derechos y garantías constitucionales, en particular los de debido proceso y de propiedad, y por contrariar el orden público, conforme se ha demostrado más arriba.

París, 5 de noviembre de 2007

José Rosell

Hughes Hubbard & Reed LLP
47 avenue Georges Mandel
75116 PARIS
Francia

---

[41] "José Cartellone Construcciones S.A. c/ Hidronor S.A.", 01/06/04; decisión recientemente confirmada en el fallo "Esca, Sideco y Saigus c/Dirección Nacional de Vialidad", 12/06/07.

15

# EXHIBIT 2



## TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Katharine Perekslis, hereby certify that the following document is to the best of my knowledge and belief, a true and accurate translation, of the EDF International S.A.'s Recourse For Partial Annulment Against The Final Award Of October 22, 2007 from Spanish into English.

Katharine Perekslis
Signature

Sworn to before me this
July 11, 2008

Signature, Notary Public

Pamela Boyle
Notary Public, State of New York
No. 01BO6181278
Qualified in NEW YORK County
Commission Expires Jan 28, ____

Stamp, Notary Public

INTERNATIONAL COURT OF ARBITRATION
OF THE
INTERNATIONAL CHAMBER OF COMMERCE
ICC No. 12231 / KGA / CCO / JRF

RECOURSE FOR PARTIAL ANNULMENT AGAINST THE
FINAL AWARD OF OCTOBER 22, 2007

**presented by**

EDF INTERNATIONAL, S.A.
Plaintiff and
Counterdefendant

**represented by**

Hughes Hubbard & Reed LLP
47 avenue Georges Mandel
75116 PARIS
France

Estudio Beccar Varela
Cerrito 740 Piso 16
1309 BUENOS AIRES
Argentina

November 5, 2007

1

# I. DEFINITIONS

Except as otherwise specified in this Recourse for Partial Annulment (the "Recourse"), the following definitions will be used:

**Shares**: The shares of ELECTRICIDAD ARGENTINA S.A. ("EASA") and EMPRESA DISTRIBUIDORA Y COMERCIALIZADORA NORTE SOCIEDAD ANONIMA ("Edenor"), whose sale/purchase was the object of the Contract; and for each seller, the shares sold by it pursuant to said Contract.

**Argentina**: The Republic of Argentina

**Complementary Agreement**: Agreement signed by the parties on 3/30/01 which provided for the readjustment of the Contract Price "*based on the result of the tariff revision planned for August 31, 2002*".

**Letter Agreement**: Letter signed by the Parties on 3/31/01, which formed part of the Contract, and which established that the Contract Price would be readjusted in the event of the occurrence of the "Contingency" defined in Paragraph 2 as "the *unpegging of the official exchange rate for the Argentine peso and the US dollar, regardless of the cause for same.*"

**Contract**: Contract dated 3/30/01 entered into by ENDESA INTERNACIONAL S.A. and ASTRA COMPAÑIA ARGENTINA DE PETROLEO S.A. (later absorbed by YPF S.A.) as Sellers, and EDF INTERNATIONAL S.A. as Purchaser, for the purchase and sale of direct and indirect shareholdings held by Sellers in EASA and Edenor. The Contract forms part of the Complementary Agreement and the Letter Agreement.

**Contingency**: Is, according to the definition of paragraph 2 of the Letter Agreement, the "*unpegging of the official exchange rate for the Argentine peso and the US dollar, regardless of the cause for same*".

**Supreme Court**: The Supreme Court of Justice of the Nation (Argentina).

**Defendants**: are, jointly, ENDESA INTERNACIONAL S.A. AND YPF S.A.

**Unpegging**: is the "*unpegging of the official exchange rate for the Argentine peso and the US dollar, regardless of the cause for same*" (according to the definition of Contingency in paragraph 2 of the Letter Agreement).

**Dollar or US$**: is the currency of the United States of America

**Edenor**: is Empresa Distribuidora y Comercializadora Norte S.A.

**EDFI**: is EDF INTERNATIONAL S.A:

**Endesa**: is ENDESA INTERNACIONAL S.A.

**Parties**: Are, jointly, EDFI, Endesa and YPF (parties to the Contract and this arbitration).

**Peso o $**: is the peso, currency of the Republic of Argentina

**Price**: is the purchase price paid by EDFI for the Shares, pursuant to Clause 2 of the Contract.

**YPF**: is YPF S.A.

## II. INTRODUCTION

In accordance with the provisions of Art. 760, Second Paragraph of the Civil and Commercial Procedure Code of the Nation (Argentina) (the "CPCC" for the Spanish acronym), now comes EDFI to present this Recourse against the final award entered October 22, 2007 (the "Award"), with regard to the allowance deduced by the Defendants' counterclaim (the "Counterclaim") (said Award shall hereinafter be understood as referring only to the part of the Award that decides in favor of the Counterclaim). Inasmuch as said decision is <u>unconstitutional, unreasonable</u> and <u>contrary to public order</u> a partial annulment should be declared, according to the resolutions of the Supreme Court, final interpreter of Argentine law which is applied by the Arbitral Tribunal to resolve this case. [1]

In fact, "*each time that the Constitution yields a jurisdiction to an organ of power, it requires that the exercise of the consequent activity have a reasonable content. (…) the judges when issuing a decision must do so in a reasonable manner; an unreasonable or arbitrary act is defective and unconstitutional. Reasonableness is therefore a substantive rule which has also been termed 'the principle or guarantee of substantive due process"* [2]. In the case at hand then, as we will show, the Award to resolve the Counterclaim deliberately omits consideration of that which is expressly provided in the text of the Complementary Agreement and against the clear provisions of substantive Argentine law, granting a different treatment to EDFI than that granted to the Defendants, and therefore in the opinion of EDFI violating its right to defend itself and arriving at an arbitrary result which is unreasonable and contrary to public order.

In this sense, the Supreme Court has repeatedly held[3] that the arbitration clause does not leave the petitioner defenseless against abuses in which the arbitral body may incur because - whether the respective clause so provides or not - the exercise made of arbitral jurisdiction in each case has no attribute other than to judge legally and reasonably within the terms of the conflict. Furthermore, while the interpretation of the facts and regular application of law is the function of the arbitrator, it does not exclude the award from being judicially challenged as unconstitutional, illegal or unreasonable. (Conf. Arts. 787 and 788 of the CPCC).

In this sense, Roque Caivano[4] explains that "*the situation that would allow judicial review could be summarized by using as an analogy the [Supreme] Court's case law on arbitrariness, which has been used to give access to the remedies of Art. 14 of Law 48 even when there is no Constitutional matter involved.*"

Caivano continues explaining that, "*it has been declared to be arbitrary and that must be declared null and void an arbitral award which finds the existence of proofs that are not (existent) (…) and that there was no application of current law; since if the award presupposes certain facts that should have been clearly proven, the decision then becomes founded on conjectures or*

---

[1] Point 604 of the Award.
[2] Bidart Campos, *Tratado Elemental de Derecho Constitucional,* T.I-A, Volume I-A, ed. 2000, page 805.
[3] Among other rulings of the Court: "Cooperativa Electrica y Anexos de General Acha Ltda., administrative case No. 12.663/67 of the Ministry of Labor", 7/7/75; "Jose Cartellone Construcciones Civiles S.A. v. Hidroelectrica Norpatagonica S.A. o Hidronor S.A.", 6/01/04; "Empresa de Navegacion y Astilleros Busslo Hnos. v. Capitan, Armador, Propietrio and/or Agente del Buque 'Del Oro' y Flota Argentina de Navegacion Fluvial", 11/29/1965.
[4] Roque J. Caivano, *Arbitration*, 2nd Edition, page 307.

*presumptions, converting the award into a judicially disqualifiable act (Rulings, 290:458)"*.

Therefore, EDFI prays that the Arbitral Tribunal, upon expiration of the period for the Parties to present their requests for correction and interpretation of the Award in accordance with Article 29(2) of the ICC Arbitration Regulation, and after Defendants are served with this Recourse, confirm that the formal requirements for allowing the Recourse have been met, and consequently grant [the Recourse] and send a copy of the arbitral file to the Front Desk of the National Chamber of Appeals on Commercial Matters in the Autonomous City of Buenos Aires, located at Av. Roque S. Peña 1211 (1035), Autonomous City of Buenos Aires, Argentina[5], so that it can proceed to decide on which Court will resolve the Recourse and remit the file to the Court to which it has been assigned.

We pray that this Honorable Chamber grant the Recourse and declare the partial annulment of the Award with regard to the Defendants' Counterclaim, declaring it unconstitutional, arbitrary and clearly unreasonable.

In this regard, according to the CPCC procedural law applicable in the City which is the site of the arbitration, the recourse of annulment against an arbitral award cannot be waived[6]. As such, the presentation of this Recourse is not contrary to the waiver to present other recourses made by EDFI by virtue of Article 28(6) of the ICC Arbitration Regulation.

In this sense it has been held[7] "*that finding 14 of the Cartellone[8] ruling unhesitatingly answers that the award shall not be appealable as the result of a "regular" application of law; however, even when the parties have waived their right to appeal the award, said award can be judicially challenged if it is unconstitutional, illegal or unreasonable.*

*"These three qualifications seem to close the debate: judicial control of the constitutionality of the arbitral award is always viable and, therefore, unaffected by the waivers that may be agreed on by the parties in the arbitral agreement.*

*"Such is the hardest core from which the jurisprudence of the Court arises today, and it leads us to imagine that the "exclusivity" of constitutional control is no longer set apart for judicial tribunals, but rather – in its own way – opens a space for it in the private administration of justice, this time outside the functions of state and bodies of power."*

---

[5] EDFI assumes the costs incurred in copying and sending the file to the Front Desk of the National Chamber of Commerce, which shall be paid or reimbursed according to the decision of the Arbitral Tribunal.

[6] *"Waiver of recourses shall nevertheless prevent the admissibility of the (…) annulment (…)"*. (Art. 760, second paragraph of the CPCC).

[7] German J. Bidart Campos, *"El control constitucional y el arbitraje",* Sup. Const. 2004 (August), page 17 (emphasis and underline added).

[8] Ruling from the Supreme Court issued in 2004 (cited in other parts of this Recourse), which declared the partial annulment of an arbitral award, thus setting doctrine according to which all awards that are *"unconstitutional, illegal or unreasonable"* are judicially reviewable (Rulings: 292:223).

## III. FLAWS IN THE AWARD

### A) REVISION OF THE TARIFF AS A CONDITION FOR APPLICATION OF THE COMPLEMENTARY AGREEMENT

Although the Award begins by acknowledging that *"Unlike the Letter Agreement, the Parties presented scarce evidence with regard to the negotiation of the Complementary Agreement"*,[9] it later affirms that *"In the opinion of the Tribunal, parties in the position of EDFI and ENDESA and YPF had little interest in exactly [hand-circled] how the tariff revision would be carried out, or if said revision would actually be carried out. In reality and in practice the parties were interested in what was going to happen with the tariffs, and moreover with the element of the Distribution Cost."*[10] This decisive conclusion by the Arbitral Tribunal, which leaves without effect the express text of the Complementary Agreement, is not supported by any proof identified (on the contrary, it discards proof contrary to same), and is therefore only an arbitrary affirmation founded on the naked desire of the majority of the Arbitral Tribunal (for all purposes of this Recourse all references to the Arbitral Tribunal shall hereafter be understood as the majority of the Arbitral Tribunal which voted to allow the Counterclaim).

The Arbitral Tribunal expressly acknowledges that the position of EDFI *"is based more than anything else on a literal interpretation of the Complementary Agreement"*.[11] A reading of the text of the Complementary Agreement[12] is sufficient to confirm that this is true and that the Award orders against the agreements made by the Parties in said Agreement, inasmuch as it establishes that *"the price paid by EDF according to the terms of Clause 2 of said Contract shall be submitted for review, based on the result of the tariff revision projected for August 31, 2002 (…)"*. The language is clear and simple: The parties have established a condition, basically subordinating the adjustment of the Contract Price to the result of the tariff revision "planned" for a determined date and that tariff revision did not occur.[13] As such, and by application of Article 548 of the Argentine Civil Code, by not complying with the condition – the tariff revision – *"the obligation is considered as if it had never occurred (…)"*

Based on what proof and/or substantive Argentine law did the Arbitral Tribunal conclude that the parties had not agreed on a condition necessary to set in motion the revision of the price of the shares assigned to EDFI? This can only remain unknown since it does not say; or rather, the majority vote does not say, since the dissenting arbitrator very clearly refutes the reasoning (to call it that) and conclusions of the Arbitral Tribunal based on considerations of Argentine law and the business reality that the majority preferred to ignore. The essential part of this deserves to be transcribed due to its clarity:

*"In the presence of a clear act, Argentine law does not allow the search for a different desire other than that correctly expressed by the parties. It authorizes the search for*

---

[9] Point 742 of the Award.

[10] Point 766 of the Award (pages 227/228)

[11] Point 754 of the Award (Page 222).

[12] Clause 1 of the Complementary Agreement, transcribed in Point 88 of the Award (page 17).

[13] Although at the beginning of this arbitral proceeding it still appeared that the tariff revision could occur, although late, it later became clear that the Argentine government had decided to not carry it out permanently.

*intention when it clarifies the sense of a text that is obscure, ambiguous, or that expresses approximately or clumsily the desire of the parties."*

*"Such is not the case at hand: the Complementary Agreement logically places – with one premise (revision by administrative mechanism), a second [premise] (level of tariffs after that revision) and a conclusion (calculation of the price adjustment for the shares) – an economic desire that also makes sense."[14]*

*"There is no doubt that no party would have accepted, either in the MOU or in the contract, a clause similar to the reason founded by the part of the Award related to the counterclaim".[15]*

*"That principle* (referring to Article 535 of the Argentine Civil Code which establishes that compliance with the conditions is indivisible) *prevents considering as a fulfillment of the condition that tariffs be maintained in the absence of the procedure to revise the condition, which by statement of law, is an indivisible part as CC of the condition."[16]*

*"Article 1350* (of the Argentine Civil Code) *– When the person or people who have been specified to state the price do not or cannot state said price, then the sale shall be void." Applied to the case at hand, as a consequence of that text, the Complementary Agreement which forms an element of the purchase price of the shares cannot be effective."[17]*

*"Furthermore, a quick scan of the situation caused by the absence of the tariff revision results in a paradox: it requires payment from the party who has lost money, while the parties had established a link between greater benefits and an upwards adjustment of the purchase price." [18]*

The only true and proven fact is that the Parties agreed that the Price revision (i) depended on the *"result of the tariff revision planned for August 31, 2002";* and that (ii) said tariff revision did not occur on the date planned, nor will it occur.

A literal application of the clear and final clauses of the contract – such as the one analyzed in this case – has been repeatedly required by the Supreme Court, which provides *"if the terms and expressions used in a contract are clear and final, then we are limited to their application, with no need for any additional language work."[19]* This is because *"it is not for the judges to assign a meaning that is at variance with the clauses of a contract containing the literal sense of their terms and the clear intention of the parties, and what has been decided is not based on sufficiently explicit reasons of law when those terms are clear and final."[20]*

---

[14] Point 794 of the Award (page 241)
[15] Point 794 of the Award (page 242)
[16] Point 794 of the Award (page 242)
[17] Point 794 of the Award (page 242)
[18] Point 794 of the Award (page 243)
[19] Supreme Court, Rulings 314:363; 319:1648 and 3395; 322:1546; 324:606 and 466, among others.
[20] Supreme Court, Rulings 314:1358

The affirmations of the Award regarding the *"scarce evidence with respect to the negotiation of the Complementary Agreement"* are real if one considers the documentary proof as the only evidence; however, there is more important evidence with respect to those negotiations in the testimonial proof offered. But in this respect the Arbitral Tribunal acts with an inexplicable briskness, discarding the testimonial proof offered by EDFI with a mere rhetorical argument and accepting in its place the position of the Defendants, founded solely of the declarations of its officers and which have not been submitted by the Arbitral Tribunal to the same critical test.

Note:

1. The reasoning of the Arbitral Tribunal on this point, up to where it can be followed, is tortuous and contradictory. It begins by recognizing that "*Beginning with a literal interpretation of the Letter Agreement, this Tribunal notes that it reflects the expectation of the Parties on the tariff revision to be made on August 31, 2002. (…) dealing with the adjustment in the price (…) for the purchase of shares based on the results of the tariff revision projected for August 31, 2002."* [21]

2. However it later holds that "*Nevertheless, **the Complementary Agreement does not state that execution of the revision is a necessary condition** for the Complementary Agreement to take effect. The principal focus of the Agreement appears to be the <u>change</u>* [22] *in the unit Distribution Cost. **Although it is true** that paragraph 1.a of the Complementary Agreement refers to the Concession Agreement and to Law No. 24.065, said reference **appears to be** to the Distribution Cost according to the definition contained in the Concession Agreement, and not specific reference to the process adopted to change the Distribution Cost as part of the tariff revision."* [23]

A very careful reading is not required to detect the <u>inconsistencies and fallacies of this reasoning</u>. In the first phrase, the Award indicates that the text of the Complementary Agreement does not use the term "*necessary condition",* but there is no norm of any kind in substantive Argentine law that would require the sacramental use of said term [24] (it is assumed that it is for this reason that the Award does not cite here any norm whatsoever). What should be the evident conclusion is immediately discarded, instead holding that "*the focus of the Agreement appears to be"* the opposite of what the contract text states, again without indicating why it *"appears to be"* what the Arbitral Tribunal states it is. Moreover, in this decision the Arbitral Tribunal does not apply the same criterion used by it to discard the EDFI position; and acceptance of the interpretation proposed by the Defendants does not require that the Complementary Agreement "*state"* this; it is sufficient for the Arbitral Tribunal to conclude, in a purely subjective manner, that it "*appears to be"* what the Defendants say it is.

---

[21] Point 764 of the Award (page 226)

[22] Underlined emphasis in the original.

[23] Point 765 of the Award (page 227) (emphasis added).

[24] Argentine doctrine holds that: "*Expression of the condition obeys the guiding principles of the declaration of will in legal acts (Arts. 915, 973 and ss). Sacramental terms are not required, although they participate in the form of the legal document whose content they integrate" (Codigo Civil y normas complementarias. Analisis doctrinario y jurisprudencial.* Alberto Bueres and Elena I. Highton, T.2A, page 255). Doctrine also states: *"The existence of the condition is not subject to the use of sacramental terms, which can be tacitly understood".* (Salas, Acdeel E., Civil Code annotated, Lexis Nexis 1999, comments to Article 528 of the Civil Code).

The Arbitral Tribunal then recognizes that, as held by EDFI, the Complementary Agreement refers to the Concession Agreement and Law 24,065, to later again discard textual evidence by resorting anew to an irrefutable argument: that the Arbitral Tribunal considers that it "*appears*" that the Parties agreed to something different and contrary to the text of the Complementary Agreement itself, without it being necessary for the Arbitral Tribunal to make the effort to identify the proof behind such a conclusion.

B)       THE MEANING OF THE TERM "PESOS" AND THE OBTAINING OF UNEXPECTED BENEFITS

The only foundation – not proof – alleged in the Award is a hypothesis alleged by the Defendants, which has such evident errors that it is unbelievable that the Arbitral Tribunal even took it into consideration. The award states: "*In this regard, the Tribunal finds that the example proposed by Defendants is useful. In the event that the parity between the peso and the dollar is maintained and if, for any reason ENRE did not carry out the tariff revision, then there would be no reduction in the tariffs and EDFI would have obtained an unexpected benefit.*"[25]

This nexus of two hypotheses was not taken into consideration by the Parties; its plausibility is not supported by any proof, nor is there any support of the conclusion of the Arbitral Tribunal to the effect that the essential issue is the existence or inexistence of a change in the unitary Distribution Cost at a determined date (August 31, 2002), regardless of the cause. What would the Arbitral Tribunal have resolved if said change had occurred not on August 31, 2002, but rather on September 1, 2002, or on September 2, 2002, or 20 days later, or three or nine months after those dates, and with a retroactive effect?[26] What authorizes the Arbitral Tribunal to select a date independently of the tariff revision? Nothing.

And if the point of interest is the change – or the absence thereof – in the Distribution Cost at a determined date, independently of the reason for same, then in order to prevent the occurrence of an *"unexpected benefit"* for EDFI in the economic reality, the Arbitral Tribunal should have listened to the economic reality and verified if at August 31, 2002 said change had occurred and, if so, what its magnitude was, independently of the most appropriate terminology to designate Argentine currency on both dates. It is not reasonable [*hand-circled and marked*] to apply at the same time a literal criterion to interpret the term *pesos,* and not apply it to interpret (or rather, to discard with no further analysis) the term *tariff revision,* alleging that in one improbable hypothesis the economic reality would have been able to favor EDFI in a manner that could not have been foreseen, to later alternatively discard that criterion of economic reality when required to analyze the situation at August 31, 2002. Or,

---

[25] Point 767 of the Award (page 228).

[26] In its *Brief in Response to the Brief Founding the Counterclaim,* presented by EDFI on 7/21/05, EDFI explained that the Emergency Law installed a new "*regulatory framework*" that replaced the one in effect until that time, and amply demonstrated, based on the tables prepared by Atty. Vicens, expert economist appointed by EDFI, that the evolution of Edenor tariffs beginning in November 2001 (Table I: Amounts in Pesos and Table 2: Amounts in Dollars), that the reduction of Edenor tariffs (of the unit margin of Distribution Cost in the terminology of the Complementary Agreement) was 121% in real terms (i.e., measured in Dollars) at August 31, 2002 (see the Brief mentioned, pages 45/46 and tables attached as Document C-158).

better yet, as we will see below, to recognize that that economic reality is causing an "*unexpected benefit*" for the Defendants, and still to grant it to them. For what reason does the Arbitral Tribunal consider itself authorized to generate an "*unexpected benefit*" for the Defendants, founded only on the possibility of an "*unexpected benefit*" for EDFI which never occurred nor could have reasonably occurred, given the circumstances?

On the other hand, what makes the Award completely arbitrary and unreasonable is the application of the mathematical formula contained in Paragraph 1.a of the Complementary Agreement, showing a result that is not related in any way to the economic reality existing in Argentina at that time, even though the Complementary Agreement was thought of by the Parties for a totally different context. Thus, as a result of the application of this mathematical formula EDFI is ordered to pay a higher Price to Defendants for their Shares, even though in the economic reality those shares had lost a great part of the value borne by them at the date of sale (March 2001) due to the emergency rules which were enacted to freeze and weigh tariffs, while various concepts of electricity distribution cost remained and still remain in dollars.

In other words, before the emergency regulations, the profit margin of Edenor considered by the Parties for the purchase and sale of the shares was notably greater. Nevertheless, the Award orders EDFI to pay a "supplement" to the Price, in exchange for shares that have lost a great part of their value by virtue of the measures ordered by said emergency regulation!!! In other words, failure to declare the partial annulment of the Award will allow an unjustified gain to the Defendants. Remember that what the Complementary Agreement sought, and it was intended to guarantee was for the purchase/sale operation of the shares to reflect the true value of the shares within a determined period, during which the Parties had decided to distribute the risk of the operation in that form.

In this sense, the Supreme Court has held that mathematical formulas shall be set aside *"if the result obtained becomes objectively unfair, being disproportionate and unreasonable, ostensibly surpassing the intention of the creditor and producing an unjustified and unequivocal divestment of the debtor, to the detriment of morals or good practices - Arts. 21, 953 and 1071, Civil Code - inasmuch as the economic reality must prevail over abstract mathematical formulas."*[27]

If the concern of the Arbitral Tribunal was to not grant "*unexpected benefits*" to either of the Parties, then the Complementary Agreement should have been interpreted according to its text and the common intent of the Parties, which the majority of the Arbitral Tribunal recognizes as existing at the time said Agreement was negotiated;[28] and if

---

[27] In re "*Jose Cartellons Construcciones Civiles S.A. v. Hidroelectrica Norpatagonica S.A. or Hidronar S.A., 6/1/04.*
[28] In point 764 of the Award, the Arbitral Tribunal notes that "*the language of the Agreement reflects the expectation that the tariff revision will give the results that would be used in order to perform the calculations contained in paragraph 1.a*". (page 226) and even qualifies said expectation as "reasonable" (*idem*, page 227). Later at point 765 of the Award, the Arbitral Tribunal deduces arbitrarily that the focus of the Complementary Agreement was the change (or absence thereof, but considered in a purely nominal manner) in the Distribution Cost, independently of the performance of the tariff revision.

it was later verified that (i) the condition foreseen by the parties for application of the Complementary Agreement did not occur, and (ii) that there was no "*unexpected benefit*" to EDFI in the economic reality, then the Tribunal should have resolved that the Counterclaim was without foundation and therefore deny same.

However, if carried by its own peculiar literal interpretation, the Arbitral Tribunal would conclude that all that mattered was the situation of the Distribution Cost at August 31, 2002, independently of whether the tariff revision foreseen had actually occurred or not, what it should have done was confirm what the true situation of the planned tariff revision actually was, apply the formula included in the Complementary Agreement, and grant the maximum tariff revision to EDFI once it had proven the enormous reduction suffered in real terms by the unitary distribution cost margin at August 31, 2002.[29]

After discarding the contractual text with no further arguments, the Arbitral Tribunal then discards the testimonial evidence provided by EDFI regarding the common intent of the Parties, applying a purely subjective criterion that – again – it does not consider necessary to apply to Defendants. In effect, *"The Tribunal finds it difficult to comprehend how the internal motivation and comprehension of EDFI can affect the interpretation of the common intent of the Parties expressed in the Complementary Agreement. There is no indication that the Defendants had the same comprehension or that this had been communicated to Defendants and that there was any agreement that reflected said comprehension or common intent of the Parties when referring to "pesos" in paragraph 1.a."*[30]

We have already seen how the Arbitral Tribunal determines the "*common intent of the Parties*" by replacing what is expressed in the text by what the majority of the Arbitral Tribunal considers as "*what appears to be",* without even feeling a need to indicate any proof that would make what is concluded as effectively "*what would appear to be*". In the point analyzed here, the Arbitral Tribunal also requests of EDFI what it knows does not exist – documentary evidence of what EDFI sustains – and given this inexistence it concludes that the interpretation affirmed by the Defendants is valid, with no documentary proof of any kind provided by the Defendants. But why has the Arbitral Tribunal forgotten to require from Defendants what it has required from EDFI; i.e., documentary proof of its own interpretation? In effect the position of the Defendants is founded on the internal motivation and comprehension of what according to the declarations of its officers – during the course of the arbitration proceeding – was sustained at the time of execution of the Complementary Agreement; and if the same parameter is used as the one used for EDFI, then it is also easy to conclude that said interpretation should have been discarded by the Arbitral Tribunal.

As such, all that remains is the recourse to the contractual text which refers to *"pesos",* as they were at the time of execution of the Complementary Agreement and which both Parties agree were not the same *"pesos"* as those existing at August 31, 2002. On what legal or contractual basis, with what logic or common sense can it be affirmed that where the Complementary Agreement says *"pesos"* in March 2001, it should be understood as

---

[29] As indicated by us previously, said reduction in real terms (or constant values measured in dollars) has been amply demonstrated by EDFI in its Brief in Response to the Brief on the Foundation of the Counterclaim (pages 45/46).
[30] Point 782 of the Award (pages 234/235).

dealing with the same "pesos" as those existing at August 2002, when, as was just said, both Parties agree that said *pesos* were not the same?[31]

When the Arbitral Tribunal states that "*it is difficult to comprehend why the Parties made an express reference to pesos in Paragraph 1.a of the Complementary Agreement, if they had no intention of doing so*", it deliberately ignores the obvious: that that reference is addressed to Argentine currency as it was denominated (and with the characteristics held by it) at the time of execution of the Complementary Agreement, and that the Parties could not refer at that time to the denomination (and characteristics) that Argentine currency would have at August 31, 2002, simply because it was impossible for them to anticipate how Argentine currency would be denominated at that future date. Nothing authorizes the Arbitral Tribunal to make interpretative inferences to a presumed common intention of the Parties based on what as of the date of the Complementary Agreement was first a future (but uncertain) act, which is currency exchange, but to contradict the declared statement of the common intention of the Parties – to revise the price paid by EDFI for the shares – upon the occurrence of a second future act considered certain in terms of its occurrence but uncertain in terms of the exact date, which was the tariff review contractually agreed on between the Government of Argentina and Edenor.[32]

And if the Arbitral Tribunal felt a requirement to "*give a useful meaning to the words chosen by the Parties when referring to 'pesos in paragraph 1.a of the Complementary Agreement*", then it should also have felt required to give a "*useful meaning*" to the words "*planned tariff revision*" in paragraph 1 of the Complementary Agreement, and to the reference to "*the terms defined in the Concession Agreement according to Law No. 24,065*" in Paragraph 1.a, a phrase found in parentheses immediately after the mention to "*change in the Distribution Cost*". But the Award cannot give certain terms of the Complementary Agreement an interpretation that it alleges to be useful (as has been seen, it is only useful to grant an unexpected benefit to the Defendants) and at the same time not grant any meaning (useful or any other kind) to other terms included in the same clause of said Agreement.

C)    TRANSFORMATION OF AN AGREEMENT TO REVISE PRICES IN A CONTRACT FOR WAGER

The arbitrary and torturous interpretation made by the Arbitral Tribunal of the Complementary Agreement is complemented by a lack of knowledge over the purpose of said Agreement, as literally stated in its text. In effect, it "*refers to the Share Purchase/Sale Agreement*" and establishes "*that the price paid by EDFI (…) shall be submitted to revision*";[33] that is, it deals with revising the price paid – i.e. the value – for the shares purchased by EDFI based on Edenor receipts, and this is how the Arbitral Tribunal recognized it when it began its analysis.[34] Nevertheless, the

---

[31] In this respect, it is sufficient to refer to the analysis made by the majority of the Arbitral Tribunal when dealing with the Complaint in the same Award.

[32] The Complementary Agreement expressly "foresaw" only that it was to occur on a date, without categorically stating it.

[33] Paragraph title and clause 1, transcribed in point 88 of the Award (page 17)

[34] In point 742 of the Award (page 217) the majority of the Arbitral Tribunal refers to the common intention of the Parties in negotiating and executing the Complementary Agreement as "*the adjustment in the price (…) for the purchase of shares based on the results of the tariff revision projected for August 31, 2002*".

11

conclusion reached by the Arbitral Tribunal in resolving the Counterclaim is directly contrary to what it had recognized as the common intent of the Parties, which the majority did not hesitate to recognize, when it wrote:

*"Although this could at first sight appear anomalous because EDENOR and EASA, and thusly EDFI, suffered very substantial damages as a result of the declaration of the change in exchange rate and adoption of the Emergency Law, this interpretation reflects the intentions of the Parties with regard to the assignment of risks among them at the time of the sale of the shares."[35]*

*"The decision of the Tribunal with respect to the Counterclaim should not be interpreted as if the Tribunal had concluded that EDFI did not suffer any damage (…) On the contrary, all proofs available indicate that EDENOR and EASA suffered considerably as a result of said measures. This Award only deals with the consequences of the definition and distribution of certain risks by the parties in the context of the sale of EDENOR and EASA shares. As purchaser and owner of the shares of said companies, EDFI must bear the consequences of any risk not covered under the terms of the Contract, the Complementary Agreement and the Letter Agreement, and find where it can additional compensation for the damages suffered."[36]*

It is completely anomalous that the Arbitral Tribunal grants the Complementary Agreement an interpretation contrary to what the text declares to be the common intention of the parties at the time they executed same. In light of the resolution this is cynically acknowledged by the Arbitral Tribunal, as it accepts that EDFI has suffered *"very substantial damages"*, which in the framework of the Contract and the Complementary Agreement can only refer to the ratio between the price paid for the shares and their value at the date chosen by the Arbitral Tribunal (independently of the tariff revision); and yet decides to aggravate those damages by ordering EDFI to pay an additional amount to the Defendants, despite expressly recognizing that that amount bore no relation to the real value of the shares.

Now then, if what the Arbitral Tribunal attempts to do is to deal with the consequences of the contractual distribution of certain risks, then nothing prevents it from doing so. However, it cannot validly generate an additional loss to EDFI solely on the basis that, following the interpretation presented by EDFI – which the Arbitral Tribunal recognizes as arising from the text of the Complementary Agreement – a hypothetical *"unexpected benefit"* could have been produced for EDFI – if two highly unforeseeable hypotheses had occurred in tandem, thus arriving at a solution that grants a real *"unexpected benefit"* to the Defendants. In this way, the Defendants ultimately and unfairly receive a supplement to the Price, even though the shares had considerably devalued at December 31, 2001 due to the fact that the Unpegging had already occurred by that time according to the decision contained in that award; and the shares had a lower value yet at August 31, 2002, the date selected by the Arbitral Tribunal to take the Distribution Cost and to calculate the price adjustment to be borne by EDFI.

---

[35] Point 778 of the Award (pages 232/233).
[36] Point 793 of the Award (pages 240/242).

By allowing the Counterclaim for the foundations stated, the Arbitral Tribunal has transformed the Complementary Agreement into a wager over a game of chance, inasmuch as it has made payment of the sum which EDFI was ordered to pay independent of the value of the shares. The interpretation made by the Arbitral Tribunal transforms the Complementary Agreement into a contract through which the parties do not adjust the price over the base value of [the shares], but rather decide on the payment of an amount of money which is calculated based on the Price, in accordance with a future event which is random and outside the skill or ability of the Parties and not related in any way to the value of the shares, all as expressly acknowledged in the Award. "*Art. 2055* (of the Argentine Civil Code) *appropriately establishes that Civil Law does not grant any judicial action to claim compliance of a contract for a game of chance or bet when there is no skill or ability on the part of the parties. (…) It is further appropriate to add that betting agreements and contracts for activities not governed and in fact forbidden also have this character, because they meet the requirements for those legal acts, but are completely null and void due to their illicit purpose.*"[37] In addition, this type of contract is forbidden by Argentine law to companies whose corporate purpose is not to "organize" lotteries.

The Arbitral Tribunal has denied the Complementary Agreement its function of agreeing to revise the price based on the variation in value of the shares at a determined date or in the event of the occurrence of a determined event, which was actually the agreement made by the Parties. Thus the arbitrary interpretation made by the Arbitral Tribunal as to the true nature of the Complementary Agreement converts this into a contract that is completely null and void, contrary to public order, and which the Parties had no power to execute. That is, the Arbitral Tribunal has selected the interpretation that removes the validity of said Agreement, thus openly violating the rule for interpreting contracts which is established in Art. 217, Incise 3 of the Argentine Commercial Code, which provides that, "*Clauses susceptible to two meanings, one of which would result in validity and the other in the annulment of the act, must be understood as the first.*"

The Award thus establishes the validity of a type of contract that would normally be considered, under Argentine law, to be void as contrary to public order and for lack of validity of the parties; and therefore with no legal effect inasmuch as it is a "wager" and not tied to any personal skill or ability of the Parties.[38] Consequently, if a judicial tribunal orders execution of the Award, to the extent that it decides in favor of Counterclaim, it would be violating standards of public order of Argentine law, which law is applicable to the basis of the dispute. We must therefore conclude that this is not simply a case where a judicial tribunal examines the degree of arbitrariness manifested by the Arbitral Tribunal in the interpretation made of the Complementary Agreement, but rather also that said judicial tribunal definitely decides if a solution can be established when it is openly contrary to standards of public order of the law applicable to the base matter.

---

[37] Bueres and Highton, *Codigo Civil y otras normas complementarias. Analisis doctrinario y jurisprudencial. T. 4 D, pages 496 and 498.*

[38] The Civil Code defines "wager" in its Art. 2053: *"The wager occurs when two people who have opposing opinions on any matter, agree that whoever's opinion results as founded, shall receive a sum of money or any other determined object, from the other."* The Civil Code does not recognize the legal force of this type of activity, removing any judicial action for collection from parties participating in a wager (Art. 2055) and generally not recognizing any legal effects of same (Art. 2057).

## IV. CONCLUSIONS

Having analyzed how the Arbitral Tribunal discarded the text of the Complementary Agreement and the testimonial proof offered by EDFI to accept the interpretation made by the Defendants based on the unfounded conclusion of the majority at each stage of its reasoning, that all *"appears to be"* as the Defendants had alleged, without submitting the position and testimonial proof offered by the Parties to the same language criteria, we can conclude that from the perspective of Argentine law applicable to the basic controversy between the parties, that the Award, to the extent that it grants the Counterclaim, violates public order of said law, the right of EDFI to defend itself at trial and is unconstitutional as unreasonable and arbitrary.

The lack of foundation, contradictions in the reasoning and clear violation of the rules of interpretation set by Argentine law stated in this Recourse with respect to the decision issued by the majority of the Arbitral Tribunal on the Counterclaim, in addition to the violation of said decision of the standards of Argentine law noted in the dissenting vote and those that forbid that the Parties perform agreements for wagers or that do not recognize the legal effect of this type of contracts, allows the Award to be qualified as illegal, unreasonable and arbitrary, and void of any legal effect with regard to the decision of the rights of the Defendants, thus enabling EDFI to present this Recourse.

In addition to ignoring evidence submitted by EDFI, the majority of the Arbitral Tribunal has established an arbitrary solution from all points of view by allowing the Counterclaim, which solution unjustly imposes a payment that is additional to a payment to be paid by EDFI which has suffered serious losses as a result of the Unpegging, recognized by the Award. This is all by virtue of the Complementary Agreement whose application was clearly made dependent, as seen from the same text, on the occurrence of various events[39] which never actually occurred, as recognized by the same Arbitral Tribunal inasmuch as the legal framework applicable was fundamentally transformed as a consequence of the Argentine crisis at the end of 2001 and the enactment of emergency legislation in 2002.[40] The Complementary Agreement has thus stopped being an instrument for a price adjustment, and become a wager contract through which one of the parties gains a premium (or obtains an "unexpected benefit" in the terminology of the Arbitral Tribunal), independently of the value of the shares whose assignment constituted the purpose of the Contract, and independently of the economic reality of the Distribution Cost or any other parameter related to the real situation of Edenor at the time that the Arbitral Tribunal finds that the agreements made in said Complementary Agreement should be executed.

Wherefore, this party respectfully requests that the Arbitral Tribunal declare this Recourse for partial annulment presented by EDFI as allowed, by virtue of the decisions of the Supreme Court which have determined doctrine that an arbitral

---

[39] Specifically, a projected tariff revision which should have occurred according to the terms of the Concession Agreement and the Electrical Regulatory Framework, which would have led to a variation in the unitary distribution cost margin if different to the reduction of 5% projected by the parties when agreeing on the price of the shares in the contract, as seen in the Complementary Agreement.

[40] See points 747/749 of the Award.

award is judicially appealable when it is "unconstitutional, illegal or unreasonable",[41] thus recognizing the possibility that a judicial court of Argentina can declare the partial annulment of the Award.

### V. RESERVE OF THE FEDERAL CASE

As required under Argentine law to leave open the procedure of appeal before the Supreme Court on unconstitutionality grounds, I expressly request that the Federal Case be reserved for violation of rights and constitutional guarantees, and in particular those of due process and property, and as they are contrary to public order, as has been shown above.

Paris, November 5, 2007

(Signature, illegible)

Jose Rosell
Hughes Hubbard & Reed LLP
47 avenue Georges Mandel
75116 PARIS
France

---

[41] "Jose Cartellone Construcciones S.A. v. Hidronor S.A." 6/1/04, decision recently confirmed in the ruling "Eaca, Sideco and Saigue v. Direccion Nacional de Vialidad", 6/12/07.

15

# EXHIBIT 3

EDICIÓN 2002

# Código

# Procesal
# Civil y Comercial
# de la Nación

**LEY Nº 17.454 (TEXTO ORDENADO POR DECRETO Nº 1042/81)**
**LEYES COMPLEMENTARIAS, ACORDADAS Y RESOLUCIONES ACTUALIZADAS**

VIGÉSIMA NOVENA EDICIÓN

Equipo de Actualización de LexisNexis Argentina:
Abogados Vanesa Gabriela Borgoña, Marco Rufino y Karina Orquera

REIMPRESIÓN



# LexisNexis™
## Abeledo-Perrot

BUENOS AIRES

Si el procedimiento estuviere ajustado a derecho y el tribunal de alzada declarare la nulidad de la sentencia por cualquier otra causa, resolverá también sobre el fondo del litigio.

**253 bis.—** *Consulta.* En el proceso de declaración de demencia, si la sentencia que la decreta no fuera apelada se elevará en consulta. La cámara resolverá previa vista al asesor de menores e incapaces y sin otra sustanciación.

### Sección 3

### Apelación ordinaria ante la Corte Suprema

**254.—** *Forma y plazo.* El recurso ordinario de apelación ante la Corte Suprema, en causa civil, se interpondrá ante la cámara de apelaciones respectiva dentro del plazo y en la forma dispuesta por los arts. 244 y 245.

**255.—** *Aplicabilidad de otras normas.* Regirán respecto de este recurso, las prescripciones de los arts. 249, 251, 252 y 253.

### Sección 4

### Apelación extraordinaria ante la Corte Suprema

**256.—** *Procedencia.* El recurso extraordinario de apelación ante la Corte Suprema procederá en los supuestos previstos por el art. 14 de la ley 48.

**257.—** *Forma, plazo y trámite.* El recurso extraordinario deberá ser interpuesto por escrito, fundado con arreglo a lo establecido en el art. 15 de la ley 48 ante el juez, tribunal u organismo administrativo que dictó la resolución que lo motiva, dentro del plazo de diez días contados a partir de la notificación.

De la presentación en que se deduzca el recurso se dará traslado por diez días a las partes interesadas, notificándolas personalmente o por cédula. Contestado el traslado, o vencido el plazo para hacerlo, el tribunal de la causa decidirá sobre la admisibilidad del recurso. Si lo concediere, previa notificación personal o por cédula de su decisión, deberá remitir las actuaciones a la Corte Suprema dentro de cinco días contados desde la última notificación. Si el tribunal superior de la causa tuviera su asiento fuera de la Capital Federal, la remisión se efectuará por correo, a costa del recurrente.

La parte que no hubiera constituido domicilio en la Capital Federal quedará notificada de las providencias de la Corte Suprema por ministerio de la ley.

Regirá respecto de este recurso lo dispuesto en el art. 252.

**258.—** *Ejecución de sentencia.* Si la sentencia de la cámara o tribunal fuese confirmatoria de la dictada en primera instancia, concedido el recurso, el ape-

**752.—** *Cuestiones previas.* Si a los árbitros les resultare imposible pronunciarse antes de que la autoridad judicial haya decidido alguna de las cuestiones que por el art. 737 no pueden ser objeto de compromiso, u otras que deban tener prioridad y no les hayan sido sometidas, el plazo para laudar quedará suspendido hasta el día en que una de las partes entregue a los árbitros un testimonio de la sentencia ejecutoriada que haya resuelto dichas cuestiones.

**753.—** *Medidas de ejecución.* Los árbitros no podrán decretar medidas compulsorias, ni de ejecución. Deberán requerirlas al juez y éste deberá prestar el auxilio de su jurisdicción para la más rápida y eficaz sustanciación del proceso arbitral.

**754.—** *Contenido del laudo.* Los árbitros pronunciarán su fallo sobre todas las pretensiones sometidas a su decisión, dentro del plazo fijado en el compromiso, con las prórrogas convenidas por los interesados, en su caso.

Se entenderá que han quedado también comprometidas las cuestiones meramente accesorias y aquellas cuya sustanciación ante los árbitros hubiese quedado consentida.

**755.—** *Plazo.* Si las partes no hubieren establecido el plazo dentro del cual debe pronunciarse el laudo, lo fijará el juez atendiendo a las circunstancias del caso.

El plazo para laudar será continuo y sólo se interrumpirá cuando deba procederse a sustituir árbitros.

Si una de las partes falleciere, se considerará prorrogado por treinta días.

A petición de los árbitros, el juez podrá prorrogar el plazo, si la demora no les fuese imputable.

**756.—** *Responsabilidad de los árbitros.* Los árbitros que, sin causa justificada, no pronunciaren el laudo dentro del plazo, carecerán de derecho a honorarios. Serán asimismo responsables por los daños y perjuicios.

**757.—** *Mayoría.* Será válido el laudo firmado por la mayoría si alguno de los árbitros se hubiese resistido a reunirse para deliberar o para pronunciarlo.

Si no pudiese formarse mayoría porque las opiniones o votos contuviesen soluciones inconciliables en la totalidad de los puntos comprometidos, se nombrará otro árbitro para que dirima.

Si hubiese mayoría respecto de algunas de las cuestiones, se laudará sobre ellas. Las partes o el juez, en su caso, designarán un nuevo integrante del tribunal para que dirima sobre las demás y fijarán el plazo para que se pronuncie.

**758.—** *Recursos.* Contra la sentencia arbitral podrán interponerse los recursos admisibles respecto de las sentencias de los jueces, si no hubiesen sido renunciados en el compromiso.

**759.—** *Interposición.* Los recursos deberán deducirse ante el tribunal arbitral dentro de los cinco días, por escrito fundado.

Si fueren denegados, serán aplicables los arts. 282 y 283, en lo pertinente.

**760.**— *Renuncia de recursos. Aclaratoria. Nulidad.* Si los recursos hubiesen sido renunciados, se denegarán sin sustanciación alguna.

La renuncia de los recursos no obstará, sin embargo, a la admisibilidad del de aclaratoria y de nulidad, fundado en falta esencial del procedimiento, en haber fallado los árbitros fuera del plazo, o sobre puntos no comprometidos. En este último caso, la nulidad será parcial si el pronunciamiento fuere divisible.

Este recurso se resolverá sin sustanciación alguna, con la sola vista del expediente.

**761.**— *Laudo nulo.* Será nulo el laudo que contuviere en la parte dispositiva decisiones incompatibles entre sí.

Se aplicarán subsidiariamente las disposiciones sobre nulidades establecidas por este Código.

Si el proceso se hubiese sustanciado regularmente y la nulidad fuese únicamente del laudo, a petición de parte, el juez pronunciará sentencia, que será recurrible por aplicación de las normas comunes.

**762.**— *Pago de la multa.* Si se hubiese estipulado la multa indicada en el art. 741, inc. 4), no se admitirá recurso alguno, si quien lo interpone no hubiese satisfecho su importe.

Si el recurso deducido fuese el de nulidad por las causales expresadas en los arts. 760 y 761, el importe de la multa será depositado hasta la decisión del recurso. Si se declarase la nulidad, será devuelto al recurrente. En caso contrario, se entregará a la otra parte.

**763.**— *Recursos.* Conocerá de los recursos el tribunal jerárquicamente superior al juez a quien habría correspondido conocer si la cuestión no se hubiere sometido a árbitros, salvo que el compromiso estableciera la competencia de otros árbitros para entender en dichos recursos.

**764.**— *Pleito pendiente.* Si el compromiso se hubiese celebrado respecto de un juicio pendiente en última instancia, el fallo de los árbitros causará ejecutoria.

**765.**— *Jueces y funcionarios.* A los jueces y funcionarios del Poder Judicial les está prohibido, bajo pena de nulidad, aceptar el nombramiento de árbitros o amigables componedores, salvo si en el juicio fuese parte la Nación o una provincia.

## TÍTULO II

### Juicio de amigables componedores

**766.**— *Objeto. Clase de arbitraje.* Podrán someterse a la decisión de arbitradores o amigables componedores, las cuestiones que puedan ser objeto del juicio de árbitros.

# EXHIBIT 4



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Katharine Perekslis, hereby certify that the following document is to the best of my knowledge and belief, a true and accurate translation, of the Civil and Commercial Trial Procedure Code Of The Nation from Spanish into English.

Katharine Perekslis
Signature

Sworn to before me this
July 11, 2008

Signature, Notary Public

Pamela Boyle
Notary Public  State of New York
No. 01BO6181278
Qualified in NEW YORK County
Commission Expires  Jan 28, 2010

Stamp, Notary Public

# Civil and Commercial

# Trial Procedure
# Code
# of the Nation

GENERAL PROVISIONS

…

Section 4

**Extraordinary Appeal to the Supreme Court**

**256.—** *Admissibility.* The extraordinary remedy of appeal to the Supreme Court shall be admissible in the cases provided for in Article 14 of Law 48.

**257.—** *Form, time limit, and procedure.* Extraordinary appeals must be filed in writing, grounded in accordance with Article 15 of Law 48 before the judge, court, or administrative agency that issued the resolution to which they respond, within a term of ten days from service of process thereof.

The presentation in which the appeal is filed shall be served on the interested parties within ten days, with service in person or by judicial notice. Once service has been acknowledged or the term for doing so has expired, the trial court shall determine the appeal's admissibility. If it grants admission, following service of its decision in person or by judicial notice, the case must be sent to the Supreme Court within five days from the last presentation. If the superior court responsible for the case has its seat outside the Federal Capital, it shall be sent by mail, at the appellant's expense.

Service of the Supreme Court's decisions shall be practiced on a party that has not designated domicile in the Federal Capital by legally prescribed means.

The provisions of Article 252 shall apply in regard to this appeal.

ARBITRATION PROCEDURE

…

**759.**— *Filing*. Challenges or appeals must be filed with the arbitral tribunal within a term of five days, by means of reasoned document.

     If they are denied, Articles 282 and 283 will be applicable, as appropriate.

LAW ARBITRATOR PROCEEDING

**760.—** *Waiver of challenges or appeals. Clarification. Annulment.* If challenges or appeals were waived, they shall be denied without any substantiation whatsoever.

However, a waiver of challenges or appeals shall not block the admissibility of the petition for clarification and annulment, grounded in an essential defect of the procedure, in the arbitrators' having decided after the expiration of the term for doing so, or in points not at issue. In the latter case, the annulment shall be partial if the decision is divisible.

This challenge or appeal shall be resolved without any substantiation whatsoever, merely by examination of the record.

…

**763.—** *Challenges or Appeals.* The court that ranks higher than the judge who would have been called upon to try the case if it had not been submitted to arbitration shall hear challenges or appeals, unless other arbitrators are stipulated by the arbitral undertaking to be competent to hear such challenges or appeals.

# EXHIBIT 5

## ÍNDICE

I. PERSONERÍA.................................................................................................1

II. OBJETO ......................................................................................................1

III. INTRODUCCION. SE HABÍA PACTADO UN ARBITRAJE DE DERECHO Y LOS ÁRBITROS DECIDIERON CON TOTAL PRESCINDENCIA DEL DERECHO ARGENTINO APLICABLE AL CASO, COMO SI FUERAN AMIGABLES COMPONEDORES. LA ARBITRARIEDAD MANIFIESTA DEL LAUDO POR VIOLAR EL ORDEN PUBLICO Y EXCEDER LOS PUNTOS COMPROMETIDOS .......................................................................2

IV. LA COMPETENCIA DE LA EXCMA. CÁMARA NACIONAL DE APELACIONES EN LO COMERCIAL DE LA CAPITAL FEDERAL................5

V. LA ADMISIBILIDAD DEL RECURSO POR ARBITRARIEDAD Y VIOLACION DEL ORDEN PUBLICO, POR EXCEDER LOS PUNTOS COMPROMETIDOS, POR EXISTIR FALTA ESENCIAL DEL PROCEDIMIENTO Y POR PRESENTARSE UN CASO DE INUSITADA GRAVEDAD INSTITUCIONAL .........................................................................6

    A. La irrenunciabilidad del recurso de nulidad ..............................................6

    B. La admisibilidad del recurso de nulidad frente a la arbitrariedad manifiesta del Laudo, basada en su inconstitucionalidad, ilegalidad e irrazonabilidad. La doctrina de la Corte Suprema de Justicia de la Nación ........................................................................................................6

    C. La admisibilidad del recurso de nulidad por haber incurrido en falta esencial del procedimiento, por haber fallado los árbitros sobre puntos no comprometidos y por existir un caso de gravedad institucional.............9

VI. ANTECEDENTES RELEVANTES DEL CONFLICTO .................................9

    A. EDFI, ENDESA y ASTRA adquieren el control de EDENOR ...................10

    B. ENDESA es obligada a desprenderse de su participación indirecta en EDENOR por decisión del Estado Nacional............................................10

    C. El Memorandum de Entendimiento .........................................................10

    D. El contrato de compraventa de las acciones de EASA y EDENOR. La ley aplicable y la prórroga de jurisdicción..................................................10

    E. El Ministerio de Finanzas de la República Francesa condicionó su aprobación, indispensable para concretar la operación, a que las partes acordaran una compensación para EDFI en la hipótesis de que, por alguna razón, quedara sin efecto la paridad cambiaria de la Ley de Convertibilidad .......................................................................................11

    F. La Carta Acuerdo, que lleva fecha 31 de marzo de 2001, pero que fue firmada el 27 de abril de 2001, cumple la exigencia del gobierno de Francia..................................................................................................11

    G. El reclamo compensatorio de EDFI fundado en el alegado acaecimiento de la Contingencia antes del 31 de diciembre de 2001.............................12

    H. El rechazo de ENDESA e YPF a ese reclamo. Las posiciones de las partes en el proceso arbitral .....................................................................13

2

**VII. EL LAUDO ARBITRAL** .................................................................................. 15

A. La decisión impugnada de nulidad .......................................................... 15

B. El voto mayoritario: sus inadmisibles y arbitrarios fundamentos, que sólo tienen la apariencia de tales ........................................................................ 15

C. La disidencia que pone las cosas en su lugar: sus fundamentos .............. 17

**VIII. LA DECISIÓN RECURRIDA ES INCONSTITUCIONAL, ILEGAL E IRRAZONABLE. POR LO TANTO, ES ARBITRARIA Y DEBE SER DECLARADA NULA** .................................................................................. 20

A. Comentario preliminar sobre la notable extensión del Laudo y su carencia de todo fundamento de derecho. Lo relevante son sólo 40 páginas ........................................................................................................ 20

B. El Laudo es manifiestamente arbitrario por no haber aplicado el derecho argentino y violar el orden público. Al haber laudado de acuerdo con su particular voluntad, en lugar de sujetarse a las bases legales pactadas por las partes, el Tribunal Arbitral se ha extralimitado en sus funciones y se apartó del primer punto comprometido: resolver la controversia de acuerdo con el derecho de la República Argentina .................................. 21

a) Los árbitros debían aplicar obligatoria e inexcusablemente la ley argentina ...................................................................................... 22

b) Los árbitros no aplicaron la ley argentina sino que, por el contrario, la infringieron flagrante e injustificadamente .................................. 23

**IX. ES ARBITRARIA LA CONCLUSIÓN DEL TRIBUNAL ARBITRAL EN CUANTO A QUE EL 21 DE DICIEMBRE DE 2001 YA NO REGÍA EL TIPO DE CAMBIO OFICIAL DE LA LEY DE CONVERTIBILIDAD Y QUE EN ESA FECHA SE PRODUJO LA CONTINGENCIA PACTADA POR LAS PARTES** ................................................................................................... 25

A. Lo que acordaron las partes respecto de la Contingencia ........................ 25

B. La claridad y precisión de esa convención ............................................... 26

C. La imperatividad de lo convenido a la luz del art. 1197 del Código Civil ... 26

D. La Carta Acuerdo –interpretada, por imposición legal, con arreglo a las pautas previstas en la legislación argentina– no ofrece duda alguna y excluye inequívocamente la posibilidad de acudir a otros principios para dirimir el conflicto. La interpretación del Laudo no constituye una derivación razonada del derecho vigente ................................................... 27

E. El único "tipo de cambio oficial" existente en la República Argentina durante todo diciembre de 2001 fue el impuesto por la Ley 23.928. La inobservancia de la fecha límite pactada por las partes para el acaecimiento de la Contingencia torna al Laudo nulo por arbitrario y por exceder los puntos comprometidos .......................................................... 30

F. La arbitraria interpretación que da el Laudo a la precisa disposición contractual relativa al "tipo de cambio oficial", invocando que la paridad

3

*1 peso por 1 dólar no estaba dada por la Ley de Convertibilidad sino por lo que establecían los mercados, carece de base contractual, legal, fáctica y lógica, e infringe el orden público argentino* ................................ 32

G. *Arbitrariedad del alcance dado por el voto de la mayoría a la expresión "desvinculación del tipo del cambio oficial" porque (i) no se compadece y es incongruente con los propios términos de esa cláusula y con la intención de las partes evidenciada en las restantes cláusulas del Acta Acuerdo, (ii) transgrede el significado del término "desvinculación" y (iii) viola el orden público y constitucional* ...................................................... 36

H. *El Laudo incurre en una grosera autocontradicción: primero sostiene que, de partes que no eran especialistas en el régimen de convertibilidad, no podía esperarse que hicieran referencia al tipo de cambio oficial de la Ley de Convertibilidad; para afirmar luego que, para pactar la Contingencia, las partes tuvieron en cuenta los sofisticados aspectos de política económica y cambiaria establecidos en la Ley de Convertibilidad* ............................................................................. 46

I. *Para definir a la Contingencia en forma diferente a lo que expresa su texto, el Laudo se basa en prueba falsa* ................................................. 48

J. *La afirmación del Laudo de que el término contractual "desvinculación" no apuntaba al tipo de cambio oficial sino a los postulados básicos del régimen de convertibilidad, colisiona con la precisión y claridad de lo pactado y carece de todo sentido lógico, jurídico y económico. Pero aun en esta absurda y negada hipótesis, el Laudo interpretó el asunto de un modo manifiestamente arbitrario* ............................................................. 49

K. *El Laudo impugnado, emitido por árbitros que debieron actuar como árbitros de derecho, se apoyó en una "interpretación" flagrantemente contraria a la literalidad de lo acordado por las partes, a su intención evidenciada en todos los antecedentes del caso, al orden público argentino e, incluso, a principios constitucionales básicos. Esa interpretación, se basó únicamente en especulaciones y conjeturas sobre la realidad económica, totalmente desacertadas e impropias de cualquier decisión jurisdiccional. No existe en el Laudo, siquiera tangencialmente, una derivación razonada del derecho vigente* ............... 55

L. *A mayor abundamiento, la arbitrariedad del Laudo impugnado condujo, incluso, a considerar inaplicable en la especie el art. 218, inciso 7, del Código de Comercio* .......................................................................... 57

X. **LA IRRAZONABILIDAD Y FALTA DE TODA LÓGICA JURÍDICA Y ECONÓMICA DE LO QUE AFIRMA EL LAUDO AL CUANTIFICAR LA CONDENA, APARTÁNDOSE DE LO PACTADO, VIOLANDO EL ORDEN PÚBLICO ARGENTINO Y AFECTANDO INDEBIDAMENTE DERECHOS CONSTITUCIONALES BÁSICOS DE LOS DEMANDADOS** ...................... 57

A. *Arbitrariedad por no aplicar el método pactado por las partes: el promedio la cotización oficial del peso frente al dólar entre la fecha de la primera alteración y el 31 de diciembre de 2001. De haber aplicado el método escogido por las partes, la condena hubiera sido igual a "0".* ....... 57

B. *Extralimitación en las facultades encomendadas al Tribunal al adoptar, según su caprichoso arbitrio, un tipo de cambio y fechas de referencia distintas de las expresamente pactadas por las partes* ............................ 58

4

C. *Arbitrariedad porque el Laudo escoge las peores hipótesis para incrementar en la mayor medida posible el monto de la por sí improcedente compensación* ................................................................... 61

    a) Resultado en un primer supuesto: la desvinculación ocurre como consecuencia de la sanción de la Ley 25.445, que modificó la Ley de Convertibilidad para introducir una canasta de monedas con el euro .......................................................................................... 61

    b) Resultado en un segundo supuesto: la desvinculación ocurre como consecuencia de la caída del nivel de reservas del Banco Central ................................................................................................ 62

    c) Resultado en un tercer supuesto: la desvinculación ocurre como consecuencia de la implementación del Corralito ......................... 63

XI.  LA ARBITRARIEDAD ES TAL QUE CONSTITUYE UN PRONUNCIAMIENTO SOBRE PUNTOS NO COMPROMETIDOS: EL TRIBUNAL NO APLICÓ EL DERECHO, COMO ESTABA PACTADO, SINO QUE ACTUÓ COMO AMIGABLE COMPONEDOR, LO QUE LE ESTABA VEDADO. DOCTRINA DE LOS TRIBUNALES ARBITRALES INTERNACIONALES Y DE LA CORTE SUPREMA ....................................... 64

XII. EL LAUDO IMPUGNADO ES TAMBIÉN NULO POR INCURRIR EN FALTA ESENCIAL EN EL PROCEDIMIENTO ..................................................................... 67

    A. *La falta de independencia e imparcialidad del árbitro designado por EDFI. La omisión de la CCI de abrir un procedimiento de confirmación de árbitro que garantizara la igualdad de las partes en el proceso y el derecho de defensa de las demandadas. La falta de fundamento del rechazo de la recusación del referido árbitro y vicepresidente de la CCI .. 68*

    B. *La falta de fundamentos del Laudo* ........................................................... 75

XIII. LA GRAVEDAD INSTITUCIONAL DE LA DECISIÓN ADOPTADA ................ 78

XIV. CONCLUSIÓN ..................................................................................................... 80

XV. EL INTERÉS JURÍDICO DE ENDESA E YPF EN LA DECLARACIÓN DE NULIDAD PARCIAL DEL LAUDO IMPUGNADO ........................................... 82

XVI. REFERENCIAS COMPLEMENTARIAS DE INEXCUSABLE CONOCIMIENTO POR EL TRIBUNAL AD QUEM. EL AVENTURADO COMPORTAMIENTO DE LA ACTORA EN CUANTO AL MONTO DE LA DEMANDA AL QUE, SUPUESTAMENTE, SE CREÍA CON DERECHO ....... 83

XVII. DOCUMENTACIÓN .......................................................................................... 84

XVIII. INTRODUCCIÓN DE LA CUESTIÓN FEDERAL ........................................... 84

XIX. AUTORIZACIONES ............................................................................................ 85

XX. ADVERTENCIA SOBRE LAS RESTRINGIDAS POTESTADES DEL TRIBUNAL ARBITRAL LUEGO DE PRONUNCIADO EL LAUDO. REMISIÓN A LA CÁMARA DE APELACIONES SIN SUSTANCIACIÓN Y NUEVA DECISION DEL TRIBUNAL ARBITRAL ........................................... 85

5

**XXI. PETITORIO** .................................................................................................**86**

**INTERPONEN RECURSO DE NULIDAD CONTRA EL LAUDO ARBITRAL DEL 22
DE OCTUBRE DE 2007**

Excmo. Tribunal Arbitral:

FRANCISCO M. GUTIÉRREZ, abogado, C.P.A.C.F., To. 58, Fo. 992, en mi
carácter de letrado apoderado de ENDESA INTERNACIONAL S.A. (en adelante
"ENDESA"), con domicilio real en calle Príncipe Vergara 187, Ciudad de Madrid,
Reino de España, con el patrocinio letrado de MÁXIMO L. BOMCHIL, abogado,
C.S.J.N., To. 17, Fo. 18, RAFAEL M. MANÓVIL, abogado, C.S.J.N., To. 6, Fo. 599,
HUGO P. LAFALCE, abogado, C.P.A.C.F., To. 17, Fo. 356, CARLOS MARÍA
ROTMAN, abogado, C.P.A.C.F., To. 30, Fo. 544, y ALFREDO JORGE DI IORIO,
abogado, C.P.A.C.F., To. 35, Fo. 284, constituyendo nuevo domicilio procesal en
Suipacha 268, piso 12, Ciudad A. de Buenos Aires, República Argentina (Estudio M.
& M. Bomchil), y ROGELIO DRIOLLET LASPIUR, abogado, C.P.A.C.F., To. 9, Fo.
204 en mi carácter de letrado apoderado de YPF S.A. (en adelante "YPF"), con
domicilio real en Diagonal Roque Sáenz Peña 777, Ciudad A. de Buenos Aires,
República Argentina, con el patrocinio letrado de CARLOS MARÍA TOMBEUR,
abogado, C.S.J.N., To. 20, Fo. 107, constituyendo nuevo domicilio procesal en
Reconquista 336 piso 2°, Ciudad A. de Buenos Aires, República Argentina (Estudio
Severgnini, Robiola, Grinberg & Larrechea), en el arbitraje internacional caratulado
**"EDF INTERNATIONAL S.A. (Francia) vs/ 1. ENDESA INTERNACIONAL S.A.
(España) – 2. REPSOL YPF S.A. (España) – 3. YPF S.A. (en calidad de
adquirente de ASTRA C.A.P.S.A.) (Argentina)"** (Caso CCI No.
12231/KGA/CCO/JRF), ante V.E. nos presentamos y respetuosamente decimos:

## I. PERSONERÍA

1.1. Que conforme lo acreditamos con los poderes que en copia simple se
acompañan como Anexos I y II, respecto de los cuales declaramos bajo juramento
que son copia fiel de sus originales y se encuentran vigentes, somos apoderados de
ENDESA e YPF, respectivamente, con facultades suficientes para interponer este
recurso.

1.2. En esas condiciones, solicitamos se nos tenga por presentados, por
parte en el carácter precedentemente invocado, por denunciado el domicilio real y
por constituido el procesal indicado.

## II. OBJETO

2.1. En el carácter invocado y en los términos de los artículos 760 y
concordantes del Código Procesal Civil y Comercial de la Nación ("CPCCN"),
venimos en legal tiempo[1] y forma a interponer recurso de nulidad contra el laudo
final emitido el 22 de octubre 2007 (el "Laudo"), cuya copia se acompaña al
presente como Anexo III, a fin de que se declare su nulidad parcial[2], ello en cuanto
hace lugar a la demanda deducida por EDF INTERNATIONAL S.A. (EDFI) y, en

---

[1] El Laudo fue notificado a las demandadas el 31 de octubre de 2007, por lo que el recurso es deducido dentro del
plazo de cinco días hábiles judiciales establecido en el artículo 759 del CPCCN.

2

consecuencia, condena a ENDESA e YPF al pago de US$ 100.757.875 y 28.933.850, respectivamente, más intereses[3].

2.2. Según se demostrará a lo largo de este escrito, el Laudo es nulo **(a)** por resultar inequívocamente arbitrario en los términos de la doctrina sentada por la **Corte Suprema de Justicia de la Nación**, entre otras causas, en *"José Cartellone Construcciones Civiles SA c/ Hidroeléctrica Norpatagónica SA o Hidronor SA"*, del 1º de junio de 2004[4], y por importar una flagrante violación del orden público argentino provocando una situación de innegable gravedad institucional; **(b)** por haber excedido el pronunciamiento del Tribunal los puntos comprometidos al haber resuelto como si los árbitros hubieran sido amigables componedores y no árbitros de derecho, como estaba comprometido; y **(c)** por presentarse en el caso faltas esenciales en el procedimiento que conducen a su nulidad (CPCCN, art. 760).

### III. INTRODUCCION. SE HABÍA PACTADO UN ARBITRAJE DE DERECHO Y LOS ÁRBITROS DECIDIERON CON TOTAL PRESCINDENCIA DEL DERECHO ARGENTINO APLICABLE AL CASO, COMO SI FUERAN AMIGABLES COMPONEDORES. LA ARBITRARIEDAD MANIFIESTA DEL LAUDO POR VIOLAR EL ORDEN PUBLICO Y EXCEDER LOS PUNTOS COMPROMETIDOS

3.1. En los capítulos siguientes se explicará cómo los árbitros que suscriben el voto mayoritario incurrieron en un total apartamiento de su deber de emitir un laudo conforme al derecho elegido por las partes, para decidir a su libre arbitrio, haciendo uso y abuso de una discrecionalidad no conferida por los litigantes ni por el tipo de arbitraje pactado.

3.2. El primer punto comprometido por las partes fue someterse a un arbitraje de derecho, en el que el derecho argentino debía aplicarse en su totalidad, tanto sus normas imperativas como dispositivas. A pesar de las advertencias del voto disidente, la mayoría del Tribunal ignoró arbitrariamente los estrictos límites jurídicos impuestos por las partes y los sustituyó por consideraciones de orden político, económico y hasta pseudo-psicológico -en definitiva, todos criterios metajurídicos- para resolver según su saber y entender, como si se tratara de un proceso de amigables componedores.

3.3. El caso a resolución se originó en el contrato suscripto por las partes para la venta de las acciones que poseían las demandadas en Empresa Distribuidora y Comercializadora Norte SA ("EDENOR") y de Electricidad Argentina SA ("EASA").

---

[2] El artículo 760 del CPCCN admite expresamente la declaración de nulidad parcial de un laudo arbitral.

[3] Las cifras expuestas constituyen el monto neto del capital objeto de condena, en la medida en que el Laudo acogió la demanda de EDFI por un importe de US$ 187.000.000 (a razón de US$ 147.000.000 a cargo de ENDESA y US$ 40.000.000 a cargo de YPF), disponiendo que debía deducirse de dicha cifra el monto de la reconvención de ENDESA e YPF a la que hizo lugar por un monto de US$ 57.308.275, todo lo cual da por resultado un monto neto total de US$ 129.691.725, a razón de US$ 100.757.875 a cargo de ENDESA y 28.933.850 a cargo de YPF. Las demandadas consienten la decisión adoptada en el Laudo en materia de reconvención, no integrando ella el objeto del presente recurso.

[4] Fallos: 327:1881.

3

3.4. Lo que el Tribunal Arbitral debía resolver era si, antes del 31 de diciembre de 2001, se produjo o no se produjo una *Contingencia* contractualmente definida. En caso afirmativo, ello generaba la obligación de las demandadas de devolver a la actora una porción del precio cobrado por la venta. En caso negativo, no correspondía devolución alguna.

3.5. La *Contingencia* consistía en la "*desvinculación del tipo de cambio oficial del peso argentino con el dólar USA*", de modo que redundara en una "***disminución*** ... *o aumento del tipo de cambio oficial del peso respecto al dólar*". Para que hubiera derecho a compensación, todo ello debía ocurrir, de modo fatal, **hasta el 31 de diciembre de 2001**.

3.6. El significado de esas expresiones era claro y preciso: el **único *tipo de cambio oficial*** vigente a la fecha del contrato (marzo/abril de 2001) era el establecido en el **art. 1 de la Ley de Convertibilidad**. Y cualquier tipo de cambio *oficial* que lo reemplazara, debía ser establecido también por una ley o por una norma jurídica dictada por delegación del Congreso, previa derogación o modificación, también por ley, de la Ley de Convertibilidad.

3.7. <u>Esto último ocurrió pocos días después de la fecha clave</u>. Como es público y notorio, fueron la <u>**Ley 25.561, aprobada el 6 de enero de 2002, y posteriormente el Decreto N° 71/02, los que establecieron el *nuevo tipo de cambio oficial.***</u>

3.8. Sin embargo, los árbitros que suscribieron el voto mayoritario resolvieron sobre la base de su peculiar convicción acerca de los sucesos –que no vivieron porque no residen en la Argentina ni son argentinos- relativos a la crisis política y económica padecida por el país a fines de 2001. Por un acto voluntarista, decidieron que la actora debía recuperar parte de lo pagado, apiadándose, tal vez, porque los hechos que daban lugar a la *Contingencia* <u>**se suscitaron escasos días después de la fecha límite pactada**</u>.

3.9. Pero las partes no habían pactado que los árbitros establecieran lo que era mejor o peor, ni que resolvieran en base a sus propias convicciones y arbitrio. Muy lejos de ello, las partes -tres de las mayores empresas energéticas del mundo- habían decidido contractualmente **dividir los riesgos**. Esa división de riesgos se pactó de modo frío, metódico, empresario y claramente objetivo, sobre la base de datos muy precisos y muy concretos.

3.10. Por una parte, **<u>una fecha clave exacta</u>**. Ya se dijo: el 31 de diciembre de 2001. Por la otra, **un hecho de significado jurídico preciso**: la desvinculación del "*tipo de cambio oficial del peso argentino con el dólar USA*" y la consiguiente modificación, ya sea por disminución como por aumento, "*del tipo de cambio oficial del peso respecto al dólar*".

3.11. ¿Qué hizo, en realidad, la mayoría del tribunal?

4

3.12. Dejó de aplicar una ley de orden público –la Ley de Convertibilidad- y, también, la ley de las partes (artículo 1197 del Código Civil).

3.13. **Sin ninguna base positiva –a pesar de tratarse de un Tribunal de Derecho-, de modo totalmente arbitrario, generando un caso de gravedad institucional manifiesta y violando flagrantemente el orden público argentino, el Laudo juzgó por mayoría que dicha desvinculación (la *Contingencia*) se produjo antes del 31 de diciembre de 2001, con el inocultable pero falso presupuesto de considerar que en esa fecha el artículo 1 de la Ley 23.928 no estaba vigente.**

3.14. ¿Cómo justificó la mayoría esa conclusión?

3.15. Diciendo que **no importaba**, a efectos de considerar producida la Contingencia, si había existido, hasta el 31 de diciembre de 2001, **una disminución o aumento del *tipo de cambio oficial* (!!!)**. Los que **sí importaban**, en la arbitraria y antojadiza visión del voto mayoritario, eran **otros factores de índole política y económica**: que las **bases esenciales** sobre las que se asentaba la Ley de Convertibilidad habían dejado de cumplirse, en la realidad práctica, en diciembre de 2001.

3.16. Pero el apartamiento del derecho aplicable no terminó allí.

3.17. El pacto que debían aplicar era que, producida la *Contingencia*, para determinar la revisión del precio debía tomarse como base para el cálculo "*el promedio de la **cotización oficial del peso argentino** frente al dólar de Estados Unidos durante el período comprendido **entre la fecha [en] que se produzca la primera alteración de la paridad peso/dólar y el 31 de diciembre de 2001**".

3.18. Nuevamente, la mayoría se apartó de los dos elementos claros, precisos y concretos pactados por las partes: la **cotización oficial** del peso y la fecha límite del *31 de diciembre de 2001*.

3.19. A pesar de que ello era una nueva prueba de que lo único que contaba era el mercado *oficial* y el tipo de cambio *oficial* -descartando toda suerte de cotización paralela- los señores árbitros de la mayoría sintieron que la primera parte de la decisión, es decir, afirmar que se produjo la *Contingencia*, no alcanzaba para arbitrariamente resolver condenando al pago a ENDESA e YPF. Entonces adoptaron dos fechas absolutamente antojadizas para hacer el cálculo. **Como fecha de ocurrencia de la *Contingencia* fijaron el 21 de diciembre de 2001**, día en que nada ocurrió y en que no hubo, según el mismo Laudo, mercado, ni cotización, ni nada, porque el Banco Central había decretado feriado a raíz de la renuncia del Presidente de la Rúa. Para la cotización, fijaron como parámetro base del cálculo, **el tipo de cambio libre del 11 de enero de 2002**, o sea, **una cotización, NO oficial, muy posterior a la fecha clave pactada entre las partes.**

3.20. El prorrateo que hicieron entre ambas fechas se habrá correspondido con su arbitrio personal. Pero no tiene base alguna en el derecho. Jugaron con

5

promedios y prorrateos fijados a su antojo, ignorando otros cálculos análogos que hubieran establecido un resultado muy menor al del Laudo. Así hubiera ocurrido con sólo adelantar la fecha de supuesta ocurrencia de la *Contingencia* llevándola, por ejemplo, a la fecha en que se estableció el Corralito. Ello al margen de que **el cambio oficial al 31 de diciembre que debían aplicar era el último existente y no el siguiente que se estableció**: o sea, 1 peso igual 1 dólar, lo que equivalía a que la *Contingencia*, aunque se hubiera tenido por producida, daba por resultado una compensación igual a cero.

3.21. De haberse pactado un arbitraje de amigables componedores todos estos malabares podrían, muy eventualmente, ser comprendidos, aun cuando el resultado final habría resultado igualmente ilegítimo en razón de su irrazonabilidad intrínseca. Pero **en un arbitraje de derecho, esto lleva a la nulidad manifiesta de lo decidido** por configurar un supuesto de arbitrariedad y de violación del orden público que, además, constituye una manifiesta extralimitación en las facultades del Tribunal o, dicho de otro modo, un pronunciamiento *"sobre puntos no comprometidos"* en los términos del artículo 760 del CPCCN.

3.22. Ni uno solo de los razonamientos de la mayoría se apoya en derecho, pese a que los conceptos a aplicar, tal como fueron pactados por las partes, eran nítidamente jurídicos: se produjo o no se produjo el hecho jurídicamente relevante antes del 31 de diciembre de 2001.

3.23. Casi todo lo que aquí se expone fue advertido en el voto disidente del árbitro Illescas Ortiz.

### IV. LA COMPETENCIA DE LA EXCMA. CÁMARA NACIONAL DE APELACIONES EN LO COMERCIAL DE LA CAPITAL FEDERAL

4.1. Como no ha existido pacto entre las partes en sentido contrario, ese Tribunal es competente por la materia y por el territorio para conocer en este recurso (CPCCN, art. 763).

4.2. Es que las partes, sociedades comerciales, han debatido sobre la interpretación y aplicación de cierta cláusula -que luego se examinará en detalle- agregada a un contrato de compraventa de acciones de sociedades anónimas cuyas sedes y actividad se ubican en la ciudad de Buenos Aires, República Argentina (Decreto-Ley Nº 1285/58, arts. 36, 43 bis y ccdtes.). De modo que **(i)** las partes son comerciantes (Código de Comercio, arts. 1, 5 y ccdtes.), **(ii)** celebraron un acto de comercio (Código de Comercio, art. 451 y ccdtes.) relacionado con sociedades mercantiles -comerciantes- que, en sí mismas, son actos de comercio (Código de Comercio, art. 8, inc. 6, y ccdtes. y Ley 19.550, arts. 384 y ccdtes.) y **(iii)** el cumplimiento del contrato se concretó en aquella jurisdicción (cláusula 4.3 del contrato; CPCCN, art. 5, inc. 3).

4.3. De conformidad con lo pactado en el contrato, la sede del arbitraje fue la Ciudad de Buenos Aires.

6

## V. LA ADMISIBILIDAD DEL RECURSO POR ARBITRARIEDAD Y VIOLACION DEL ORDEN PUBLICO, POR EXCEDER LOS PUNTOS COMPROMETIDOS, POR EXISTIR FALTA ESENCIAL DEL PROCEDIMIENTO Y POR PRESENTARSE UN CASO DE INUSITADA GRAVEDAD INSTITUCIONAL

### A. La irrenunciabilidad del recurso de nulidad

5.1. El presente recurso de nulidad es irrenunciable (CPCCN, arts. 741, inc. 5, y 760)[5], amén de estar habilitado por el Reglamento de Arbitraje de la CCI (artículo 28.6)[6].

### B. La admisibilidad del recurso de nulidad frente a la arbitrariedad manifiesta del Laudo, basada en su inconstitucionalidad, ilegalidad e irrazonabilidad. La doctrina de la Corte Suprema de Justicia de la Nación

5.2. Desde una perspectiva procesal, el art. 760 del CPCCN prevé expresamente que *"la renuncia de los recursos no obstará... a la admisibilidad del de aclaratoria y de nulidad, fundado en falta esencial del procedimiento, en haber fallado los árbitros fuera del plazo, o sobre puntos no comprometidos"*.

5.3. Desde una perspectiva sustancial, la Corte Suprema de Justicia de la Nación ha sentado como doctrina en la mencionada causa *"José Cartellone Construcciones Civiles SA c/ Hidroeléctrica Norpatagónica SA o Hidronor SA"* del 1° de junio de 2004, que *"...no puede lícitamente interpretarse que la renuncia a apelar una decisión arbitral se extienda a supuestos en que los términos del laudo que se dicte contraríen el orden público, pues no es lógico prever, al formular una renuncia con ese contenido, que los árbitros adoptarán una decisión que incurra en aquel vicio. Caber recordar al respecto que la apreciación de los hechos y la aplicación regular del derecho son funciones de los árbitros y, en consecuencia, el laudo que dicten será inapelable en esas condiciones, pero, en cambio, su decisión podrá*

---

[5] Las normas que habilitan el recurso de nulidad contra un laudo arbitral son de orden público e indisponibles (Código Civil, art. 872 y codtes.), por lo que dicho recurso es irrenunciable (Caivano, Roque J., "Los laudos arbitrales y su impugnación por nulidad", en JA 1994, I, p. 845). Se ha sostenido en tal sentido que "dado que el arbitraje supone el sometimiento a jueces privados y la renuncia de las partes a ser juzgados por órganos estatales, es natural que el legislador haya querido rodear al arbitraje de ciertas garantías, que impone como condición de validez de la decisión de los árbitros. Precisamente para eso establece una instancia de revisión judicial irrenunciable, otorgando a los jueces estatales la potestad de verificar que tales requisitos se cumplan, y de anular el laudo en caso contrario (...) La revisión por nulidad resulta –por lo que antecede– protegida por la legislación, al dotarla de la condición de orden público." (Caivano, Roque J., "Arbitraje", Buenos Aires, Ed. Ad-Hoc, 2000, p. 289,). Asimismo, en referencia concreta a arbitrajes CCI (como el presente) se ha manifestado que "aunque las partes válidamente hayan acordado ajustarse a las reglas de procedimiento de la Corte de Arbitraje de la Cámara de Comercio Internacional, ha de reconocerse –en todos los supuestos en que pudiera hallarse en juego alguna disposición de carácter imperativo aplicable al proceso arbitral conforme a nuestro derecho interno– el debido control judicial sobre ese arbitraje a fin de revisar toda posible transgresión de disposiciones de ese naturaleza" (Kielmanovich, Jorge L., "Código Procesal Civil y Comercial de la Nación", T. II, Ed. Lexis-Nexis Abeledo Perrot, Buenos Aires, 2005, p. 1173, en referencia a la sentencia de la CNCom B, del 21.12.90, en los autos "Cía. Naviera Pérez Companc S.A. y otro c/ Ecofisa S.A. y otro", publicada en ED 143-435). En tal sentido, en doctrina se sostiene que la renuncia anticipada a los recursos contra un laudo no siempre será de aplicación efectiva, ya que su validez depende de la ley procesal aplicable (Rubino-Sammartano, Mauro, "International Arbitration. Law and Practice", p. 874, Kluwer Law International, The Hague, 2001) y que, aun cuando el Reglamento CCI establezca la renuncia genérica de las partes a los recursos contra laudos, ello es sin perjuicio de los recursos que las legislaciones nacionales impiden renunciar, como en casos de violaciones al debido proceso, al orden público internacional o a la competencia del tribunal (Derains, Yves y Schwartz, Eric A., "A guide to the new ICC Rules of Arbitration", Kluwer Law International, The Hague, 1998, p. 297).

7

*impugnarse judicialmente cuando sea inconstitucional, ilegal o irrazonable (Fallos: 292:223)".*

5.4. La visión del Alto Tribunal en esta materia, vigente en la actualidad[7], no admite dudas[8].

5.5. En nuestro derecho, las personas pueden prorrogar contractualmente jurisdicción a un tribunal de árbitros cuando se trata de materia patrimonial disponible para ellas, como sucede en el caso (CPCCN, arts. 1, 736, 737 y ccdtes.). No pueden hacerlo, ciertamente, cuando se trata de cuestiones que no pueden ser objeto de transacción.

5.6. Empero, esa prórroga de jurisdicción e, incluso, la renuncia contractual a impugnar el laudo que emitan los árbitros -con los acotados límites impuestos por el art. 760 del CPCCN o, en su caso, el art. 771- en ningún caso habilita a los árbitros a violar el orden público de nuestro sistema jurídico.

5.7. De ese modo, los laudos emitidos por los árbitros de derecho -como los que dictaron el laudo impugnado con este recurso- deben sujetarse a las normas de orden público vigentes y aplicables al caso.

5.8. Si el orden público no es disponible para las personas (Código Civil, arts. 19, 21, 953 y ccdtes.), mal podría *canalizarse* una infracción al orden público mediante la prórroga de jurisdicción a un tribunal de arbitraje y mediante la renuncia a los recursos para impugnar el laudo que se dicte en el proceso arbitral.

5.9. Por lo demás, constituye un principio de orden público procesal y constitucional la necesidad de que las decisiones jurisdiccionales sean fundadas, congruentes y razonables, por lo que no cabe excluir la revisión judicial de tales resoluciones cuando no cumplen ese recaudo fundamental[9].

5.10. La ausencia de los recaudos mencionados precedentemente redunda, claramente, en la afectación de la garantía de defensa en juicio

---

[6] Copia del Reglamento de Arbitraje de la CCI se acompaña como Anexo XII.

[7] La Corte Suprema de Justicia de la Nación ha reiterado su doctrina respecto de decisiones de tribunales arbitrales, afirmando que a fin de *"examinar la admisibilidad formal del recurso cabe tener presente que la doctrina del tribunal en la materia es que las decisiones del tribunal arbitral de obras públicas son recurribles en el supuesto de arbitrariedad"* y agregando luego que esa revisión era procedente *"toda vez que la decisión cuestionada omitió tratar extremos conducentes para la adecuada solución del caso, oportunamente propuestos a la consideración del tribunal, y expresó fundamentos que sólo en apariencia satisfacen los requisitos a cuyo cumplimiento se haya supeditada la validez de los actos jurisdiccionales (Fallos: 312:1034, 315:1561 y 2512, entre otros)"* (sentencia del 13.6.07 en los autos "Recurso de hecho deducido por la demandada en la causa Eaca S.A. – Sideco Americana S.A.C.I.F. – Saiuge Argentina c/ Dirección Nacional de Vialidad", publicado en www.csjn.gov.ar).

[8] Se ha dicho al respecto que *"...cuando el árbitro se aparta de lo pautado en el compromiso arbitral o bien su laudo es inconstitucional, ilegal o irrazonable puede recurrirse a la justicia ordinaria a través del recurso de nulidad o bien el recurso extraordinario que son irrenunciables y serán procedentes aunque las partes hayan pactado lo contrario, pues esto hace al interés y orden público, a la salud comunitaria y a la salud de los medios alternativos de resolución de conflictos atento que, so pretexto que una materia sea posible de ser sometida a arbitraje por las partes, no es admisible que por vía del laudo se pueda transgredir la Constitución Nacional"* (Gualtiero Martín Marchesini, *"Arbitraje y recurso extraordinario"*, publicado en la revista jurídica La Ley, el 29.9.04).

[9] Véase que *contrario sensu* la CNCom C, en su fallo dictado el 21.12.01 en la causa *"Cortesfilms Argentina SA c/ Seb Argentina SA"*, publicado en La Ley 2002-A, 632, ha considerado que la no violación del principio de congruencia constituye un requisito de validez del laudo: *"no surge, del tenor literal del laudo..., omisión o defecto que lo invalide. Dicha pieza...respeta el principio de congruencia...(y) el laudo expresó la decisión en forma expresa, positiva y precisa...lo que disipa el riesgo de arbitrariedad"*. Se admitió así, *contrario sensu*, la posibilidad de impugnar un laudo arbitral.

8

establecida en el artículo 18 de la Constitución Nacional. Por ello se ha sostenido, con acierto, que *"para que algo sea de verdad una sentencia judicial* [o un laudo arbitral]*, la adecuada culminación de un juicio, tiene que reunir ciertos requisitos mínimos...Un pronunciamiento de un juez* [o de un tribunal arbitral]*, aunque venga rotulado de esa manera no es la sentencia que quiere la Constitución si tal pronunciamiento es arbitrario o insostenible"*[10].

5.11. Con sustento en esta doctrina, la Corte Suprema de Justicia de la Nación ha sostenido desde antaño que la necesidad de control judicial suficiente se impone a las eventuales restricciones que pueden surgir de las reglas procesales aplicables *"puesto que un pronunciamiento arbitrario y carente de todo fundamento jurídico no es una sentencia judicial"*[11]. Esta doctrina ha sido reiterada sucesivamente en diversos pronunciamientos, afirmándose, por ejemplo, que decisiones arbitrarias son aquellas en que se presenta *"la inexistencia de las calidades mínimas para que el acto impugnado constituya una sentencia judicial"*[12], o que carecen de *"las cualidades indispensables para su subsistencia como decisión judicial"*[13], o *"actos que no son propiamente sentencias sino expresión de la sola voluntad de los jueces que la suscriben"*[14].

5.12. Por tal razón, el Alto Tribunal preserva la posibilidad de impugnar judicialmente un laudo arbitral en caso de arbitrariedad. Al declarar la nulidad de un laudo arbitral, la Corte Suprema de Justicia de la Nación ha establecido que *"la prescindencia de normas objetivas, en principio aplicables, sin justificarlo con fundamento alguno, torna la decisión (en un pronunciamiento) exclusivamente basad(o)... en un criterio personal..., (siendo) que...(si) el árbitro fue de iure para la resolución de todas las cuestiones que le fueron sometidas ... era recaudo esencial de su decisión fundarla en derecho vigente"*[15].

5.13. El Alto Tribunal también ha considerado que *"corresponde dejar sin efecto la sentencia que prescindió de la consideración de una norma aplicable, que pudo ser decisiva en la litis"* (Fallos: 302:761), y que es descalificable como acto jurisdiccional válido el laudo que *"da por existentes pruebas que no lo son, afirma su competencia en asertos dogmáticos y la extiende a reclamos que implicaban la transformación de pretensiones de una de las partes introduciéndolas como integrantes de la litis y <u>variando así el compromiso, aparte de modificar el derecho aplicable y prescindir de normas objetivas</u>"* (Fallos: 290:458; el destacado es nuestro).

5.14. En la misma línea, la Corte Suprema de Justicia de la Nación ha expresado que *"...dígalo o no la respectiva cláusula, el ejercicio que en cada caso*

---

[10] Carrió, Genaro R., *"El recurso extraordinario por sentencia arbitraria"*, Abeledo-Perrot, Buenos Aires, 1978, p. 38/39.
[11] Fallos: 207:72.
[12] Fallos: 237:74.
[13] Fallos: 237:225.
[14] CSJN, *"Cía. Naviera Argentina Pérez Companc (S.A.) c. Cía. Aseguradora Argentina"*, sentencia del 1.06.56, publicada en La Ley, T. 33, p. 203.
[15] CSJN, *"Yacimientos Petrolíferos Fiscales c. Sargo S.A. Arg. obras oleoductos y gasoductos s/ juicio arbitral"*, sentencia del 27.12.74, Fallos: 290:458.

9

se haga de la jurisdicción arbitral no comporta más atribución que la de juzgar legal y razonablemente dentro de los términos del conflicto; y si bien la apreciación de los hechos y la aplicación regular del derecho es función del árbitro, no excluye que pueda ser impugnada judicialmente la inconstitucionalidad, la ilegalidad o la irrazonabilidad en que hubiese incurrido al laudar (confr. arts. 787 y 788 Cód. Proc.)"[16].

5.15. Los tribunales inferiores no son ajenos a estos pronunciamientos de la Corte Suprema. Se ha considerado sobre el particular que "...la doctrina de la Corte Suprema en Fallos: 327:1881... reconoce que aun en casos de pronunciamientos arbitrales inapelables lo decidido podrá impugnarse judicialmente cuando sea inconstitucional, ilegal o irrazonable (en el mismo sentido, Fallos: 292:223) o arbitrario (confr. CSJN 'Eaca SA – Sideco Americana SA SACIIFF Saiuge Argentina c/ Dirección Nacional de Vialidad', 12/06/07)"[17].

5.16. En similar sentido, la Cámara Comercial ha sostenido recientemente que, "como lo ha señalado la Corte Suprema de Justicia de la Nación, el ejercicio que en cada caso se haga de la jurisdicción arbitral no comporta más atribución que la de juzgar legal y razonablemente dentro de los términos del conflicto; y si bien la apreciación de los hechos y la aplicación regular del derecho es función del árbitro, no excluye que pueda ser impugnada judicialmente la ilegalidad o la irrazonabilidad en que se hubiese incurrido al laudar (conf. CSJN, Fallos 292:223, "Cooperativa Eléctrica y Anexos de General Acha Limitada"), máxime ponderando que los árbitros, como los jueces, también ejercen una función jurisdiccional por su naturaleza, aunque convencional por su origen (conf. CSJN, Fallos 320:2379, 11/11/97, "Yacimientos Carboníferos Fiscales s/ tribunal arbitral"), de donde se sigue que la carga de adecuada fundamentación que se exige para las sentencias judiciales, no puede menos que también ser exigida para los laudos de arbitrajes de derecho"[18].

**C. La admisibilidad del recurso de nulidad por haber incurrido en falta esencial del procedimiento, por haber fallado los árbitros sobre puntos no comprometidos y por existir un caso de gravedad institucional**

5.17. De acuerdo a los fundamentos que han de exponerse en los capítulos XI y XII, el presente recurso de nulidad encuentra sustento en el art. 760 del CPCCN, por haber fallado los árbitros sobre puntos no comprometidos y por existir en el caso falta esencial del procedimiento. Asimismo, tal como se desarrollará en el capítulo XIII, se presenta un caso de inusitada gravedad institucional.

**VI. ANTECEDENTES RELEVANTES DEL CONFLICTO**

---

[16] CSJN, "Cooperativa Eléctrica y Anexos de General Acha Ltda. s/ expediente administrativo nº 12.663/67 del Ministerio de Trabajo", 7.7.75, Fallos: 292:223.
[17] CNContAdmFed, 3.7.07, "Procuración del Tesoro c/ Cámara de Comercio Internacional", publicado en www.laleyonline.com.ar.
[18] CNCom D, 3.10.07, "Ruberto Guillermo Miguel c/Atanor S.A. s/precio equitativo de acciones" (sin publicar).

10

6.1. Por razones de metodología expositiva se enunciarán los antecedentes más relevantes del conflicto que suscitó este juicio arbitral sin que, obviamente, se pretenda relatar aquí todo lo ocurrido, pues ello agobiaría innecesariamente al Tribunal y desvirtuaría el sentido del recurso.

### A. EDFI, ENDESA y ASTRA adquieren el control de EDENOR

6.2. En el marco del proceso de privatización de los servicios públicos de distribución eléctrica en el área metropolitana de la ciudad de Buenos Aires, producido en la década del 90', EDFI, ENDESA y ASTRA Compañía Argentina de Petróleo SA ("ASTRA") adquirieron en 1992 el control de EDENOR y EASA.

### B. ENDESA es obligada a desprenderse de su participación indirecta en EDENOR por decisión del Estado Nacional

6.3. En lo que aquí interesa destacar, ENDESA adquirió en 1999 el control de la empresa chilena ENERSIS, sociedad controlante de la Empresa Distribuidora y Comercializadora de Electricidad Sur S.A. ("EDESUR").

6.4. Frente a una situación de control simultáneo sobre EDENOR Y EDESUR, el Ente Nacional Regulador de la Electricidad (ENRE) impuso a ENDESA la obligación de desprenderse de las acciones de las que era titular: o controlaba en EDENOR o lo hacía en EDESUR[19].

6.5. ENDESA decidió, entonces, vender su participación en EASA y EDENOR. Igual decisión tomó ASTRA, luego incorporada por fusión en YPF SA ("YPF")[20].

### C. El Memorandum de Entendimiento

6.6. El 21 de febrero de 2001 ENDESA y ASTRA, por un lado, y la actora, por el otro, firmaron un memorandum de entendimiento ("Memorandum of Understanding" o "MOU"), acordando los términos básicos con arreglo a los cuales se venderían a EDFI las acciones de EASA y EDENOR de las que eran titulares ENDESA y ASTRA (se acompaña copia como Anexo IV).

6.7. El MOU estableció -entre otras normas convencionales- que la compraventa estaría condicionada a la obtención de la autorización de la operación por parte del Ministerio de Finanzas de la República Francesa.

### D. El contrato de compraventa de las acciones de EASA y EDENOR. La ley aplicable y la prórroga de jurisdicción

---

[19] Resolución ENRE n° 480/00, del 10.8.00.

[20] En marzo de 2001 la Comisión Nacional de Valores otorgó su conformidad para la fusión por absorción acordada por YPF y ASTRA, y el 4 de abril de 2001 el acuerdo definitivo de fusión fue inscripto en la Inspección General de Justicia, por lo que ASTRA se disolvió sin liquidarse y fue absorbida por YPF (Ley de Sociedades Comerciales, art. 83 y ccdtes.).

11

6.8. Aunque se hallaba pendiente la autorización de la operación por el Gobierno de Francia, luego de la aprobación de los respectivos directorios, las partes suscribieron el contrato de compraventa de las citadas acciones[21] (se acompaña copia como Anexo V). Ello sucedió el 30 de marzo de 2001.

6.9. El precio se pactó en US$ 930.333.248, percibiendo ENDESA US$ 735.437.282 y ASTRA US$ 194.895.966.[22]

6.10. Las partes pactaron que **(a)** el contrato sería *"...regido e interpretado conforme a las leyes de la República Argentina"*[23] y **(b)** en caso de controversias no resueltas mediante negociación, las partes podrían someterlas *"...a arbitraje comercial internacional...(que) se regirá por el Reglamento de Arbitraje de la Cámara de Comercio Internacional (CCI)..., (debiendo los árbitros fallar) de acuerdo al derecho sustantivo de la República Argentina..."* (el destacado es nuestro)[24].

### E. El Ministerio de Finanzas de la República Francesa condicionó su aprobación, indispensable para concretar la operación, a que las partes acordaran una compensación para EDFI en la hipótesis de que, por alguna razón, quedara sin efecto la paridad cambiaria de la Ley de Convertibilidad

6.11. Dicho Ministerio impuso a las partes, como condición para la aprobación de la operación de compraventa, que se acordara un mecanismo para compensar en cierta medida a EDFI en razón de la preocupación generada ante un eventual abandono del tipo de cambio previsto en el artículo 1 de la Ley 23.928[25].

### F. La Carta Acuerdo, que lleva fecha 31 de marzo de 2001, pero que fue firmada el 27 de abril de 2001, cumple la exigencia del gobierno de Francia

6.12. Las partes negociaron los términos de un instrumento que procurara superar la exigencia del Ministerio de Finanzas francés, firmándose el 27 de abril de 2001 la *Carta Acuerdo* antedatada el 31 de marzo de 2001 (la *"Carta Acuerdo"*, cuya copia se acompaña como Anexo VI")[26].

---

[21] El objeto del contrato fue la transferencia de: **(i)** Acciones de EASA vendidas por ENDESA: **(a)** 43.636.244 Acciones Ordinarias Clase "B", **(b)** 50% (cincuenta por ciento) indiviso de la única Acción Ordinaria Clase "D", **(c)** 12.986.855 Acciones Preferidas Clase "A", representadas por 2.597.371 ADS's (American Depositary Shares) emitidos por Morgan Guaranty Trust Company of New York, y **(d)** 8.734.505 Acciones Preferidas Clase "B"; **(ii)** Acciones de EDENOR vendidas por ENDESA: 162.163.989 Acciones Ordinarias Clase "C"; y **(iii)** Acciones de EASA vendidas por ASTRA: **(a)** 32.757.511 Acciones Ordinarias Clase "C", y **(b)** 6.553.280 Acciones Preferidas Clase "B" (ver el artículo 1.2. del contrato).

[22] Cláusula 2.1 del contrato.

[23] Cláusula 7.6 del contrato.

[24] Cláusula 7.7 del contrato.

[25] Laudo, párrafo 89 e infra párrafo 9.9 de este recurso. Cabe recordar que la preocupación generada en el mes de abril de 2001 tenía su causa, principalmente, en el anuncio realizado por el Ministro Cavallo del proyecto de ley que modificaba el art. 1 de la Ley de Convertibilidad a fin de que la paridad cambiaria tuviera en cuenta la cotización del euro, proyecto que luego se convertiría en la Ley 25.445.

[26] Las negociaciones se condujeron entre las partes por vía de conversaciones telefónicas y comunicaciones escritas por fax y correo electrónico entre el 19 y el 27 de abril de 2001. Estas últimas fueron acompañadas a la declaración testimonial –presentada como Documento R-24 de la Memoria de Fundamentación de la Contestación de

12

6.13. En la interpretación de la *Carta Acuerdo* radica el conflicto entre las partes.

6.14. Se pactó allí lo siguiente:

- Que el precio pagado por EDFI *"... será sometido a una revisión si se produce la Contingencia prevista en el párrafo segundo de esta carta hasta el 31 de diciembre del año 2001"* (el destacado es nuestro).

- Que *"a los efectos de esta carta se entiende por Contingencia la desvinculación del tipo de cambio oficial del peso argentino con el dólar USA, cualquiera que sea la causa que lo produzca"* (el destacado es nuestro).

- Que *"en el supuesto de producirse la Contingencia... los vendedores reintegrarán a (EDFI)... en caso de disminución del tipo de cambio oficial del peso respecto del dólar, o... (EDFI) a los vendedores en caso de aumento del tipo de cambio oficial del peso respecto del dólar, una cantidad en dólares de Estados Unidos... que se calculará en la forma establecida en el Anexo...,*[27] *(tomando) como base para el cálculo... el promedio de la cotización oficial del peso argentino frente al dólar de Estados Unidos durante el período comprendido entre la fecha [en] que se produzca la primera alteración de la paridad peso/dólar y el 31 de diciembre de 2001"* (el destacado es nuestro).

- Que *"las cantidades resultantes se liquidarán, de producirse la contingencia, y se pagarán sin intereses antes del 15 de enero de 2002".*

### G. El reclamo compensatorio de EDFI fundado en el alegado acaecimiento de la Contingencia antes del 31 de diciembre de 2001

6.15. El 31 de diciembre de 2001 EDFI envió sendas notas a ENDESA y ASTRA en las que expresó: *"Nos informan desde la Argentina que por decisión de la autoridad monetaria de ese país, no pueden realizarse operaciones cambiarias desde hace varios días. En razón de ello, les hacemos saber que estamos analizando la situación a los efectos de tomar posición respecto de la ocurrencia de*

---

Demanda de ENDESA e YPF– del Sr. Alfredo Llorente Legaz, Director General de Internacional y Consejero Director General de ENDESA desde febrero de 1998 hasta julio de 2002 (tanto esa declaración testimonial como las comunicaciones escritas allí adjuntadas se acompañan al presente, como Anexo VII).

[27] En el Anexo de la *Carta Acuerdo*, como puede observarse, se incluyó una tabla para cuantificar el monto a pagarse, de producirse la *Contingencia* prevista por las partes, según el nivel de devaluación del tipo de cambio oficial del peso argentino respecto del dólar.

13

*la contingencia prevista en la carta del 31 de marzo de 2001 suscripta por ENDESA, ASTRA y EDFI con motivo del contrato de compraventa de acciones de EDENOR/EASA...".*

6.16. Luego, el 5 de abril de 2002, es decir, transcurridos más de dos meses desde la fecha acordada para la liquidación del ajuste del precio si se producía la *Contingencia*, EDFI dirigió sendas cartas a ENDESA e YPF (a ésta como adquirente de ASTRA) en las que expresó que *"... en nuestra opinión, se ha producido antes del 31.12.01 la contingencia (es decir, 'la desvinculación del tipo de cambio oficial del peso argentino con el dólar USA, cualquiera que sea la causa que la produzca') prevista en la carta de fecha 31 de marzo de 2001 referente al contrato de compraventa de acciones de Electricidad Argentina S.A. y de Empresa Distribuidora Norte S.A. celebrado el 30 de marzo de 2001 que genera una revisión del precio pagado por EDFI. En consecuencia, solicitamos a Uds. el inicio de negociaciones respecto de la cuestión antes señalada".*

### H. El rechazo de ENDESA e YPF a ese reclamo. Las posiciones de las partes en el proceso arbitral

6.17. El 19 de abril de 2002 ENDESA e YPF comunicaron su rechazo al planteo de EDFI, por considerar que *la Contingencia* no se había producido antes del 31 de diciembre de 2001.

6.18. Ante ese rechazo, EDFI promovió un juicio arbitral ante la Secretaría de la Corte Internacional de Arbitraje de la CCI contra REPSOL YPF SA, en su calidad de controlante de YPF, y contra YPF y ENDESA, exigiendo el pago de US$ 325.000.000. El reclamo contemplaba el reparto por partes iguales del impacto económico de la supuesta alteración del *tipo de cambio oficial argentino* con anterioridad al 31 de diciembre de 2001. No obstante ello, EDFI amplió posteriormente su reclamo a US$ 516.000.000, sosteniendo que las demandadas debían soportar íntegramente el impacto de la supuesta alteración del citado tipo de cambio.

6.19. En síntesis, EDFI argumentó que la vinculación referida en la *Carta Acuerdo*, cuando menciona *"la desvinculación del tipo de cambio oficial del peso argentino con el dólar USA"*, tuvo origen en el *Régimen de Convertibilidad* y es la del tipo de cambio de un peso equivalente a un dólar estadounidense. Agregó que las partes eligieron utilizar conceptos amplios en la *Carta Acuerdo* y que la *"desvinculación"* abarcaba la mayor cantidad de causales posibles, **sin restringirse a una causal exclusivamente normativa**. Y, en tal sentido, sostuvo que el inicio del feriado cambiario del 21 de diciembre de 2001 importó la desaparición del *Régimen de Convertibilidad*, pues acarreó la **violación de dos *"postulados esenciales"*** de dicho régimen: la libre disposición de las divisas y la obligación del Banco Central de la República Argentina de vender los dólares que le fueran requeridos a la relación de un peso por un dólar.

14

6.20. Sostuvo EDFI que el 21 de diciembre de 2001, a partir del feriado cambiario, se produjo la ruptura del vínculo que ligaba el tipo de cambio del peso con el dólar; y que por efecto del feriado cambiario, entre el 21 de diciembre de 2001 y el 10 de enero de 2002 no hubo un tipo de cambio oficial. Puntualizó que por tal razón el cálculo de la compensación solicitada, que -según la *Carta Acuerdo*- debía ser calculada a partir del promedio de la **cotización oficial** del peso argentino frente al dólar de Estados Unidos durante el período comprendido entre la fecha en que se produjera la primera alteración a la paridad peso-dólar y el 31 de diciembre de 2001, debía adecuarse a las circunstancias del caso, utilizándose el tipo de cambio más semejante al aludido por las partes, como el correspondiente a las operaciones realizadas en el *Mercado Libre* (sic) de Cambios una vez terminado el feriado cambiario, cuyo valor -siempre según la actora- fue de US$ 1 igual $ 1,70.

6.21. En definitiva, EDFI argumentó que la *desvinculación* del *tipo de cambio oficial* del peso argentino respecto del dólar estadounidense, ésto es, la *Contingencia*, se produjo el 21 de diciembre de 2001 con la declaración por parte del Banco Central de la República Argentina de un feriado cambiario que se prolongó hasta el 10 de enero de 2002.

6.22. YPF y ENDESA pidieron el rechazo de la demanda arbitral. Además, promovieron una reconvención contra EDFI en los términos que fluyen de sus presentaciones; reconvención admitida por el Laudo, en decisión que nuestras representadas consiente y, por tanto, no impugnan en este recurso.

6.23. **En resumen, la defensa de ENDESA e YPF se sustenta en un extremo indiscutible: la _desvinculación_ del _tipo de cambio oficial_ del peso argentino con el dólar estadounidense no se produjo antes del 31 de diciembre de 2001 sino con la derogación del artículo 1 de la Ley 23.928, el 6 de enero de 2002 (Ley 25.561), es decir con posterioridad a la fecha límite pactada.**

6.24. Nuestra parte alegó que una *desvinculación* presupone, lógicamente, una *vinculación* y que la única *vinculación* del tipo el cambio del peso argentino con el dólar estadounidense que existía el 27 de abril de 2001, cuando se firmó la *Carta Acuerdo*, era la *vinculación legal* que establecía el artículo 1 de la Ley 23.928, única a la que las partes pudieron denominar razonablemente "*tipo de cambio oficial*". De manera que la producción de la *Contingencia* imponía ineludiblemente que la expresada *vinculación legal* desapareciera antes del **31 de diciembre de 2001**; lo cual, como es evidente, no sucedió: esa paridad cambiaria oficial **fue derogada, después de esa fecha**, mediante la Ley 25.561.

6.25. ENDESA e YPF explicaron que el propio texto de la *Carta Acuerdo* abonaba decisivamente esa conclusión, puesto que para que cualquiera de las partes tuviera derecho a la revisión del precio era siempre necesario que, antes del fin del año 2001, hubiera existido una disminución o un aumento del *tipo de cambio oficial* del peso respecto del dólar, es decir, "*una primera alteración de la paridad peso/dólar*" establecida por el artículo 1 de la Ley 23.928. Ello **no sucedió hasta el**

15

**10 de enero de 2002**, cuando el Decreto Nº 71/02 estableció **un Mercado Oficial de Cambios**[28].

6.26. Este breve resumen procura expresar el núcleo central de la defensa de nuestra parte, pero no agota los argumentos, numerosos y contundentes, que se expusieron para formar convicción en el Tribunal Arbitral sobre la improcedencia del reclamo de la parte actora en razón de la inexistencia de bases positivas y fácticas que lo pudieran sustentar.

## VII. EL LAUDO ARBITRAL

### A. La decisión impugnada de nulidad

7.1. El Tribunal Arbitral emitió un laudo que –por mayoría– declaró que EDFI tiene derecho –en razón de su demanda– al pago US$ 187.000.000 en concepto de capital, a razón de US$ 147.000.000 a cargo de ENDESA y de US$ 40.000.000 a cargo de YPF. Sin embargo, en la medida en que el Tribunal también admitió la reconvención deducida por nuestras representadas, el monto neto de condena quedó fijado en un total de US$ 129.691.725, de lo cuales ENDESA está obligada a pagar US$ 100.757.875 e YPF está obligada a pagar US$ 28.933.850, más intereses.

7.2. Por su lado, **el voto en disidencia postuló la desestimación de la demanda y consideró expresamente que el voto mayoritario no cumplió con su deber de resolver la controversia según el derecho argentino, constituyendo ello una manifiesta arbitrariedad.**

### B. El voto mayoritario: sus inadmisibles y arbitrarios fundamentos, que sólo tienen la apariencia de tales

7.3. El voto mayoritario se apoyó básicamente en lo siguiente:

- Las partes habrían pactado la *Contingencia* en términos amplios y generales, preocupadas por la paridad de 1 peso por 1 dólar, sin enfocarse en el tipo de cambio de la convertibilidad establecido en el artículo 1 de la Ley 23.928, sino en el tipo de cambio de los mercados legalmente reconocidos en Argentina (párrafos 641 a 665 y 686).

- La conservación de dicha paridad dependía del funcionamiento eficaz del régimen de convertibilidad en su totalidad, lo cual hace relevantes los diferentes aspectos del régimen (párrafo 686).

---

[28] Ese decreto (B.O. del 10.01.02) previó que *"las operaciones de compra y venta de DOLARES ESTADOUNI-DENSES que efectúe el BANCO CENTRAL DE LA REPUBLICA ARGENTINA en el mercado oficial de cambios, las realizará a la relación de cambio de PESOS UNO CON CUARENTA CENTAVOS ($ 1,40) por cada unidad de DO-LARES ESTADOUNIDENSES, quedando así establecida la relación de cambio entre el peso y la citada divisa ex-tranjera".*

16

- Para que el régimen de convertibilidad funcionara y lograra su objetivo de mantener la paridad entre el peso y el dólar, el Banco Central de la República Argentina tenía la obligación de observar y desempeñar eficazmente los postulados esenciales de la Ley de Convertibilidad, en particular sus artículos 2 y 4, es decir, (a) vender dólares con una equivalencia de $ 1 = US$ 1, de manera ilimitada; (b) mantener un nivel adecuado de reservas en esa entidad y (c) garantizar la libertad de cambio y transferencia de fondos (párrafos 686 y 687).

- El 21 de diciembre de 2001 el tipo de cambio establecido por la Ley de Convertibilidad habría sido para todo efecto modificado o desvinculado como consecuencia de la declaración del feriado cambiario por parte del Banco Central de la República Argentina (párrafo 690).

- **Si bien la Ley de Convertibilidad y el tipo de cambio establecido en su artículo 1 permanecieron legal y oficialmente vigentes hasta el 6 de enero de 2002, no habrían estado vigentes en términos *"prácticos y económicos"* y nunca habrían vuelto a estarlo desde el 21 de diciembre de 2001 (párrafos 690 a 702).**

- La *Carta Acuerdo* no habría requerido una modificación del tipo de cambio oficial como elemento constitutivo de la *Contingencia*. Un aumento o disminución en el tipo de cambio sólo habría tenido que ver con el cálculo de cualquier cantidad pagadera. Por lo que la supuesta imposibilidad o dificultad para determinar el *tipo de cambio oficial* antes del 31 de diciembre de 2001 habría sido irrelevante para determinar si la *Contingencia* ocurrió (párrafos 703 y 704).

- Ante la supuesta inexistencia de un *tipo de cambio* oficial distinto de la paridad 1 a 1 de la Ley de Convertibilidad entre el 21 de diciembre de 2001 y el 31 de diciembre de 2001, la solución generalmente adoptada habría sido tomar el primer tipo de cambio disponible luego de la conclusión del feriado bancario (párrafo 711).

- El primer tipo de cambio disponible después del feriado bancario habría sido el del 11 de enero de 2002, cuando existió un *"Mercado Oficial de Cambios"* a razón de $ 1,40 por dólar (Decreto N° 71/02) y un mercado libre de cambios en el que la divisa cotizó a $ 1,70 por dólar. Aun cuando las partes utilizaron en la *Carta Acuerdo* la palabra *"oficial"* en la expresión *"tipo de cambio oficial"* y *"cotización oficial"*, debía desecharse el *tipo de cambio oficial* o la *cotización oficial* del "Mercado Oficial de Cambios" ($ 1,40), pues el dólar del mercado libre ($ 1,70) sería el que mejor reflejaba la intención de las partes, por lo que debía tomarse el promedio de la diferencia con la paridad un peso por un dólar vigente hasta el 21 de diciembre de 2001, dando por resultado un valor de $ 1,35 por dólar (párrafos 712 a 731).

17

- A su vez, el cálculo de la compensación debía realizarse considerando un valor de $ 1,175 como consecuencia del acuerdo de las partes de dividir en partes iguales el impacto de la alteración del tipo de cambio (párrafo 731).

### C. La disidencia que pone las cosas en su lugar: sus fundamentos

7.4. La disidencia, por su parte, es clara y contundente. Su lectura basta para concluir que el voto de la mayoría es arbitrario y que, por conducir a un resultado ilegal, irrazonable e inconstitucional, debe ser anulado en lo que atañe a la condena a ENDESA e YPF.

7.5. Sostuvo ese voto que:

- El Tribunal Arbitral debía resolver el conflicto con arreglo a las leyes de la República Argentina. Ese deber no ha sido cumplido por cuanto se ha resuelto a favor de una supuesta equidad de reparto entre las partes del infortunio económico argentino que, al margen de no estarle permitida a los árbitros, constituye una decisión inconciliable con el derecho sustantivo argentino, con las estipulaciones contractuales y los usos referidos en el artículo 17.2 del Reglamento de Arbitraje de la CCI (puntos 1 y 2).

- La arbitrariedad reside en la interpretación de la *Contingencia,* en la determinación de su acaecimiento el 21 de diciembre de 2001 y en la decisión de condenar a ENDESA y a YFP a pagar, respectivamente, 147 y 40 millones de dólares. No se trata, en consecuencia, de una diferencia de perspectivas jurídicas entre la decisión de la mayoría y el voto en disidencia, sino del hecho de que la mayoría ha traspasado los límites del derecho aplicable (puntos 3 y 4).

- La demanda debió desestimarse dado que lo que la *Carta Acuerdo* del 31 de marzo de 2001 denomina *"tipo de cambio oficial"* es igual a lo que en la terminología cambiaria argentina se denomina *"tipo de convertibilidad",* esto es, la relación de un peso por cada dólar estadounidense establecida en el art. 1 de la Ley de Convertibilidad. Ello así porque las partes, razonablemente, sólo pudieron referirse a ese *tipo de cambio.* De modo que la *Contingencia* exigía que el tipo de cambio del artículo 1 de la Ley 23.928 fuera derogado antes del 31 de diciembre de 2001 y que, antes de esa fecha, se verificara un *tipo de cambio oficial* distinto (puntos 5 y 7).

- No obstante ello, la mayoría del Tribunal negó las premisas mencionadas precedentemente, sosteniendo las siguientes tesis: **(a)** que por *"tipo de cambio oficial"* debía entenderse al tipo de cambio en el mercado de divisas legalmente establecido y reconocido en la Argentina (a diferencia del tipo de mercados paralelos o

negros), **(b)** que por *"desvinculación"* de dicho *"tipo de cambio oficial"* debe entenderse la ruptura o desaparición de los elementos esenciales del régimen de convertibilidad (libertad de transferir fondos al exterior, facultad irrestricta de cambiar pesos por dólares al tipo 1 a 1 y mantenimiento de un nivel adecuado de reservas) y **(c)** que por no haber existido ningún tipo de cambio oficial a partir del 21 de diciembre de 2001, debía utilizarse el tipo de cambio del 1,7 pesos por dólar del Mercado Libre de Cambios del 11 enero de 2002. Todas esas tesis carecen de fundamento suficiente y en algunos casos hasta llegan al extremo de ser frontalmente contrarias al material probatorio existente (puntos 6 a 8).

- La evidencia existente en el expediente demuestra que las partes –en particular EDFI- tuvieron en cuenta la ratio de convertibilidad del peso con el dólar ("ratio de convertibilité de l'USD et du peso argentin"), expresión muy próxima a la empleada en la Ley de Convertibilidad, lo que constituyó la base para la negociación de la *Carta Acuerdo*. El perito económico de EDFI, que desconocía estos antecedentes, admitió, una vez que ellos le fueron revelados por las demandadas, que si se asumían los extremos mencionados, la *Contingencia* no se habría producido en el año 2001. Asimismo, el experto legal de EDFI afirmó en una obra jurídica de su autoría que por "tipo oficial" había que entender el establecido por la Ley de Convertibilidad (punto 9).

- Con relación a lo que el Laudo (voto mayoritario) denomina *"el tipo de cambio de los mercados legalmente establecidos"* para operar en la República Argentina no hay evidencias de que los tipos de cambio utilizados por todos los operadores del mercado en el año 2001 hayan sido siempre equivalentes a la paridad cambiaria establecida por la Ley de Convertibilidad. Aún más, la evidencia demuestra lo contrario, por cuanto se ha probado que antes de la fecha en que el voto mayoritario consideró producida la *Contingencia* se utilizaron en el mercado tipos de cambio por los que, por cada dólar estadounidense, se pagaba más de un peso (punto 9).

- Carece de sentido y de sustento probatorio la interpretación que hace la mayoría del significado del término *"desvinculación"*, pues es difícil pensar que las partes quisieron referirse a algo tan complejo e indeterminado como la ruptura del funcionamiento efectivo de las bases del *régimen de convertibilidad* (constituido éste por la obligación del BCRA de vender dólares a la paridad 1 a 1, por el mantenimiento de un adecuado nivel de reservas y por la vigencia de la libertad cambiaria de transferencia de fondos) si ninguna de las partes era especialista en el *régimen de convertibilidad,* como el propio voto mayoritario lo recuerda. Tanto más si, además, ambas partes pretendían, como se ha acreditado, que la *Contingencia* fuese un

19

parámetro objetivo, y si no se refirieron a ese *régimen* en ninguno de los borradores de la *Carta Acuerdo* ni en su texto definitivo (punto 10).

- La mayoría atribuyó a la palabra *"desvinculación"* y a la expresión *"cualquiera sea la causa que lo produzca"* el mismo significado que el que funcionarios de EDFI dicen que acordaron con ENDESA e YPF en una supuesta reunión realizada en Madrid. Ello revela una notable parcialidad porque ENDESA e YPF manifestaron que esos supuestos acuerdos y esa supuesta reunión en Madrid son **"rotundamente falsos"** y, a pesar del requerimiento realizado por el Tribunal, EDFI no presentó ninguna evidencia de que efectivamente hubiese tenido lugar esa supuesta reunión. *"La gravedad de esto último ha sido ampliamente obviada, casi olvidada, en el laudo"* (punto 10).

- Las evidencias que surgen del expediente indican, además, que ninguno de los tres elementos del régimen de convertibilidad -que la mayoría considera esenciales- dejaron de cumplirse el 21 de diciembre de 2001 (punto 10).

- Carece de sustento afirmar que a partir del 21 de diciembre de 2001 no existió en la Argentina ningún *"tipo de cambio oficial"*, por cuanto, aun después de esa fecha, existieron operaciones de cambio producidas con arreglo al tipo de cambio oficial, esto es, al establecido por la Ley de Convertibilidad, que no podía ser modificada por el Banco Central de la República Argentina (punto 11).

- Es improcedente sostener, además, que las partes no pudieron prever una situación de inexistencia del *tipo de cambio oficial* como resultado del feriado bancario. También lo es que el Laudo haya cubierto esa ficticia laguna contractual acudiendo al tipo de cambio equivalente a $ 1,7 igual US$ 1, que rigió en el Mercado Libre de Cambios a partir del 11 de enero de 2002. El método que las partes pactaron para el cálculo de cualquier pago en caso de ocurrir la *Contingencia*, fue un método claro, concreto y taxativo basado en la disminución o el aumento de *tipo de cambio oficial* respecto del dólar, desde que dicho tipo sufriese la primera alteración hasta el 31 de diciembre de 2001. Ésto no es una mera expectativa de las partes. Es un pacto que el Tribunal Arbitral está obligado a respetar según lo dispuesto en el artículo 1197 del Código Civil y, por lo tanto, únicamente una disminución o aumento del *tipo de cambio oficial* del peso con respecto al dólar, dentro del año 2001, podía dar lugar a un pago. Ni el derecho argentino, ni los principios UNIDROIT, amparan la infundada decisión de la mayoría de hacer un cálculo de un pago incumpliendo el pacto de las partes (punto 12).

- Todo lo anterior revela la insostenible tesis del Laudo (voto de la mayoría) de que la Ley de Convertibilidad dejó de estar virtualmente

20

vigente a partir del 21 de diciembre de 2001 porque la expresión *"cualquiera que sea la causa"* utilizada en la definición de *Contingencia* incluía acontecimientos prácticos de la economía argentina. Es claro que había múltiples acontecimientos que podrían haber producido la desvinculación del tipo de cambio oficial, pero __ninguno de los acontecimientos del año 2001 pudo ser causa eficiente para ello porque ninguno de ellos fue un acto normativo que dejara sin efecto el tipo de cambio 1 a 1__ (puntos 13 y 14).

- En razón de lo expuesto, el derecho argentino no está presente en la decisión del Laudo (punto 15). La inconsistencia del Laudo es tal que, incluso si la mayoría del Tribunal hubiera sido coherente con su razonamiento, debería haber concluido que la desvinculación se produjo antes del 21 de diciembre de 2001 (instauración del *"Corralito"*, o el 11 de diciembre cuando el dólar cotizó a $ 1,30). Ello hubiera obligado a considerar los tipos de cambio entre el 1 y el 20 de diciembre, lo que, a su vez, hubiera significado que ENDESA e YPF no tuvieran que pagar nada o, a lo sumo, una suma significativamente inferior al monto de condena (punto 16).

## VIII. LA DECISIÓN RECURRIDA ES INCONSTITUCIONAL, ILEGAL E IRRAZONABLE. POR LO TANTO, ES ARBITRARIA Y DEBE SER DECLARADA NULA

### A. Comentario preliminar sobre la notable extensión del Laudo y su carencia de todo fundamento de derecho. Lo relevante son sólo 40 páginas

8.1. Advertirá la Excma. Cámara que el Laudo tiene una extensión inusual.

8.2. Una ponderación preliminar y superficial de ese dato podría conducir a la primaria y errónea conclusión de que el Laudo está suficientemente fundado, con prescindencia del análisis puntual de los argumentos en los que se sustenta.

8.3. Pero ello no es así.

8.4. Como se podrá apreciar en los puntos siguientes, más allá de que la mera lectura de la descripción precedente ya debería haber formado convicción en la Excma. Cámara en cuanto a la arbitrariedad del Laudo, el Tribunal Arbitral ocupó la mayor parte de sus 256 páginas en un relato tedioso e innecesario y en un aparente desmembramiento analítico de cada término del texto contractual cuyo alcance está controvertido entre las partes.

8.5. Sin embargo, la aparente fundamentación en la que se apoya la condena no es más que una sucesión de afirmaciones carentes de toda base jurídica, que no constituyen una derivación razonada del derecho vigente y que ocupan sólo **40 páginas**, aproximadamente, del Laudo.

21

8.6. La extensión del Laudo no implica, en este caso, la presencia de una fundamentación en derecho. Esa fundamentación, simplemente **no existe**.

8.7. Una segunda conclusión que podría eventualmente derivarse de la extensión del Laudo radica en la complejidad del asunto. Mas no se trata de materia compleja, en absoluto.

8.8. La cuestión radica en determinar si la Ley de Convertibilidad estaba o no estaba vigente al 31 de diciembre de 2001. Nada más que eso.

**B. El Laudo es manifiestamente arbitrario por no haber aplicado el derecho argentino y violar el orden público. Al haber laudado de acuerdo con su particular voluntad, en lugar de sujetarse a las bases legales pactadas por las partes, el Tribunal Arbitral se ha extralimitado en sus funciones y se apartó del primer punto comprometido: resolver la controversia de acuerdo con el derecho de la República Argentina**

8.9. El Laudo no aplicó el derecho vigente, violó normas de orden público, pero, aunque es sólo una ficción, invocó que la solución adoptada tendría base legal. Ello es a todas luces manifiestamente contradictorio, en tanto ningún tribunal jurisdiccional obligado a aplicar el derecho sustantivo argentino está habilitado para infringir las normas de orden público salvo que declare –como principio a petición de parte- la inconstitucionalidad de la norma en cuestión.

8.10. La Ley 23.928 era -en la parte derogada- y es -en la parte vigente- de orden público (artículo 13 de la Ley 23.928 y disposiciones de la Ley 25.561). Cabe recordar que *"de acuerdo con el punto de vista clásico, que aún hoy es el generalmente aceptado, leyes de orden público serían aquellas en que están interesados, de una manera muy inmediata y directa, la paz y la seguridad sociales, las buenas costumbres, un sentido primario de la justicia y la moral; en otras palabras, las leyes fundamentales y básicas que forman el núcleo sobre el cual está estructurada la organización social"* y que *"...una cuestión es de orden público, cuando responde a un interés general, colectivo, por oposición a las cuestiones de orden privado, en las que sólo juega un interés particular...(por lo que) las leyes de orden público son irrenunciables, imperativas".* [29]

[29] Borda, Guillermo, *"Tratado de Derecho Civil – Parte General"*, Tomo I; Ed. Perrot; Buenos Aires, 1991, p. 75 y ss. Dicho autor también ha señalado que una norma es de orden público *"...porque cada vez que el legislador impone una norma con carácter obligatorio y veda a los interesados apartarse de sus prescripciones, es porque considera que hay un interés social comprometido en su cumplimiento; en otras palabras, porque se trata de una ley de orden público"* y ha recalcado que *"...para el Código, por consiguiente, existen dos tipos o categorías de normas en lo que atañe a este punto: las que pueden ser dejadas sin efecto por las partes- que son las llamadas supletorias, interpretativas o permisivas- y las que no pueden serlo, que el Código llama de orden público y que no son precisamente las imperativas, puesto que lo que caracteriza y configura a estas, es que las partes no pueden dejarlas sin efecto"*. En igual sentido se ha señalado que se denomina orden público *"al conjunto de ideas, sociales, políticas, morales, económicas, religiosas a veces, a cuya conservación una sociedad cree ligada su existencia"* (Baudry-Lacantinerie, citado por Belluscio, Augusto C. y Zannoni, Eduardo A. en *"Código Civil y Leyes Complementarias, Comentado, Anotado y Concordado"*, T I, Astrea, Buenos Aires, 1978, p. 104). También se ha afirmado que las leyes de orden público son aquéllas que reflejan esos principios de orden superior que determinan el sentido de la legislación de un país (Belluscio y Zannoni, ob. cit., pág. 106). El orden público se erige de esta manera, en general, como un límite a los actos humanos (Vanossi, Jorge Reinaldo, *"Teoría Constitucional, Supremacía y Control de Constitucionalidad"*, T II, Depalma, Buenos Aires, p. 42) y, en especial, como un límite a la autonomía de la voluntad privada (Belluscio y Zannoni, ob. cit., p. 107). En el mismo sentido se ha sostenido que el orden público es

22

8.11. Seguidamente se demostrará que, al haber dejado de lado el *tipo de cambio oficial* establecido en el art. 1 de la Ley 23.928 en la determinación de la ocurrencia de la *Contingencia*, el Laudo es manifiestamente arbitrario y que esa solución conduce a un resultado que afecta grave e irreparablemente garantías constitucionales básicas de las demandadas, generando, asimismo, una inusitada gravedad institucional.

8.12. Al respecto, cabe recordar que "*la Corte...ha elaborado un concepto general sobre la sentencia arbitraria, diciendo que es aquella que no constituye una 'derivación razonada del derecho vigente con aplicación de las circunstancias comprobadas de la causa', criterio que repite en forma constante...(Fallos 323:192...; 323:212...)*".[30]

8.13. **Debe destacarse que el presente recurso no constituye una mera discrepancia con lo juzgado por la mayoría de los árbitros. Menos aún, un disenso respecto de su interpretación jurídica o respecto de su interpretación sobre los antecedentes fácticos del conflicto o sobre los elementos agregados a la causa.**

8.14. **Por el contrario, se trata de un Laudo, <u>emitido por árbitros que debiendo laudar en derecho</u>, decidieron -sin ningún argumento legítimo o justificación de ninguna naturaleza- omitir la aplicación del derecho vigente y del orden público argentino, de naturaleza imperativa. Más aún: lo infringieron flagrantemente, ocasionando serios daños a las recurrentes y generando un peligrosísimo antecedente, de incontrovertible gravedad institucional.[31]**

8.15. **En efecto:**

a) *Los árbitros debían aplicar obligatoria e inexcusablemente la ley argentina*

8.16. Como se recordó, las partes acordaron que el contrato sería regido e interpretado conforme a las leyes de la República Argentina.[32] Asimismo, al convenir que toda controversia que no pudiera ser negociada amigablemente por las partes sería resuelta mediante la intervención de árbitros, las partes establecieron que los árbitros fallarían "*de acuerdo al derecho sustantivo de la República Argentina*"[33]. Esa convención fue ratificada en el Acta de Misión cuando

---

"*un concepto superior que limita la autonomía de la voluntad de las partes cuando las bases en que se apoya la organización de la sociedad a que se refiere resultan comprometidas y se vincula sustancialmente al estado de equilibrio, de paz social y de justicia, al que deben acomodarse las leyes y los actos de los particulares*" (CNCom D, 23.8.82, "*Automóviles Saavedra, S. A. c. Administración de Grupos Cerrados, S. A.*", publicado en La Ley 1998-E, 195).
[30] Bianchi, Alberto, "*El recurso extraordinario ha perdido los límites de su actuación*", publicado el 26.3.03 en el número especial de Lexis Nexis – Jurisprudencia Argentina titulado "*Recurso extraordinario federal*".
[31] No podría sostenerse válidamente que el Tribunal ha efectuado una interpretación válida, en tanto "*no cabe admitir un criterio de (...) interpretación de las normas aplicables que conduzca a una comprensión de la ley que equivalga a prescindir de sus términos*" (CSJN, 29.11.88, "*Morganti, Inés Mercedes s/ reconocimiento de servicios*", Fallos: 311:2435).
[32] Cláusula 7.6 del contrato.
[33] Cláusula 7.7 del contrato.

23

se estipuló que "*la ley aplicable al fondo de la controversia*" sería la "*ley de la República Argentina*"[34].

8.17. Las partes, pues, se sujetaron explícitamente **a un arbitraje de derecho** y los árbitros debían laudar con estricta sujeción al derecho argentino[35]. Como advierte el voto en disidencia (punto 4), ese era el límite infranqueable que poseían los árbitros, límite que ha sido completamente violado por la decisión de la mayoría.

8.18. Ciertamente, no estaban habilitados a emitir un laudo conforme a su saber y entender, o a lo que ellos -sin base positiva alguna- pudieran considerar en forma voluntarista que era una solución adecuada. Recuérdese que el artículo 17(3) del Reglamento prevé que "*el Tribunal Arbitral tendrá los poderes de amigable componedor o decidirá ex aequo et bono **únicamente si las partes, de común acuerdo, le han otorgado tales poderes**" (el subrayado es nuestro). Y ello, por cierto, jamás ocurrió.

8.19. Y aun en la hipótesis de que a los árbitros se les hubiera confiado actuar bajo el régimen de amigables componedores, **en ningún caso podrían infringir el orden público**, como ha sucedido en el caso a pesar de tratarse de un arbitraje de derecho[36].

8.20. La Cámara de Apelaciones que deberá entender en la resolución de este recurso comparte el razonamiento expuesto. En un reciente pronunciamiento recaído en el ámbito de un proceso arbitral, el tribunal ha afirmado con elocuencia que "*como lo explica Tito Carnacini, **ni siquiera en los juicios según equidad pueden los árbitros prescindir de observar las normas jurídicas de orden público** o las que constituyen el fundamento de los varios institutos (conf. Carnacini, T., Arbitraje, p. 143, traducción de S. Sentís Melendo, Buenos Aires, 1961); y, con tal orden de ideas, es indudable que el laudo de un arbitraje de derecho, aun cuando aplique el criterio de equidad, debe estar suficientemente fundado, en el sentido de que sea derivación razonada del derecho vigente con adecuación a las circunstancias comprobadas de la causa.*"[37]

> *b)* *Los árbitros no aplicaron la ley argentina sino que, por el contrario, la infringieron flagrante e injustificadamente*

---

[34] Punto 11 del Acta de Misión.

[35] Más precisamente, del derecho argentino en su integridad, sin ninguna reserva ni condicionamiento, incluyendo sus normas dispositivas e imperativas. Ello es así a punto tal que en el Acta de Misión quedó claramente estipulado que "*la participación en la elaboración del Acta de Misión y su eventual firma por las demandadas no puede interpretarse como sugiriendo o implicando una aplicación matizada de las citadas leyes ni, mucho menos, una renuncia a la aplicación de las leyes de la República Argentina*" (Acta de Misión, punto 4.2.3).

[36] Se ha dicho al respecto que "*por cierto que el límite en la discrecionalidad de los amigables componedores para aplicar o no las normas de Derecho positivo, estará dado respecto de aquellas que puedan ser objetivamente consideradas de orden público, cuya observancia es exigible erga omnes. Los amigables componedores no podrán ampararse en su condición de 'juzgadores extrajurídicos' para no aplicar una disposición de esa naturaleza. Si el ordenamiento veda en sus propias partes la posibilidad de dejar sin efecto, mediante convenciones particulares, las normas legales en cuya observancia está interesado el orden público (art. 21 del Código Civil), es lógico suponer que tampoco podrán los arbitradores dejarlas sin efecto*". Caivano, Roque J., "Arbitraje", p. 255, Ed. Ad Hoc, Buenos Aires, 2000).

[37] CNCom D, sentencia del 3.10.07 en la causa "*Ruberto Guillermo Miguel c/Atanor S.A. s/precio equitativo de acciones*" (sin publicar).

24

8.21. El deber de aplicar el derecho argentino, como advierte prístinamente el voto en disidencia, ha sido *"sacrificado en el laudo a favor de una equidad de reparto entre las partes del infortunio económico argentino que, al margen de no estar[le] permitida a los árbitros, constituye, a mi parecer, una decisión difícilmente conciliable con el derecho sustantivo argentino y con las estipulaciones contractuales y los usos a los que se refiere el artículo 17.2 del Reglamento de Arbitraje de la CCI"* (punto 2, el destacado es nuestro).

8.22. El Laudo impugnado, a partir de consideraciones de índole política, sociológica, macroeconómica y de pseudo-psicología interpretativa, es decir en base a consideraciones metajurídicas, concluye que el 21 de diciembre de 2001 se produjo la *desvinculación* del *tipo de cambio oficial* impuesto por el artículo 1 de la Ley de Convertibilidad, sin que en esa fecha esa norma jurídica hubiera sido derogada.

8.23. Como es público y notorio, la derogación de esa norma legal se produjo recién el **6 de enero de 2002** (Ley 25.561).

8.24. Obsérvese que tal derogación –acontecimiento desconocido e incierto hasta su efectiva ocurrencia- no pudo legalmente producir ningún efecto en los días anteriores a la sanción de la Ley 25.561. Concluir lo contrario conduciría a transgredir -ciertamente de un modo inadmisible- principios esenciales de nuestro sistema jurídico. Máxime, cuando el propio texto de la Ley 25.561 no previó la aplicación retroactiva de ninguna de sus disposiciones (lo cual, obviamente, sólo podría haber sucedido en los límites impuestos por la Constitución Nacional), y mal podría ello haber sucedido por medio de las normas reglamentarias de ese texto legal.

8.25. Se suma a ello que cualquier aplicación retroactiva de ese cuerpo legal, especialmente en lo concerniente a la derogación del *tipo de cambio oficial* que había establecido muchos años antes el artículo 1 de la Ley 23.928, habría colisionado irremediablemente con derechos adquiridos y protegidos por la Constitución Nacional (Código Civil, art. 3)[38].

---

[38] El art. 3 del Código Civil prevé que *"a partir de su entrada en vigencia, las leyes se aplicarán aún a las consecuencias de las relaciones y situaciones jurídicas existentes. No tienen efecto retroactivo, sean o no de orden público, salvo disposición en contrario. La retroactividad establecida por la ley en ningún caso podrá afectar derechos amparados por garantías constitucionales. A los contratos en curso de ejecución no son aplicables las nuevas leyes supletorias"*. Sobre esta norma se ha señalado que *"en los ordenamientos en que existe una garantía constitucional de la propiedad, como ocurre entre nosotros, la acción del legislador en su proyección sobre el pasado se detiene frente a la garantía constitucional de la propiedad... El... texto afirma redundante la irretroactividad de la ley al expresar que ella 'no tiene efecto retroactivo'. La retroactividad de la ley nueva implica extraer de actos o hechos ya realizados jurídicamente, consecuencias diferentes de las que contempla la aplicación de la ley antigua. Es decir que los hechos pasados que han agotado la virtualidad que les es propia, no pueden ser alcanzados por la nueva ley, conforme la noción de 'consumo jurídico', y si se los afectara se incurriría en retroactividad... Establecido el principio de la irretroactividad, el texto indica la salvedad de la 'disposición en contrario', con lo cual aclara que dicho principio no obliga al legislador, sino al intérprete, pues siempre puede el Poder Legislativo, en ejercicio de sus atribuciones dictar normas retroactivas, mientras haya materia social regulable, es decir, en tanto no haya ocurrido el consumo jurídico, luego de lo cual no podría el legislador restablecer derechos ya agotados... (Pero por supuesto que) el principio de irretroactividad deja de ser un mero criterio interpretativo y pasa a ser una exigencia constitucional en dos hipótesis: 1) cuando la aplicación retroactiva de la ley redunda en menoscabo de la propiedad particular; 2) cuando se trata de una ley penal. Esta exigencia ha sido marcada innecesariamente en el texto –la retroactividad establecida por la ley en ningún caso podrá afectar derechos amparados por garantías constitucionales–, porque el legislador carece de atribuciones constitucionales para desconocer los derechos garantidos por la Constitución Nacional. Así, pues, si llegara a dictarse una ley, retroactiva o irretroactiva que lesiona-ra tales derechos sería declarada inconstitucional por el Poder Judicial... Finalmente, al suprimirse el art. 5 y esta-*

25

8.26. A continuación demostraremos detalladamente que ni uno solo de los argumentos del voto de la mayoría en el Laudo está sustentado en derecho y que, incluso, basa su decisión en prueba falsa.

### IX. ES ARBITRARIA LA CONCLUSIÓN DEL TRIBUNAL ARBITRAL EN CUANTO A QUE EL 21 DE DICIEMBRE DE 2001 YA NO REGÍA EL TIPO DE CAMBIO OFICIAL DE LA LEY DE CONVERTIBILIDAD Y QUE EN ESA FECHA SE PRODUJO LA CONTINGENCIA PACTADA POR LAS PARTES

#### A. Lo que acordaron las partes respecto de la Contingencia

9.1. Las partes acordaron que el precio pagado por EDFI *"...será sometido a una revisión si se produce la Contingencia prevista en el párrafo segundo de esta carta __hasta el 31 de diciembre del año 2001__"* (el destacado es nuestro). Y convinieron que *"a los efectos de esta carta se entiende por Contingencia __la desvinculación del tipo de cambio oficial del peso argentino con el dólar USA, cualquiera que sea la causa que lo produzca__"* (el destacado es nuestro).

9.2. El *tipo de cambio oficial* fue modificado luego del 31 de diciembre de 2001. Este es un hecho objetivo e indiscutible de la realidad económica y jurídica del país. No se produjo desvinculación alguna de ese tipo de cambio hasta esta fecha.

9.3. En palabras de la Corte Suprema, *"a diferencia de otras normas que reemplazaron la moneda nacional por otro signo de distinta denominación (...) __la ley 23.928__ creó una nueva unidad monetaria, en tanto __declaró la convertibilidad de la moneda local, el austral, con el dólar estadounidense, a partir del 1° de abril de 1991 'a una relación de diez mil australes por cada dólar para la venta' (art. 1°)__, relación que quedó uno a uno desde el 1° de enero de 1992, con el nuevo peso creado por el decreto 2128/91. __Esta ley rigió hasta el dictado de la ley 25.561__ –llamada de emergencia pública y de reforma del régimen cambiario– __que derogó__ la convertibilidad y __el tipo de cambio anterior__"*[39] (el destacado es nuestro).

9.4. Este hecho jurídico -indubitablemente reconocido por la Corte Suprema- no pudo ser válidamente ignorado por la mayoría del Tribunal Arbitral. La realidad jurídica es unívoca y no puede ser tergiversada mediante inferencias infundadas de la supuesta intención psicológica de las partes o de la sustentabilidad político-económica que, en diciembre de 2001, tenía la política de convertibilidad, aspectos sobre los que nos explayaremos más abajo.

---

blecerse expresamente en el precepto que comentamos que las leyes *"no tienen efecto retroactivo, sean o no de orden público, salvo disposición en contrario"*, ha quedado eliminada la posibilidad de que el intérprete pueda aplicar retroactivamente una ley de orden público, si el legislador ha omitido darle ese alcance. Con ello se produce una dualidad de régimen, el antiguo y el nuevo, pese a que este último se nutre en valores eminentes, a los cuales está ligada la digna subsistencia de la sociedad. En teoría, no se justifica la perduración del régimen anterior al contradice principios de orden público" (Llambías, Jorge J., *"Código Civil Anotado"*, T. I, Ed. Abeledo Perrot, Bs. As., 1978, p. 17/9).

[39] CSJN, 26/10/2004, *"Bustos, Alberto R. y otros v. Estado Nacional y otros s/amparo"*, voto concurrente de la Dra. Elena Highton de Nolasco, cons. 13, Fallos: 327:4495.

26

### B. La claridad y precisión de esa convención

9.5. La expresión *tipo de cambio oficial* no es una creación libre de las partes a la que hubieran otorgado un contenido determinado para regir sus relaciones en un caso concreto. Por el contrario, es un concepto nítido, objetivo y predeterminado. *Tipo de cambio oficial* es, y sólo puede ser, como su nombre lo indica, aquél establecido por un acto de autoridad pública, pues la Constitución Nacional reserva al Congreso la facultad privativa de "*hacer sellar moneda, fijar su valor y el de las extranjeras*..." (artículo 75, inc. 11; el destacado es nuestro).

9.6. El artículo 1 de la ley 23.928 y sus normas ccdtes. y reglamentarias **caracterizan sobradamente el tipo de cambio oficial instituido por aquel cuerpo legal**, sin necesidad de recurrir al *espíritu de la ley*, ni a leyes análogas, ni a otros principios interpretativos. **No hubo durante los más de 10 años en que rigió esa ley otro *tipo de cambio oficial* en la Argentina**.

9.7. De manera que el único *tipo de cambio oficial* al cual hizo referencia con toda precisión y claridad la *Carta Acuerdo* era el establecido por la Ley 23.928.

9.8. Otra lectura, como la del Laudo impugnado, resulta antojadiza y carente de razonabilidad.

9.9. Lo dicho quedó acreditado en la segunda declaración testimonial escrita del Sr. Didier Lamèthe, Director del Departamento de Proyectos Internacionales de EDFI al momento de la celebración del Contrato, y su anexo[40], quien explicó que la razón de la revisión de precio pactada posteriormente fue que, a criterio del Ministerio de Finanzas francés, dicha revisión era conveniente si "*por cualquier motivo el tipo de cambio entre el peso y el dólar dejara de ser 1 a 1*" (cfr. punto 5, el destacado es nuestro).

9.10. Dicho testigo no mencionó el *régimen de convertibilidad*, ni los *postulados de la convertibilidad*, ni nada parecido; por el contrario, fue muy preciso: **lo relevante era el tipo de cambio 1 peso por 1 dólar**. Y es indudable que ese *tipo de cambio* fue fijado por la Ley 23.928.

### C. La imperatividad de lo convenido a la luz del art. 1197 del Código Civil

9.11. Los términos de la *Carta Acuerdo* eran imperativos y obligatorios para las partes (Código Civil, art. 1197): la revisión del precio sólo era viable, porque así lo acordaron los cocontratantes, si la *Contingencia* se producía antes del 31 de diciembre de 2001. Y esa *Contingencia* consistía en que, eventualmente, antes de esa fecha, el *tipo de cambio oficial* establecido por la Ley 23.928 fuera derogado por otra ley.

---

[40] Ambos documentos fueron presentados por EDFI como Documento C-173 de su Memoria de Réplica, acompañados al presente recurso como Anexo VIII.

27

9.12. De modo que el Laudo, al apartarse de lo expresamente pactado por las partes, violó el art. 1197 del Código Civil. O, desde otro enfoque, permitió que la parte actora violara la obligación asumida en la *Carta Acuerdo*, pese a que aquella regla legal le imponía respetar sus obligaciones y los derechos de su contraparte como a la ley misma.

**D. La Carta Acuerdo –interpretada, por imposición legal, con arreglo a las pautas previstas en la legislación argentina- no ofrece duda alguna y excluye inequívocamente la posibilidad de acudir a otros principios para dirimir el conflicto. La interpretación del Laudo no constituye una derivación razonada del derecho vigente**

9.13. Se trata de un conflicto de naturaleza mercantil, que debe juzgarse con estricta sujeción a lo pactado claramente por las partes (Código Civil, art. 1197).

9.14. Como acertadamente advierte el voto de la disidencia, el deber señalado no fue cumplido por el Tribunal Arbitral, conclusión que no se modifica por el hecho de que el Laudo haya hecho una mención retórica a los artículos 217 y 218 del Código de Comercio.

9.15. El art. 217 establece que *"las palabras de los contratos y convenciones deben entenderse en el sentido que les da el uso general, aunque el obligado pretenda que las ha entendido de otro modo"*. El art. 218, de su lado, dispone que *"habiendo ambigüedad en las palabras debe buscarse más bien la intención común de las partes que el sentido literal de los términos..."* (inc. 1º) y que *"las cláusulas equívocas o ambiguas deben interpretarse por medio de los términos claros y precisos empleados en otra parte del mismo escrito, cuidando de darles, no tanto el significado que en general les pudiera convenir, cuanto el que corresponda por el contexto general"*.

9.16. Interesa poner de relieve que **no** existe ambigüedad alguna en los términos utilizados en la *Carta Acuerdo*. En consecuencia, esas normas — contrariamente a lo juzgado por el Laudo- son inaplicables en la especie.

9.17. Aun en la hipótesis de que esas reglas pudieran ser de aplicación al caso -lo que las recurrentes niegan terminantemente- lo cierto es que la conclusión del Laudo, aplicando tales normas, es igualmente por completo equivocada, irrazonable e ilegal.

9.18. A poco que se analice el texto de la *Carta Acuerdo* podrá observarse que, en su primera parte, se acordó que el precio pagado por EDFI *"... será sometido a una revisión si se produce la Contingencia prevista en el párrafo segundo de esta carta hasta el 31 de diciembre del año 2001"*; que, en su segunda parte, se precisó que la Contingencia se produciría frente a la ***"desvinculación del tipo de cambio oficial del peso argentino con el dólar USA**, cualquiera que sea la causa que lo produzca"*; y que, en su tercera parte, se aclaró que, *"en el supuesto de producirse la Contingencia,... los vendedores... o...*

28

*EDFI* (según el caso) *reintegrarán... en caso de **disminución** ..o en caso de **aumento** del **tipo de cambio oficial del peso respecto a dólar** una cantidad en dólares de Estados Unidos... que se calculará en la forma establecida en el Anexo..., (tomando) como base para el cálculo... el **promedio de la cotización oficial** del peso argentino frente al dólar de Estados Unidos durante el período comprendido **entre** la fecha [en] que se produzca **la primera alteración** de la paridad peso/dólar **y el 31 de diciembre de 2001**"* (el destacado es nuestro).

9.19. El texto, acordado por empresarios profesionales que conocían bien el mercado argentino, no puede generar duda alguna.[41]

9.20. Sin embargo, el Laudo pasó por encima de ellos y recurrió a interpretaciones antojadizas en abierta contradicción a la letra de lo pactado.

9.21. ¿Qué "interpretó" el Laudo?

9.22. "Interpretó" que "...***desvinculación del tipo de cambio oficial del peso argentino...***" **no equivale a la modificación del tipo de cambio oficial** (párrafo 703) establecido en el art. 1 de la Ley de Convertibilidad **sino** a una afectación **del "postulado esencial del Régimen de Convertibilidad"** (párrafos 686 y 687) **(SIC!!!).**

9.23. A esos efectos, el Tribunal centró sus esfuerzos en intentar desentrañar cuales eran, en el segundo semestre de 2001, las perspectivas económicas o de sustentabilidad que tenían aspectos ostensiblemente tan distintos de la expresión *tipo de cambio oficial* como, por ejemplo, la obligación del Banco Central de mantener un nivel de adecuado de reservas, de vender dólares de manera ilimitada, o de garantizar la libertad cambiaria y de transferencia de fondos. Es decir, **el Tribunal se interesó en hechos de diversa índole, menos en el único que debería haber focalizado**: si había habido un aumento o disminución del *tipo de cambio oficial*.

9.24. Todo esto lo hizo la mayoría del Tribunal Arbitral con la excusa – porque no es ni puede ser otra cosa que una "excusa"- del giro *"...cualquiera que sea la causa que lo produzca..."*, utilizado en la Carta Acuerdo, como si dicho giro hubiese estado aislado o desprovisto de un contexto preciso. Luego, el Laudo cuantificó la condena utilizando un tipo de cambio **NO** oficial, **posterior** a la fecha límite pactada para la *Contingencia* (31 de diciembre de 2001) y a la derogación del artículo 1 de la ley 23.928.

---

[41] Cabe recordar que el contrato de compraventa que dio lugar a este arbitraje no fue la primera inversión de EDFI en la Argentina. Muy por el contrario, como refleja el art. 5.3 del contrato, su participación en EDENOR databa del año 1992, es decir, que contaba con una presencia consolidada en la Argentina con largos años –todos ellos bajo la vigencia de la Ley 23.928- de experiencia y conocimiento del entorno político, económico y legal del país. En función de lo expuesto y de la obligación que pesa sobre los administradores y representantes de sociedades comerciales de obrar con la diligencia exigible a un experimentado y buen hombre de negocios (artículo 59 de la Ley de Sociedades Comerciales nº 19.550), debe concluirse que EDFI conocía perfectamente que el régimen monetario y cambiario es una cuestión de orden público que forma parte de los poderes soberanos del país y que el *tipo de cambio oficial* entre el peso y el dólar no podía ser otra que el que establece el Congreso o, a lo sumo, el Poder Ejecutivo mediante delegación legislativa (artículo 75, inciso 11 de la Constitución Nacional), habiendo sido ejercida esa función a través del art. 1 de la Ley 23.928.

29

9.25. Tal interpretación **no constituye una derivación razonada del derecho vigente ni responde al mandato de la lógica**. Como advierte el voto disidente, el Laudo llega a conclusiones arbitrarias por cuanto todas las tesis que asume el voto de la mayoría *"son carentes de fundamento suficiente, y alguna de ellas frontalmente contrarias al material probatorio..."* (punto 8). La claridad del texto convenido por las partes es incontrovertible; no hay ambigüedad, ni vaguedad, ni vacío alguno en la convención que requiera una "interpretación".

9.26. Tratándose, como se trata, de un *tipo de cambio oficial*, fijado por una ley nacional en consonancia con lo dispuesto por el art. 75, inc. 11 de la Constitución, **en el régimen legal argentino ese tipo de cambio sólo puede ser desvinculado, apartado, dejado sin efecto, o como se lo quiera expresar, mediante una ley nacional, un decreto del Poder Ejecutivo Nacional con facultades expresas al efecto** o por la declaración de la inconstitucionalidad de la ley. Se ha dicho sobre el punto que *"el haber fijado tal paridad y las reglas complementarias por medio de una ley sancionada por el Congreso Nacional contribuye a reforzar ese esquema cambiario, **ya que cualquier 'devaluación' o 'desvalorización' de la moneda nacional deberá, necesariamente, depender de la sanción de una nueva ley que modifique la paridad consagrada en el art. 1 de la ley 23.928**. De esta forma se da cumplimiento al precepto constitucional del art. 67, inc. 10, [actual art. 75, inc. 11] de la Constitución Nacional, que establece que es atribución del Congreso 'hacer sellar moneda, fijar su valor y el de las extranjeras'"* (el destacado es nuestro)[42].

9.27. Nada de ello sucedió hasta después del 31 de diciembre de 2001.

9.28. La segunda parte del texto de la *Carta Acuerdo* antes transcripta -que el Laudo parece haber olvidado, pero que resulta esencial al interpretar el texto de ese documento- corrobora que la producción de la *Contingencia* requería inexorablemente que el *tipo de cambio oficial* fijado por el artículo 1 de la Ley 23.928 fuera derogado antes del 31 de diciembre de 2001. De otro modo resulta inexplicable la razón por la que la *Carta Acuerdo*, en su última parte, haya previsto que la cuantificación de la revisión del precio debía realizarse de acuerdo *"...al promedio de la cotización oficial del peso argentino frente al dólar de Estados Unidos durante el período comprendido entre la fecha (en la) que se produzca la primera alteración de la paridad peso/dólar y el 31 de diciembre de 2001"*.

9.29. **La intención de las partes fue más que evidente**: hasta el 31 de diciembre de 2001. Y sólo hasta esa fecha se revisaría el precio si por alguna razón se desvinculaba, insístese, antes del 31 de diciembre de 2001, el *tipo de cambio* establecido de modo legal durante una década por la Ley de Convertibilidad. **Y esa desvinculación** –entendida como un aumento o disminución de la paridad 1 a 1– **no se produjo antes del 31 de diciembre de 2001.**

9.30. Huelgan mayores comentarios sobre el particular.

---

[42] Villegas, Carlos Gilberto, *"Convertibilidad y Desindexación – su aplicación a la actividad bancaria"*, Actividad Práctica Bancaria, N° 4, p. 57, 58 y ss., Director Carlos G. Villegas, Ed. Depalma, Bs. As., 1991.

30

9.31. Tanto el art. 1197 del Código Civil, como los arts. 217 y 218 del Código de Comercio y el derogado artículo 1 de la ley 23.928, conducen a la conclusión -con efectos decisivos- de que al 31 de diciembre de 2001 el *tipo de cambio* establecido por esa última regla legal estaba plenamente vigente. No procedía, entonces, recurrir supletoriamente a principios generales de derecho en los términos del art. 16 y ccdtes. del Código Civil cuando -como en el caso- las normas enunciadas en el inicio de este párrafo resultaban autosuficientes para dirimir el entuerto.

**E. El único "*tipo de cambio oficial*" existente en la República Argentina durante todo diciembre de 2001 fue el impuesto por la Ley 23.928. La inobservancia de la fecha límite pactada por las partes para el acaecimiento de la Contingencia torna al Laudo nulo por arbitrario y por exceder los puntos comprometidos**

9.32. Como expresamos precedentemente, el único *tipo de cambio oficial* existente en la República Argentina en el mes de diciembre de 2001 fue el fijado por una norma de orden público, como lo era el artículo 1 de la Ley 23.928[43].

9.33. Esa norma legal fue, por cierto, derogada unos días después del 31 de diciembre de 2001, fecha límite, fatal e inexorable, para que pudiese considerarse ocurrida la *Contingencia*.

---

[43] Ese tipo de cambio había sido fijado por el artículo 1 de la Ley de Convertibilidad. No había en la Argentina el 27 de abril de 2001, cuando se acordó la revisión de precio, otro "*tipo de cambio oficial*" que ese. Esta es una realidad tan evidente y absoluta que nadie que haya estado familiarizado con la economía argentina desde la década del '90 -como de hecho lo estaba EDFI- podría controvertir. Como se recordará, la Ley de Convertibilidad estableció en su artículo 1 un tipo de cambio fijo y oficial entre la moneda estadounidense y la moneda argentina a la relación 1 dólar por 10.000 australes. El austral convertible fue considerado como una nueva moneda, distinta de la anterior no convertible. Por ello, el artículo 12 de la Ley de Convertibilidad estableció "*dado el diferente régimen jurídico aplicable al austral, antes y después de su convertibilidad, considéraselo a todos sus efectos como una nueva moneda. Para facilitar dicha diferenciación, facúltese al Poder Ejecutivo Nacional para reemplazar en el futuro la denominación y expresión numérica del austral, respetando la relación de la conversión que surge del artículo 1*". A su vez, en cumplimiento de lo dispuesto en la Ley de Convertibilidad, el Poder Ejecutivo Nacional dictó el Decreto Nº 2128/91, mediante el cual estableció una nueva moneda -el peso- en reemplazo del austral. Su artículo 3 dispuso que "*el peso será convertible con el dólar de los Estados Unidos de América, a una relación de 1 peso por cada dólar, para la venta, en las condiciones establecidas por la ley 23.928.*" La paridad establecida en el artículo 3 del Decreto Nº 2128/91 recogió así -por vía reglamentaria- lo dispuesto por el Congreso Nacional en el artículo 1 de la ley de convertibilidad, al establecer la conversión de la moneda local con el dólar estadounidense a una tasa fija y oficial. Por ello, es indudable que el "*tipo de cambio oficial*" contemplado en el párrafo 2 de la Carta Acuerdo es el establecido en el artículo 1 de la ley 23.928, por lo que, mientras ese artículo continuara vigente, el tipo de cambio allí establecido -y sólo ése- sería para las partes el "tipo de cambio oficial". En tales condiciones, es indiscutible que la expresión contractual "*cualquiera que sea la causa que lo produzca*" -relativa al término de la "*desvinculación del tipo de cambio oficial*"- se refería a la posibilidad de que el vínculo reflejado en el tipo de cambio oficial al momento de la celebración de la Carta Acuerdo pudiera haber sido modificado de modos distintos; pero, obviamente, siempre dentro de los mecanismos constitucionalmente previstos para dejar sin efecto normas legales preexistentes. Nótese que el tipo de cambio oficial establecido por la ley de convertibilidad podría haberse modificado, por ejemplo, por la entrada en vigencia de la Ley 25.445, que preveía por el cumplimiento de haberse la condición suspensiva allí establecida, vale decir cuando "*el euro de la Unión Europea (E 1) cotice a un dólar de los Estados Unidos de América (US$ 1) para la venta, en el mercado de Londres, o supere dicha cotización*", el peso sería "*convertible para la venta, a una relación de un peso ($ 1) por el promedio simple de un dólar de los Estados Unidos de América (US$ 1) y un euro de la Unión Europea (E 1)*". El tipo de cambio oficial también podría haber sido modificado por la fijación -por parte del Estado Nacional- de una paridad distinta entre el peso y el dólar, tal como lo hizo recién en el año 2002 mediante el Decreto Nº 71/02, o mediante la libre flotación del peso implementada por el Decreto Nº 260/02. En ambos casos, ello ocurrió claramente después del vencimiento del plazo establecido por las partes para la producción de la contingencia. Por el contrario, cualquier otra medida que -aun cambiando las condiciones económicas vigentes en el país- no alterara la relación de cambio prescripta por la Ley de Convertibilidad, carecía de virtualidad suficiente para producir la desvinculación, esto es, la *Contingencia*. Incluso si el Estado, por medio de cualquier norma jurídica, hubiera establecido la prohibición general de operar en cambios, salvo permiso especial, y hubiera mantenido el tipo de cambio oficial en un peso por un dólar, la desvinculación no se hubiera producido. Tampoco la dolarización a una relación 1 a 1 hubiera alterado el tipo de cambio oficial vigente al momento de la celebración del Contrato.

31

9.34. Mas esa circunstancia, como ya se explicó en este escrito, no puede imponer la retroacción de los efectos de la derogación al mes de diciembre de 2001 (Código Civil, art. 3).

9.35. Al parecer, el Tribunal consideró que resultaba de algún modo desafortunado que EDFI hubiera perdido la posibilidad de reclamar la compensación del precio por unos pocos días de diferencia. Eso lo llevó a recurrir a forzadas y antojadizas construcciones *ex post*, para condenar a ENDESA e YPF al pago de una compensación a la que no se habían obligado.

9.36. Sin embargo, ese no es el rol que le cabe cumplir a un tribunal en un arbitraje de derecho, el cual debe emitir su Laudo dentro de los estrictos límites del derecho aplicable, como bien advierte el voto disidente (punto 4). Al obrar del modo indicado, la mayoría del Tribunal Arbitral excedió los puntos comprometidos, **tornando al Laudo en nulo** en lo que es materia de este recurso (CPCCN, art. 760).

9.37. Las partes pactaron en la *Carta Acuerdo* un plazo estricto, amplio y extenso, entre el 1 de abril de 2001 y el 31 de diciembre de 2001; ningún dato o extremo autorizaba a ampliarlo y extenderlo más allá de su vencimiento, hasta enero del año siguiente, cualquiera fuera la opinión subjetiva que tuvieran los miembros del Tribunal sobre la razonabilidad de la solución adoptada por las partes al momento de contratar.

9.38. **Las partes ya habían convenido,** en pleno ejercicio de la autonomía de su voluntad, **que era razonable y equitativo limitar la *Contingencia* al 31 de diciembre de 2001,** de modo tal que si el tipo de cambio oficial dejaba de ser un peso por un dólar, por ejemplo, el 29 de diciembre, la *Contingencia* se tenía por producida, mientras que si esa alteración ocurría el 1 de enero, la *Contingencia* no se configuraba.

9.39. **No le correspondía al tribunal develar si esa solución era adecuada** –ello ya lo habían hecho las partes, empresarios profesionales y experimentados– ni si era razonable que las partes compartieran los efectos del "*infortunio económico argentino*", como lo advirtió, sin éxito, el voto de la disidencia (punto 2).

9.40. El Tribunal debía limitarse a determinar si hasta el 31 de diciembre de 2001 se verificó, como obligaba la *Carta Acuerdo*, un ***"aumento ... o disminución del tipo de cambio oficial del peso respecto del dólar"***. Sorpresiva y lamentablemente, la mayoría del Tribunal se negó a cumplir con lo que le encomendaron las partes.

32

**F. La arbitraria interpretación que da el Laudo a la precisa disposición contractual relativa al "*tipo de cambio oficial*", invocando que la paridad 1 peso por 1 dólar no estaba dada por la Ley de Convertibilidad sino por lo que establecían los mercados, carece de base contractual, legal, fáctica y lógica, e infringe el orden público argentino**

9.41. Para tratar de distraer la atención del hecho de que el *tipo de cambio oficial* de la Ley de Convertibilidad se mantuvo sin alteraciones hasta la fecha límite pactada, el Laudo afirma que *"es mucho más probable que ambas Partes tuvieran la intención de referirse simplemente al tipo de cambio en el mercado de divisas legalmente establecido y reconocido en Argentina, a diferencia de mercados paralelos o negros, cuando firmaron el Contrato y de Carta Acuerdo"* (párrafo 662).

9.42. El dogmatismo y la arbitrariedad de tal afirmación fluyen de su sola lectura: se trata de meras suposiciones del Tribunal, sin otro asidero que su imaginación.

9.43. Para formular tal afirmación, el Tribunal argumenta que ello se infería de las declaraciones de los expertos designados por EDFI y del hecho de que el Sr. Källstrand, funcionario de EDFI, en su fax del 20 de abril de 2001, habría rechazado cualquier referencia a la Ley de Convertibilidad (párrafos 657, 658, 660 y 662).[44]

9.44. Ni lo uno ni lo otro responde a la verdad.

9.45. Los expertos de EDFI reconocieron que entre las acepciones de la expresión *"tipo de cambio oficial"* se incluye la paridad de un peso por un dólar para la venta establecida en el artículo 1 de la Ley de Convertibilidad (párrafos 659 y 660 del Laudo).

9.46. Además, se ha probado que en las comunicaciones internas de EDFI, que constituyeron la base sobre la que EDFI negoció la *Carta Acuerdo* del 31.3.01, se definió a la ***Contingencia*** como el ***"cambio del ratio de convertibilidad del USD y del peso argentino"*** (punto 9 apartado 1 del voto en disidencia)[45].

9.47. El experto económico de EDFI, Licenciado Mario Vicens, preparó su dictamen pericial sin conocer la documentación mencionada en el párrafo anterior.

9.48. Sin embargo, durante las audiencias, su contenido le fue revelado por ENDESA, siendo interrogado sobre la definición adoptada por EDFI para negociar.

9.49. Como lo resalta el voto disidente (punto 9, apartado 2), la respuesta del Licenciado Vicens sobre lo que constituyeron las bases negociales de EDFI no deja dudas: si **la frase** *"cambio en la ratio de convertibilidad del USD y del peso argentino"* utilizada por EDFI en la comunicación del Sr. Lamèthe del 19 de abril de

---

[44] Ver el fax del Sr. Källstrand en la documentación anexa a la declaración del Sr. Alfonso Llorente Legaz, cuya copia se acompaña al presente como Anexo VII.
[45] Ver, asimismo, comunicación interna del EDFI del 19 de abril de 2001, adjunta a la declaración declaración testimonial del Sr. Didier Lamèthe, cuya copia se acompaña al presente como Anexo VIII.

33

2001 como base de negociación para definir la Contingencia **se interpreta como** *"**tipo de cambio de convertibilidad**"*, en opinión del Lic. Vicens, *"**el tipo de cambio de convertibilidad al 31 de diciembre de 2001 no habría cambiado, y por lo tanto no se habría producido la contingencia**"[46].*

9.50. Interesa destacar particularmente que el propio experto legal de EDFI -al que el Laudo citó para negar la identidad entre *"tipo de cambio oficial"* y el establecido en el artículo 1 de la Ley de Convertibilidad- ha escrito en el libro de su autoría, titulado ***"Legislación de Emergencia"***, que, por *"tipo oficial"*, debe entenderse el establecido por la mencionada ley (punto 9 apartado 3 del voto en disidencia). En esa obra el doctor **Carlos G. Gerscovich** sostiene reiteradamente que el *tipo de cambio oficial*, y fijo, era el establecido por una ley de orden público, como lo era la Ley 23.928 (artículo 1)[47].

9.51. Incluso algunos autores sumamente críticos del denominado régimen de la convertibilidad afirman que el tipo de cambio fijado por esa ley rigió *"desde el 1º de abril de 1991 **al 6 de enero de 2002**, con la vigencia de la Ley de Convertibilidad..."[48].*

9.52. Lo expuesto precedentemente demuestra, también desde este enfoque, que el Tribunal Arbitral ha incurrido en una grave contradicción y arbitrariedad en su Laudo.

9.53. Por lo demás, tampoco es cierto, como infiere el Laudo, que el Sr. Källstrand, en su fax del 20 de abril de 2001, se haya negado a tomar como referencia el tipo de cambio de la Ley de Convertibilidad. Es manifiestamente absurdo y contrario a las más elementales pautas del sentido común que el voto de la mayoría pretenda asignar al mencionado documento entidad suficiente para apoyar el planteo de EDFI, a poco que se advierta que, paradójicamente, el fax del Sr. Källstrand no fue presentado por la actora sino, precisamente por las demandadas, como prueba irrefutable de que el tipo de cambio tenido en cuenta era el de 1 peso por 1 dólar y que esa paridad aritmética no estaba dada por lo que establecían los mercados de cambios –en los que se podían presentar fluctuaciones

---

[46] Ver la Audiencia de Interrogatorio del Licenciado Vicens, TR 20.10.05, p. 20, líneas 12-19, en las que se lee: *"PERITO: Si suponemos, señor presidente, que en el párrafo donde dice: "El cambio del ratio de la convertibilidad", esto se interpreta como "tipo de cambio de convertibilidad", y haciendo caso omiso de las fechas, verdad, porque estamos hablando del 30 de noviembre de 2001"* [es necesario aclarar que la salvedad efectuada por el perito respecto de la fecha fue porque en la carta del Sr. Lamèthe todavía se contemplaba que la fecha límite fuera el 30/11, plazo que luego fue extendido hasta el 31/12, como finalmente quedó reflejado en la Carta Acuerdo ] *"SEÑOR PANTALEÓN: Por supuesto tiene usted la razón." "PERITO: Y si se hubiera fijado la fecha al 31 de diciembre de 2001* [como en realidad ocurrió], *el tipo de cambio de convertibilidad al 31 de diciembre de 2001 no habría cambiado, y por lo tanto no se habría producido la contingencia".*
[47] Gerscovich, Carlos G., *"Legislación de Emergencia"*, Ed. Lexis Nexis, Depalma, Buenos Aires, 2002, pág. 137 (Documento R-58 acompañado al Primer Escrito de Conclusiones de ENDESA e YPF). En esta obra, el perito de EDFI afirma que *"Tipo oficial; es el establecido por un acto de autoridad. Sea la autoridad cambiaria, o el PEN, por delegación, cuando posee facultades legales al efecto; o el Parlamento, como sucedía con el tipo máximo para la venta, que denominamos 'legal' y se hallaba establecido mediante la ley 23.928 de Convertibilidad".*
[48] Mosset Iturraspe, Jorge – Falcón, Enrique M. – Piedecasas, Miguel A., *"Contratos – de la Convertibilidad a la Pesificación"*, Ed. Rubinzal – Culzoni Editores, Bs. As., 2002, p. 15, 16 y ss.

34

en torno a esa tasa de cambio, como en realidad ocurrió- sino por lo establecido en el art. 1 de la Ley de Convertibilidad[49].

9.54. No se trata, en consecuencia, de una diferencia en la interpretación de la prueba, sino del hecho de que el Laudo (párrafo 662) otorga al fax del Sr. Källstrand del 20 de abril de 2001 un contenido que no posee. Como bien destaca el voto en disidencia (párrafo 10, apartados 2 y 3), el mencionado documento no dice que las partes hayan tenido en cuenta el tipo de cambio de los mercados legalmente reconocidos en la Argentina ni el *"Régimen de Convertibilidad, constituido éste, a su vez por los tres aspectos que el laudo dice que son los aspectos esenciales de ese régimen"*. La dogmática –y por lo tanto arbitraria- conclusión del Laudo en este sentido se ve corroborada por el hecho de que en los borradores de acuerdo posteriores al fax del Sr. Källstrand surgió la necesidad de adicionar la palabra "***oficial***" a la expresión "***tipo de cambio***" para aventar cualquier duda sobre su identidad con el establecido por ley. A mayor abundamiento y para no agobiar innecesariamente a la Excma. Cámara con repeticiones ociosas, nos remitimos a lo expuesto en los párrafos 9.80 a 9.103 de este escrito respecto de cuál fue el real sentido de las expresiones del Sr. Källstrand.

9.55. Finalmente, la arbitrariedad de la mayoría al identificar la expresión *"tipo de cambio oficial"* con el *"tipo de cambio en el mercado de divisas legalmente establecido"*, no sólo se basa en las circunstancias expuestas precedentemente, sino también en que tiene una clara **inconsistencia intrínseca**.

9.56. Esta inconsistencia ha sido destacada por el voto de disidencia (punto 9) cuando advierte que, de ser cierto el criterio de la mayoría, no hubiera habido solo un tipo de cambio durante 2001, sino tantos cambios "oficiales" como operaciones de cambio pudieran realizar los bancos y agencias autorizados para operar. Aun más, no hay ninguna evidencia de que, en todos esos casos, las operaciones de cambio se hubieran realizado a la paridad 1 peso por 1 dólar tenida en cuenta por las partes sino que, incluso, estaba probado que, en algunos casos, la cotización fue de más de 1 peso por 1 dólar.

9.57. La **conclusión de la disidencia** en este aspecto exime de mayores comentarios. *"Ante esta doble realidad, la realidad de que los tipos de cambio en el mercado argentino de divisas en el año 2001 podían ser distintos y la realidad de que además esos tipos fueron de hecho distintos, la decisión del laudo de construir la intención común de las partes sobre el significado de la expresión "tipo de cambio oficial" como "el tipo de cambio o cotización en el mercado de divisas reconocido oficialmente o legalmente en Argentina" (párrafo 663), presumiendo que sólo podía ser uno, supone a mi juicio una equivocación patente. Con la evidencia en la mano, el único vínculo oficial entre el peso y el dólar que era uno y único y que existía en la República Argentina en el año 2001, y el único al que por lo tanto pudieron razonablemente referirse las partes al hablar de "desvinculación del tipo de cambio oficial" en la definición de la*

---

[49] El fax del Sr. Källstrand fue presentado como anexo de la declaración del Sr. Alfonso Llorente Legaz, cuya copia se acompaña al presente como Anexo VII.

35

*Contingencia, era el tipo de cambio que estaba establecido en la Ley de Convertibilidad, conocido también como "tipo de cambio de convertibilidad"* (punto 9, apartado 4, el destacado es nuestro).

9.58. La transgresión del orden público argentino que presenta la solución dada por el Laudo impugnado resulta evidente y manifiesta.

9.59. Como ya se dijo reiteradamente, el Laudo consideró que la *Contingencia* se produjo el 21 de diciembre de 2001, con la declaración del feriado bancario dispuesto por el Banco Central de la República Argentina; conclusión violatoria del orden público argentino en tanto importa la no aplicación de una ley de orden público vigente, como lo era la Ley 23.928 (en particular, en el caso, su artículo 1).

9.60. Según hemos expresado, la expresión *"tipo de cambio oficial"* sólo podría ser interpretada -bajo el derecho argentino- como referida a aquel establecido por el ordenamiento legal de manera imperativa. No se trata de una cuestión que pueda ser materia de libre interpretación por las partes de un contrato privado o por un tribunal que dirime un conflicto interpretativo suscitado a su respecto.

9.61. Cuando las partes adoptan como parámetro el *"tipo de cambio oficial"* sólo pueden hacer referencia a un acto de autoridad pública, pues la Constitución Nacional en su art. 75, inciso 11 expresamente atribuye al Congreso Nacional la función de *"hacer sellar moneda, fijar su valor y el de las extranjeras..."*.

9.62. Al integrar el concepto de soberanía indelegable del Estado, la regulación del sistema monetario se ubica en el área del orden público en razón de la materia regulada[50]. Así, lo ha entendido la Corte Suprema de Justicia de la Nación al juzgar que *"la atribución de curso legal a las monedas o a los billetes y su valor constituye sin duda un acto de soberanía y, consecuentemente, pertenece al derecho público y entra en la esfera del orden público"* (Fallos: 327:4495).

9.63. El Laudo impugnado ignoró por completo esos conceptos y principios que constituyen pilares de nuestro sistema jurídico.

9.64. Las previsiones de la Ley de Convertibilidad no sólo eran de orden público en cuanto tenían por objeto regular la materia monetaria[51], sino también porque expresamente así lo ratificaba su artículo 13 al disponer que *"la presente ley es de orden público. Ninguna persona puede alegar en su contra derechos irrevocablemente adquiridos. Derógase toda otra disposición que se oponga a lo en ella dispuesto"*.

---

[50] Trigo Represas, Félix, A., *"El Austral y el Desagio"*, p. 39, Ed. Depalma, Buenos Aires, 1985; Busso, Eduardo B., *"Código Civil Anotado"*, Ed. Ediar, Buenos Aires, 1951.

[51] Alterini, Atilio A., *"Desindexación. El retorno al nominalismo. Análisis de la ley nº 23.928 de convertibilidad del austral"*, Ed. Abeledo Perrot, Buenos Aires, 1991, pág. 39; y Mosset Iturraspe, Jorge, *"Autonomía Privada y Orden Público Monetario"* en "Revista de Derecho Privado y Comunitario", Ed. Rubinzal Culzoni, Buenos Aires, 2001-2.

36

9.65. El Tribunal Arbitral, entonces, estaba impedido de apartarse del *"tipo de cambio oficial"* previsto en el artículo 1 de la Ley de Convertibilidad, es decir la paridad cambiaria de un peso igual a un dólar.

9.66. Cabe puntualizar que la Corte Suprema de Justicia de la Nación *"ha decidido reiteradamente que la emisión de la moneda y la fijación de su valor son actos privativos del Gobierno Nacional y constituyen un atributo de la soberanía (Fallos: 225:135) cuyo ejercicio no corresponde que sea sometido a revisión judicial acerca de su acierto o error, conveniencia o inconveniencia (Fallos: 305:1045); no resultando óbice para ello la existencia de convenios anteriores entre particulares, regidos por el derecho privado..., ya que no hay duda de que (no)... pueden afectar atribuciones propias de las autoridades de la Nación, como... las de carácter económico (Fallos: 267:247)"[52].*

9.67. Sin embargo, al juzgar que el *tipo de cambio oficial* se desvinculó en la realidad práctica el 21 de diciembre de 2001, el Laudo se apoyó en apreciaciones metajurídicas sobre el acierto o desacierto, conveniencia o inconveniencia, de la aptitud que poseía el artículo 1 de la Ley de Convertibilidad para reflejar el valor real de la moneda en ese entonces; juicio de valor absolutamente inadmisible en nuestro régimen legal, que exorbita cualquier derivación razonada del derecho vigente.

9.68. Por todo lo expuesto, al haber adoptado parámetros distintos a los del artículo 1 de la Ley de Convertibilidad (vgr. económicos, supuesta intención de las partes, preservación del valor de las acciones de EDENOR, etc.) para interpretar qué es *"tipo de cambio oficial"* y para fijar su valor, el Tribunal violó lisa y llanamente disposiciones de orden público, de aplicación imperativa, que determina inexorablemente la nulidad del Laudo impugnado.

**G. Arbitrariedad del alcance dado por el voto de la mayoría a la expresión *"desvinculación del tipo del cambio oficial"* porque (i) no se compadece y es incongruente con los propios términos de esa cláusula y con la intención de las partes evidenciada en las restantes cláusulas del *Acta Acuerdo*, (ii) transgrede el significado del término *"desvinculación"* y (iii) viola el orden público y constitucional**

9.69. Como la *Contingencia* prevista en la *Carta Acuerdo* **no** se produjo, porque no hubo ningún otro *tipo de cambio oficial* hasta el 31 de diciembre de 2001 que el establecido por el artículo 1 de la Ley 23.928, el Laudo impugnado **se apartó de lo acordado expresamente por las partes** y, en un salto lógico inexplicable, transgrediendo disposiciones de orden público, concluyó que *"la definición contenida en la última versión de la Carta Acuerdo no requiere un cambio en el tipo de cambio oficial, ni ningún comprobante del mismo, como elemento constitutivo de la Contingencia"*, a la vez que aseveró que *"los Artículos 1 y 2 de la Carta Acuerdo*

---

[52] CSJN, 15/08/95, *"Revestek S.A. c/Banco Central de la República Argentina y ot. s/ordinario"*, Fallos: 318:1531, disidencias de los Dres. Eduardo Moliné O'Connor y Guillermo A. F. López. Ver también, entre otros, CSJN, 1/04/97, *"Boasso S.A. c/Banco Central de la República Argentina"*, Fallos: 320:406, disidencias de los Dres. Antonio Boggiano, Eduardo Moliné O'Connor y Guillermo A. F. López.

37

*contienen la definición de la Contingencia: la ocurrencia, antes del 31 de diciembre de 2001 de la desvinculación del tipo de cambio oficial del peso argentino con el dólar USA, cualquiera la sea la causa que lo produzca"*, mientras que *"los Artículos 3 a 5 de la Carta Acuerdo tratan las consecuencias de la ocurrencia de la Contingencia"*, es decir el cálculo de la compensación (párrafo 703).

9.70. Como se advierte, el Laudo interpreta las diferentes cláusulas de la *Carta Acuerdo* de manera aislada, incongruente y arbitraria, como si fueran compartimentos estancos que no poseen ninguna vinculación entre sí.

9.71. Al decir que la *"desvinculación del tipo oficial de cambio"*[53] no tiene relación con el *"aumento o disminución del tipo de cambio oficial del peso respecto al dólar"*[54] el Laudo no respeta el pacto entre las partes (art. 1197 del Código Civil), pues ***"únicamente una disminución o aumento del tipo de cambio oficial del peso respecto del dólar dentro del año 2001 podía dar lugar a un pago"*** (voto disidente, punto 12, apartado 3).

9.72. Es con sustento en esta **dogmática deducción** que la mayoría del Tribunal concluye que la *Contingencia* se produjo porque no se mantuvieron las bases esenciales de todo el régimen económico de la convertibilidad. A saber, que el BCRA vendiera dólares en los términos de la Ley 23.928, que existiera un nivel de reservas adecuado y que rigiera la libertad para cambiar y transferir fondos al exterior.

9.73. Esta particular construcción del Laudo **tampoco constituye una derivación razonada del derecho** vigente en el país al 31 de diciembre de 2001.

9.74. En la negociación del texto que finalmente se plasmó en la *Carta Acuerdo*, las partes analizaron -en primer lugar- la posibilidad de definir la *Contingencia* como una derogación o modificación de la Ley de Convertibilidad exclusivamente.

9.75. Pero como esa ley contenía diversas disposiciones, aquella idea inicial fue descartada para evitar que eventuales modificaciones parciales de la ley pudieran resultar irrelevantes a los efectos de la *Contingencia*: por ejemplo, una modificación que no alterara el texto del artículo 1 de la Ley de Convertibilidad o que lo modificara sin alterar el *tipo de cambio oficial* de un peso por un dólar fijado en esa regla legal[55].

9.76. Se eligió entonces la palabra *"desvinculación"* para definir con precisión y claridad la intención de las partes, que concebía la Contingencia como la eventual modificación del *tipo de cambio oficial* dispuesto en esa normativa.

---

[53] *Carta Acuerdo*, punto 2.

[54] *Carta Acuerdo*, punto 3.

[55] La posibilidad de que la Ley 23.928 fuera modificada sólo parcialmente quedó demostrada por los hechos. Si bien su artículo 1 fue dejado sin efecto por la Ley 25.561, no sucedió lo mismo con otras disposiciones de ese cuerpo legal, como la que prevé y está actualmente vigente, la *prohibición de indexación*. De modo que nada hubiera impedido el supuesto según el cual se derogara legalmente esa disposición u otras de la referida ley, manteniendo vigente exclusivamente el tipo de cambio oficial establecido en el artículo 1 de dicho cuerpo normativo.

38

9.77. Para evidenciar la claridad y precisión del término es útil acudir al International Monetary Fund Glossary[56], que contiene los términos más usuales en materia monetaria, financiera y económica, en inglés, francés y español. Por ejemplo, el inglés *"currency peg"* corresponde al francés *"determination du taux de change para référence a une monnaie"* y en español a <u>*vínculo con una moneda*</u>[57]. De modo similar, a *"peg (a currency) to"*, le corresponde *"fixer le taux de change par rapport à"*, o *"rattacher une monnaie à"* y en español <u>*vincular (una moneda) a*</u>[58], a *"single (currency) peg"*, le corresponde *"établissement du taux de change par rapport à une seule monnaie"* y <u>*vínculo a una sola moneda*</u>[59], y a *"unicurrency pegging"* le corresponde *"rattachement à une seule monnaie"* y *"vinculación a una sola moneda"*[60].

9.78. Existen otras definiciones o conceptos similares, en el glosario del FMI, a partir del *"to peg"* en inglés, que corresponden en español a vincular. El concepto básico de *"to peg"* una moneda a otra -o a un metal precioso o canasta de monedas- corresponde al <u>*vincular*</u> en español. Así, a *"peg"* le corresponde como definición *"fijar el valor de un bien, especialmente de una moneda, en relación a otro, puede ser el oro o una moneda extranjera"*.[61] O bien, **"vincular algo a algo; the peso is pegged to the dollar: el peso está vinculado al dólar"**[62].

9.79. En definitiva, existe un concepto claro y preciso, tanto en el lenguaje específico económico, financiero y monetario, como en el lenguaje usual, en inglés, que es el de *"peg"*, que se ajusta a las definiciones de los diccionarios -tanto generales como específicos, jurídicos o económicos- que se han mencionado. A ese concepto le corresponde claramente el de *"vincular"* en español. Y si bien no existe otra palabra tan unívoca en francés, tanto *"lier"*, como *"accrocher"*, como *"rattacher"*, resultan palabras equivalentes.

9.80. Abona lo expuesto la expresión del Sr. Källstrand, en su fax del 20 de abril de 2001 al Sr. Llorente, de ENDESA, cuando se refiere en tres oportunidades al *"décrochage du Peso argentin par rapport a l'US dollar"*[63]. Ese *"décrochage"* se corresponde exactamente a la ruptura del *"lien"*, o *"rattachement"*, o

---

[56]  International Monetary Fund, *"IMF Glossary – English-French-Spanish"* Washington, D.C., 1986.
[57]  *Ibíd*, p. 36.
[58]  *Ibíd*, p. 111.
[59]  *Ibíd*, p. 135.
[60]  *Ibíd*, p. 154.
[61]  Diccionario Jurídico, Guillermo Cabanellas de las Cuevas-Eleanor Hoague, Heliasta, Bs. As.
[62]  The Oxford Spanish Dictionary, Spanish – English, English – Spanish, Thumb Index Edition, Oxford University Press, 1994, p. 1415. En idéntico sentido, *"peg"* es *"to fix the price of something, as the government may stabilize the price of gold by offering to buy all the gold offered at a stated price"* (Black's Law Dictionary 6th Edition, 1991, p. 1132). O, *"in Foreign Exchange, the process by which a government ties the value of its own currency to the currency of another country, usually the currency of its strongest trading partner, or a basket of currencies"* (Dictionary of Banking Terms, Thomas Fitch, Barron's, 1990, p. 457). En francés a *lier* le corresponde *"atar, amarrar, unir, juntar, trabar, vincular, enlazar, ligar"* (Larousse, Grand Dictionnaire, Español, Francés, Français, Espagnol, Larousse–Bordas, 1996, p. 356). Y a *"décrocher"*, *"accrocher"*, le corresponde respectivamente el sentido de *"desenganchar"* y *"enganchar"*. A *"rattacher"* le corresponde *"atar de nuevo", "unir", "vincular"* (ver ambos diccionarios Larousse citados anteriormente, p. 1573 y 511, respectivamente). En idéntico sentido debe tenerse presente que *"rattacher"*, en francés, corresponde a *vincular* en español (Dictionaire Juridique, Olivier Merlin Walch, 4e edition, LGDJ, p. 1143).
[63]  Esa expresión, traducida, dice lo siguiente: *"desvinculación del peso argentino respecto del dólar norteamericano"*. El fax del  Sr. Källstrand fue acompañado como anexo a la declaración testimonial del Sr. Alfredo Llorente Legaz y su copia, debidamente traducida, se acompaña al presente como Anexo VII.

39

*"accrochement"*, o *"peg"*, o *"vínculo"*, que el artículo 1 de la Ley de Convertibilidad estableció a la relación 1 a 1 entre el dólar estadounidense y el peso, <u>esto es, a la</u> <u>***desvinculación*** del tipo de cambio oficial del peso argentino con el dólar</u> <u>estadounidense</u>.

9.81. De modo que, como surge, entre otros elementos, de las comunicaciones escritas adjuntadas a la declaración del Sr. Alfredo Llorente,[64] el sentido de la definición de la *Contingencia* implicaba <u>necesaria y únicamente el</u> <u>abandono del tipo de cambio oficial establecido en el artículo 1 de la Ley</u> <u>23.928</u>.

9.82. Cabe recalcar a ese respecto, que en el borrador de la *Carta Acuerdo* enviado por fax el 19 de abril de 2001 por el Sr. Alfredo Llorente -de ENDESA- al Sr. Bo Källstrand -de EDFI- puede advertirse, en lo que interesa puntualizar aquí, que se proponía que la contingencia tuviera dos presupuestos: *"A los efectos de esta carta se entiende por Contingencia la modificación en la Ley de Convertibilidad vigente en la República Argentina, que suponga una desvinculación de la paridad del peso argentino con el dólar USA (primer presupuesto), y que además suponga una devaluación del peso argentino respecto del dólar (segundo presupuesto)"*.

9.83. También abona lo antedicho el anexo de la comunicación circulada internamente en EDFI por el Sr. Lamèthe el día 19.4.01 (acompañada a su segunda declaración testimonial),[65] que, según lo declarado por el Sr. Lamèthe en autos, <u>contenía el entendimiento jurídico de EDFI</u> (*"los principios jurídicos"*) de la *Carta Acuerdo* y, además, sirvió de base a los representantes de EDFI en su negociación con ENDESA.

9.84. En dicha comunicación EDFI consignó que *"se conviene que el precio de adquisición será revisado en baja en los siguientes casos: devaluación oficial del peso argentino por una decisión gubernamental o parlamentaria o del Banco Central de ARGENTINA y que tenga un efecto negativo respecto del contravalor de USD en ARGENTINA; cambio del ratio de convertibilidad del USD y del peso argentino que afecta negativamente el contravalor del peso argentino respecto del USD, aunque haya o no devaluación oficial del peso argentino"*[66] y añadió que *"los vendedores y el comprador admiten que en los casos descriptos más arriba, la evolución repercute en un 100% sobre el valor de EASA y de EDENOR y los vendedores y el comprador aceptan la repartición de las consecuencias financieras negativas para el comprador hasta el 30 de noviembre de 2001 incluido, sin facultad de prórroga eventual del plazo inicial"*[67] (el destacado es nuestro).

---

[64] Ver nota anterior.

[65] Ver Anexo VIII.

[66] El original en francés se lee: *"il est convenu que le prix d'acquisition sera révisé à la baisse dans les cas suivants: dévaluation officielle du peso argentin par une décision gouvernementale ou parlementaire ou de la Banque centrale d'Argentine et ayant un effet négatif par rapport à la contre-valeur de l'USD en Argentine; changement du ratio de convertibilité de l'USD et du peso argentin affectant négativement la contre-valeur du peso argentin par rapport à l'USD, qu'il y ait ou non dévaluation officielle du peso argentin"*.

[67] El original en francés se lee: *"Les vendeurs et l'acheteur admettent que, dans les cas décrits ci-dessus, l'évolution se répercute à 100 % sur la valorisation d'EASA et d'EDENOR et que les vendeurs et l'acheteur accep-*

40

9.85. EDFI coincidió, pues, en que la *Contingencia* podía consistir en una alteración del *tipo de cambio oficial* provocada en forma directa e inmediata por una devaluación efectuada mediante un acto de autoridad pública o por un cambio **en la ratio de la convertibilidad**, aunque no hubiera devaluación oficial, esto último en clara referencia a la hipótesis de que rigiera el factor de convergencia basado en una *canasta* de monedas (euro y dólar) que, para entonces, había anunciado el ministro de economía Domingo F. Cavallo[68].

9.86. Al día siguiente, el 20 de abril, el Sr. Källstrand envió al Sr. Llorente un fax en el que expresó: *"acuso recibo del borrador que Usted propone que traduce el acuerdo preliminar entre los señores Rafael MIRANDA y Loïc CAPÉRAN sobre una posible desvinculación de la paridad del peso argentino respecto del dólar norteamericano"*[69]. En línea con la idea de que la modificación de la Ley de Convertibilidad era necesaria, pero podía no ser suficiente, para alterar la paridad entre el peso y el dólar establecida por el tipo de cambio de la convertibilidad, el Sr. Källstrand dejó en claro su reparo en limitar la contingencia a este último supuesto. Así continuaba diciendo en su fax: *"no puedo aceptar la redacción del párrafo nº 2. **Para mí**, lo que Usted llama la "contingencia" que desata la compensación **es simplemente la existencia al primero de diciembre de 2001 de una diferencia entre el valor de un dólar norteamericano y de un peso argentino, ya que el peso vale menos que el dólar**. Cualquier referencia a la Ley de Convertibilidad y al euro me parece inaceptable"*[70] (el destacado es nuestro).

9.87. En consecuencia, **no es cierto, como afirma el Laudo, que el fax del Sr. Källstrand demuestre que las partes no quisieron referirse al tipo de cambio de la Ley de Convertibilidad.** De otro modo, no hubiera tenido sentido su insistencia en que lo relevante era la *"diferencia entre el valor de un dólar norteamericano y de un peso argentino"*, paridad que había sido fijada por dicha norma, ni los esfuerzos en que posteriormente incurrieron las partes para evitar toda duda de que el tipo de cambio a utilizarse como parámetro fuera el *"oficial"* y no el de los mercados reconocidos o paralelos.

9.88. Como destaca el voto de la disidencia (punto 10, apartado 2 *in fine*), las negociaciones posteriores de las partes no dejan margen a dudas de que la inserción de la expresión *"tipo de cambio oficial"* en la *Carta Acuerdo* estuvo destinada a aventar cualquier duda sobre su vinculación con el tipo de cambio de la

---

tent le partage des conséquences financières négatives pour l'acheteur jusqu'au 30 novembre 2001 inclus, sans fa-
cuté de prorogation éventuelle du délai inicial".
[68] La repercusión que produjo el anuncio del proyecto de ley destinado a modificar el art. 1 de la Ley de Convertibilidad para incorporar una canasta de monedas que incluyera al euro es pública y notoria y no requiere mayor demostración documental, más allá de que los elementos incorporados en las actuaciones lo demuestra suficientemente. A mayor abundamiento, puede verse diario Clarín del 15.04.01, *"Cavallo envía una ley para hacer más flexible la convertibilidad"*; Ámbito Financiero del 16.04.01, *"Lo intrascendente de Cavallo: le anunció a la exitosa convertibilidad actual teórica paridad futura, mezcla de dólar con el euro"*; La Nación del 17.04.01, *"Cavallo obtuvo apoyos pero aún hay confusión"*; entre otros.
[69] Ver Anexo VII. El original en francés se lee: *"J'accuse réception du Borrador que vous proposez traduisant le principe d'accord intervenu entre MM Rafael Miranda et Loïc Capéran au sujet d'un possible décrochage du Peso argentin par rapport à l'US dollar »*.
[70] El original es francés se lee: *"Je ne peux pas accepter la rédaction du paragraphe Nº 2. Pour moi, ce que vous appelez la «contingencia» qui déclenche la compensation est simplement l'existence au 1er décembre 2001 d'une différence entre la valeur d'un US dollar et d'un peso argentin, le peso valant moins que le dollar. Toute référence à la Loi de Convertibilité et à l'Euro me paraît inacceptable"*.

41

Ley de Convertibilidad. En efecto, adviértase que el fax del Sr. Källstrand fue seguido de nuevas conversaciones telefónicas, en las que se coincidió en que la idea del Sr. Källstrand sobre la *Contingencia* era demasiado imprecisa, aunque denotaba que la definición propuesta en el borrador podría resultar demasiado limitada. Los representantes de ENDESA aceptaron, entonces, que la *Contingencia* se redactase de forma tal que no sólo contemplara una modificación de la Ley de Convertibilidad dispuesta por el Congreso, sino también por una decisión delegada del Poder Ejecutivo, o por el libre juego de la oferta y la demanda de pesos y dólares, ésto en la hipótesis de que, luego de derogarse o modificarse en legal forma la Ley de Convertibilidad, se adoptara un régimen de libre flotación.

9.89. Como se advierte, **en todas las hipótesis** trabajadas por las partes al negociar la *Carta Acuerdo*, **era necesario**, aunque no suficiente, **que el tipo de cambio establecido en el artículo 1 de la Ley de Convertibilidad fuera derogado o modificado**.

9.90. Los representantes de EDFI aceptaron que el documento también contemplara como *Contingencia* la hipótesis de una eventual revaluación del peso respecto del dólar estadounidense; caso en el que sería EDFI la que compensaría a los vendedores.

9.91. También se acordó que la cuantificación de la eventual revisión del precio se basaría en un promedio de la ***cotización oficial del peso*** respecto del dólar durante el período comprendido desde la primera alteración de la paridad peso/dólar hasta el **1 de diciembre de 2001** (primera fecha límite negociada por las partes). De modo que el tope temporal del cálculo sería únicamente **ése**.

9.92. Luego, el 25 de abril de 2001, el Sr. Alfonso Arias -de ENDESA- remitió un correo electrónico al Sr. Källstrand que decía: "*Siguiendo las instrucciones de D. Alfredo Llorente le adjunto el borrador de la carta que se firmaría una vez que EDF Internacional haya recibido la autorización del Gobierno francés al que se refiere el Contrato de compraventa*".[71]

9.93. En este borrador del 25 de abril de 2001:

- Se mantenía la fecha del 1 de diciembre de 2001 como fecha final para la producción de la contingencia y la fecha del 15 de diciembre de 2001 para efectuar el pago sin intereses.

- Se definía la contingencia como "*la desvinculación de la paridad del peso argentino con el dólar USA, ya suponga una devaluación o una revaluación del peso argentino respecto del dólar*". Se suprimía así, la exigencia de que la devaluación (o la revaluación) del peso respecto del dólar fuera producida únicamente como consecuencia directa e inmediata de una modificación en la ley de convertibilidad, pero continuaba subsistiendo el requisito primordial de que se produjera la

---

[71] Documento anexo a la declaración del Sr. Llorente Legaz, ver Anexo VII.

42

*"desvinculación de la paridad del peso argentino respecto del dólar"*. **Ello implicaba que el artículo 1 de la Ley de Convertibilidad perdiera legalmente su vigencia.**

- Se ratificaba que la cantidad en dólares a pagar sería calculada *"aplicando al precio recibido por los vendedores la mitad del porcentaje de la variación de la paridad del peso argentino respecto del dólar"*, pero se añadía: *"para cuyo cálculo se tomará el promedio de la cotización oficial del peso argentino respecto del dólar de Estados Unidos durante el período comprendido entre la fecha en que se produzca la primera alteración de la paridad peso/dólar y el 30 de noviembre de 2001"*.

9.94. Frente a ello, los representantes de EDFI plantearon una nueva inquietud.

9.95. Se habían considerado hasta ese momento los términos *"devaluación"* y *"revaluación"*, sin tener en cuenta que, en su sentido técnico, definían una modificación del tipo de cambio oficial decretada en forma directa por una decisión de una autoridad pública, pudiendo quedar excluido el supuesto - previamente acordado- de que el peso se depreciara (o apreciara) respecto del dólar, no como consecuencia de un nuevo tipo de cambio oficial, sino por la libre oferta y demanda de divisas en la hipótesis de adoptarse un sistema de libre flotación luego de derogada la paridad cambiaria del artículo 1 de la Ley de Convertibilidad. Incluso, según ese criterio, podía quedar excluida una posible declaración judicial de inconstitucionalidad de esa norma y quedar dudas sobre las consecuencias de alguna ley que, sin derogarla, estableciera alguna limitación, como por ejemplo, establecer a la vez varios tipos de cambio **oficiales** diferenciados[72].

9.96. Por ello, EDFI exigió que la referencia específica a la *devaluación* y a la *revaluación* se reemplazara por una referencia a cualquier causa que produjera un aumento o una disminución del tipo de cambio del peso respecto del dólar.

9.97. Los representantes de ENDESA aceptaron la nueva frase propuesta por EDFI; pero para evitar que dicha frase (*"cualquiera que sea la causa que lo produzca"*) pudiera malinterpretarse y dar lugar a alguna incertidumbre y discusión sobre datos puramente fácticos, **exigieron que quedara bien claro que siempre se requeriría, para que la *Contingencia* se produjese, que hubiera desaparecido la vinculación del tipo de cambio establecida en el artículo 1 de la Ley de Convertibilidad.**

9.98. A dicho efecto se acordó que las palabras **"desvinculación de la paridad del peso argentino con el dólar USA"** fueran sustituidas por las palabras

---

[72] En la historia económica argentina en numerosas oportunidades coexistieron diversos tipos de cambio oficiales para diversas operaciones. Basta recordar, durante la presidencia del Dr. Raúl R. Alfonsín, en su última etapa, la gestión del Ministro de Economía Jesús Rodríguez.

43

"desvinculación del *tipo de cambio oficial* del peso argentino con el dólar USA" (el destacado es nuestro).

9.99. Así las cosas, el 27 de abril de 2001, el Sr. Arias envió al Sr. Källstrand un correo electrónico que decía: *"Por indicación del Sr. Llorente le adjunto una nueva versión del documento en la que se han introducido los pequeños cambios comentados"*, anexando un nuevo borrador en el que la contingencia aparecía ya definida como quedó en el apartado 2 de la *Carta Acuerdo*, es decir: *"A los efectos de esta carta se entiende por Contingencia la desvinculación del tipo de cambio oficial del peso argentino con el dólar USA, cualquiera que sea la causa que lo produzca"* (el destacado es nuestro).

9.100. Sin embargo, inmediatamente, los representantes de EDFI plantearon dos nuevas exigencias: la extensión del plazo del posible acaecimiento de la contingencia hasta el 31 de diciembre de 2001 y que el cálculo de la cantidad que eventualmente habría de pagarse se hiciera según el modelo de un Anexo a la *Carta Acuerdo*.

9.101. Los representantes de ENDESA aceptaron también esas exigencias.

9.102. Empero, solicitaron que el adjetivo *"oficial"* fuese añadido también al giro *"tipo de cambio"* en las expresiones *"disminución del tipo de cambio"* y *"aumento del tipo de cambio"* contenidas en el apartado 3 de la *Carta Acuerdo*. Ello así para evitar que pudieran considerarse tipos de cambio de mercados "negros" o "paralelos" (no oficiales), o cualesquiera otros que no fueran "oficiales" de la República Argentina, al determinar si se había producido o no la disminución o aumento del *tipo de cambio oficial* de la Ley 23.928.

9.103. Tal planteo de ENDESA fue admitido sin discusión por EDFI. Ello revela *per se* que la **intención de las partes era indiscutiblemente definir la Contingencia** en función de cualquier eventual alteración puntual y concreta, cualquiera fuera el sentido de ella, **del tipo de cambio oficial de la Ley 23.928** (artículo 1).

9.104. **La fundamentación del Laudo impugnado es, pues, claramente ilegal.**

9.105. **La *desvinculación* del *tipo de cambio oficial* requería, como causa eficiente y primaria, cualquiera de las siguientes causas: la sanción de una ley que modificara o dejara sin efecto el tipo de cambio oficial de la Ley 23.928 o, en su caso, el dictado de un decreto con sujeción a facultades delegadas por el Poder Legislativo en el Poder Ejecutivo o, alternativamente, la hipotética declaración de inconstitucionalidad por el Poder Judicial (art. 31 de la Constitución Nacional).** Estos y no otros, son los únicos criterios posibles de interpretación de la frase *"cualquiera sea la causa que lo produzca"*, con relación a la *desvinculación* del *tipo de cambio oficial*.

44

9.106. Pero ninguna de las causas mencionadas precedentemente se verificó antes del *límite temporal* existente en el mecanismo de revisión de precio pactado por las partes, esto es, antes del 31 de diciembre de 2001.

9.107. Resulta contrario al orden público constitucional asumir, como hizo el Laudo impugnado, que como las partes pactaron que la desvinculación podía producirse *"cualquiera fuese su causa"*, una ley puede ser derogada por la declaración de feriado bancario decretada por el Banco Central de la República Argentina.

9.108. Como señala acertadamente el voto en disidencia, *"el **Banco Central de la República Argentina no tiene autoridad** para modificar el tipo de cambio del peso con el dólar, ni del peso con ninguna otra moneda, pues **son únicamente el Congreso y el Poder Ejecutivo Nacional de la República Argentina**, este último mediante delegación legislativa, **los facultados para fijar la relación de cambio entre el peso y las divisas extranjeras"** (punto 11, el destacado es nuestro).

9.109. En efecto, ni el Banco Central ni el mercado ni la economía tienen virtualidad suficiente en la Argentina para derogar o modificar una ley, según es de toda obviedad.

9.110. Si las partes hubieran querido prever simplemente el cambio de cotización de la moneda en el mercado -con prescindencia de lo que sucediera con el tipo de cambio oficial impuesto por el artículo 1 de la Ley 23.928- hubieran recurrido a cualquiera de las fórmulas sucesivamente desarrolladas y reiteradas durante los años de inestabilidad cambiaria en el país. Máxime tratándose de empresas profesionalizadas que celebraron en ese tiempo numerosos contratos en la Argentina[73].

9.111. Pero no lo hicieron.

9.112. Por el contrario, las partes se refirieron expresamente a la *desvinculación* del *tipo de cambio oficial*. Mencionaron explícitamente *ese tipo de cambio oficial* a efectos de determinar la cuantificación de la revisión del precio que podría producir el acaecimiento de la *Contingencia*. Y ese es el elemento decisivo en este conflicto: las partes pretendían -y así lo plasmaron con total precisión y claridad tras analizarlo muy detenidamente durante días- que se instrumentara un acuerdo referido a cualquier alteración del *tipo de cambio oficial* establecido imperativamente por la Ley 23.928. Y fijaron, con total libertad y conciencia, un límite temporal para esa *Contingencia*. La referencia a *"cualquier causa que la produzca"* no podía ser otra, formalmente, que la derogación o modificación del

---

[73] Por ejemplo, en caso de derogación de la convertibilidad o modificación de la paridad cambiaria establecida en la ley respectiva, se podría haber utilizado para recalcular el precio de la compraventa la cotización del dólar en el mercado libre de cambios y que, de no hacerlo, se recurriría al valor del peso que resultara de la venta de Bonex u otros títulos públicos en el mercado de Montevideo o Nueva York. Finalmente, en el Anexo de la Carta *Acuerdo* del 31.3.01, al igual que en todos sus antecedentes, quedó claro que la compensación a abonarse no sería equivalente al 100% de la diferencia suscitada en el *"tipo oficial de cambio"* pactado como referencia, sino sólo de la mitad, es decir del 50%, a fin de compartir el riesgo por partes iguales. Por ello, en el ejemplo brindado en el Anexo –que tiene en cuenta la hipótesis de una *"devaluación media del 20%"*– se establece que se abona sólo un 10%.

# EXHIBIT 5

45

artículo 1 de la Ley 23.928 por una ley nacional o un decreto delegado, o la declaración de inconstitucionalidad de esa norma jurídica. Pero la amplitud de la expresión, en definitiva, no hizo más que reflejar que la intención de las partes era cubrir cualquier hipótesis de modificación de aquella regla legal, en un país que evidenciaba endeblez en lo institucional y en lo económico ya a la fecha de celebración del contrato.

9.113. Por ello, predicar, como hace el Laudo, que la *Contingencia* se produjo porque dejaron de cumplirse, en la realidad práctica, las bases de la Ley de Convertibilidad es tan abiertamente contrario al ordenamiento jurídico que conduce a la conclusión, ciertamente inadmisible, de que **cualquier magistrado podría descartar la aplicación de cualquier norma de orden público no derogada, sosteniendo dogmáticamente que perdió vigencia porque se extinguieron o desnaturalizaron los fundamentos que dieron lugar a su sanción.**

9.114. De seguirse ese razonamiento antijurídico debería admitirse, por ejemplo, que en la actualidad ha perdido vigencia la prohibición de indexación contenida en la ley 25.561 -norma que también es de orden público- ante los significativos índices de inflación experimentados desde su sanción. O peor aún: si se admitiera que la paridad de la Ley de Convertibilidad *se desvinculó* en términos económicos el 21 de diciembre de 2001, todas las normas posteriores que pesificaron las obligaciones en moneda extranjera al 6 de enero de 2002 (Decreto Nº 214/02 y normas complementarias) deberían considerarse sin ningún valor.

9.115. En estas condiciones, todas las referencias efectuadas por el Tribunal Arbitral a aspectos de la *realidad económica* de diciembre de 2001 -tales como el deterioro de la economía argentina, la reducción del nivel de depósitos junto con las reservas monetarias del Banco Central de la República Argentina, las restricciones impuestas por el "Corralito", la aparición de mercados cambiarios paralelos, las manifestaciones masivas y violentas contra la política económica del gobierno y el feriado cambiario dictado en respuesta a la crisis política que culminó con la renuncia del Presidente de la Nación y la sucesión de diversos reemplazantes en escasos días (párrafos 674 a 680 y 690 a 696)- carecen de relevancia para resolver la controversia cuando existen disposiciones contractuales y legales claras y precisas para dirimirla. **Ninguna de esas circunstancias fue suficiente para reemplazar, modificar o derogar una ley de la Nación que, en ejercicio de la facultad constitucional del artículo 75, inciso 11 CN, había fijado el valor de la moneda.**

9.116. Como lo advierte el voto en disidencia, todo lo anterior *"revela además la discrecionalidad del laudo al concluir que la expresión 'cualquiera sea la causa' es suficientemente amplia para incluir, como posibles causas de la Contingencia, los que llama 'acontecimientos prácticos en el economía o mercado de divisas argentino' (parágrafo 654) ...Es claro que había múltiples causas que podrían haber producido 'la desvinculación del tipo de cambio oficial del peso argentino con el dólar USA',* **pero ninguno de los acontecimientos del año 2001 pudo ser una de esas causas porque ninguno de ellos fue un acto normativo**

46

*que hiciera que dejara de estar en vigor el tipo 1-1 del artículo 1 de la Ley de Convertibilidad*" (punto 14, el destacado es nuestro).

**H. El Laudo incurre en una grosera autocontradicción: primero sostiene que, de partes que no eran especialistas en el régimen de convertibilidad, no podía esperarse que hicieran referencia al tipo de cambio oficial de la Ley de Convertibilidad; para afirmar luego que, para pactar la** *Contingencia,* **las partes tuvieron en cuenta los sofisticados aspectos de política económica y cambiaria establecidos en la Ley de Convertibilidad**

9.117. El Laudo incurre en manifestaciones autocontradictorias que confirman los vicios referidos precedentemente.

9.118. En efecto, para obviar que en ejercicio de las facultades constitucionales para fijar el valor de la moneda la Ley de Convertibilidad había establecido en su art. 1 el *tipo de cambio oficial,* el Laudo señaló que ENDESA, YPF y EDFI *"sencillamente tenían en mente la paridad de un peso por un dólar"; y* puntualizó que *"de las Partes, que no eran especialistas en el Régimen de Convertibilidad y que admitieron no haber revisado los términos de la Ley de Convertibilidad en ningún detalle, no podría esperarse que identificaran provisiones específicas de la Ley de Convertibilidad"* y que por ello *"no era el mecanismo para obtener la paridad entre el peso y el dólar lo que le interesaba a las partes, más bien, era la realidad práctica de una tasa de cambio uno por uno"* (párrafo 661, el destacado es nuestro).

9.119. Pero, al mismo tiempo, **en clara contradicción** con lo anterior, para arbitrariamente decir que la Contingencia ocurrió antes del 31 de diciembre de 2001, **el Laudo consideró que las partes habrían tenido en cuenta los sofisticados instrumentos de política económica y financiera de los artículos 2 y 4 de la Ley de Convertibilidad** en que se apoyaba el régimen de conversión. Y serían esos fundamentos instrumentales de la convertibilidad los que habrían desaparecido antes de que se derogara esa ley el 6 de enero de 2002.

9.120. Para ello sostuvo, dogmáticamente, que eran particularmente relevantes *"....las obligaciones del BCRA contenidas en los Artículos 2 y 4 de la Ley de Convertibilidad. Mientras el Artículo 1 de la Ley de Convertibilidad, con las enmiendas correspondientes, establece la paridad de un peso por un dólar estadounidense para las ventas de dólares por el BCRA, el postulado esencial del Régimen de Convertibilidad era la obligación y desempeño efectivo de las obligaciones del BCRA con respecto a la venta de dólares en esta tasa de manera ilimitada"* (párrafo 686). Añadió que *"los otros requisitos del BCRA consistían en mantener reservas adecuadas y la libertad de cambiar y transferir fondos eran asimismo factores esenciales del Régimen de Convertibilidad"* (párrafo 686). Agregó que *"para que este régimen funcionara y lograra su objetivo de mantener la paridad entre el peso y el dólar, el BCRA tenía la obligación de observar y desempeñar eficazmente las obligaciones establecidas en la Ley de Convertibilidad...[pues] de*

47

*otra manera el tipo de convertibilidad establecido en el Artículo 1 de la Ley hubiera sido de poco interés"* (párrafo 687). Consideró que *"cada una de dichas obligaciones, especialmente la obligación de vender cuantos dólares fuesen requeridos a la tasa de un peso por un dólar, contribuyó al funcionamiento del Régimen de Convertibilidad y a la vinculación del tipo de cambio oficial del peso con el dólar"* (párrafo 687). Y puntualizó que *"la vinculación del tipo de cambio oficial del peso con el dólar consistía en el funcionamiento efectivo del Régimen de Convertibilidad en el cual el tipo de convertibilidad era uno de sus elementos"* (párrafo 687).

9.121. **La autocontradicción es tan evidente como insalvable.**

9.122. El Laudo no pudo sostener válidamente que las partes no eran expertas en el régimen de convertibilidad y que lo único que les importaba era que *"la paridad 1 a 1 del tipo de cambio oficial siguiera inalterada"* y, a la vez, afirmar que para definir la *Contingencia* decidieron sujetarse a lo que sucediera con aspectos económicos, bancarios y financieros muy complejos -como los derivados de los artículos 2 y 4 de la Ley 23.928- cuyo análisis, ciertamente, era sumamente subjetivo y propio de expertos en el tema.

9.123. En otras palabras, el **Laudo incurre en la curiosa, contradictoria y, por lo tanto, arbitraria conclusión de que las partes no eran especialistas en la Ley de Convertibilidad a los efectos de su artículo 1 y que, al mismo tiempo, eran especialistas en esa ley a los efectos de sus artículos 2 y 4 (!!!)**

9.124. Es imposible suponer, como advierte el voto disidente (punto 10), que las partes hubieran negociado arduamente la redacción de una cláusula para concluir en un texto cuya interpretación estaría sujeta a evidentes subjetividades y previsibles discusiones, por ejemplo, acerca de si el nivel de reservas era el adecuado, o si el Banco Central estaba cumpliendo eficazmente con sus funciones monetarias y cambiarias.

9.125. Si se siguiera esa errónea línea de pensamiento, sería incomprensible la razón por la que las partes definieron a la *Contingencia* como la *"desvinculación del tipo de cambio oficial"* y no lo hicieron como *"el abandono de los postulados esenciales del régimen de convertibilidad"*. Si esta última hubiera sido la intención de las partes, empresarios profesionales, como los involucrados, ciertamente así lo hubieran reflejado en el texto de la *Carta Acuerdo*.

9.126. Pero ello no surge, ni siquiera indiciariamente, de la negociación de la *Carta Acuerdo* ni de lo expresamente pactado por las partes en ese documento.

9.127. **La mera comparación entre lo que dice la *Contingencia* descripta en la *Carta Acuerdo*** (*"desvinculación de tipo de cambio oficial del peso argentino con el dólar USA"*, de modo tal que se verifique una *"disminución o ...aumento del tipo de cambio oficial del peso respecto del dólar"*) **y lo que el Tribunal dice que dice** (*"funcionamiento eficaz y continuidad del régimen de convertibilidad en su totalidad"*) **resulta suficiente para que la Excma. Cámara**

48

**advierta que el Laudo se aparta inexplicable y arbitrariamente de la convención celebrada entre las partes.**

9.128. En consecuencia, la referencia a los *postulados de la convertibilidad* no es más que un invento de la parte actora, en el que se apoyó decisivamente el Laudo para condenar a las demandadas, que en nada se compadece con lo pactado por las partes y que conduce directa e inmediatamente a una flagrante violación del orden público argentino y a la afectación irremediable de derechos amparados por la Constitución Nacional.

9.129. La arbitrariedad es evidente y manifiesta.

**I. Para definir a la Contingencia en forma diferente a lo que expresa su texto, el Laudo se basa en prueba falsa**

9.130. Como lo advierte el voto disidente (punto 10, apartado 4), la única explicación posible de la razón por la cual la mayoría del Tribunal ignoró la clara letra de la *Carta Acuerdo* es que **se ha basado en prueba falsa**, es decir, en mentiras de los testigos de EDFI.

9.131. EDFI argumentó que el origen de la palabra *"desvinculación"* y de la expresión *"por cualquier causa"* se hallaba en lo discutido en una supuesta reunión llevada a cabo en Madrid en fecha incierta, en la que el Sr. Didier Lamèthe, funcionario de EDFI, habría propuesto su inclusión a los representantes de ENDESA y YPF para que reflejara *"correctamente la idea de realidad del mercado cambiario"* (documento C-173, segunda declaración escrita del Sr. Didier Lamèthe, párrafos 11 a 13).[74]

9.132. Pero, **la reunión mencionada jamás ocurrió (!!!)**. Ello fue terminantemente negado por ENDESA, por YPF y por sus testigos, y su existencia no pudo ser probada por la demandante, como advierte el voto disidente (punto 10, apartado 4).[75]

9.133. Si bien el Laudo admite disimuladamente en la nota al pie 68 que no puede concluir en que se haya celebrado la mencionada reunión, lo cierto es que adopta el mismo significado de *"desvinculación"* y *"cualquiera sea la causa que lo produzca"* que el atribuido por los representantes de EDFI en la falsa reunión de Madrid, para afirmar que la intención de las partes fue referirse a la realidad económica y práctica de los postulados esenciales del régimen de convertibilidad (párrafos 686, 687 y 690 a 696).

---

[74] Ver Anexo VIII.

[75] Durante las audiencias de interrogatorio, tanto los letrados de ENDESA e YPF como el Tribunal requirieron insistentemente a los testigos de EDFI que aportaran pruebas concretas (agendas, pasajes de avión, etc.) que demostraran que efectivamente había tenido lugar la reunión de Madrid, en la que según ellos, surgió el acuerdo de utilizar la palabra "desvinculación" con el alcance otorgado por EDFI y, posteriormente, por el voto de la mayoría. Los testigos de EDFI no pudieron aportar una sola evidencia en ese sentido, a punto tal que ante los infructuosos requerimientos el presidente del Tribunal expresó: "¿Nadie en EDFI anotó esto en un calendario? ¿Nadie tiene boletos de avión? ¡Qué diablos! ¿Cómo es que no se puede identificar la fecha de esa reunión? (ver la Audiencia de Interrogatorio del Sr. Patricio Meés, TR 17.10.05, p. 68, líneas 32/33).

49

9.134. En definitiva, es de una *"notable parcialidad, ya no sólo por el derecho argentino (artículos 1198 del Código Civil y 218.4 del Código de Comercio), sino en el contexto de un arbitraje internacional ante la CCI, la decisión del laudo de atribuir a la palabra 'desvinculación' y a la expresión 'cualquiera que sea la causa que la produzca' unos significados que son los mismos"* que, según la actora, <u>fueron acordados en una reunión que, se probó, nunca existió</u> (voto disidente, punto 10, apartado 4, el destacado es nuestro).

### J. La afirmación del Laudo de que el término contractual *"desvinculación"* no apuntaba al tipo de cambio oficial sino a los postulados básicos del régimen de convertibilidad, colisiona con la precisión y claridad de lo pactado y carece de todo sentido lógico, jurídico y económico. Pero aun en esta absurda y negada hipótesis, el Laudo interpretó el asunto de un modo manifiestamente arbitrario

9.135. El *régimen* de la Ley de Convertibilidad era, sustancialmente, un sistema monetario. No era un régimen de libertad de cambios que acordara el derecho de efectuar libremente transferencias al exterior sin autorizaciones previas.

9.136. La convertibilidad era un sistema monetario de tipo de cambio fijo, en el cual la moneda argentina -el peso- se encontraba *"anclada"* en el valor 1 a 1 al dólar estadounidense. Como tal, resulta similar a los regímenes de *"patrón oro"* que existieron en el pasado en Argentina, como la denominada *Caja de Conversión* (que operó entre los años 1884 y 1885, en 1890, entre los años 1899 y 1914, etc.), o a los denominados sistemas de *"currency board"* que han existido en otros países (por ejemplo, Hong Kong).

9.137. Mas la libertad para transferir dólares al exterior <u>no</u> constituía un elemento esencial e inherente del denominado *régimen* de convertibilidad, tal como incorrecta y dogmáticamente afirma el Laudo.

9.138. Un sistema monetario es, por definición, diferente de un régimen de control de cambios. La relación de la moneda local podrá estar vinculada a otra moneda o metal precioso sin que ello signifique que no deba existir un régimen de control de cambios.

9.139. Habitualmente, los países establecen autorizaciones previas para las transferencias al exterior, para controlar la balanza de pagos, el ingreso al país de las divisas de las exportaciones y el valor de transferencia declarado para ellas, el egreso y valor declarado de las importaciones, los pagos de servicios (seguros, transferencia de tecnología, royalties, etc.), los intereses y amortizaciones de préstamos, etc.

9.140. Pero ello no impide que exista un régimen monetario de convertibilidad que vincule, en una relación de tipo de cambio fijo, la moneda del país con otra moneda extranjera, u otro parámetro de vinculación (patrón oro u otro).

50

9.141. De hecho, como se mencionó antes, así ocurrió históricamente en Argentina en otras oportunidades. Por ejemplo, la Ley de Conversión del año 1899, n° 3871: la conversión (patrón oro) continuó hasta 1914, fecha en la cual se suspendió a raíz de la primera guerra mundial. Pero mientras la suspensión de la conversión, en razón de la emergencia, y la prohibición de exportar oro subsistieron respectivamente hasta octubre de 1927 y hasta 1925 (leyes 9481, 9506, 9483 y facultades delegadas al Poder Ejecutivo), la paridad de conversión continuó vigente.

9.142. **Es por tanto inexacto que los parámetros esenciales de la vinculación del peso con el dólar hayan sido *"completamente modificados"* en el curso del mes de diciembre de 2001, como se afirma en el Laudo.**

9.143. En la demanda se sostuvo que la desvinculación se habría producido **en dos etapas** (el Laudo por una parte fijó la *Contingencia* en el feriado cambiario pero también sostuvo que el control de cambios y la caída de reservas rompieron los *"postulados esenciales del régimen de convertibilidad"*).

9.144. La primera de esas etapas habría ocurrido el 1 de diciembre de 2001, con el dictado del Decreto N° 1570/01.

9.145. Ese decreto, en su artículo 2, inciso b), prohibió las operaciones de transferencias al exterior, **con excepción** de las que correspondieran a operaciones de comercio exterior, al pago de gastos o retiros que se realizaran en el exterior a través de tarjetas de crédito o débito emitidas en el país, **o a la cancelación de operaciones financieras o por otros conceptos, en este último caso, sujeto a que las autorice el Banco Central de la República Argentina.** También prohibió, en su artículo 7°, la exportación de billetes y monedas extranjeras y metales preciosos amonedados, salvo que se realizaran a través de entidades financieras argentinas supervisadas por el Banco Central, o fueran inferiores a 1.000 dólares. Además, en el artículo 8° estableció que el Banco Central de la República Argentina sería la autoridad de aplicación del decreto.

9.146. En realidad, según ya se ha analizado, **esta norma no produjo la *"desvinculación"* del tipo de cambio oficial del peso argentino con el dólar estadounidense** sino que, simplemente, estableció un régimen de control de cambios con autorización previa del Banco Central, similar al existente en Argentina en otros períodos y, también, en otros países.

9.147. **Pero ello <u>no</u> importó desvincular la relación 1 á 1 del peso con el dólar estadounidense, ni derogar la Ley de Convertibilidad, ni devaluar.**

9.148. Para entender claramente lo expuesto es útil y necesario reseñar otras normas dictadas por el Poder Ejecutivo y el Banco Central de Argentina durante el mes de diciembre, complementarias del Decreto N° 1570/01, que **continuaron dando forma al régimen de control de cambios y autorizaciones** por parte del Banco Central:

51

- El Decreto Nº 1606/01, del 5.12.01, publicado el 6.12.01, estableció excepciones al régimen del artículo 2, inciso b) del Decreto Nº 1570/01 y restringió la limitación del artículo 7 a la exportación de billetes y metales preciosos amonedados ampliándola a 10.000 dólares estadounidenses. También, en el artículo 5, derogó el Decreto Nº 530/91, y restableció la vigencia del artículo 1 del Decreto Nº 2581/64 y del artículo 10 del Decreto Nº 1555/86. El Decreto Nº 530, del 27.3.91, en su artículo 1, había dejado sin efecto la obligatoriedad del ingreso y negociación en el mercado de cambios de las divisas provenientes de la exportación de productos, que fuera dispuesta por el artículo 1 del Decreto Nº 2581/64. También dispuso su aplicación a toda suma ganada en moneda extranjera a favor de un residente en la República Argentina y a las divisas provenientes por el cobro de conceptos tales como fletes, pasajes, comisiones, seguros y otros similares (artículo 2). Dejó además sin efecto el artículo 10 del Decreto Nº 1555/86, que requería el ingreso y la negociación de divisas para acceder al sistema de devolución de tributos (artículo 4). Se advierte de los vistos y considerandos del Decreto Nº 530/91 y de su propio articulado, que carece de toda relación directa o referencia a la Ley de Convertibilidad. Es que, reiteramos, la convertibilidad como sistema monetario puede funcionar tanto en un régimen de libertad absoluta para las transferencias al exterior como en regímenes de mayor o menor control de cambios. El Decreto Nº 2581/64, en su artículo 1º, establece que el contravalor en divisas de la exportación de productos nacionales, hasta alcanzar su valor FOB o C y F, según el caso, deberá ingresarse al país y negociarse en el mercado único de cambios dentro de los plazos que establezca la reglamentación pertinente.

- El Decreto Nº 1638/01, del 11 de diciembre de 2001, continuó reglamentando el régimen de control de cambios. Su artículo 1 estableció que el ingreso y negociación de divisas previsto en el artículo 1 del Decreto Nº 2581/64 y su negociación prevista en el artículo 10 del Decreto Nº 1555/86 se consideraría cumplida mediante el ingreso de las divisas correspondientes y su depósito en una cuenta del exportador abierta en una entidad sujeta a la Superintendencia de Entidades Financieras y Cambiarias del Banco Central, sin que sea necesaria su negociación en el mercado de cambios o su conversión a ninguna otra moneda, nacional o extranjera. Luego, en su artículo 2, reguló otros aspectos del régimen de control cambios, ordenando al Banco Central exceptuar del ingreso de las divisas a los exportadores, cuando se apliquen a la cancelación de obligaciones contraídas en el exterior para la financiación de proyectos de inversión, la prefinanciación de exportaciones, la concertación de préstamos estructurados, la colateralización o garantía de operaciones financieras y la atención

52

de compromisos financieros de los exportadores. El artículo 3, estableció por su parte, que no estaban obligadas al ingreso de divisas las actividades que tuvieran una exención especial otorgada por ley, por contrato con el Estado Nacional o por decretos de fecha anterior a éste decreto, y en la medida de tal exención. Tal es el caso, por ejemplo, del régimen de promoción minera de la Ley 24.196 o el régimen de libre disponibilidad de divisas de los hidrocarburos aprobado por el Decreto Nº 1589/89. Por último, se autorizaba a la Administración Federal de Ingresos Públicos y la Secretaría de Comercio, a disponer excepciones al ingreso de divisas por resolución conjunta, y se designaba a la Secretaría de Comercio y al Banco Central, dentro del ámbito de sus competencias, como autoridad de aplicación, facultadas para dictar normas e interpretaciones (artículos 4 y 5).

- El Banco Central dictó normas reglamentarias del régimen de control de cambios, operaciones excluidas, excepciones, procedimiento, etc., y también reglamentó la nueva normativa bancaria que limitó drásticamente los retiros en efectivo dispuesta por el art. 2, inc. a), del Decreto Nº 1570/01. Así por ejemplo, la Comunicación "A" 3372, y el Comunicado de Prensa Nº 42.059, emitidas el 1 de diciembre, en consonancia con el referido decreto, ratificaron que *"conforme a lo dispuesto por la ley de convertibilidad, podrán continuar realizándose operaciones de cambio entre billetes pesos y dólares, con las mismas modalidades actualmente vigentes"*. Agregaron que *"los préstamos que se otorguen a partir del próximo lunes 3 de diciembre, incluyendo las renovaciones de las financiaciones acordadas con anterioridad, sólo podrán ser instrumentados en dólares. Los préstamos en pesos vigentes a esa fecha podrán convertirse en dólares a la paridad $1 = US$ 1, siempre que medie el consentimiento del cliente"*. Y puntualizaron que *"las operaciones de pesos a dólares y viceversa no estarán sujetas al pago de comisiones y se efectuarán al mencionado valor, siempre que se cursen a través de cuentas abiertas en entidades financieras"* (Comunicado de Prensa Nº 42.059).

- La Comunicación "A" 3377 del Banco Central, del 5 de diciembre de 2001, estableció la posibilidad de conversión de las financiaciones en pesos vigentes al 2 de diciembre de 2001 a dólares estadounidenses al valor de un peso por cada dólar, con el consentimiento del deudor (p.1). También dispuso que los titulares de los depósitos a plazo fijo, las inversiones a plazo, las aceptaciones, los pases pasivos, y las cauciones y pases bursátiles pasivos, vigentes al 3 de diciembre, y los saldos en cuentas de cajas de ahorros, cuentas corrientes, cuentas corrientes especiales para personas jurídicas, colocaciones de fondos comunes de inversión y otros depósitos a la vista, podrían requerir su conversión a dólares estadounidenses al valor de un peso por cada dólar, al vencimiento, sin comisiones.

53

9.149. Todas estas normas estuvieron vigentes y se aplicaron en diciembre de 2001, **sin que por ello pueda afirmarse que tenían aptitud legal para *desvincular* el tipo de cambio del art. 1 de la Ley de Convertibilidad.**

9.150. Como advierte el voto disidente, la evidencia existente en las actuaciones indica, además, que calificadas instituciones nacionales e internacionales consideran que *"**técnicamente se puede demostrar que al 31 de diciembre de 2001 el Gobierno Nacional estaba cumpliendo la Ley de Convertibilidad**"*[76] y la "***tasa oficial*** [de cambio] *estuvo vinculada al dólar estadounidense hasta el 6 de enero de 2002*"[77] (punto 10, apartados 7 y 8, el destacado es nuestro).

9.151. Es un hecho público y notorio que, **durante ese mes, numerosas colocaciones bancarias, mayormente por vía telefónica o electrónica, se convirtieron de pesos a dólares o de dólares a pesos según la Ley de Convertibilidad, incluso en días inhábiles o feriados cambiarios.**

9.152. Sin ir más lejos, el 5 de diciembre de 2001 se emitió la Comunicación "A" 3378. Allí se precisaron y ampliaron las excepciones del artículo 2 inciso b) del Decreto Nº 1570/01 para las operaciones de comercio exterior a través de entidades financieras, incluyendo las importaciones de bienes y los servicios asociados a su adquisición, los fletes, seguros y cargos, intereses de financiación, etc., asociados a importaciones o exportaciones. También se excluyó a las transferencias al exterior ordenadas por representaciones diplomáticas o consulares, organismos internacionales, etc., se estableció el rol de control para las entidades financieras intervinientes y se aclaró que se encontraban incluidas en la excepción del artículo 2 inciso b) las transferencias al exterior que realizaran las empresas administradoras de tarjetas de crédito para atener consumos y retiros efectuados en el exterior. La Comunicación "A" 3382, del 7 del mismo mes reglamentó el régimen de autorización previa para las transferencias al exterior, indicando las transferencias de comercio exterior no excluidas de la autorización previa, las transferencias financieras de autorización automática y las que requerían autorización previa. La Comunicación "A" 3394, del 13 de diciembre, incorporó a la Com. "A" 3382 las excepciones al régimen de ingreso de divisas establecidas por el Decreto Nº 1638/01.

9.153. De modo que, a partir de diciembre, se estableció un régimen de control de cambios y autorizaciones previas del Banco Central de la República Argentina para ciertas transferencias al exterior, excluyendo el comercio exterior y numerosas operaciones financieras. **Pero no se produjo una *desvinculación* de la relación 1 á 1 que establecía la Ley de Convertibilidad entre el peso y el dólar estadounidense.**

---

[76] Ver Cámara Argentina de Sociedades Anónimas, nota de 9 de enero de 2002 presentada a la Comisión Nacional de Valores, obrante en las actuaciones arbitrales como Documento R-53.
[77] Ver Fondo Monetario Internacional, publicación "*Internacional Financial Statistics*", obrante en las actuaciones arbitrales como Documento R-45.

54

9.154. **Esa vinculación, por el contrario, se fortaleció y simplificó, particularmente en cuanto a la conversión de operaciones bancarias.**

9.155. El artículo 9 del Decreto Nº 1570/01 estableció que su vigencia sería hasta las 24 horas del día siguiente al del cierre de las operaciones de crédito público previstas en el artículo 24 del Decreto Nº 1387/01, que era precisamente la reestructuración de deuda a la que hicimos referencia. Pero en todos los actos de gobierno que dispusieron tales medidas y otras vinculadas a ellas se ratificó la plena vigencia de la vinculación de la relación 1 a 1 entre el peso y el dólar estadounidense establecida por la Ley de Convertibilidad. Tal, por ejemplo, los vistos y considerandos del Decreto Nº 1570/01 y las normas reglamentarias del Banco Central de la República Argentina que hemos analizado previamente.

9.156. La segunda etapa de la *desvinculación* habría ocurrido, en lo que interesa al Laudo, el 20 de diciembre de 2001, cuando el Banco Central de la República Argentina dispuso -mediante su Comunicación "A" 3409- un feriado bancario para las operaciones de cambio.

9.157. Sin embargo, **tales feriados cambiarios no constituyeron la desvinculación**. Muy por el contrario, **al igual que la finalidad perseguida con las medidas del "Corralito", ha quedado acreditado en las actuaciones arbitrales y ha sido admitido por EDFI que** *"la voluntad declarada por el Banco Central de la República Argentina al declarar aquellos feriados fue la de proteger la base de reservas"* (voto de la disidencia, punto 11).

9.158. A ese respecto corresponde, en primer lugar, exponer la situación en una perspectiva más precisa:

- Los feriados cambiarios dispuestos hasta el día 31 de diciembre de 2001 corresponden, en rigor, a **seis días hábiles bancarios** (teniendo en cuenta sábados y domingos y el 24 y el 31 de diciembre que habitualmente han sido días inhábiles bancarios en la Argentina).

- Tales feriados no fueron absolutos pues ciertas operaciones se hallaban autorizadas (Punto 2 de la Com. "A" 3409). La Comunicación "A" 3413, del 24 de diciembre de 2001, extendió el feriado hasta el 26, pero habilitó la realización de una serie de operatorias, inclusive la transferencia de cuentas en dólares estadounidenses a cuentas en pesos de un mismo cliente o las compras en dólares efectuadas mediante tarjetas de crédito o débito, a la relación 1 a 1. La Comunicación "A" 3416, del 26 de diciembre, que prorrogó el feriado agregó que, sin perjuicio de ello, se admitían las transferencias de cuentas en dólares estadounidenses a cuentas en pesos y la acreditación en cuenta de transferencias desde el exterior.

55

9.159. En consecuencia, aun durante esos pocos días, el feriado cambiario no era absoluto y podían realizarse operaciones de transferencias desde el exterior que se convertían según el *tipo de cambio oficial* fijado obligatoriamente en la Ley de Convertibilidad. Así surge del Comunicado Telefónico del BCRA a las Entidades Financieras N° 5897 del 27.12.01 (confirmado mediante Comunicación "C" 33616, del 3 de enero de 2002) y del Comunicado Telefónico N° 5898, de la misma fecha (confirmado mediante Comunicación "C" 33617) que permitieron determinadas operaciones al tipo de cambio un peso por un dólar estadounidense.

9.160. Lo expuesto demuestra que, lejos de reflejar meras discrepancias con los fundamentos del Laudo, los agravios vertidos constituyen prueba irrefutable de los graves defectos en que ha incurrido. <u>El Tribunal Arbitral simplemente dejó de aplicar el derecho argentino (en rigor, dejó de aplicar todo derecho) y resolvió en contra de los extremos de hecho acreditados en la causa.</u>

9.161. El voto en mayoría no sólo se apartó de los puntos comprometidos al considerar que la Contingencia consistía en la ruptura de los postulados básicos del régimen de convertibilidad o en un *"acontecimiento práctico de la economía"*, sino que, <u>como critica con meridiana claridad el voto disidente, lo expuesto en los párrafos anteriores demuestra que es arbitraria *"la conclusión del laudo de que a partir del 21 de diciembre de 2001 no existió en la Argentina ningún 'tipo de cambio oficial'"*</u> (punto 11, el destacado es nuestro).

**K. <u>El Laudo impugnado, emitido por árbitros que debieron actuar como árbitros de derecho, se apoyó en una "interpretación" flagrantemente contraria a la literalidad de lo acordado por las partes, a su intención evidenciada en todos los antecedentes del caso, al orden público argentino e, incluso, a principios constitucionales básicos. Esa interpretación, se basó únicamente en especulaciones y conjeturas sobre la realidad económica, totalmente desacertadas e impropias de cualquier decisión jurisdiccional. No existe en el Laudo, siquiera tangencialmente, una derivación razonada del derecho vigente</u>**

9.162. Como expusimos precedentemente, el punto comprometido en arbitraje se limitaba a verificar si se había producido la *Contingencia*, es decir, si había ocurrido hasta el 31 de diciembre de 2001 una disminución o aumento del *tipo de cambio oficial* que implicase una desvinculación de la paridad 1 a 1 entre el peso y el dólar.

9.163. La mayoría del tribunal no cumplió con ese cometido. **El Laudo no dice que haya habido un tipo de cambio oficial distinto de 1 peso por 1 dólar en el período comprendido entre el 21 de diciembre de 2001 y el final de ese año.** El voto en disidencia así lo subrayó (punto 16).

9.164. En defecto de cumplir con su obligación legal, la mayoría del tribunal optó por analizar las bases de sustentabilidad del sistema económico (párrafos 684

56

y 691) y **conjeturó sobre si los acontecimientos económicos y políticos sucedidos en la Argentina durante diciembre de 2001 tenían entidad para conducir a la salida de la convertibilidad y a la devaluación del peso.**

9.165. En efecto, el Laudo especuló sobre la eficiencia de la medidas económicas adoptadas por el gobierno argentino al afirmar que *"la declaración e implementación del feriado cambiario el 21 de diciembre de 2001, ocurrió como resultado de una crisis económica y sociopolítica sin precedentes en **Argentina** que hizo patente que las medidas económicas y cambiarias previamente tomadas por las autoridades argentinas fueran inadecuadas..."* (párrafo 691, el destacado es nuestro). Además, conjeturó sobre lo que hubiera podido ocurrir en el país en diciembre de 2001 al afirmar que *"todas las pruebas disponibles indican que en ausencia de la prohibición y suspensión de todas las actividades cambiarias, el valor del peso hubiera disminuido significativamente"* (párrafo 695, el destacado es nuestro). Más aún: el Laudo juzgó la suficiencia de los intentos del gobierno argentino por combatir la crisis económica para evitar la derogación de la ley de convertibilidad, afirmando que *"en su discurso de aceptación como Presidente Provisional el 22 de diciembre de 2001, el Presidente Rodríguez Saá indicó que el curso a tomar para resolver la actual crisis económica y social sería la implementación de una tercera moneda **para evitar las consecuencias negativas de la dolarización o devaluación del peso. Mencionó las dificultades que el 'tipo real de cambio'** había causado en las relaciones comerciales argentinas y que dichos problemas serían encarados específicamente. El Presidente Rodríguez Saá renunció unos pocos días después, y el 2 de enero de 2002, el Dr. Eduardo Duhalde asumió la presidencia de Argentina. Dos días más tarde, el Proyecto de Ley de Emergencia Económica... fue enviado al Congreso y la ley fue aprobada el 6 de enero de 2002"* (párrafo 696; el destacado es nuestro).

9.166. Tales afirmaciones son claramente **improcedentes**. Lo hubieran sido, incluso, si se hubiesen expresado como un *obiter dictum* y lo son, con muchísima más razón, **cuando se trata del eje central en que reposa la fundamentación del Laudo impugnado.**

9.167. No era misión del Tribunal juzgar en este arbitraje si en diciembre de 2001 estaban dadas las condiciones para la continuidad de la política económica conocida como "régimen de convertibilidad" o si las condiciones económicas existentes en ese entonces eran suficientes para que se mantuviera en el futuro la paridad 1 a 1.

9.168. El Tribunal debía aplicar el derecho argentino para dirimir la disputa, y no recurrir a conjeturas y especulaciones impropias para fundar su decisión. Esto es, el Tribunal debía dirimir exclusivamente si se había producido una *desvinculación del tipo de cambio oficial* que redundara en un aumento o disminución de la paridad 1 a 1 entre el peso y el dólar antes del 31 de diciembre y, en su caso, identificar de modo concreto el valor del nuevo tipo de cambio oficial en la fecha de la primera alteración y al 31 de diciembre para calcular la eventual compensación.

57

9.169. El laudo, en cambio, juzgó virtualmente inaplicable al caso la Ley de Convertibilidad que estaba vigente en diciembre de 2001 con fundamento en razones metajurídicas, sin declarar su inconstitucionalidad e ignorando lo que las propias partes habían pactado en el texto contractual.

9.170. En definitiva, resulta evidente que **la preocupación de los árbitros de la mayoría** por analizar los lamentables acontecimientos políticos y económicos que sufrió la Argentina en diciembre de 2001 y las perspectivas futuras **se encontraba destinada**, como advierte acertadamente el voto disidente (punto 2), **a laudar como amigables componedores y no como jueces de derecho**, repartiendo a su antojo las consecuencias del infortunio económico argentino.

L. **A mayor abundamiento, la arbitrariedad del Laudo impugnado conduyo, incluso, a considerar inaplicable en la especie el art. 218, inciso 7, del Código de Comercio**

9.171. Tal como lo expresa el voto disidente, los términos de la Carta Acuerdo -en particular la palabra *"desvinculación"* y la expresión *"tipo de cambio oficial"*- no son dudosos y ello conducía indefectiblemente al rechazo de la demanda (puntos 5 y 8).

9.172. Pero, si hipotéticamente se concluyera que esos términos son dudosos, se imponía legalmente la aplicación del principio *favor debitoris*, tanto en cuanto a la vigencia de la *Contingencia* como en lo concerniente a su definición y a los cálculos realizados.[78]

9.173. Lo que no pudo hacer válidamente el Tribunal es *"crear"* términos y expresiones groseramente distintas de las utilizadas por las partes y considerarlas lo suficientemente claras como para obviar la aplicación del mencionado principio.

X. **LA IRRAZONABILIDAD Y FALTA DE TODA LÓGICA JURÍDICA Y ECONÓMICA DE LO QUE AFIRMA EL LAUDO AL CUANTIFICAR LA CONDENA, APARTÁNDOSE DE LO PACTADO, VIOLANDO EL ORDEN PÚBLICO ARGENTINO Y AFECTANDO INDEBIDAMENTE DERECHOS CONSTITUCIONALES BÁSICOS DE LOS DEMANDADOS**

A. **Arbitrariedad por no aplicar el método pactado por las partes: el promedio la _cotización oficial_ del peso frente al dólar entre la fecha de la primera alteración y el 31 de diciembre de 2001. De haber aplicado el método escogido por las partes, la condena hubiera sido igual a "0".**

---

[78] En este sentido, la doctrina ha destacado que *"las reglas que establece el artículo que comentamos puedan clasificarse de clásicas, pues han sido tomadas de los textos romanos o de las leyes o autores antiguos que las han reproducido y explicado. Su fundamento es de toda evidencia y no se discuten en doctrina"* (Fernández, *"Código de Comercio"*, T. 1, Amorrortu, 1957, p. 343.). Asimismo, Malagarriga señala que el principio *"es una consecuencia del principio del derecho común de que no hay obligación sin causa, o, en otros términos, no debe considerarse obligado a nadie si no surge la obligación de la ley o de un contrato del cual aquel de quien se trate haya participado. La regla es la libertad, la carencia de obligación. Lógico es, entonces, que, en la duda, se esté por la liberación"* (*"Tratado de Derecho Comercial"*, T. II, Los contratos comerciales, p. 13, TEA, 1963).

58

10.1. Como se dijo, el Laudo se apartó del texto de la *Carta Acuerdo* y de la ley argentina al considerar que la *Contingencia* se produjo a pesar de no haberse verificado la *desvinculación* del *tipo de cambio oficial argentino* vigente al 31 de diciembre de 2001.

10.2. Seguidamente y a fin de cuantificar la condena a imponer a ENDESA e YPF, el Tribunal debió explicar lo inexplicable: esto es, **cuáles habían sido las tasas *oficiales* de cambio del dólar y del peso entre el 21 y el 31 de diciembre de 2001, diferentes de la paridad 1 a 1 de la Ley de Convertibilidad vigente y obligatoria hasta el 6 de enero de 2002.**[79] Pero el Laudo no dijo que existió un tipo de cambio distinto durante ese período, como puntualizó con elocuencia el voto en disidencia (punto 16).

10.3. No lo hizo, claro está, porque era una tarea imposible ya que el marco legal y la realidad indican que el *"tipo de cambio oficial"* siguió siendo el dispuesto obligatoriamente por la Ley de Convertibilidad hasta más allá del 31 de diciembre de 2001.

10.4. En esas condiciones, es evidente que si el Laudo hubiese respetado el método de cálculo pactado por las partes[80], la ***cantidad a pagar necesariamente hubiere sido igual a "0" (cero) puesto que el promedio de la cotización o tipo de cambio oficial[81] entre los seis días hábiles que mediaron entre el 21 y el 31 de diciembre de 2001 fue igual a 1.***

10.5. Pero ¿qué hizo el Laudo?

10.6. Se apartó nuevamente de lo expresamente convenido por las partes y creó *ex nihilo* un nuevo método de cálculo sin ningún sustento en el derecho positivo que debía aplicar. A ellos nos referiremos a continuación.

**B. Extralimitación en las facultades encomendadas al Tribunal al adoptar, según su caprichoso arbitrio, un tipo de cambio y fechas de referencia distintas de las expresamente pactadas por las partes**

10.7. El Laudo incurre también en arbitrariedad manifiesta al adoptar como base de cálculo de la condena un tipo de cambio **distinto y posterior** (el del 11.1.02) a la fecha límite de la *Contingencia* prevista contractualmente (el

---

[79] El Laudo consideró que *"durante el feriado cambiario las operaciones del mercado de divisas fueron suspendidas y no se realizó ningún trámite cambiario ya que éstos estaban prohibidos. Como resultado, ni el BCRA ni el Banco de la Nación Argentina publicaron la cotización oficial diaria del peso argentino frente al dólar. En tales circunstancias, el Tribunal ha determinado que no había ningún 'tipo de cambio oficial' de acuerdo con la definición de las partes en el contexto de la Carta Acuerdo. Por esto, resulta difícil calcular cualquier compensación que pueda ser apropiada de acuerdo con el Artículo 4 de la Carta Acuerdo, según el cual la base de los cálculos será el promedio de la cotización oficial del peso argentino frente al dólar de Estados Unidos durante el período comprendido entre la fecha que se produzca la primera alteración de la paridad peso/dólar y el 31 de diciembre de 2001"* (párrafo 707).

[80] Cabe recordar una vez más que las partes acodaron que la compensación se calcularía tomando como base *"el promedio de la cotización oficial del peso argentino frente al dólar de Estados Unidos durante el período comprendido entre la fecha en que se produzca la primera alteración de la paridad peso/dólar y el 31 de diciembre de 2001"* (punto 4 de la Carta Acuerdo).

[81] El Laudo admite que las partes utilizaron las expresiones *"tipo de cambio oficial"* y *"cotización oficial"* para referirse a lo mismo (párrafo 726).

59

31.12.01)[82]. La simple constatación de lo expuesto deja en evidencia que se ha violado la ley de las partes (art. 1197 del Código Civil).

10.8. La aplicación de ese supuesto *tipo de cambio oficial* (**que no es siquiera "oficial"**), posterior al tope temporal pactado libremente por las partes para cuantificar el alcance de la revisión de precio en los términos de la *Carta Acuerdo*, es una demostración adicional, muy contundente por cierto, de las incongruencias en que incurrió el Laudo.

10.9. Esa notable inconsistencia es más grave aún a poco que se advierta que el propio Laudo había admitido previamente que el riesgo cubierto por la *Contingencia* era que "*se produjera una modificación en el tipo de cambio entre el peso y el dólar <u>dentro de un plazo que acordasen las partes</u>*" (párrafo 624; el destacado es nuestro). Ese plazo era <u>**esencial**</u> y, como reconoce el Laudo, durante el mismo <u>**no hubo ninguna modificación del tipo de cambio oficial 1 peso por 1 dólar**</u>.

10.10. En resumen, es evidente que la mayoría del Tribunal <u>**inventó**</u> que el tipo de cambio de $ 1,7 por dólar era el que mejor se adaptaba a la intención de las partes.

10.11. Por ello, el Laudo cae en una nueva arbitrariedad cuando afirma que como las partes no pudieron prever la inexistencia de un tipo de cambio oficial, esa ficticia laguna debe ser llenada con los principios UNIDROIT y con lo que supone ser la práctica argentina de acudir a la cotización del mercado libre de cambios del primer día hábil siguiente en que se haya operado con cambios. Empero, **si no hubo al 31 de diciembre de 2001 un tipo de cambio oficial distinto**, lo que se verificó simplemente, es que **la Contingencia no tuvo lugar**. Suponer que, ante la ausencia de ese tipo de cambio diferente se debe recurrir a uno posterior al vencimiento del término temporal acordado, importa modificar ostensiblemente y arbitrariamente la letra y el sentido del mecanismo de revisión del precio pactado.

10.12. Al Tribunal se le **encomendó que aplicara lo estipulado en el Acta Acuerdo**, ni más ni menos. **No se le encomendó que fuera más allá y que llenara una supuesta laguna contractual** –en realidad inexistente, como bien advierte la disidencia- creando *ex post facto* una metodología de cálculo completamente distinta.

10.13. Esta arbitrariedad ha sido marcada por el voto en disidencia cuando sentencia que lo convenido por las partes fue un "<u>*método claro, concreto y taxativo basado en la disminución o el aumento del tipo de cambio oficial del peso respecto del dólar*</u> (Artículo 3 de la carta Acuerdo) <u>*desde que dicho cambio sufriese la primera alteración hasta el 31 de diciembre de 2001*</u> (Artículo 4 de la carta Acuerdo)". Ello no era una mera expectativa sino <u>un pacto en los términos del art. 1197 del Código Civil</u>, de modo tal que "<u>*ni el derecho argentino ni los*</u>

---

[82] A fin de calcular la condena, la mayoría del Tribunal adoptó el tipo de cambio libre de $ 1,70 por dólar correspondiente al 11 de enero de 2002 (párrafo 728 del Laudo).

60

*principios UNIDROIT, que el laudo también cita (parágrafo 711), amparan la infundamentada decisión del laudo de hacer un cálculo de un pago incumpliendo lo pactado por las partes en la Carta Acuerdo"* (punto 12, el destacado es nuestro).

10.14. Por si ello no fuera suficiente, **no** es cierto siquiera que el derecho argentino avale la adopción de la cotización inmediatamente posterior a un feriado cambiario en supuestos como el examinado.

10.15. Esa es una alternativa sólo utilizada cuando existen operaciones abiertas en las que el monto de la deuda está determinado de antemano, a efectos de liquidar la obligación en una moneda diferente. Y, como tal, esa alternativa debe ser objeto de pacto expreso entre las partes.

10.16. Ni lo uno ni lo otro ha ocurrido en este caso.

10.17. En el caso no se trata de una obligación con monto determinado que debía liquidarse a un tipo de cambio a establecer. Por el contrario, la **existencia de una cotización oficial distinta de la paridad prevista en la Ley de Convertibilidad era el elemento esencial para que naciera, o no, la obligación de pago**.

10.18. Esa modalidad imaginada por el Laudo tampoco había sido pactada por las partes, pese a que la práctica mencionada por el Tribunal existía al momento de suscribir la *Carta Acuerdo*. Ello ratifica que su ausencia, lejos de responder a lo imprevisible de los acontecimientos de diciembre de 2001, se debe a que no es ni se consideró una herramienta apta para determinar la obligación de las partes.

10.19. La arbitrariedad del Laudo se ve ratificada aún más apenas se advierte que ni siquiera adoptó la cotización oficial del Mercado Oficial de Cambios instrumentado por el Decreto Nº 71/02 ($ 1,40 por dólar), cuando la letra de la *Carta Acuerdo* en cuestión no presenta duda alguna en cuanto al tipo de cambio que debía utilizarse: *el tipo de cambio oficial*.

10.20. Súmase a ello que el Laudo afirmó, bien que equivocadamente, que lo relevante para la *Contingencia* era el precio al cual el Banco Central de la República Argentina vendiera dólares (párrafos 686 y 687). Sin embargo, cuando esa entidad vende y compra dólares **a un tipo de cambio oficial** ($ 1,40 por cada dólar), en razón de un acto de autoridad pública (Decreto Nº 71/02, dictado en función de la delegación legislativa efectuada por la Ley 25.561), el Laudo interpretó que ése **no** era el tipo de cambio que *"mejor refleja las intenciones de las partes"* (párrafo 728).

10.21. De modo que, en el amplio abanico de posibilidades que se abrieron al apartarse de los estrictos marcos legales, **el Laudo adoptó los peores extremos posibles para incrementar el monto de la condena a las demandadas** (punto 16 del voto disidente).

61

**10.22. Frente a tamaña irrazonabilidad, ilegitimidad e inconstitucionalidad, la arbitrariedad no pudo ser mayor.**

C. <u>Arbitrariedad porque el Laudo escoge las peores hipótesis para incrementar en la mayor medida posible el monto de la por sí improcedente compensación</u>

10.23. El voto disidente advierte que no le bastó al Tribunal con resolver prescindiendo de lo pactado por las partes y del derecho argentino, sino que una vez que se apartó arbitrariamente de esos estrictos límites legales y discurrió sobre una variedad de acontecimientos económicos y políticos de carácter difuso e interpretación subjetiva (vgr., nivel de reservas, restricciones a la libertad cambiaria y transferencia de fondos, Corralito, etc.), <u>escogió discrecionalmente los peores parámetros</u> con el propósito de calcular la mayor compensación posible.

10.24. Es así que, más allá de la arbitrariedad primaria (apartamiento del derecho argentino y del compromiso arbitral) el Laudo incurre en una nueva causal de arbitrariedad. **Si el Tribunal hubiera sido consistente con su propia lógica, la compensación hubiera resultado nula o, al menos, sustancialmente inferior.**

10.25. A continuación analizaremos los principales supuestos posibles asumiendo, como negada hipótesis, las mismas bases argumentales utilizadas por el Laudo.

a) *Resultado en un primer supuesto: la desvinculación ocurre como consecuencia de la sanción de la Ley 25.445, que modificó la Ley de Convertibilidad para introducir una canasta de monedas con el euro*

10.26. Si fuera cierto, como afirma el Laudo, que las partes quisieron definir la *Contingencia* como el mantenimiento de los postulados esenciales del régimen de convertibilidad (aunque no lo hicieron así), no cabe duda de que la sanción de la Ley 25.445 del 22 de junio de 2001 (párrafo 108 del Laudo) hubiera sido la primera desvinculación del tipo de cambio oficial, ya que modificó la Ley de Convertibilidad para hacer convertible el peso *"a una relación de un peso ($ 1) por el promedio simple de un dólar de los Estados Unidos de América (u$s 1) y un euro de la Unión Europea"*. De hecho, fue el anuncio del Ministro Cavallo de haber preparado este proyecto de ley en la época en que las partes negociaban los términos de la *Carta Acuerdo*, lo que las indujo a incluir la frase *"cualquiera que sea la causa que la produzca"*.

10.27. En este supuesto, ocurrida la *Contingencia* y siguiendo con la lógica del Laudo, no cabe duda de que la paridad del peso con el dólar se mantuvo a la relación 1 a 1 hasta el 20 de diciembre de 2001 (*"la tasa de un peso por un dólar representa la última cotización oficial del peso frente al dólar disponible el 20 de diciembre de 2001"*, párrafo 717 del Laudo) de modo que transcurrieron 113 días

62

hábiles desde el 22 de junio y sólo 6 días hábiles desde la declaración del feriado bancario hasta el 31 de diciembre de 2001.

10.28. Como el Laudo ha concluido que se debe asumir que el valor del dólar al 31 de diciembre era de $ 1,35 y no es posible saber, en la conjetura realizada por el tribunal, cómo podría haber evolucionado incrementalmente desde el 21 de diciembre, asumiremos la peor hipótesis posible. Esta hipótesis consiste en asumir que el tipo de cambio se mantuvo estable en $ 1,35 entre el 21 y el 31 de diciembre, aunque lo verdaderamente razonable sea suponer que la escalada desde el 1 a 1 hubiera sido paulatina. De este modo, el cálculo de la compensación, luego de promediar la cotización y repartir por partes iguales el efecto de la alteración[83], da el siguiente resultado:

Cotización entre el 22.06.01 y 20.12.01 = $ 1 por dólar

Cotización entre el 21.12.01 y 31.12.01 = $ 1,35 por dólar

Cantidad de días $ 1 por dólar = 113

Cantidad de días $ 1,35 por dólar = 6

Promedio de cotización entre 22.06.01 y 31.12.01: $ 1,0176 por dólar

Distribución del riesgo en un 50%: $ 1,0088 por dólar

**Monto de condena p/ ENDESA (US$): 8,50 millones vs. 147 millones (Laudo)**

**Monto de condena p/ YPF (US$): 2,69 millones vs. 40 millones (Laudo)**

10.29. Como consecuencia del acogimiento de la reconvención, en este primer supuesto, el resultado **debió** haber sido: **condenar a EDFI al pago** de US$ 37,74 millones a ENDESA y de US$ 8,37 millones a YPF.

### *b) Resultado en un segundo supuesto: la desvinculación ocurre como consecuencia de la caída del nivel de reservas del Banco Central*

10.30. Si fuera cierto, como afirma el Laudo, que a efectos de que ocurra la *Contingencia* era esencial que el BCRA cumpliera con la obligación establecida en el artículo 4 de la Ley de Convertibilidad de mantener reservas internacionales equivalentes, por lo menos, al 100% de la base monetaria (párrafo 686), tampoco cabe duda de que la desvinculación se habría producido, como máximo, a mediados de agosto de 2001 cuando el nivel de reservas cayó al 82% (párrafo 110 del Laudo). Al igual que el caso anterior, asumimos la hipótesis menos conveniente para ENDESA e YPF, ya que incluso según el propio experto económico de EDFI, el incumplimiento en el nivel de reservas se verificó en el mes de julio de 2001 (ver punto 10, apartado 6 del voto en disidencia).

---

[83] Ver cálculo en Anexo IX.

63

10.31. De esta manera, siguiendo la misma metodología que en el supuesto anterior, habría que considerar que transcurrieron 89 días hábiles desde el 15 de agosto hasta el 20 de diciembre de 2001, a la paridad 1 a 1 a efectos de obtener el promedio de la cotización oficial[84]. El resultado es el siguiente:

---

Cotización entre el 15.08.01 y 20.12.01 = $ 1 por dólar

Cotización entre el 21.12.01 y 31.12.01 = $ 1,35 por dólar

Cantidad de días $ 1 por dólar = 89

Cantidad de días $ 1,35 por dólar = 6

Promedio de cotización entre 15/8 y 31/12: $ 1,022 por dólar

Distribución del riesgo en un 50%: $ 1,011 por dólar

**Monto de condena p/ ENDESA (US$): 10,62 millones vs. 147 millones (Laudo)**

**Monto de condena p/ YPF (US$): 3,27 millones vs. 40 millones (Laudo)**

---

10.32. Como consecuencia del acogimiento de la reconvención, en el segundo supuesto, el resultado **debió** haber sido: **condenar a EDFI al pago de** US$ 35,62 millones a ENDESA y de US$ 7,79 millones a YPF.

### c) *Resultado en un tercer supuesto: la desvinculación ocurre como consecuencia de la implementación del Corralito*

10.33. Si fuera cierto, como afirma el Laudo, que a efectos de la ocurrencia de la *Contingencia* era esencial que se garantizara la libertad de cambiar y transferir fondos, tampoco cabe duda de que, como lo advierte la disidencia (punto 10, apartado 6), la desvinculación se habría producido el 1 de diciembre de 2001 cuando, mediante el Decreto N° 1570/01, se impusieron una serie de restricciones de esa naturaleza (párrafo 117 del Laudo).

10.34. En este supuesto habría que considerar que transcurrieron 14 días hábiles desde el 1 de diciembre hasta el 20 de diciembre de 2001 a la paridad 1 a 1 a efectos de obtener el promedio de la cotización oficial[85]. El resultado es el siguiente:

---

[84] Ver cálculo en Anexo X.
[85] Ver cálculo en Anexo XI.

64

---

Cotización entre el 1.12.01 y 20.12.01 = $ 1 por dólar

Cotización entre el 21.12.01 y 31.12.01 = $ 1,35 por dólar

Cantidad de días $ 1 por dólar = 14

Cantidad de días $ 1,35 por dólar = 6

Promedio de cotización entre 1/12 y 31/12: $ 1,105 por dólar

Distribución del riesgo en un 50%: $ 1,0525 por dólar

**Monto de condena p/ ENDESA (US$): 49,13 millones  vs. 147 millones (Laudo)**

**Monto de condena p/ YPF (US$): 13,61 millones vs. 40 millones (Laudo)**

---

10.35. Como consecuencia del acogimiento de la reconvención, en el tercer supuesto, el resultado **debió** haber sido: condenar a ENDESA al pago de US$ 2,89 millones y a YPF al pago de US$ 2,55 millones, respectivamente, a favor de EDFI.

10.36. La mera comparación de la condena a ENDESA (100 millones de dólares antes de deducir el monto de la reconvención) y a YPF (29 millones de dólares antes de deducir el monto de la reconvención) con los resultados expuestos precedentemente es reveladora del grado de arbitrariedad con que se ha manejado el Tribunal para calcular intencionalmente la mayor compensación posible[86].

10.37. En tales condiciones, el Laudo no puede considerarse como un acto jurisdiccional válido por ser arbitrario, irrazonable e ilegal en la terminología de nuestra Corte Suprema.

**XI. LA ARBITRARIEDAD ES TAL QUE CONSTITUYE UN PRONUNCIAMIENTO SOBRE PUNTOS NO COMPROMETIDOS: EL TRIBUNAL NO APLICÓ EL DERECHO, COMO ESTABA PACTADO, SINO QUE ACTUÓ COMO AMIGABLE COMPONEDOR, LO QUE LE ESTABA VEDADO. DOCTRINA DE LOS TRIBUNALES ARBITRALES INTERNACIONALES Y DE LA CORTE SUPREMA**

11.1. El artículo 760 del CPCCN dispone que es causal de nulidad de los laudos arbitrales el expedirse *"sobre puntos no comprometidos"*.

---

[86] Inclusive, si se tomara el tipo de cambio oficial establecido en el Decreto Nº 71/02 de $ 1.40 por dólar (cotización oficial vigente al 11 de enero de 2002) y se siguiera la misma metodología de cálculo adoptada por Laudo, el resultado de la condena neta contra ENDESA hubiera sido US$ 43,40 millones (en lugar de los US$ 100 millones impuestos por el Laudo) y contra YPF hubiera sido US$ 13,32 millones (en lugar de los US$ 29 millones impuestos por el Laudo). Ello ratifica la absoluta arbitrariedad del Laudo.

65

11.2. El primer punto comprometido en este proceso fue **que el arbitraje fuera de derecho, siendo el derecho argentino el aplicable al caso**.

11.3. Sin embargo, como se ha acreditado en los capítulos precedentes, para condenar a ENDESA e YPF, el Laudo ha omitido aplicar el derecho argentino, inclusive sus normas de orden público. En rigor, omitió aplicar cualquier derecho.

11.4. A partir de interpretaciones metajurídicas sobre la supuesta intención de las partes y de consideraciones de índole política, económica y de equidad el Laudo resolvió por mayoría que el 21 de diciembre de 2001 se produjo la desvinculación del tipo de cambio de un peso igual a un dólar consagrado en el artículo 1 de la Ley de Convertibilidad porque esta ley habría perdido eficacia práctica y económica durante diciembre de 2001 al desaparecer sus postulados esenciales. Asimismo, calculó la compensación recurriendo a criterios que, según su personal arbitrio, considera razonables, a pesar de apartarse abiertamente de aquellos contemplados expresamente por las partes en la *Carta Acuerdo*.

11.5. Al respecto el voto disidente sentenció: *"no reconozco el derecho argentino en la decisión del Laudo de interpretar la Carta Acuerdo como lo ha hecho y condenar a ENDESA e YPF como lo ha hecho"* (punto 15, el destacado en nuestro).

11.6. Al Tribunal no le ha bastado, sin embargo, con apartarse del derecho vigente. Sólo en la arbitraria visión de los árbitros se puede concebir su decisión de inventar intenciones de las partes, en modo alguno existentes, para apartarse del texto expreso de *la Carta Acuerdo* y del derecho sustantivo argentino.

11.7. No cabe duda de que un laudo dictado con sustento en criterios distintos de los jurídicos aplicables al caso sólo puede, eventualmente, ser válido en un arbitraje de "amigables componedores". Pero ello importaría **el ejercicio de una discrecionalidad no otorgada en este caso por las partes al fijar los puntos del compromiso arbitral, ni tampoco por el derecho vigente.**

11.8. Por el contrario, en los arbitrajes de derecho, como el presente, los árbitros deben resolver la controversia llevada ante ellos de modo idéntico a como lo haría un juez estatal.[87] Los árbitros deben ceñirse a las normas vigentes, ya sea las señaladas por las partes en su compromiso arbitral –como ocurre en el presente caso- o a las del derecho que corresponda aplicar en forma supletoria a los acuerdos de aquellas.

11.9. Esta condición es, precisamente, lo que diferencia a esta clase de arbitrajes de aquellos llamados *"de amigables componedores"*, en los que los árbitros fallan de acuerdo con su leal saber y entender, pudiendo introducir valoraciones ajenas a las estrictamente jurídicas, como las que se relacionan con criterios económicos, políticos o sociales.

---

[87] Caivano, *"Arbitraje"*, ob. cit., pág. 72

66

11.10. Esta diferencia fue claramente delimitada por la Excma. Cámara al decidir que *"según los principios aplicados por quien decide la controversia, los árbitros se distinguen de los amigables componedores. Los primeros, al igual que los jueces, deben aplicar el derecho vigente; los segundos harán uso de su leal saber y entender y 'procederán sin sujeción a formas legales' (art. 769, Cpr.); es decir, decidirán la cuestión 'según equidad' (art. 766. párr. 2º, Cpr.; conf. Fenochietto-Arazi, 'Código Procesal...', T. 3, p. 471/2, Ed. Astrea, Buenos aires, 1993)"* (el subrayado nos pertenece)[88].

11.11. La doctrina se ha pronunciado de modo concordante. Así, se ha señalado que *"se distinguen los árbitros o árbitros juris de los amigables componedores, por la forma y modo como deben sustanciarse y decidirse las cuestiones sometidas a arbitraje... Los primeros resuelven con arreglo a derecho, los segundos según su saber y entender"*[89].

11.12. Igualmente grave resulta una decisión que –como ha acontecido en este caso- se aparta del derecho vigente.

11.13. Como se ha señalado con acierto, si las partes han acordado el derecho aplicable a la resolución de la controversia, el tribunal arbitral no debe evaluar si la elección del derecho está bien fundada o relacionada con la cuestión objeto de disputa, sino que debe limitarse a respetar esa elección[90].

11.14. Y eso es, precisamente, lo que la mayoría no ha hecho en este caso. Al afirmar que lo que importa es la **"realidad práctica y económica"** (párrafos 661 y 685), **el Tribunal no ha respetado la elección de las partes de definir a la *Contingencia* como un estricto y concreto hecho jurídico, que debía juzgarse de acuerdo con el derecho argentino y sus disposiciones de orden público.**

11.15. Sin embargo, la arbitrariedad con la que se ha conducido en este caso es de una gravedad tal que ni siquiera bastaría considerar que hay un vicio en el procedimiento por haber dejado de aplicar una norma. En el caso en examen, **el Tribunal ha dejado de aplicar todas las normas jurídicas que eran aplicables y conducentes para la solución del caso** y las ha reemplazado por consideraciones metajurídicas. Ello obliga a concluir, sin hesitación, que ha mediado una manifiesta extralimitación de facultades del Tribunal, es decir, un pronunciamiento sobre puntos no comprometidos en los términos del art. 760 del CPCCN.

11.16. Como explica Boggiano, *"se plantea el problema de saber si un árbitro ha excedido su función si actúa laudando como amigable componedor cuando no le fue conferido ese poder y sólo puede laudar como árbitro juris. En este*

---

[88] Cámara Nacional de Apelaciones en lo Comercial, sala B, 19/03/01, "Importadora Mediterránea S.A. c/ Honda Motor Company Ltd. y otro s/ queja", elDial.com AA7F1.
[89] Fassi, Santiago C., "*Código Procesal Civil y Comercial*", T. III, Ed. Astrea, Buenos Aires, 1973, p. 469.
[90] Derains y Schwartz, ob. cit., p. 220.

67

*caso, se puede reprochar al laudo una incongruencia __por haber excedido los términos del compromiso__*" (el destacado es nuestro)[91].

11.17. En igual sentido, calificada jurisprudencia arbitral internacional tiene dicho que *"la causal de manifiesta extralimitación de facultades no está circunscripta al error jurisdiccional; se establece que __la omisión completa en aplicar el derecho a que está sujeto el tribunal (...) puede constituir una manifiesta extralimitación de facultades, como también una sentencia dictada ex aequo et bono –esto es, en una discrecionalidad general no otorgada por el derecho aplicable– que no esté autorizada por las partes__ ...*" (el subrayado en nuestro)[92].

11.18. De manera similar, se ha sostenido que *"la prescindencia por el tribunal de las normas de derecho acordadas constituiría una derogación de los términos de referencia dentro de los cuales el tribunal ha sido autorizado a funcionar. __Ejemplos de tal derogación__ incluyen la aplicación de normas de derecho diversas de las acordadas por las partes, o __una decisión basada en ninguna norma de derecho__ salvo que las partes hayan convenido en una decisión ex aequo et bono. Si la derogación es manifiesta, la misma implica __un manifiesto exceso de poder__*" (el subrayado es nuestro)[93].

11.19. Idéntica visión ha adoptado nuestra Corte Suprema al pronunciarse por la nulidad de un laudo arbitral con fundamento en que la *"prescindencia de normas objetivas, en principio aplicables, sin justificarlo con fundamento alguno, torna la decisión exclusivamente basada en un criterio personal y __dado que "que el árbitro fue de iure para la resolución de todas las cuestiones que le fueron sometidas (...) era recaudo esencial de su decisión fundarla en derecho vigente__*" (el destacado es nuestro)[94].

11.20. En razón de lo expuesto, no cabe duda de que la Excma. Cámara deberá declarar la nulidad parcial del Laudo porque los agravios de nuestras representadas se basan en la constatación objetiva de que se ha omitido aplicar el derecho pactado –la ley de las partes consagrada en la Carta Acuerdo, la Ley de Convertibilidad, el Código Civil, el Código de Comercio y la Constitución Nacional– y vigente en la Argentina al 31 de diciembre de 2001 y, en su reemplazo, el Tribunal ha resuelto en base a consideraciones ajenas, muchas de ellas de índole metajurídica. De ese modo __se ha configurado un claro supuesto de pronunciamiento sobre puntos no comprometidos__.

## XII. EL LAUDO IMPUGNADO ES TAMBIÉN NULO POR INCURRIR EN FALTA ESENCIAL EN EL PROCEDIMIENTO

---

[91] Boggiano, Antonio, *"Lex Mercatoria non est lex"*, en Revista de Derecho Comercial y de las Obligaciones, Buenos Aires, Nº 226, Setiembre/Octubre 2007, p. 425.

[92] *"MTD Equity Sdn. Bhd. & MTD Chile S.A. vs. República de Chile"*, Caso CIADI No. ARB/01/07, Decisión de Anulación del 21 de marzo de 2007 (www.investmentclaims.com).

[93] *"Maritime International Nominees Establishment v. Republic of Guinea"*, Caso CIADI No. ARB/84/4, Decisión de Anulación del 22 de diciembre de 1989, 4 ICSID Reports 79, 87.

68

12.1. Más allá de que lo expuesto en los capítulos anteriores resulta de suyo suficiente para declarar la nulidad del Laudo recurrido, cabe advertir –además– la falta esencial en el procedimiento en que se incurrió en estas actuaciones y que, con base en el CPCCN, art. 760, conduce igualmente a la declaración de nulidad peticionada.

12.2. Las faltas esenciales del procedimiento pueden conceptualizarse de un modo genérico como las que implican *un quebrantamiento serio e inequívoco de la garantía constitucional de defensa en juicio*. Esta garantía se encuentra integrada inescindiblemente al concepto de debido proceso legal, el que "abarca diversas garantías específicas destinadas a suministrar a los *individuos el amparo necesario para la salvaguarda de sus derechos*"[95].

**A. La falta de independencia e imparcialidad del árbitro designado por EDFI. La omisión de la CCI de abrir un procedimiento de confirmación de árbitro que garantizara la igualdad de las partes en el proceso y el derecho de defensa de las demandadas. La falta de fundamento del rechazo de la recusación del referido árbitro y vicepresidente de la CCI**

12.3. ENDESA e YPF se van han visto obligadas a litigar en el proceso arbitral con claro menoscabo de su derecho de defensa como consecuencia de la existencia de dudas objetivas y fundadas de la falta de imparcialidad e independencia del árbitro designado a propuesta de la parte actora, Sr. Jean Paul Béraudo.

12.4. Como es sabido, la recurribilidad de los laudos arbitrales es muy restringida, por lo que las cualidades y el desempeño de los árbitros -en cuanto a su idoneidad, solvencia técnica, independencia e imparcialidad- son de máxima relevancia[96].

---

[94] CSJN, *"Yacimientos Petrolíferos Fiscales c. Sargo S.A. Arg. obras oleoductos y gasoductos s/ juicio arbitral"*, sentencia del 27 de diciembre de 1974, Fallos: 290:458.

[95] Badeni, Gregorio, *"Tratado de Derecho Constitucional"*, Tomo II, La Ley, Buenos Aires, 2004, pág. 804. Consagrada la inviolabilidad de la *"defensa en juicio de la persona y de los derechos"* en el artículo 18 de la Constitución Nacional, ella se efectiviza en el proceso a través del principio de contradicción que brinda a los litigantes la oportunidad real de ser oídos, oponer defensas y producir prueba ante un juzgador imparcial e independiente. Pero estas garantías no culminan con el mero hecho de brindar a los litigantes una oportunidad formal para que ellas puedan ser ejercidas, sino que se complementan con la necesidad de que se vean reflejadas de un modo congruente en la decisión que ponga final al pleito, la que además deberá ser razonable y respetar el orden de prelación de las normas (28 y 33). En sentido similar, la Convención Americana sobre Derechos Humanos (Pacto de San José de Costa Rica) dispone en su artículo 8.1. que *"toda persona tiene derecho a ser oída, con las debidas garantías y dentro de un plazo razonable, por un juez o tribunal competente, independiente e imparcial, establecido con anterioridad por la ley, en la sustanciación de cualquier acusación penal formulada contra ella, o para la determinación de sus derechos y obligaciones de orden civil, laboral, fiscal o de cualquier otro carácter"*. Lo expuesto precedentemente permite advertir que la existencia de vicios en el procedimiento que vulneren la garantía de defensa y el debido proceso constituyen un apartamiento indebido a principios constitucionales de aplicación imperativa. En concordancia con lo expuesto, la Corte Suprema ha declarado que el debido proceso y el derecho de defensa forman parte del orden público argentino de modo tal que la prescindencia de ellos en una sentencia determina la imposibilidad de su ejecución (15.10.96, *"Riopar S.R.L. c/ Transporte Fluviales Argenrío"*, Fallos: 319:2411).

[96] La imparcialidad y la independencia de los árbitros son principios reconocidos universalmente (Redfern, Alan y Hunter, Martin, *"Law and practice of international arbitration"*, Sweet & Maxwell, London, 1999, p. 210; Gaillard, Emmanuel y Savage, John, *"Fouchard, Gaillard, Goldman on international commercial arbitration"*, Kluwer Law, Boston, 1999, p. 561).

69

12.5. La imparcialidad se relaciona con la neutralidad de quien debe dirimir un conflicto respecto de las partes y la independencia está vinculada a la autonomía de los árbitros respecto a dichas partes, en cuanto a relaciones comerciales, profesionales, personales y financieras.

12.6. La imparcialidad es una cualidad esencial que se requiere de un juzgador. Dado que raramente es posible acreditarla, la independencia de un árbitro, que es una cuestión de hecho y por ello más fácilmente verificable, constituye, en principio, una garantía de la autonomía de su voluntad.

12.7. Los principios de imparcialidad e independencia de los árbitros son recogidos en el Reglamento aplicable al caso (artículos 7.1 y 15.2)[97] y en la generalidad de los reglamentos de procedimientos arbitrales[98]. El propio Sr. Didier Lamèthe, Director Jurídico de EDFI, en un seminario que coordinara con el abogado externo de la empresa y compartiera con uno de los integrantes del tribunal arbitral - el Sr. Jean Paul Béraudo - se ha referido a estos requisitos de modo elocuente al señalar que *"las calidades de independencia absoluta y de imparcialidad objetiva*

---

[97] En el caso, ENDESA e YPF tuvieron especialmente en cuenta, al pactar el compromiso arbitral, que la Corte Internacional de Arbitraje de la CCI, como lo anuncia la contraportada de su Reglamento (ver Anexo XII) es *"mundialmente reconocida por su imparcialidad y eficacia"*.

[98] En sentido similar, el Reglamento de Arbitraje de la Comisión de las Naciones Unidas para el Derecho Mercantil Internacional (el "Reglamento UNCITRAL") establece que la autoridad encargada de designar los árbitros debe tomar las medidas necesarias para garantizar el nombramiento de árbitros independientes e imparciales (cfr. artículos 6 y 7). Por su parte, el Reglamento de la London Court of International Arbitration ("Reglamento LCIA") dispone que *"todos los árbitros que instruyan un arbitraje al amparo de este Reglamento serán y se mantendrán en todo momento imparciales e independientes de las partes"* (artículo 5.2). En esa misma línea, el Código de Ética para Árbitros de Disputas Comerciales de la American Bar Association ("el Código ABA"), establece en su Canon I, sección B, que un árbitro sólo debe aceptar una designación en la medida que pueda estar razonablemente seguro de desempeñarse de modo imparcial e independiente.

Ninguna duda cabe que la confianza de las partes en el modo en el que los árbitros resolverán la disputa adquiere importancia decisiva para la eficacia y viabilidad de un proceso arbitral. En este sentido, la inclusión del requisito de independencia contenido en el Reglamento de la CCI está dirigido a preservar la confianza o la "atmósfera de confianza" en el desarrollo de un arbitraje, de modo de evitar disrupciones en el desarrollo del procedimiento e impugnaciones al laudo fundadas en la parcialidad de los árbitros (Derains y Schwartz, ob. cit., p. 110).

Por ello, al disponer el artículo 7.1 del Reglamento CCI que *"todo árbitro debe ser y permanecer independiente de las partes en el arbitraje"* (el subrayado nos pertenece), impone un límite a la libertad de elección de los árbitros que tienen las partes, ya que incluso los árbitros designados a propuesta de ellas deben ser y mantenerse independientes.

En función de las dificultades que reviste acreditar el cumplimiento de tales requisitos, la obligación de los árbitros de revelar a las partes toda información susceptible de afectar la independencia e imparcialidad de los árbitros asume relevancia decisiva en el procedimiento arbitral y es instrumental en garantizar la preservación de la confianza antes mencionada.

Como consecuencia de lo anterior, se entiende que el hecho mismo de la falta de revelación por parte de un árbitro se transforma en un elemento clave para considerar transgredido el requisito de la independencia y la imparcialidad (Redfern y Hunter, ob. cit., p. 216).

En este sentido, el Reglamento de la CCI prevé que quien sea propuesto como árbitro *"debe suscribir una declaración de independencia a conocer cualesquiera hechos o circunstancias susceptibles, desde el punto de vista de las partes, de poner en duda su independencia"* (artículo 7.2). Además, extiende esta obligación a todo el tiempo que dure el arbitraje, disponiendo que el árbitro debe *"dar a conocer inmediatamente y por escrito, tanto a la Secretaría como a las partes, cualesquiera hechos o circunstancias de naturaleza similar que pudieran surgir durante el arbitraje"* (artículo 7.3, el subrayado es nuestro).

El Reglamento UNCITRAL consagra, por su parte, el deber de toda persona propuesta como árbitro de *"revelar a quienes hagan averiguaciones en relación con su posible nombramiento todas las circunstancias que puedan dar lugar a dudas justificadas acerca de su imparcialidad e independencia. Una vez nombrado o elegido, el árbitro revelará tales circunstancias, a menos que ya les haya informado de ellas"* (artículo 10). El Reglamento LCIA estipula que antes de su nombramiento, *"cada árbitro remitirá al Secretario un resumen escrito de su actividad profesional pasada y presente (...) y firmará una declaración en el sentido de que no existen a su conocimiento circunstancias susceptibles de producir dudas razonables sobre su imparcialidad o independencia, distintas de las ya reveladas por el árbitro en su declaración. Asimismo, cada árbitro asumirá el compromiso permanente de revelar a la Corte de la LCIA, a los demás miembros del Tribunal Arbitral y a todas las partes cualesquiera otras circunstancias similares, sobrevenidas con posterioridad a la declaración y efectuada y antes de la conclusión del arbitraje"* (artículo 5.3). Asimismo, el Código ABA expresa que un árbitro debe revelar –antes y durante el arbitraje- cualquier interés o relación susceptible de afectar la imparcialidad o de generar una apariencia de imparcialidad (Canon II, A).

70

*constituyen los denominadores comunes, verdaderos postulados incontrastables y devienen consustanciales a la función del árbitro*[99].

12.8. El principio de independencia e imparcialidad de los árbitros debe ser analizado en función de los dos aspectos esenciales del arbitraje: (i) un elemento convencional o contractual presidido por el principio de la libertad de las partes; y (ii) un elemento jurisdiccional dado por el hecho que se dirime un conflicto de modo vinculante y definitivo. En cuanto a la primera de la cuestiones, debe tenerse en cuenta que el arbitraje comercial internacional es un proceso de resolución de disputas que se caracteriza por la posibilidad que tienen las partes de elegir por sí mismas, lo que incluye la decisión misma de someter la cuestión a arbitraje, las reglas que lo gobernarán, el derecho que le será aplicable y -en supuestos como el del arbitraje bajo las reglas de la CCI- la posibilidad de determinar la selección y el modo de la designación de los árbitros[100].

12.9. En el caso, las partes acordaron que "*el número de árbitros será de tres, uno designado por los VENDEDORES, otro designado por el COMPRADOR y el tercero por los dos árbitros así nombrados por las PARTES.*

12.10. Si uno de los árbitros no es independiente o es parcial, la CCI no debe confirmarlo y las partes pueden recusarlo.

12.11. La apertura de un procedimiento de confirmación y la recusación de un árbitro no sólo proceden en el caso que se verifiquen hechos específicos que denoten indubitablemente la violación a la independencia y la imparcialidad exigidas sino, también, en el supuesto que se acrediten circunstancias que **generen dudas razonables** respecto de la falta de independencia e imparcialidad de un árbitro.

12.12. ENDESA e YPF solicitaron a la CCI la apertura de un procedimiento de confirmación del Sr. Jean Paul Béraudo, árbitro propuesto por la parte actora, y posteriormente lo recusaron -en los términos del artículo 11.1 del Reglamento.

12.13. Ello fue motivado en el hecho de que, largo tiempo después de comenzado el proceso arbitral, ENDESA e YPF tomaron conocimiento de la designación del Sr. Jean Paul Béraudo como uno de los vicepresidentes de la Corte Internacional de Arbitraje de la CCI.

12.14. A pesar de su inexcusable deber de revelación, el Sr. Béraudo nunca informó a las demandadas dicha designación; omisión que confirmó la sospecha de parcialidad del Sr. Béraudo que surgiera a partir de la emisión de su opinión disidente en el Laudo Preliminar sobre jurisdicción del 11 de febrero de 2005. En esa ocasión, sin proporcionar argumento jurídico alguno fundado en el derecho argentino, el Sr. Béraudo propuso hacer lugar a la postura de EDFI.

---

[99] Lamèthe, Didier, "*Portraits de groupe d'arbitres internationaux*" en "Les Arbitres Internationaux", Colloque du 4 février 2005, AAVV [Rosell, José, Coordinador], Société de Législation Comparée, Paris, 2005.
[100] Gaillard y Savage, ob. cit, pág. 11.

71

12.15. Ante esta circunstancia, nuestras representadas expresaron reiteradamente su sorpresa y protesta ante la Corte de la CCI, requiriendo que se abriera un trámite de confirmación del Sr. Béraudo a fin de poder realizar en ese ámbito los comentarios y peticiones para la defensa de sus intereses[101].

12.16. En su carta del 19 de octubre de 2007, la representación de ENDESA e YPF fundó sobradamente las razones de hecho y derecho que justificaban la imperiosa necesidad de que la la Corte de la CCI abriera un trámite de confirmación. Se expresó allí: "...si bien es cierto que el apartado 1 del artículo 2 del Reglamento Interno de la Corte no prohibe a sus Vice-presidentes (a diferencia de lo que ocurre con el Presidente) que sean árbitros en asuntos sometidos a arbitraje CCI, permitiéndose expresamente en el aparatado 2 del mismo que sean propuestos para desempeñar tal función por una de las partes, resulta igualmente cierto que el repetido apartado 2 termina con las palabras 'sujeto a confirmación', y que el Sr. Béraudo no era todavía Vice-Presidente de la Corte Internacional de Arbitraje de la CCI cuando fue designado como árbitro" (el destacado es nuestro).

12.17. Tal vez con inconsciente, pero en todo caso equivocado, sentido de autoprotección corporativa, la CCI hizo caso omiso a los graves fundamentos que justificaban la solicitud de las demandantes y, en su respuesta del 27 de octubre de 2006, se limitó a señalar que si bien un vicepresidente de la Corte puede ser propuesto para desempeñar la función de árbitro sujeto a un procedimiento de confirmación, dicho trámite no estaba expresamente previsto para el caso análogo de personas que se encuentran desempeñándose como árbitros al momento de recibir un nombramiento como miembro de la Corte de la CCI.

12.18. Como se advierte, la CCI adoptó un criterio formalista y restrictivo, aislado de las restantes disposiciones aplicables que enfatizan la necesidad de preservar la ausencia de toda duda sobre la independencia e imparcialidad de los árbitros. Con el solo sustento del silencio normativo y sin siquiera explicar las razones que podían hipotéticamente justificar –desde la perspectiva jurídica, axiológica y finalista- la diversidad de trato entre las dos situaciones por ella descriptas, la CCI adoptó el criterio menos protector frente al riesgo –cierto y obetivo- de imparcialidad del Sr. Béraudo y se negó a aplicar el trámite de confirmación previsto expresamente para las supuestos en que surge un conflicto de interés entre el rol de miembro de la Corte y el rol de árbitro en un procedimiento CCI.

12.19. En esas condiciones, nuestras representadas se vieron en la necesidad de reiterar su solicitud de apertura de un trámite de confirmación mediante su carta del 3 de noviembre de 2006. En esta oportunidad, ENDESA e YPF llamaron la atención sobre el hecho de que la cuestión fundamental a ser dilucidada -frente al silencio normativo alegado por la CCI- era si este silencio respondía a una decisión consciente de los autores de las normas de la CCI o, por el contrario, se trataba de una simple laguna de la regulación. Más allá de que

---

[101] Ver al respecto cartas del 19 de octubre y 3 de noviembre de 2006 presentadas por la representación de ENDESA e YPF, así como los rechazos de la CCI a abrir el trámite de confirmación de fecha 27 de octubre y 10 de

72

nuestras representadas están convencidas de que se trata de este último supuesto, destacaron que a todo evento, en caso de duda, razones de buena lógica y un elemental principio de prevención de situaciones delicadas obligaban a abrir un nuevo trámite de confirmación del Sr. Béraudo con motivo de su nombramiento como Vice-Presidente de la CCI, con audiencia de partes y, en especial, de aquella que no lo propuso como árbitro, a fin de resguardar así la igualdad de las partes en el proceso[102].

12.20. Lamentablemente, por medio de su carta del 10 de noviembre de 2006, la CCI se negó sin fundamento a acceder al mencionado requerimiento, remitiéndose lacónicamente a su carta previa del 27 de octubre de 2006.

12.21. Ello obligó a ENDESA e YPF a recusar formalmente al Sr. Béraudo[103]. Entre las principales razones que confirmaban la pérdida de confianza en la independencia e imparcialidad del árbitro propuesto por EDFI se mencionaron: la inmediata proximidad jerárquica del cargo de vicepresidente de la Corte con el de presidente, quien tiene expresamente prohibido desempeñarse como árbitro; la mayor inmediación del Sr. Béraudo con la Corte con respecto al resto de los vicepresidentes, por ser el único vicepresidente francés (nacionalidad de la parte actora) y tener la Corte asiento en París, Francia; la inexistencia de vicepresidentes de la Corte de nacionalidad argentina o española; la decisión de la Corte al inicio de este arbitraje (por razón de la oposición de EDFI) de no confirmar al árbitro designado originalmente por ENDESA e YPF; y la participación conjunta durante el curso de este arbitraje del Sr. Béraudo con el letrado representante de EDFI y con el Director Jurídico del Grupo EDFI -testigo en el procedimiento a instancias de EDFI- en actividades ajenas al procedimiento arbitral.

---

noviembre de 2006.

[102] Al dirigirse nuevamente a la CCI, con fecha 3 de noviembre de 2006, la representación de ENDESA e YPF enfatizó: *"Debo manifestarle, con el mayor respeto pero con igual firmeza, nuestra profunda discrepancia con el contenido de su respuesta. No se nos escapó en su día, ni se nos escapa ahora, que el Reglamento de la Corte no ha previsto el trámite de confirmación de una persona que, estando desempeñándose como árbitro en un arbitraje CCI, sea nombrado Vice-Presidente de la Corte. Pero la pregunta fundamental es, obviamente, si dicho silencio responde a una decisión consciente de los autores del repetido Reglamento o, por el contrario, se trata de una laguna de regulación.*
*Esta parte está razonablemente convencida de que ese último tiene que ser el caso. Y en la duda al respecto, nos parece seguro que la buena lógica (y un elemental principio de precaución de situaciones delicadas para el valiosísimo prestigio de la Corte) obligarían a asumirlo así, y mantener la necesidad de un nuevo trámite de confirmación, tras el nombramiento de un árbitro como Vice-Presidente. Comprendemos que una eventual no confirmación de dicho árbitro podría provocar un serio problema para el arbitraje en curso. Pero dicho problema no sería en ningún caso mayor que el que generaría que un árbitro, en un arbitraje CCI en tramitación, fuera designado Presidente de la Corte; y no creemos que nadie pueda albergar la menor duda que sobre que, en tal hipótesis, tendría que dejar inmediatamente de desempeñarse como árbitro. Lo natural sería, claro está, y en defensa de la necesaria igualdad entre las partes que ha de regir el procedimiento, partir del sano principio de que quienes estén desempeñándose como árbitros en arbitrajes CCI no sean nombrados, mientras tanto, miembros de la Corte de Arbitraje.*
*No atenerse a ello a, nuestro juicio, elemental principio -como ha ocurrido en este caso- debe, como mínimo, abrir un trámite de confirmación, con audiencia de las partes y, en especial, de aquella que no propuso como árbitro al posteriormente nombrado alto ejecutivo de la Corte. Por ello, esta parte continúa esperando que así se haga respecto del Dr. Jean-Paul Béraudo, dándonos así la oportunidad de exponer las razones que, en nuestra opinión, desaconsejarían su confirmación".*
[103] El artículo 11.1 del Reglamento permite fundar la recusación *"en una alegación de falta de independencia o en cualquier otro motivo"*. El reglamento UNCITRAL dispone, por su parte, en su artículo 10.1. que *"un árbitro podrá ser recusado si existen circunstancias de tal naturaleza que den lugar a dudas justificadas respecto de su imparcialidad o independencia"*. El Reglamento LCIA establece, a su vez, que *"un árbitro podrá ser recusado por cualquiera de las partes si concurren circunstancias que originen dudas razonables sobre su imparcialidad o sobre su independencia. Una parte sólo podrá recusar al árbitro designado por ella misma -o en cuyo nombramiento haya participado- basándose en motivos conocidos posteriormente a su designación"* (cfr. artículo 10.3).

73

12.22. Interesa puntualizar a ese respecto, que ENDESA e YPF conocieron casualmente -sin que el Sr. Béraudo informara en modo alguno a las partes- que, en febrero del año 2005, el Sr. Béraudo participó conjuntamente con el abogado de EDFI, Sr. José Rosell y el Director Jurídico de EDFI y testigo en la causa, Sr. Didier Lamèthe, en un coloquio coordinado por el Sr. Rosell, que diera lugar posteriormente al libro titulado *"Les arbitres internationaux"*, editado por la *Société de Législation Comparée* en el mismo año 2005. Ello sumó un elemento adicional a la parcialidad ya insinuada en el *laudo preliminar* y en la omisión de revelar su designación como vicepresidente de la Corte, acreditando la existencia de fluidos y repetidos contactos entre el árbitro designado a propuesta de EDFI, funcionarios de EDFI (que actuaban como testigos en la causa que el Sr. Béraudo debía resolver) y sus letrados que, por lo menos, debieron haber sido oportunamente revelados por el Sr. Béraudo.

12.23. Resulta evidente que, a la luz de lo previsto en los artículos 7.2. y 7.3 del Reglamento CCI -que disponen que los árbitros deben revelar *"cualesquiera hechos o circunstancias susceptibles, desde el punto de vista de las partes, de poner en duda su independencia"*- los contactos entre un funcionario de una de las empresas parte (testigo en la causa), su letrado y un integrante del tribunal arbitral, debieron haber sido revelados a ENDESA e YPF sin dilación alguna.

12.24. La ausencia de toda revelación sobre estos contactos no puede sino resultar en detrimento de esa "atmósfera de confianza" indispensable para preservar un procedimiento arbitral eficaz y válido.

12.25. Por lo demás, ENDESA e YPF explicaron en su recusación que **(i)** si el Sr. Béraudo hubiera sido vicepresidente de la Corte cuando EDFI lo designó árbitro y se hubiera reflejado en su *declaración de independencia*, ellas no lo habrían consentido en tanto ello vulneraría el principio de igualdad entre las partes; **(ii)** ENDESA e YPF aceptaron someter su controversia con EDFI a un arbitraje CCI en la convicción de que las partes recibirían un tratamiento neutral e igualitario, convicción que ante los hechos ya mencionados, se encontraba severamente debilitada; y **(iii)** en caso de no hacerse lugar a la recusación planteada, ENDESA e YPF se verían obligadas a litigar y a aceptar un laudo con la sospecha y el temor de que el cargo del Sr. Béraudo en la Corte hubiese podido condicionar la actuación de la Corte, los funcionarios de la CCI involucrados en el caso o menoscabar de algún modo la libertad de juicio de los demás miembros del tribunal arbitral.

12.26. A efectos de que la Excma. Cámara pueda apreciar con claridad la gravedad de la situación planteada, es preciso destacar las implicancias que tiene, en el marco de un arbitraje CCI, la doble actuación del Sr. Béraudo como árbitro y vicepresidente de la Corte.

12.27. La Corte tiene varias funciones de relevancia respecto de los procesos arbitrales regidos por sus reglas. Entre las más importantes corresponde mencionar el examen previo que realiza la Corte, tanto respecto del laudo como de

74

las correcciones o interpretaciones que a aquél decida efectuar el Tribunal Arbitral (artículos 27 y 29, apartados 1 y 2, del Reglamento) y la función de fijar la provisión de gastos del arbitraje, incluyendo los honorarios y gastos de los árbitros (artículo 30, apartado 2 y 31, apartado 2).

12.28. Teniendo en consideración lo expuesto y aun cuando el artículo 2, apartados 4 y 5 del Apéndice II del Reglamento –"Reglamento Interno de la Corte Internacional de Arbitraje de la CCI"– disponga que cuando el Presidente, algún vicepresidente o cualquier otro miembro de la Corte o de la Secretaría esté involucrado en un proceso pendiente ante la Corte, dicha persona deberá abstenerse de toda participación en los debates y toma de decisiones de la Corte relacionados con dicho proceso, podría existir cierto condicionamiento o afectación de la libertad en quien debiese ocuparse del caso en la Corte o, incluso, en los demás árbitros que, aun cuando fuera mínimo, sería suficiente para generar dudas razonables respecto de la independencia e imparcialidad.

12.29. Adicionalmente, debe tenerse presente que -de conformidad con lo dispuesto por los artículos 7.4, 8.2, 8.3, 8.4 y 9 del Reglamento CCI- la Corte tiene facultades para confirmar o rechazar las designaciones de árbitros propuestas por las partes de una controversia y para designar directamente a los árbitros cuando las partes no llegan a un acuerdo para hacerlo o cuando se abstienen de hacerlo por otros motivos.

12.30. En este contexto se advierte que el doble rol de árbitro y vicepresidente del órgano que confirma y designa a los árbitros, pudo afectar claramente la independencia de los otros miembros del tribunal arbitral, condicionados por compartir su integración con alguien que ejerce altas funciones ejecutivas e influencia innegable en el órgano responsable, por ejemplo, de sus eventuales designaciones futuras como árbitros en otros procesos arbitrales.

12.31. Es evidente, en consecuencia, la **influencia infinita que el vicepresidente de la CCI, Sr. Béraudo, puede ejercer sobre los restantes árbitros.**

12.32. Como hemos expresado, el derecho a ser juzgado por un tribunal imparcial e independiente constituye uno de los elementos básicos en los que reposa la confiabilidad de un sistema jurídico y su respeto se transforma en parte inescindible del derecho al debido proceso. Así lo ha reconocido expresamente la legislación argentina.

12.33. Señala así el artículo 8, inciso 1º, de la Convención Americana de los Derechos Humanos (Pacto de San José de Costa Rica) -integrante del derecho argentino con jerarquía constitucional en virtud de lo dispuesto en la Constitución Nacional, art. 75, inc. 22- que *"toda persona tiene derecho a ser oída (...) por un tribunal competente, **independiente e imparcial** (...) para la determinación de sus derechos de orden civil (...) o de cualquier otro carácter"* (el subrayado es nuestro). El art. 30 del CPCC impone a los jueces, por su parte, el deber de excusarse cuando su situación personal pudiera llevarlo a no mantener la imparcialidad y, en

75

consecuencia, a crear desigualdades entre las partes. Concordantemente, la jurisprudencia ha reiterado en diversas oportunidades que **la imparcialidad del juzgador es condición necesaria de la garantía del debido proceso**[104]. Asimismo, se ha reconocido que la violación a la garantía de imparcialidad es un vicio objetivo del procedimiento y no una mala cualidad subjetiva o personal del juez[105].

12.34. El cumplimiento de tales recaudos resulta de plena aplicación en el ámbito arbitral. Así lo ha destacado nuestra Corte Suprema de Justicia de la Nación al reafirmar como características propias del arbitraje la libre elección de los árbitros y su imparcialidad, el 5 de noviembre de 2002, en la causa *"Meller Comunicaciones S.A. U.T.E. c/ Empresa Nacional de Telecomunicaciones"* (disidencia de los jueces Carlos S. Fayt y Enrique Santiago Petracchi; Fallos: 325:2893).

12.35. A pesar de todo ello, la recusación planteada fue rechazada de manera infundada.

12.36. El Laudo fue así emitido por un tribunal integrado por un miembro sobre el que se han planteado fundadas sospechas respecto de su imparcialidad e independencia (confirmadas posteriormente por el manifiesto desconocimiento del derecho aplicable a favor de EDFI) y la garantía de defensa de ENDESA e YPF se ha visto gravemente vulnerada, dando lugar así a un Laudo que no ha cumplido debidamente con su finalidad ante la existencia de un vicio en el procedimiento subsumible en el art. 760 del CPCCN.

### B. La falta de fundamentos del Laudo

12.37. Fluye de lo expuesto en los Capítulos VIII, IX y X de este escrito, que el Laudo carece de fundamentación en derecho.

12.38. Esa orfandad configura un vicio procesal esencial que provoca *per se* la nulidad del acto, por constituir una *falta esencial del procedimiento* en los términos del art. 760 del CPCCN.

12.39. El art. 34, inc. 4, del CPCCN establece que *"son deberes de los jueces...fundar toda sentencia definitiva o interlocutoria, bajo pena de nulidad, respetando la jerarquía de las normas vigentes y el principio de congruencia"*. A su vez, el art. 163, inc. 5, dispone que *"la sentencia definitiva de primera instancia deberá contener...los fundamentos y la aplicación de la ley..."*.

---

[104] Entre muchos otros, CSJN, 11.7.06, *"Pontoriero, Rubén A. s/ incidente de recusación al juez federal Leopoldo Rago Gallo -causa N° 13.670"*, P.1187.XL.RHE; CSJN, 17.5.05, *"Llerena, Horacio L. s/abuso de armas y lesiones/ arts. 104 y 89 C.Pen./ causa 3221"*, L.486.XXXVI.

[105] CSJN, 10/04/03, *"Banco Nación Argentina s/ sumario averiguación defraudación"*, disidencia del juez Belluscio, Fallos: 326:1106). *"Lo decisivo es establecer si, ya desde el punto de vista de las circunstancias externas (objetivas), existen elementos que autoricen a abrigar dudas con relación a la imparcialidad con que debe desempeñarse el juez, con prescindencia de qué es lo que pensaba en su fuero interno"* (CSJN, 23.12.04, *"Quiroga, Edgardo Oscar s/ causa N° 4302"*, Fallos: 327:5863).
En sentido similar se ha pronunciado la doctrina al sostener que <u>el ejercicio independiente e imparcial de la administración de justicia "es uno de los elementos que integran las garantías del debido proceso, reconocidas en los artículos 16, 18, 28 y 33 de la Constitución Nacional"</u> y en tratados internacionales (Highton y Areán, ob. cit., tomo 1, pág. 408, el subrayado es nuestro).

76

12.40. Las reglas legales transcriptas parcialmente en el párrafo anterior reglamentan en esta jurisdicción, en lo que concierne a los juicios civiles y comerciales -en los que se subsume este procedimiento arbitral- preceptos constitucionales básicos de nuestro sistema jurídico: *"...ningún habitante puede ser privado...(de) la propiedad...sino en virtud de sentencia <u>fundada en ley</u>..."* (art. 17); *"ningún habitante...puede ser penado sin juicio previo <u>fundado en ley</u>..."* (art. 18); y *"esta Constitución, las leyes de la Nación que en su consecuencia se dicten por el Congreso y los tratados con las potencias extranjeras, <u>son la ley suprema de la Nación</u>..."* (art. 31).

12.41. Esas normas son obligatorias para todos los jueces y árbitros que laudan conforme a *derecho* (como los que pronunciaron el decisorio impugnado en este recurso). Incluso lo son para los árbitros que laudan como amigables componedores, cuando se trata de reglas de orden público (como sucede en el caso).

12.42. A tal punto ello es así, que las normas que regulan la actividad de los magistrados expresamente contemplan supuestos y efectos de apartamiento de las normas legales. Por ejemplo, la *Ley del Consejo de la Magistratura* prevé que constituye una falta disciplinaria de los magistrados *"...el incumplimiento reiterado de las normas procesales..."*[106].

12.43. Es incontrovertible, entonces, que el Laudo impugnado, al apartarse de la aplicación del derecho que estaba obligado a aplicar, e incluso al violar flagrantemente algunas de sus normas de orden público, ha provocado una *falta esencial del procedimiento* que conduce inevitablemente a la declaración de su nulidad.

12.44. Cabe recordar que *"la falta de motivación se la equipara, por sus efectos, a arrogar al fallo, el papel de legislador. Por otra parte, prescindir del texto legal sin dar razón plausible alguna; aplicar una norma derogada o aún no vigente; dar como fundamentos pautas de excesiva latitud y sustentar el fallo en afirmaciones dogmáticas o dar un fundamento sólo aparente (Alvarado Velloso, El juez, sus deberes y facultades, p. 209), configura, en la jurisprudencia de la CSJN, causal de arbitrariedad. Por otra parte, en sucesivos pronunciamientos ha sentenciado la CSJN, la obligación que incumbe a los jueces de fundar sus decisiones que va entrañablemente unida a su condición de órganos de aplicación del derecho vigente, no solamente porque los ciudadanos puedan sentirse mejor juzgados, ni porque se contribuya así al mantenimiento del prestigio de la magistratura, sino porque la mencionada exigencia ha sido prescripta por la ley. El sentido republicano de la justicia exige la fundamentación de las sentencias, porque esta última es la aplicación de sus motivaciones (CSJN, 28/4/92, La Ley, 1992-D-648 n° 8220)"*[107].

---

[106] Ley 24.937, art. 14, inc. a), ap. 5 (T.O. Decreto N° 816/99).

[107] Fenocchietto, Carlos E., *"Código Procesal Civil y Comercial de la Nación"*, T 1, p. 132 y 133, Ed. Astrea, Bs. As., 1999. El mismo autor enseña que *"la función jurisdiccional del Estado tiene por objeto la declaración de la ley en el caso concreto, de modo tal que la aplicación de la norma jurídica, o de los principios generales del derecho,*

77

12.45. En la misma línea se explica que "...*jurisprudencialmente se ha sostenido que el deber de fundamentación, es una condición para la validez de las sentencias ('Rey c/ Rocha', Fallos: 274:260; 283:86; 295:95, entre otros); para no ser arbitraria debe expresar el derecho aplicable en cada caso concreto (Fallos: 244:521; 259:55); y es inconstitucional aquella que carece de toda motivación, o si la tiene, es aparente o insustancial*". Ello por cuanto "*en nuestro país, la obligación de fundamentar tiene origen constitucional, aunque el mismo no resulta explícito ni directo. Sólo se menciona en el artículo 17 (derecho de propiedad) la expresión 'sentencia fundada en ley' y después, en el art. 18 (debido proceso) alude al 'juicio previo fundado en ley'". Así, "la sentencia fundada en ley que tipifica el art. 17 de la Constitución Nacional, así como asegura el deber de fundamentar los fallos judiciales, también puede obrar como complemento del principio de seguridad jurídica*"[108].

12.46. A ello se agrega que "*el principio de jerarquía normativa que tutela la supremacía constitucional no puede quedar desplazado por interpretaciones esquivas o ambivalentes, de forma tal que por un capricho legalista se postergue la aplicación estricta del deber de razonar cada acto jurisdiccional*"; y que "*una de las garantías del debido proceso consiste en el límite que tiene la judicatura para no introducir alegaciones o cuestiones de hecho sorpresivamente, de manera que las partes no hayan podido ejercer su plena y oportuna defensa*"[109].

12.47. No se discute aquí si el Laudo es justo o no lo es, si es ecuánime o no lo es, si es acertado o no.

12.48. Lo que aquí se cuestiona es que **el Laudo carece de fundamentos jurídicos en nuestro derecho**, viola flagrantemente nuestro orden público y afecta indebidamente expresas garantías constitucionales de las demandadas. Aun más, el Tribunal ha emitido su decisión con sustento en prueba <u>falsa</u>.

12.49. El Laudo ha incurrido en una *falta esencial del procedimiento* en tanto los árbitros han omitido la aplicación de reglas básicas inherentes a su función jurisdiccional, afectando la garantía constitucional de la defensa en juicio: ENDESA e YPF jamás prorrogaron la competencia para dirimir un conflicto con la parte actora en la inteligencia de que el tribunal arbitral interviniente -que debía emitir su laudo conforme al derecho sustantivo argentino- resolvería un conflicto según su antojo y sin fundamentación jurídica[110].

---

*viene a ser un requisito indispensable en la actividad del juez para el pronunciamiento de la sentencia". Agrega que "dentro del sistema de legalidad, el juez fundará su decisión en el texto expreso de la ley, que por medio de él actúa, estimando o rechazando en todo o en parte las pretensiones y defensas de los justiciables. Toda decisión definitiva o interlocutoria que infrinja tal recaudo esencial <u>cae bajo la sanción de nulidad</u>". Puntualiza que "el juez inexcusablemente debe declarar el derecho en el caso particular juzgado, de conformidad con los hechos afirmados y probados en juicio... (y que) es necesario tener presente que la correcta aplicación del derecho por el juez, como recuerda el aforismo, debe resultar necesariamente de los hechos afirmados por las partes, pues dentro del régimen dispositivo del CPN la formación del material de conocimiento en el juicio constituye una carga para las partes y condiciona la actuación del juez, ya que no puede referirse en sus sentencias a otros hechos que a los alegados por ellas".*

[108] Gozaíni, Osvaldo A., "Código Procesal Civil y Comercial de la Nación", T I, p. 88/9, Ed. La Ley, Bs. As., 2002.

[109] Gozaíni, ob. cit., p. 89 y ss.

[110] Ver sobre el particular, Caivano, "Arbitraje", ob. cit., Ed. Ad Hoc, Bs. As., 2000, p. 291.

78

12.50. Consecuentemente, el Laudo también es nulo desde la óptica desarrollada en este punto.

### XIII. LA GRAVEDAD INSTITUCIONAL DE LA DECISIÓN ADOPTADA

13.1. El Laudo se apartó injustificada y arbitrariamente de la ley aplicable. El Laudo violó así el orden público argentino con grave afectación de los derechos de las demandadas tutelados por la Constitución Nacional. El Laudo ha resuelto que, en la práctica, la Ley 23.928 (de orden público) y, en especial, su artículo 1 no se encontraba vigente el 21 de diciembre de 2001 y se ha negado a aplicarla.

13.2. Si el pronunciamiento cuestionado no es anulado, quedará firme una decisión jurisdiccional -emitida por un Tribunal *de derecho*- a la que, sin que mediar planteo ni decisión de inconstitucionalidad, sólo pudo arribarse violando el orden público argentino, en infracción a lo prescripto por la Constitución en su art. 31 y las normas ccdtes., afectando derechos constitucionales básicos como los de *debido proceso* (art. 18) y *propiedad* (art. 17).

13.3. La norma de orden público cuya aplicación el voto mayoritario ha decidido ignorar no es, por cierto, irrelevante o de aplicación indirecta a este caso. Se trata de la norma sobre la que se asentó el régimen de la convertibilidad y buena parte de las relaciones jurídicas entre abril de 1991 y enero de 2002.

13.4. Es evidente que la convalidación de un pronunciamiento arbitral que (i) declara que al 31 de diciembre de 2001 no se encontraba vigente la Ley de Convertibilidad y que (ii) prescinde de la fecha de entrada en vigencia de la Ley 25.561 puede dar impulso a un sinnúmero de situaciones litigiosas en la República Argentina y en el exterior, con el consiguiente impacto en relaciones jurídicas consolidadas bajo ese régimen.

13.5. Con ese criterio, innumerables actos jurídicos -civiles, de comercio, administrativos, etc.- celebrados con estricta sujeción al artículo 1 de la Ley 23.928 hasta el mismo día de su derogación podrían ser objeto de revisión y dar lugar a situaciones de genuino escándalo jurídico, con grave afectación de principios esenciales de cualquier sistema jurídico, como los de seguridad y estabilidad jurídica.

13.6. Es de público conocimiento que la derogación del régimen de convertibilidad entre la moneda argentina y la norteamericana a la paridad 1 a 1 ha dado lugar a una litigiosidad sin precedentes en la República Argentina, al extremo de colocar en virtual situación de colapso a nuestro sistema judicial. Más aún, los drásticos efectos de tales medidas sobre la paz y la convivencia social continúan manifestándose en la actualidad sobre diversos sectores de la comunidad que no consideran satisfechos sus reclamos.

13.7. Basta advertir que, a pesar de la diversidad de criterios adoptados por los tribunales que han intervenido en conflictos relacionados con la derogación de la Ley de Convertibilidad, ninguno de los pronunciamientos del máximo tribunal

79

de justicia argentino destinado a poner fin a estos conflictos generalizados ha llegado al extremo de decidir que el tipo de cambio oficial vigente de $ 1 igual a US$ 1 establecido en la Ley de Convertibilidad no tuvo vigencia hasta el último día del año 2001.

13.8. Resulta escalofriante imaginar siquiera el grado de litigiosidad que se generaría nuevamente en aquellos casos en que se pesificaron obligaciones al 6 de enero de 2002 (cfr. Decreto Nº 214/02), por ser esa la fecha de la derogación de la Ley de Convertibilidad, si se consolidara la doctrina del Laudo en el sentido de que el tipo de cambio perdió valor frente al dólar y la Ley de Convertibilidad perdió vigencia mucho antes de esa fecha. Basta recordar, tan sólo, las numerosas decisiones judiciales que estimaron inaplicable la pesificación de la Ley 25.561 y del Decreto Nº 214/02 a las obligaciones que se hallaban en mora antes del 6 de enero de 2002.

13.9. En consecuencia, el mero riesgo de que el pronunciamiento impugnado se convierta en un precedente para que, a más de 6 años desde su derogación, se reabra la discusión sobre la vigencia temporal de la Ley de Convertibilidad y sus efectos sobre las relaciones jurídicas nacidas a su amparo constituye un supuesto típico de gravedad institucional *"por las proyecciones que para el futuro pueda tener la decisión que en definitiva recaiga"*[111].

13.10. Por lo tanto, resultan plenamente aplicables a este caso las inquietudes puestas de manifiesto por la Corte Suprema de Justicia de la Nación cuando, al pronunciarse por la constitucionalidad de la Ley 25.561, resolvió que *"una interpretación contraria a esta regla fundamental del funcionamiento económico, efectuada tres años después de establecida, traería consecuencias institucionales gravísimas, lo cual sería contrario al canon interpretativo que obliga a ponderar las consecuencias que derivan de las decisiones judiciales (Fallos: 312:156)"* (el destacado es nuestro)[112].

13.11. Más recientemente, en el caso *Massa*[113], la Corte ha ratificado esta línea jurisprudencial al destacar la trascendencia social que reviste el poner fin a la generalizada situación litigiosa suscitada a partir del abandono del régimen de convertibilidad ocurrido el 6 de enero de 2002.

13.12. En esa nueva oportunidad nuestro más Alto Tribunal recordó que la *"respuesta institucional, a adoptarse mediante la presente sentencia, es el fruto de una decisión consensuada entre los ministros que integran esta Corte. La obtención de tal consenso, en aras del elevado propósito de poner fin a un litigio de indudable trascendencia institucional y social, determina que quienes lo suscriben lo hagan sin perjuicio de las apreciaciones formuladas en conocidos precedentes sobre determinados aspectos de las cuestiones debatidas"* (considerando 10º del voto de

---

[111] CSJN, 13/04/1973, *"Treviranus, Mónica Alejandra s/ adopción"*, Fallos: 285:279.

[112] CSJN, 05/04/05, *"Galli, Hugo Gabriel y otro c/ PEN – ley 25.561 – dtos. 1570/01 y 214/02 s/ amparo sobre ley 25.561"*, voto concurrente de los Dres. Zaffaroni y Lorenzetti, Fallos: 328:690.

[113] CSJN, 27/12/06, *"Massa, Juan Agustín c/ Poder Ejecutivo Nacional – dto. 1570/01 y otro s/ amparo ley 16.986"*, M.27771.XLI.

80

la mayoría y considerando 10º del voto del Dr. Fayt; el subrayado es nuestro) y que *"las razones de gravedad institucional relatadas por la mayoría y que, en líneas generales comparto, tornan prudente, en la medida que ello resulte posible, arribar a una solución que, más allá de las diferencias en los fundamentos, permita arribar a una sentencia que, en tanto unánime en el resultado económico, ponga fin a la gran cantidad de reclamos pendientes de solución"* (considerando 11º del voto de la Dra. Argibay).

13.13. Lo expuesto permite advertir que, aun en la negada hipótesis de que la Excma. Cámara considere que los límites procesales existentes en el recurso deducido por ENDESA e YPF constituyeran un óbice para declarar la nulidad solicitada –lo que, por la existencia de causales manifiestas en ese sentido, planteamos al sólo efecto de agotar la argumentación-, la presencia en el caso de supuestos nítidos de gravedad institucional –siguiendo la doctrina elaborada por la Corte Suprema desde antiguo- exige que se haga lugar al presente recurso, así como, eventualmente, justificaría la procedencia del remedio federal ante el máximo tribunal.

13.14. En efecto, la mencionada doctrina tiene como objeto evitar que cuestiones de orden procesal puedan constituirse en un obstáculo para emitir una decisión de acuerdo a derecho cuando se encuentra afectado *"el orden institucional"* o *"el fondo de las instituciones nacionales"* o *"las instituciones básicas de la Nación"* o *"el fondo del instituto jurídico del conflicto"*. Por ello, se ha entendido que revisten *"gravedad institucional"* aquellas cuestiones que exceden *"el interés de las partes y atañen a la comunidad"*, de modo tal que se justifica el pleno ejercicio de la función jurisdiccional a fin de resguardar en cada caso *"la supremacía de la Constitución Nacional respetando las instituciones básicas de nuestro derecho (o de la nación, y teniendo en mira los intereses generales de la colectividad (o de la comunidad), o 'la conciencia de la comunidad'"*[114].

13.15. Y, como se expuso precedentemente, no hay duda de que el caso en examen reviste gravedad institucional porque exorbita los umbrales de los intereses individuales de las partes de este juicio. Se trata de una resolución arbitral que impacta directamente en pilares básicos de nuestro sistema legal (como el orden público, la supremacía normativa dispuesta en la Constitución y la seguridad jurídica), con la consecuente afectación de los intereses de la comunidad en general.

### XIV. CONCLUSIÓN

Puede concluirse entonces que:

> La notable e innecesaria extensión del Laudo podría conducir a la conclusión falsa de que tiene numerosos fundamentos con los que

---

[114] Barrancos y Vedia, Fernando, *"Recurso extraordinario y 'gravedad institucional'"*, Abeledo-Perrot, Buenos Aires, 1991, p. 51 y 231/233.

81

las recurrentes disienten y que resuelve materia muy compleja. Ni lo uno ni lo otro es así. El Laudo carece absolutamente de fundamentos jurídicos e, incluso, económicos, es totalmente arbitrario y resuelve *contra legem* una cuestión tan simple como ésta: si al 31 de diciembre de 2001 estaba vigente o no el artículo 1 de la Ley 23.928 que fijaba, con carácter de orden público, el *tipo de cambio oficial* en la República Argentina.

➢ El Laudo concluyó que el 31 de diciembre de 2001 ese *tipo de cambio oficial* no estaba vigente en la práctica (cuando la Ley 23.928 no había sido derogada ni había sido declarada inconstitucional), violando así el orden público y afectando gravemente derechos, garantías y normas organizativas del Estado establecidos en la Constitución Nacional.

➢ Los árbitros, que debían ser y actuar como de derecho, estaban obligados a aplicar la ley argentina; especialmente sus normas de orden público. Sin embargo, no sólo no lo hicieron, sino que la violaron flagrantemente afectando derechos constitucionales básicos de las demandadas.

➢ Las partes pactaron con total claridad y precisión la *Contingencia* y fijaron un límite temporal para su acaecimiento. Ese pacto era imperativo y obligatorio para ellas según el art. 1197 del Código Civil. El Laudo se apartó íntegramente de los términos pactados y de las normas legales inequívocamente referidas por las partes, para adoptar una solución antojadiza y carente de base legal y fáctica, conforme surge de todo lo expuesto en los puntos precedentes.

➢ El esfuerzo argumental de la mayoría del Tribunal para apartarse de lo pactado por las partes y del derecho argentino no ha sido suficiente para ocultar las inconsistencias y contradicciones en las que inevitablemente cae al pretender desconocer los hechos comprobados de la causa y el derecho vigente.

➢ Donde la *Carta Acuerdo* decía que debía tenerse en cuento el *tipo de cambio oficial* (es decir, el del art. 1 de la Ley de Convertibilidad), la mayoría dijo que se tenía que tener en cuenta el cambio de los mercados oficialmente reconocidos porque era de presumir que las partes no pudieron referirse al *tipo de cambio oficial* del art. 1 de la Ley de Convertibilidad porque **no eran expertas en esa ley**.

➢ Donde la *Carta Acuerdo* decía que debía desvincularse el *tipo de cambio oficial*, es decir, existir un aumento o disminución en su valor, la mayoría interpretó, en contradicción con lo anterior, que lo que las partes tuvieron en cuenta fueron los aspectos de mayor complejidad técnica del régimen de convertibilidad –**propios de**

82

expertos en la materia- como los artículos 2 y 4 de la Ley de Convertibilidad.

➢ Donde la *Carta Acuerdo* decía que el aumento o disminución del *tipo de cambio oficial* debía ocurrir hasta el 31 de diciembre de 2001, la mayoría dijo que el tipo de cambio oficial se mantuvo inalterado en ese período –lo que debería haber conducido a una condena igual a "0" (cero)- pero que eso no importaba para que se produjera la *Contingencia*.

➢ Donde la *Carta Acuerdo* decía que la compensación debía calcularse tomando la *cotización oficial* del tipo de cambio oficial del 31 de diciembre de 2001, la mayoría dijo que era más apropiado tomar el *tipo de cambio libre* del 11 de enero de 2002.

➢ A pesar de que la mayoría arbitrariamente dijo que lo relevante para la *Contingencia* era considerar los postulados esenciales del régimen de convertibilidad, la decisión adoptada resultó finalmente incongruente con su propia lógica y adoptó las peores hipótesis de cálculo. Ignoró por completo las primeras manifestaciones que, en la lógica del Laudo, afectaron el mencionado régimen (sanción de la Ley 25.445, caída en el nivel de reservas, instauración del Corralito) y que hubieran dado por resultado –en el contexto del arbitrario razonamiento del Tribunal- una condena sustancialmente inferior.

➢ Para ENDESA e YPF no es fácil desterrar la profunda inquietud resultante de pensar que una de las causas de las graves e invalidantes falencias jurídicas narradas haya residido en la falta de imparcialidad e independencia del Sr. Béraudo, precedida y agravada por la decisión de la CCI de nombrarlo vicepresidente de la Corte durante el transcurso del arbitraje y de negarse a abrir un trámite de confirmación como consecuencia de ello, pese a sus indiscutibles implicancias.

➢ En definitiva, el Laudo es nulo por arbitrario y por violar el orden público, por haber excedido los árbitros los puntos comprometidos, por mediar faltas esenciales de procedimiento, creando de esta manera una situación de inusitada gravedad institucional.

## XV. EL INTERÉS JURÍDICO DE ENDESA E YPF EN LA DECLARACIÓN DE NULIDAD PARCIAL DEL LAUDO IMPUGNADO

15.1. Para lograr la declaración de nulidad de un acto procesal como la decisión impugnada, es menester acreditar el perjuicio concreto sufrido por el nulidicente (CPCCN, art. 172). La nulidad no procede por la nulidad misma, sino que debe existir un fin práctico involucrado en la invalidación del acto viciado.

83

15.2. El perjuicio en el caso es evidente: un Laudo totalmente arbitrario, carente de todo sustento fáctico y jurídico, ha condenado a nuestras representadas a pagar cifras multimillonarias, ignorando los repetidos llamados efectuados a los árbitros respecto de la necesaria aplicación al caso del derecho argentino, de acuerdo con lo pactado por las partes y con arreglo a la naturaleza jurídica de este procedimiento arbitral.

**XVI. REFERENCIAS COMPLEMENTARIAS DE INEXCUSABLE CONOCIMIENTO POR EL TRIBUNAL AD QUEM. EL AVENTURADO COMPORTAMIENTO DE LA ACTORA EN CUANTO AL MONTO DE LA DEMANDA AL QUE, SUPUESTAMENTE, SE CREÍA CON DERECHO**

16.1. La conducta procesal que evidenció la parte actora en el trámite del juicio arbitral impone a nuestra parte formular, antes de concluir esta presentación, algunas consideraciones cuyo conocimiento ilustrará al Tribunal en ocasión de resolver el presente recurso.

16.2. El análisis de estas actuaciones revela que el comportamiento procesal de la parte actora ha sido, en lo que concierne a la cuantificación de su reclamo, inconciliable con el deber de buena fe exigible a todo litigante y, asimismo, encuadrable conceptualmente en la regla prevista en el art. 163, inc. 5°, *in fine del* CPCCN.

16.3. Dicha inconducta se patentiza con notable claridad a poco que se proceda a la lectura de la denominada *memoria de fundamentación de la demanda.*

16.4. En ocasión de promover la demanda, la parte actora reclamó el cobro de US$ 325.000.000.

16.5. Notablemente, en oportunidad de presentar la referida *memoria de fundamentación de la demanda,* la parte actora, con base en una explicación pueril e inconsistente, elevó el quantum de su pretensión a la suma de US$ 516.000.000[115].

16.6. Sostener, como hizo EDFI, que **(a)** la actitud de las demandadas de rechazar toda negociación y **(b)** la mala fe de REPSOL de negarse a participar en el arbitraje habilitaban a la pretensora a incrementar el monto del reclamo[116] constituye un proceder reñido con la conducta procesal que es de exigir a todo litigante.

16.7. Esta actitud ambivalente y la significativa diferencia en los montos deja en evidencia que la demanda arbitral careció desde el principio de la seriedad y solidez que se espera de un litigante de buena fe convencido de su derecho.

16.8. En definitiva, este arbitraje ha sido una aventura. Una aventura basada únicamente en un supuesto entendimiento sobre el significado de la Carta

---

[115] A fin de elevar el monto de la demanda, EDFI sostuvo que ENDESA e YPF debían soportar el 100% del impacto de la devaluación del peso y no sólo el 50% de esa incidencia, como surge del anexo de la *Carta Acuerdo.*

84

Acuerdo al que las partes llegaron en una reunión en Madrid **que jamás existió** y que la mayoría del Tribunal Arbitral hizo propio **a pesar de su manifiesta falsedad** (punto 10, apartado 4 de la disidencia).

### XVII. <u>DOCUMENTACIÓN</u>

A efectos de facilitar la labor del tribunal se acompaña la siguiente documentación:

(i) Copia del Laudo de fecha 22 de octubre de 2007 como Anexo III;

(ii) Copia del Memorandum of Understanding como Anexo IV;

(iii) Copia del contrato de compraventa de acciones de EDENOR y EASA como Anexo V;

(iv) Copia de la Carta Acuerdo como Anexo VI;

(v) Copia de la declaración testimonial del Sr. Alfredo Llorente Legaz y de las comunicaciones escritas allí adjuntas cursadas entre las partes durante las negociaciones de la *Carta Acuerdo* (presentada como Documento R-24 de la Memoria de Fundamentación de la Contestación de Demanda de ENDESA e YPF) como Anexo VII;

(vi) Copia de la declaración testimonial del Sr. Didier Lamèthe (presentada como Documento C-173 de la Memoria de Réplica de EDFI) como Anexo VIII;

(vii) Cálculo del primer supuesto mencionado en el Capítulo X, epígrafe C), apartado a), como Anexo IX;

(viii) Cálculo del segundo supuesto mencionado en el Capítulo X, epígrafe C), apartado b), como Anexo X;

(ix) Cálculo del tercer supuesto mencionado en el Capítulo X, epígrafe C), apartado c), como Anexo XI; y

(x) Copia del Reglamento de Arbitraje de la Cámara de Comercio Internacional como Anexo XII.

### XVIII. <u>INTRODUCCIÓN DE LA CUESTIÓN FEDERAL</u>

---

[116] Ver Laudo, párrafo 235.

85

18.1. Para el supuesto hipotético e improbable de que la Excma. Cámara Nacional de Apelaciones en lo Comercial no hiciera lugar a la nulidad de laudo planteada, dejamos planteada y desde ya introducida la cuestión federal a fin de concurrir ante la Corte Suprema de Justicia de la Nación por la vía prevista en el artículo 14 de la ley 48. Ello así porque una decisión semejante sólo podría emitirse ignorando la aplicación de normas de orden público, contrariando así los principios de supremacía de las leyes (art. 31 de la C.N.) y separación de poderes propio de la forma republicana de gobierno adoptada por la Nación Argentina (art. 1 de la C.N.) e importando, asimismo, un serio menoscabo a principios, derechos y garantías consagrados en la Constitución. Entre estos principios se destacan el de legalidad, las garantías del debido proceso, la inviolabilidad de la defensa en juicio de las personas y de los derechos y el derecho de propiedad, consagrados en los arts. 14, 17, 18, 19, 28 y 31 de la C.N.

18.2. Asimismo, una hipotética e improbable decisión que convalidara el laudo constituiría una circunstancia que, por sí sola, afectaría *"la buena marcha de las instituciones"* por ser manifiestamente contraria a principios y normas de orden público. Trascendería, sin duda, el caso concreto y el interés particular de las partes, pues dañaría irremediablemente la seguridad jurídica, la supremacía de las leyes y el principio de legalidad, de modo que esta situación y su mantenimiento en el tiempo consumaría una situación que justifica el acceso a la instancia extraordinaria ante la Corte Suprema de Justicia de la Nación, en los términos de la doctrina de la **gravedad institucional,** elaborada en forma pretoriana por el más alto tribunal de la Nación en Fallos: 248:189, 257:134; 256:263 y 491, 260:204; 300:417, 326:4087, 316:1930, entre muchos otros.

### XIX. AUTORIZACIONES

Autorizamos expresamente a nuestros letrados patrocinantes y a los Dres. Leandro Javier Caputo, Mónica Laura Rothenberg, Osvaldo Pérez Sammartino, Martín Torres Girotti, María del Carmen Kupsch Araneo, Paula de la Serna, Felipe Eduardo Zabalza, María Gabriela Casanova, Cecilia Elena Lasmartres y Romina Laura Papel a tomar vista de las actuaciones, obtener copias, presentar escritos, diligenciar cédulas y oficios, solicitar el expediente en préstamo, extraer fotocopias, retirar copias, oficios, testimonios y documentación original, efectuar desgloses, dejar notas de estilo y realizar cualquier otro trámite conducente a la compulsa de las presentes actuaciones.

### XX. ADVERTENCIA SOBRE LAS RESTRINGIDAS POTESTADES DEL TRIBUNAL ARBITRAL LUEGO DE PRONUNCIADO EL LAUDO. REMISIÓN A LA CÁMARA DE APELACIONES SIN SUSTANCIACIÓN Y NUEVA DECISIÓN DEL TRIBUNAL ARBITRAL

20.1. De acuerdo con los argumentos expuestos en los parágrafos precedentes, el recurso es formalmente admisible. Debe ser concedido y oportunamente resuelto por el Tribunal competente, **sin sustanciación**.

86

20.2. Esto es, sólo incumbe al Tribunal Arbitral remitir la causa, sin más trámite a la Excma. Cámara. Vale decir, no procede que el recurso sea sustanciado con la contraparte -por expresa imposición del CPCCN, art. 760 in fine-[117] so pena de nulidad.

20.3. Ante la interposición de recurso de nulidad, el Tribunal Arbitral debe circunscribir su actuación a proveer aspectos formales, y tiene **vedada** la posibilidad de pronunciarse nuevamente -bajo pena de nulidad- sobre fundamentos o afirmaciones vinculados a las materias debatidas y decididas en autos (objeto de este recurso).[118]

20.4. Se ha decidido sobre el particular que "*procede la queja interpuesta en virtud de la denegación de un recurso de nulidad deducido contra un laudo arbitral dictado por el tribunal de arbitraje general de la Bolsa de Comercio de Buenos Aires cuando, como en el caso, surge que dicho organismo fue quien lo trató y denegó, toda vez que tal denegatoria extralimitó su competencia pues ha conocido del fondo del mismo para luego desestimarlo, siendo que solo le cupo verificar el acatamiento formal del mismo a las normas en vigencia a fin de conocerlo o denegarlo*"[119].

### XXI. PETITORIO

1. En razón de lo precedentemente expuesto, al Tribunal Arbitral se solicita respetuosamente que:

a) Tenga a quienes suscriben este escrito por presentados, por acreditada la personería invocada y por constituido el nuevo domicilio procesal;

b) Tenga por interpuesto en legal tiempo y forma el presente recurso de nulidad parcial contra el Laudo Final emitido el 22 de octubre de 2007;

c) Tenga presente la introducción de la cuestión federal formulada; y

d) Sin sustanciación alguna e *inaudita parte,* conceda el recurso de nulidad interpuesto, remitiendo dicho recurso y las actuaciones arbitrales a la Excma. Cámara Nacional de Apelaciones en lo Comercial de la Capital Federal, con domicilio en Av. Roque Saénz Peña 1211, Planta Baja, de la Ciudad A. de Buenos Aires, República Argentina.

2. Y a la Excma. Cámara de Apelaciones se solicita que:

---

[117] Esa norma no admite la sustanciación del recurso en ninguna sede.

[118] Entre muchos otros precedentes, cabe señalar que la CNCom C ha juzgado que "*las causales que se invocan, previstas en los arts. 760 y 761 de la ley ritual, justifican el tratamiento de la nulidad denegada. Resulta suficiente para así decidir, el perjuicio que se alega. Se asegura de esta forma la garantía de defensa en juicio y el control judicial que debe imperar en toda controversia, aunque sea sometida a la decisión de árbitros y las partes, como en el caso, lo limiten voluntariamente, al pactar la inapelabilidad del laudo...*" ("*Cortesfilms Argentina SA c/ Seb Argentina SA*", 21.12.01, LL 2002-A, 632).

[119] CNCom, 15.3.01, "*Industrial e Inversiones Orion SA c/ Arcor SA s/ queja*".

87

a) Tenga por presentados los anexos documentales adjuntados al presente a los efectos de un mayor orden de la presentación y con la única finalidad de facilitar la labor del Tribunal;

b) Requiera a la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional, con domicilio en 38, Cours Albert 1er, 75008 París, Francia, la remisión de la totalidad del expediente arbitral, incluyendo las presentaciones realizadas por las partes y demás actuaciones cumplidas durante su transcurso, o copias debidamente certificadas de las mismas, a cuyo fin solicitamos se ordene librar exhorto al Tribunal con competencia comercial en la ciudad de Paris, República Francesa en los términos del Art. 132 del CPCCN a ser tramitado por vía diplomática, a cuyo fin solicitamos se ordene librar el oficio pertinente al Ministerio de Relaciones Exteriores y Culto o, según se determine, al señor Embajador de la República Argentina en Francia o al señor Cónsul de la República Argentina en Paris, en los términos del Art. 38 del Reglamento para la Justicia Nacional. En dichos instrumentos se dejará constancia de que quedan indistintamente autorizados para diligenciar el oficio y el exhorto los letrados apoderados y patrocinantes que suscriben el presente, con expresa facultad de sustituir en otros profesionales, en especial en abogados matriculados y/o admitidos ante los Tribunales de Paris. Alternativamente, se efectúe dicho requerimiento mediante la emisión de un oficio debidamente legalizado y apostillado o por otros medios aptos para lograr el cometido;

c) Tenga presente la introducción de la cuestión federal formulada;

d) Tenga presente las autorizaciones conferidas; y

e) Oportunamente, dicte sentencia declarando la nulidad parcial del Laudo Final del 22 de octubre de 2007, dejando sin efecto la condena impuesta a ENDESA e YPF, con expresa imposición de costas.

Tener presente lo expuesto y proveer de conformidad, que

SERÁ JUSTICIA

RAFAEL MARIANO MANÓVIL
ABOGADO
C. S. T° 6 - F° 599
C. A. S. I. T° XI - F° 132
CUIT: 20-04431095-4

ROGELIO DRIOLLET LASPIUR
ABOGADO
T° 9 - F° 204
C.A.S.I. T° XI - F° 196

FRANCISCO M. GUTIÉRREZ
ABOGADO
C.P.A.C.F. T° 59 - F° 802

MAXIMO LUIS BOMCHIL
ABOGADO
C.S.J.N. TOMO 17 - FOLIO 18

9522.v5.fg
ALFREDO d. DI IORIO
ABOGADO
TOMO 35 - FOLIO 284

CARLOS MARÍA ROTMAN
ABOGADO
TOMO 30 FOLIO 544

CARLOS MARIA TOMBEUR
ABOGADO
T° 63 - F° 107

HUGO PEDRO LAFALCE
ABOGADO
C.P.A.C.F Tomo 17 Folio 356
C.N.P.T.A. 3.286.011

# EXHIBIT 6



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Katharine Perekslis, hereby certify that the following document is to the best of my knowledge and belief, a true and accurate translation, of the ENDESA Internacional S.A. and YPF S.A.'s Petition For Partial Annulment Of The Award from Spanish into English.

Katharine Perekslis
Signature

Sworn to before me this
July 11, 2008

Signature, Notary Public

Pamela Boyle
Notary Public, State of New York
No. 01BO6181278
Qualified in NEW YORK County
Commission Expires Jan 28, 2012

Stamp, Notary Public

## TABLE OF CONTENTS

I.    POWER OF ATTORNEY .................................................................................................. 1

II.   PURPOSE ...................................................................................................................... 1

III.  INTRODUCTION. ARBITRATION IN LAW HAD BEEN AGREED UPON AND THE
      ARBITRATORS DECIDED, WITH ABSOLUTE DISREGARD OF THE ARGENTINE LAW
      APPLICABLE TO THE CASE, AS AMIABLE COMPOSITEURS. THE MANIFEST
      ARBITRARINESS OF THE AWARD BECAUSE IT VIOLATES THE PUBLIC ORDER AND GOES
      BEYOND THE AGREED-UPON ISSUES TO BE ARBITRATED .......................................... 2

IV.   JURISDICTION OF THE HONORABLE NATIONAL COMMERCIAL COURT OF APPEALS OF
      THE CITY OF BUENOS AIRES........................................................................................ 5

V.    ADMISSIBILITY OF THE APPEAL ON THE BASIS OF ARBITRARINESS AND VIOLATION OF
      THE PUBLIC ORDER, OF GOING BEYOND THE ISSUES THE PARTIES AGREED TO
      ARBITRATE, OF ESSENTIAL FAULT IN THE PROCEDURE, AND OF THE OCCURRENCE OF
      AN EXCEPTIONALLY SERIOUS EVENT FROM THE INSTITUTIONAL POINT OF VIEW    6

      A.    Non-waiving of the Appeal for Annulment …………………………………………… 6

      B.    Admissibility of the Appeal for Annulment by reason of the express arbitrariness of the Arbitration Award, on the
            grounds of the Award's unconstitutionality, illegality, and non-reasonability. The doctrine of the National
            Supreme Court of Justice ……………………………………………………..……………… 6

      C.    Admissibility of the Appeal for Annulment by reason of incurring in essential procedural fault, of arbitrators'
            ruling on non-agreed upon points, and of occurrence of a serious event from the institutional point of view
            …………………………………………….. ……………………………………………..…… 9

VI.   RELEVANT PRECEDENTS IN THE DISPUTE ................................................... 9

      A.    EDFI, ENDESA, and ASTRA acquire EDENOR's Control ……………………………………….. 10

      B.    By decision of the National (Federal) State, ENDESA  is forced to dispose of its indirect share of interest in
            EDENOR ………………………………………………………………….…………….. 10

      C.    The Memorandum of Understanding ……………………………………………………… 10

      D.    EASA/EDENOR's Shares of Stock Sales Contract. The Applicable Law and the venue selection clause
            …………………………………………………………………………………………..10

      E.    The Ministry of Finance of the French Republic conditioned its approval, which was essential to carry out the
            operation, on the following: the parties had to agree on a compensation for the EDFI, based on the hypothesis
            that, for some reason, the exchange parity of the Convertibility Law might lose its effect ………………… 11

      F.    The Letter of Agreement, dated March 31, 2001, but that was signed on April 27, 2001, fulfills the requirements of the
            government of France……………………………………………..…………………………….    11

      G.    The compensatory claim of EDFI based on the alleged occurrence of the Contingency before December 31,
            2001 …………………………………………………………..……………………………..………… 12

      H.    The rejection of ENDESA and YPF of this claim. The positions of the parties in the arbitral process
            ……………………………………………………………………………………………… 13

2

**VII.   THE ARBITRAL AWARD**…………………………………………………………… **15**

    *A.      The Award challenged for nullity* …………………………...............……………….. *15*

    *B.      The majority vote: its inadmissible and arbitrary grounds, which only have the appearance of such* ……………………………………………………..……………………………….. *15*

    *C.      The dissenting opinion that gets things right: its grounds* …………….....………. *17*

**VIII.   THE    CHALLENGED    DECISION    IS    UNCONSTITUTIONAL,    ILLEGAL    AND UNREASONABLE. THEREFORE, IT IS ARBITRARY AND IT MUST BE DECLARED VOID** ........................................................................................................................................... **20**

    *A.     Preliminary comment about the remarkable extension of the Award and its lack of any legal ground. The relevant part is only 40 pages long*…………………………………………….. *21*

    *B.     The Award is manifestly arbitrary because Argentine law was not applied and public policy was violated. In having an award according to its individual concept of fairness, instead of following the legal bases agreed by the parties, the Arbitration Panel exceeded its functions and moved away from the first point agreed upon: settling the dispute according to the law of the Argentine Republic* ……………………………………………………………………………………....….. *21*

           a) The arbitrators were under the inexcusable obligation to apply Argentine law. 22

           b) The arbitrators did not apply Argentine law but on the contrary, flagrantly and unjustifiably violated it……………………………………..,.…………………… 23

**IX   THE ARBITRATION PANEL'S CONCLUSION IS ARBITRARY SINCE ON December 21, 2001 THE OFFICIAL EXCHANGE RATE FROM THE CONVERTIBILITY LAW NO LONGER GOVERNED AND ON THAT DATE THE CONTINGENCY AGREED BY THE PARTIES OCCURRED** ...........................................................................................................**25**

    *A.    The agreement by the parties regarding the Contingency* ...........................................*25*

    *B.    Clarity and precision of the agreement* ......................................................................*26*

    *C.    What was agreed was imperative in the light of Article 1197 in the Civil Code* ………. *26*

    *D.    The Letter of Agreement—interpreted, as required by law, according to the milestones provided in Argentine legislation—presents no doubts and unequivocally excludes the possibility of relying on other principles to settle the dispute. The interpretation in the Award is not reasonably derived from current law.* .......................................................................*27*

    *E.    The only "official exchange rate" in the Argentine Republic during all of December 2001 was the rate imposed by Law 23.928. Failure to observe the deadline agreed by the parties for the expiration of the Contingency makes the Award null because it is arbitrary and goes beyond the issues involved.* ........................................................................................................*30*

    *F.    The arbitrary interpretation given by the Award to the specific contractual clause relating to the "official rate of exchange", citing that the parity*

3

*of 1 peso for 1 dollar was not in the Convertibility Law but was the rate established in the markets, has no contractual, legal, factual or logical basis, and violates Argentine public policy.*...................................................................................................................*32*

G.   *Arbitrariness of the scope given by the majority vote to the phrase "unlinking of the official rate of exchange" because (i) it is incompatible and incongruent with the actual terms of the clause and with the intention of the parties as shown in the other clauses of the Agreement, (ii) it oversteps the meaning of the term "unlinking," and (iii) it violates public and constitutional policy.* ................................................................................................................*36*

H.   *The award contains a gross self-contradiction: it first maintains that parties that are not specialists in the convertibility regime could not be expected to have made reference to the official exchange rate under the Convertibility Law; to later state that, to agree on the Contingency, the parties took into account the sophisticated aspects of the economic and exchange policies established in the Convertibility Law* .......................................  46

I.     *In defining the Contingency in a manner different from what is stated in the text, the award relied on false evidence* ....................................................................................  48

J.   *The award's assertion that the contractual term "unlinking" did not refer to the official exchange rate but to the basic postulates of the convertibility regime, collides with the precision and clarity of the language agreed, and is devoid of all logical, legal and economic sense. But even under this absurd and negated hypothesis, the award interpreted the matter in a manifestly arbitrary manner* ........................................................................................................ 49

K.   *The challenged Award, rendered by arbitrators that had to act like arbitrators under law, was based in a flagrantly opposite "interpretation" to the literalness of what the parties had agreed upon, to their intention as demonstrated by the factual background of the case, to public order and even, to basic constitutional principles. That interpretation was based solely on speculations and conjectures on the economic reality, which are totally wrong and improper for any jurisdictional decision. There is no reasonable or even a tangential derivation of the applicable law in the Award* .................................................................................................. 55

L.   *To greater abundance, the abuse of the opposed Award led, even, to consider Art. 218 paragraph 7, of the Code of Commerce as inapplicable* ........................................................ 57

X.    **THE UNREASONABILITY AND LACK OF ALL LEGAL AND ECONOMIC LOGIC OF WHAT THE AWARD STATES WHEN QUANTIFYING THE LIABILITY, SEPARATING ITSELF FROM THE AGREEMENT, VIOLATING THE ARGENTINE PUBLIC ORDER AND ILLEGALLY AFFECTING THE BASIC CONSTITUTIONAL RIGHTS OF THE DEFENDANTS** ........................................................................................ **57**

A.   *Arbitrariness for not applying the method agreed upon by the parties: the average official quote of the peso versus the dollar between the date of the first alteration and December 31, 2001. Had the method selected by the parties been applied, the sentence would have been equal to "0"* .......................................................................................... 57

B.   *Abuse of the powers entrusted to the Tribunal when adopting, according to its capricious will, an exchange rate and dates of reference different from those specifically agreed upon by the parties* ................................................................................................................ 58

4

*C.   Arbitrareness because the Award chooses the least plausible hypotheses to increase the amount of an already inadmissible compensation to the greatest possible extent .... 61*

    a)   Result based on a first assumption: the unlinking happens as a result of the approval of Law 25,445, which modified the Law of Convertibility to introduce a basket of currencies with the Euro …………………………………..… 61

    b)   Result based on a second assumption: the unlinking happens as a result of a drop in (international) reserves in the Central Bank…………..……………...62

    c)   Result based on a third assumption: the unlinking was a consequence of the implementation of the Corralito ……………………………………... 63

**XI.     THE ARBITRARINESS IS SUCH THAT IT RESULTS IN THE TRIBUNAL DECIDING ON NON-ARBITRABLE ISSUES: THE TRIBUNAL DID NOT APPLY THE LAW, AS IT WAS AGREED, BUT IT ACTED AS AN AMIABLE COMPOSITEUR, SOMETHING THAT IT IS NOT ALLOWED TO DO. CASE LAW FROM INTERNATIONAL ARBITRATION COURTS AND THE SUPREME COURT ………………………. 64**

**XII.    THE CHALLENGED AWARD IS ALSO NULL BECAUSE IT IS IMPAIRED BY AN ESSENTIAL FAULT IN PROCEDURE**

*A. A lack of independence or impartiality in the arbitrator appointed by EDFI. Failure by ICC to open arbitrator confirmation proceedings to guarantee the equality of the parties in the process and the defendants' right to defend themselves. The lack of grounds for the rejection of the challenge to the arbitrator and vice-president of the ICC …………………………………………………… 68*

*B. The lack of foundations of the Award …………………………………………………… 75*

**XIII.   THE INSTITUTIONAL GRAVITY OF THE DECISION …………………..…………78**

**XIV.   CONCLUSION………………………………………..…………………………………80**

**XV.    THE LEGAL INTEREST DE ENDESA AND YPF IN THE DECLARATION OF PARTIAL NULLITY OF THE OPPOSED AWARD…………………………………………... 82**

**XVI.   ADDITIONAL REFERENCES OF INEXCUSABLE KNOWLEDGE BY THE COURT AD QUEM. CLAIMANT'S OUTLANDISH BEHAVIOR AS FAR AS THE AMOUNT OF THE DEMAND TO WHICH, ALLEGEDLY, CLAIMANT BELIEVED IT WAS ENTITLED ……………………………………………………………………………………… 83**

**XVII.  DOCUMENTATION………………………………………………………………… 84**

**XVIII. INTRODUCTION OF THE FEDERAL QUESTION ..…………………,,,,…………. 84**

**XIX.   AUTHORIZATIONS …………………………………………………………………… 85**

**XX.    WARNING ON THE RESTRICTED POWERS OF THE ARBITRAL TRIBUNAL AFTER RENDERING THE AWARD. REMISSION TO THE COURT OF APPEALS WITHOUT PROCEEDINGS AND NEW AWARD BY THE ARBITRAL TRIBUNAL …………... 85**

5

**XXI.    PETITIONS**................................................................................................ **86**

**APPEAL FOR ANNULMENT FILED AGAINST ARBITRATION AWARD OF OCTOBER 22, 2007**

Honorable Arbitration Court:

    I, FRANCISCO M. GUTIÉRREZ, lawyer, C.P.A.C.F., Volume 58, Page 992, acting herein as Attorney at Law of ENDESA INTERNACIONAL S.A. (hereinafter referred to as "ENDESA"), with actual domicile at Calle Príncipe Vergara 187, City of Madrid, Kingdom of Spain, together with Attorneys at Law  MÁXIMO L. BOMCHIL, lawyer, C.S.J.N., Volume 17, Page 18, RAFAEL M. MANÓVIL, lawyer, C.S.J.N., Volume 6, Page 599, HUGO P. LAFALCE, lawyer, C.P.A.C.F., Volume 17, Page 356, CARLOS MARÍA ROTMAN, lawyer, C.P.A.C.F., Volume 30, Page 544, and ALFREDO JORGE DI IORIO, lawyer, C.P.A.C.F., Volume 35, Page 284, establishing new domicile for service of process at Suipacha 268 , 12 floor, A. City of Buenos Aires, Argentine Republic (M. & M. Bomchil Attorneys' Bureau); and ROGELIO  DRIOLLET LASPIUR, lawyer, C.P.A.C.F., Volume 9, Page 204 acting herein as attorney at law of YPF S.A. (hereinafter referred to as "YPF"), with actual domicile at Diagonal Roque Sáenz Peña 777, A. City of Buenos Aires, Argentine Republic, together with Attorney at Law CARLOS MARÍA TOMBEUR, lawyer, C.S.J.N., Volume 20, Page 107, establishing new domicile for service of process at Reconquista 336, 2° floor, A. City of Buenos Aires, Argentine Republic (Severgnini, Robiola, Grinberg & Larrechea Attorneys' Bureau), in regard of the international arbitration entitled **"EDF INTERNATIONAL S.A. (France) vs./ 1. ENDESA INTERNACIONAL S.A. (Spain) - 2. REPSOL YPF S.A. (Spain) - 3. YPF S.A. (as acquirer of ASTRA C.A.P.S.A.) (Argentina)"** **(Case  ICC # 12231/KGA/CCO/JRF),** appear before Your Honor and respectfully state:

## I.       POWER OF ATTORNEY

    1.1.    As proved by the simple copies of powers of attorney, attached hereto as Annexes I and II, and which we declare under oath to be true copies of the original documents, and valid; we are agents of ENDESA, and YPF, respectively, with sufficient powers to file this appeal.

    1.2.    Therefore, we request to be set on record that we appeared as a party in our abovementioned capacities, as well as our abovementioned actual domicile and domicile for service of process constituted for purposes hereof.

## II.       PURPOSE

    2.1.    In the capacity invoked and according to the terms of Section 760 and related provisions of the National Procedural Commercial and Civil Code (hereinafter referred to as "CCCPN", as per its acronym in Spanish), we appear in due time[1] and proper form to file an Appeal for Annulment against the final arbitration award  issued on October  22, 2007 (the "Award"), a copy of which is attached hereto as Annex III, in order to request the declaration of its <u>partial</u>[2] annulment, to the extent that it finds in favor of EDF INTERNATIONAL S.A. (EDFI)'s,

---

[1] The Defendant Parties were notified of the Award on October 31, 2007, and, therefore, the Appeal is filed within the five judicial business day term set forth in Section 759 of the CPCCN.
  [2] Section 760 of CCCPN explicitly permits the partial annulment statement of the arbitration award.

2

consequently thereof, requires from ENDESA and YPF the payment of the amounts of US$ 100,757,875 and 28,933,850, respectively, plus interests[3].

2.2.     As it shall be demonstrated herein, the Award is void **(a)** because it is unequivocally arbitrary in terms of the doctrine established by the **National Supreme Court of Justice** in the case, among others, **"José Cartellone Construcciones Civiles SA vs./ Hidroeléctrica Norpatagónica SA or Hidronor SA"**, of June 1, 2004[4], and because it flagrantly violates the Argentine public order, leading to a situation of undeniable institutional concern; **(b)** because the [Arbitral] Tribunal's decision exceeds the agreed scope of the issues to be decided in arbitration since they decided as amiables compositeurs instead of arbitrators in law as has been agreed; and **(c)** because of essential procedural faults leading to its annulment (CPCCPN, Section 760).

## III.     INTRODUCTION. ARBITRATION IN LAW HAD BEEN AGREED UPON AND THE ARBITRATORS DECIDED, WITH ABSOLUTE DISREGARD OF THE ARGENTINE LAW APPLICABLE TO THE CASE, AS AMIABLES COMPOSITEURS. EVIDENT ARBITRARINESS OF THE AWARD BECAUSE OF VIOLATION OF THE PUBLIC ORDER AND GOING BEYOND THE AGREED-UPON ISSUES.

3.1.     In the following chapters it will be explained how the arbitrators who subscribed the majority votes completely violated their duty to issue an award according to the law chosen by the parties, by deciding arbitrarily, exercising an abuse of discretion not granted by the litigants or by the type of arbitration agreed upon.

3.2.     The first point agreed upon by the parties was the submission to arbitration in law, in which the Argentine law would be applied in earnest, including both its mandatory and non-mandatory rules. In spite of the dissenting vote warnings, the majority of the Tribunal arbitrarily ignored the strict legal limitations imposed by the parties and replaced them with political, financial, and even pseudo-psychological considerations - in short, all non-legal standards - and decided, according to their knowledge and belief, as if in an amiable compositeur's proceeding.

3.3.     The case in question originated in the contract entered into by the parties for the sale of shares of stock owned by the defendants in companies Empresa Distribuidora y Comercializadora Norte SA ("EDENOR"), and Electricidad Argentina SA ("EASA").

---

[3] The figures shown herein are the net amount of capital subject to the ruling, as long as the Award accepted EDFI's request for an amount of US$ 187,000,000 (composed by the following proportions: USD 147,000,000 payable by ENDESA, and USD 40,000,000 payable by YPF), and accepted ENDESA and YPF's counterclaim for USD 57,308,275, ruling that this amount should be deducted from the former figure, all this resulting in a total net amount of USD 129,691,725, payable in the following proportions: USD 100,757,875 by ENDESA, and USD 28,933,850 by YPF. The Defendants consent the decision adopted in the Award in reference to the counterclaim, which does not form part of the Object of this Appeal.

4 Judgments: 327:1881.

3

3.4.    What the Arbitral Tribunal had to resolve was whether a *Contingency* contractually defined had taken place or not before December 31, 2001. If that was the case, the Defendants would have the obligation to return a portion of the price collected from the sale to the Plaintiff. If that was not the case, no return was required at all.

3.5.    The *Contingency* consisted in the "unlinking of the **official exchange rate** of the Argentine peso in regard to the American dollar", so that a "**reduction**... or increase **of the official exchange rate** of the peso in regard to the dollar" was obtained. In order to have a right to compensation, all this should occur, unavoidably, **by December 31, 2001**.

3.6.    The meaning of those expressions was clear and precise: the **only official exchange rate** in force on the date of the Contract (March/April 2001) was that established by Section **1 of the Law of Convertibility**. And any other official exchange rate that may replace it should be established by law or by a legal rule dictated by the Congress authority, prior revocation or amendment, also by law, according to the Law of Convertibility.

3.7.    **This took place a few days after the key date.** As it is publicly known, **the *new official exchange rate* was established by the Law 25.561, passed on January 6, 2002, and after the Decree Nº 71/02.**

3.8.    Nevertheless, the arbitrators who subscribed the majority vote taking as basis for their decision their peculiar convictions about these issues – which they did not experience due to the fact that they neither live in Argentine nor are Argentine nationals – regarding the political and economic crisis suffered by the country at the end of the year 2001. By means of a willful act, they decided that the plaintiff should recover part of the amount paid, probably because they felt sympathy [for Claimant] since the facts that were a requisite for the *Contingency* **occurred only a few days after the agreed deadline.**

3.9.    But the parties did not agree that the arbitrators would decide what was better or worse, nor that they would make a decision based on their own personal convictions and beliefs. Rather, the parties - three of the biggest energy companies in the world - had contractually decided to **share the risks**. This division of risks was agreed in a methodical, business-like and clearly objective way based on precise and concrete data.

3.10.    On the one hand, **an exact key date**. It was already said: December 31, 2001. On the other, **a fact with precise legal meaning**: the unlinking of *"the official exchange rate of the Argentine peso with the USA dollar" and, as a consequence the amendment, due to the reduction or increase "of the official exchange rate of the peso according to the dollar".*

3.11.    What did the majority of the Tribunal actually do?

4

3.12.    It failed to apply a law of public order - the Law of Convertibility - and, also, the law of the parties (Section 1197 of the Civil Code).

3.13.    **Without any positive basis – despite being a court of law - the majority decision in the Award considered, in an arbitrary way and generating a case of manifest institutional concern and breach of the Argentine public order, that said unlinking (the *Contingency*) <u>took place before December 31, 2001, under the undeniable and yet false assumption of considering that on that date Section 1 of Law 23.928 was not in force.</u>**

3.14.    How did the majority justify that conclusion?

3.15.    By saying that it **<u>was not relevant</u>** to the effects of considering the Contingency, if it existed at all, until December 31, 2001, a **<u>reduction or increase of the official exchange rate</u>** *(!!!).* What was **<u>relevant,</u>** according to the arbitrary and fickle view of the majority vote, were the **<u>other political and economic factors:</u>** that the **<u>essential basis</u>** on which the Law of Convertibility was enacted had not in fact been enforced any more in December 2001.

3.16.    But the deviation from the applicable law did not end there.

3.17.    The agreement of the parties [that the Tribunal] should have applied was that after the Contingency had occurred, in order to establish the revision of the price, the basis for the calculation should be "the average of the ***<u>official quotation of the Argentine peso</u>*** *in regard to the American dollar during the period starting on the* ***<u>date on which the first peso/dollar par value alteration occurs, and December 31, 2001</u>****"*.

3.18.    Again, the majority stepped away from the two clear, precise, and concrete elements agreed upon by the parties: **the *<u>official quotation</u>* of the peso and the deadline on *<u>December 31, 2001.</u>***

3.19.    In spite of the fact that this constituted new evidence that all that mattered for the calculation was the *official market* and the *official exchange rate* – whereas any parallel exchange rate was to be excluded- the majority of the arbitrators felt that the first part of the decision, i.e. to claim that the *Contingency* had taken place, was not enough to arbitrarily rule against ENDESA and YPF ordering them to make the payment. Therefore, two absolutely arbitrary dates were set for the calculation. **<u>December 21, 2001, was set as the date of the *Contingency*.</u>** On this date nothing happened and according to the Award there was neither market nor quotations because the Central Bank had decreed a holiday due to the resignation of President de la Rúa. As regards the quotation, the parameter basis of the calculation was fixed by means of **the free exchange rate of January 11, 2002,** i.e., an **UN**official quotation **subsequent to the key date agreed between the parties.**

3.20.    The use of an average between both dates was the result of their own personal interpretation but it had no legal bases whatsoever. They calculated

5

averages and pro-ratas at will, ignoring other analogous calculations that would have provided a result much lower than that of the Award. That would have happened if the date of said hypothetical *Contingency* had been brought forward, e.g., to the date when the banks imposed the so-called "Corralito" restrictions. All this beside the fact that **the official exchange rate at December 31 that should have been applied was the last existing one and not the one established later on**: i.e., 1 peso equals 1 dollar, which meant that even if the *Contingency* had been deemed as produced, the compensation would have resulted in zero.

3.21.    All this juggling could have been eventually understood if an arbitration of amiable compositeurs had been agreed upon, even though the final result would have been equally illegitimate due to its intrinsic irrationality. However, **in an arbitration in law this results in the manifest nullity of the award** because it amounts to a case of arbitrariness and of violation of the public order, which also constitutes an obvious abuse of the powers conferred on the tribunal; i.e. a decision "*about points not agreed-upon*" according to Section 760 of the CCCPN.

3.22.    None of the grounds presented by the majority is supported by law, even though the concepts to be applied, as agreed upon by the parties, were clearly legal: whether or not the legally relevant event took place before December 31, 2001.

3.23.    Almost everything discussed herein was noticed in the dissenting vote by Arbitrator Illescas Ortiz.


## IV.    JURISDICTION OF THE HONORABLE NATIONAL COMMERCIAL COURT OF APPEALS OF THE FEDERAL CAPITAL (BUENOS AIRES)

4.1.    As the parties have not agreed otherwise, this Court has jurisdiction as for the subject matter and the territory to rule on this Appeal (CCCPN, Section 763).

4.2.    The parties - business associations - have discussed the interpretation and application of a certain clause – examined in detail later on herein - added to a stock sales contract entered into with corporations whose headquarters and business activities are located in the city of Buenos Aires, Argentine Republic (Decree-Law Nº 1285/58, Articles 36, 43 bis, and concordant sections). Therefore, **(i)** the parties are traders (Commercial Code, Articles 1, 5, and concordant sections), **(ii)** they entered into a commercial agreement (Commercial Code, Article 451, and concordant sections) in connection with business associations - traders - which, in turn, are commercial acts by themselves (Commercial Code, Article 8, Subsection 6, and concordant sections; and Article 384 of Law 19.550, and concordant sections) and **(iii)** the Contract was executed in that jurisdiction (Clause 4.3 of the Contract; CCCPN, Article 5, Subsection 3).

4.3. As agreed upon in the Contract, the arbitration venue was the City of Buenos Aires.

6

**V.      ADMISSIBILITY OF THE APPEAL ON THE BASIS OF ARBITRARINESS AND VIOLATION OF THE PUBLIC ORDER, OF GOING BEYOND THE AGREED UPON POINTS, OF THE ABSENCE OF ESSENTIAL PROCEDURES, AND OF THE OCCURRENCE OF AN EXCEPTIONALLY SERIOUS EVENT FROM AN INSTITUTIONAL POINT OF VIEW**

**A.      Non-waiving of the Appeal for Annulment**

5.1. This Appeal for Annulment is non-waivable (CPCCN, Article 741, par. 5, and Article 760)[5]: Besides that, it is applicable pursuant to the ICC's Arbitration Regulations (Article 28.6)[6].

**B.      Admissibility of the Appeal for Annulment by reason of the express arbitrariness of the Arbitration Award, on the grounds of the Award's unconstitutionality, illegality, and non-reasonability. Case law from the National Supreme Court of Justice**

5.2. From a procedural perspective, Article 760 of the CPCCN expressly states that *"non-waiving of resources shall not affect... the admissibility of motions for clarification and appeals for annulment, by reason of essential procedural fault, untimely arbitrators' judgment, or on non-agreed upon points"*.

5.3. From a substantial perspective, the National Supreme Court of Justice, in the abovementioned case *"José Cartellone Construcciones Civiles SA vs./ Hidroeléctrica Norpatagónica SA or Hidronor SA"* of June 1, 2004, has established the doctrine stating that *"... it cannot be properly interpreted that a waiver to appeal an arbitration decision extends to circumstances in which the arbitration award decisions contradict the public order, since it is illogical to think, when formulating such waiver, that an arbitrator will take a decision incurring such a defect. In this regard, it must be remembered that consideration of facts and regular application of the law are arbitrators' functions and, therefore, arbitrators' awards judgments shall be not subjected to appeal under such conditions, but, conversely, their decisions may be judicially challenged if unconstitutional, illegal, or unreasonable (Judgments: 292: 223)"*.

---

[5] The norms enabling for appeals for arbitration award annulment are of public order and restricted (Civil Code, Article 872 and concordant sections), thus such appeals are non-waivable (Caivano, Roque J., "Los laudos arbitrales y su impugnación por nulidad" [Arbitration Awards and their Annulment Challenges], in JA 1994, I, p. 845). In that sense, it has been said that "as *arbitration implies the parties' submission to private Judges, and the parties' waivability to be judged by State entities, it is natural that the legislator's will has been to provide the arbitration process with certain guarantees, imposing the arbitrator's decision as a condition for validity. Precisely for that reason a non-waivable Judge's review instance in arbitration  has been established giving the State Judges the power to verify that such requirements are met, and to annul the Award in case they were not met (...) Annulment review is - according to the foregoing - protected by the laws, which endow it with the condition of a public order measure."* (Calvario, Roque J., "Arbitraje" [Arbitration], Buenos Aires, Ed. Ad-Hoc, 2000, p. 289). Specifically in regard to ICC arbitration cases (as the one herein), it has been stated that *"even when the parties have validly agreed to be bound by the ICC Arbitration Court procedural rules, the due judicial control on that arbitration must be recognized -in all cases in which any imperative provision applicable to the arbitration process under our internal laws might be at stake- in order to review any possible transgression to the provisions  of such nature"* (Kielmanovich, Jorge L., *Código Procesal Civil y Comercial de la Nación"* [Procedural Civil and Commercial National Code]. V. II., Ed. Lexis-Nexis Abeledo Perrot, Buenos Aires, 2005, p. 1173, in reference to CNCom B[National Chamber of Commerce "B"]'s judgment of December 21, 1990, in the case *"Cía. Naviera Pérez Companc S.A. et al vs./Ecofisa S. A. et al"*, published in ED 143-435). In that sense, case law states that the anticipated waivability to appeal against arbitration awards will not always be executable, as its validity will depend on the procedural law applicable (Rubino-Sammartano, Mauro, *International Arbitration. Law and Practice"*, p. 874, Kluwer Law International, The Hague, 2001) and that even when ICC Regulations state the parties' generic waiving to appeal against awards, it shall not affect non-waivability of resources as stated by national legislations, such as in cases of violations to due process, to international public order, or to court jurisdiction (Derains, Yves, and Schwartz, Eric A., *"A Guide to the New ICC Rules of Arbitration"*, Kluwer Law International, The Hague, 1998, p. 297).

[6] A copy of the ICC Arbitration Regulations is attached as Annex XII.

5. 4.        The Supreme Court's vision on this matter, in force today[7], is unquestionable[8].

5. 5.        In our legal system, the parties may expand, by contract, jurisdiction to an arbitral tribunal's when the matter is of an economic nature and the parties are free to dispose of them, as the case hereof (CPCCN, Articles 1, 736, 737, and concordant Sections.). They cannot do so, certainly, when the questions involved cannot be subject to settlement.

5. 6.        However, in no case does such an expansion of jurisdiction or even the contractual waiver to challenge the award to be issued by the arbitrators -with the narrow limits imposed by Article 760 of the CPCCN, or, if applicable, Article 771- entitle arbitrators to violate the public order of our legal system.

5. 7.        Thus, awards issued by arbitrators de jure - such as the ones who issued the award challenged hereunder - must subject themselves to the public order legislation in force and applicable to the case.

5. 8.        If public order is not available to the people (Civil Code, Articles 19, 21, 953, and concordant Sections), a public order infraction could not be *channeled* by means of an expansion of the jurisdiction to an arbitration tribunal and by means of a waiver to appeals challenging the award issued in the arbitration process.

5. 9.        Aside from the foregoing, the need for jurisdictional decisions to state its grounds, to be consistent and to be reasonable is a procedural and constitutional public order principle, thus making inadmissible the exclusion of judicial revision of such decisions when they fail to meet this fundamental requirement[9].

5. 10.        The absence of the abovementioned requirements clearly affects the guarantee of judicial defense in court.

---

[7] The National Supreme Court of Justice has repeated its doctrine in regard to arbitration court decisions, by stating that in order to *"examine the formal admissibility of the appeal, it must be remembered that the Court's doctrine on this matter is that arbitration courts' decisions on public works are challengeable in case of arbitrariness"* and by further adding that that revision was admissible *"whenever a challenged decision omitted the discussion of extremes that lead to an appropriate solution of the case and were timely proposed for the court's consideration, and expressed grounds that only apparently satisfy the requirements that jurisdictional acts must meet in order to be valid. (Judgments: 312: 1034, 315: 1561, and 2512, among others)"* (Judgment passed on June 13, 2007, on the Case "Appeal on Points of Fact brought by the Defendant in the Cae Eaca S. A. - Sideco Americana S.A.C.I.F. - Saluge Argentina vs./ Dirección Nacional de Vialidad [National Highway Authority]", published at www.csjn.gov.ar.

[8] In this regard, it has been said that *"...when an arbitrator diverts from the arbitration commitment previously agreed on, or when the arbitrator's award is unconstitutional, illegal, or unreasonable, ordinary justice can be sought by use of an appeal for annulment, or of an extraordinary appeal, both of which are non-waivable, and will be admissible even when the parties had agreed otherwise, since this is in favor of the public interest and order, a healthy community, and healthy alternative means of conflict resolution, since it is inadmissible that an award infringes the National Constitution on the grounds that the matter in question is susceptible of being subject to arbitration by the parties"* (Gualtiero Martín Marchesini, *"Arbitration and Extraordinary Appeal"*, published in the juridical magazine "La Ley" [The Law], on Sept. 29, 2004).

[9] Note that, in the opposite direction, the CNCom C [National Chamber of Commerce "C"], in its judgment passed on December 21, 2001, in the case *"Cortesfilms Argentina SA vs./ Seb Argentina SA"*, published in *La Ley* 2002-A, 632, considered that non-violation of the principle of congruity is a requirement for an award to be valid: *"from the literal tenor of the award no... omission or defect invalidating it arises. Such piece... respects the principle of congruity... (and) the award stated the decision expressly, positively, and precisely... thus dissipating the arbitrariness risk"*. Thus, the possibility of challenging an arbitrary award was admitted, *contrario sensu*.

8

established in Article 18 of the National Constitution. For this reason, it has been appropriately said that *"a court judgment* [or arbitration award] *will be really such if proper culmination of a trial meets a set of certain minimum requirements... A judge's* [or arbitration tribunal's] *judgment, although labeled as such, will not be a judgment as required by the Constitution if such judgment is arbitrary or unsustainable"[10].*

5. 11.        Based on this doctrine, the National Supreme Court of Justice has, since long ago, sustained that the need of sufficient judicial control is primary to the eventual restrictions that may derive from the applicable procedural rules *"since an arbitrary judgment lacking any legal foundation is not a judicial judgment"[11].* This doctrine has been successively expressed in diverse judgments; for instance, it has been asserted that an arbitrary decision is one that presents *"non-existent minimum quality for the challenged act to be considered a court judgment"[12],* or that which lacks *"the indispensable qualities to subsist as a court decision"[13],* or *"acts that are not actual judgments but expressions of the sole will of the Judges passing them"[14].*

5. 12.        Therefore, the High Court preserves the possibility to challenge an arbitration award in case of arbitrariness. Upon declaring the annulment of an arbitration award, the National Supreme Court of Justice established that *"the omission of objective norms, applicable in principle, with no grounded justification, turns the decision (into a pronouncement) exclusively based... on personal criteria..., (whereas)... (if) the arbitrator was de jure for the resolution of all issues submitted to his/her consideration...  it was an essential requirement that the arbitrator based his/her decision on the laws in force "[15].*

5. 13.        The High Court also stated that *"it is appropriate to render ineffective the judgment omitting the consideration of an applicable norm that may have been decisive in the case resolution"* (Judgments: *302:* 761), and that it must be disqualified as a valid jurisdictional act the award that *"considers nonexistent evidence as existent, bases its jurisdiction on dogmatic assertions and extends it to claims implying the transformation of requests by one of the parties introducing them as members in the case, and  therefore varying the commitment, apart from modifying the applicable law and omitting the consideration of objective norms"* (Judgments: 290: 458; the underlined emphasis is ours).

5. 14.        Following the same line, the National Supreme Court of Justice expressed that *"... whether the respective clause states so or not, the arbitration jurisdiction exercised in each case*

---

[10] Carrió, Genaro R., *"El recurso extraordinario por sentencia arbitraria"* [Extraordinary Appeal by Reason of Arbitrary Judgment], Abeledo-Perrot, Buenos Aires. 1978, pp. 38/39.
[11] Judgments: 207:72
[12] Judgments: 237:74
[13] Judgments: 237:225
[14] National Supreme Court of Justice, "Cía. Naviera Argentina Pérez Companc (S.A.) vs. / Cía. Aseguradora Argentina", judgment passed on June 1, 1956, published in La Ley, V. 33, p. 203
[15] National Supreme Court of Justice, "Yacimientos Petrolíferos Fiscales vs./ Sargo S.A. Arg. obras oleoductos y gasoductos w/o Arbitration Proceedings", judgment passed on December 27, 1974. Judgments: 290:458

9

*implies no further entitlement but that of judging legally and reasonably, within the terms of the dispute; and that even though the consideration of the facts and the regular application of the law are the arbitrator's functions, should the arbitrator incur in unconstitutionality, illegality, or non-reasonability when passing judgment on the award, it is still susceptible of being challenged* (cf. *Articles 787 and 788, Proc. Code* )[16].

5. 15.    Lower courts are not outside the aforementioned Supreme Court's assertions. In this matter, it has been considered that *"... the Supreme Court's doctrine in Judgments: 327: 1881... recognizes that even in the case of arbitration judgments not subject to appeal, the decisions may be judicially challenged when such decisions are unconstitutional, illegal, or unreasonable (in this same sense, Judgments: 292: 223), or arbitrary* (cf. *National Supreme Court of Justice, "Eaca SA - Sideco Americana SA SACIIFF Saluge Argentina vs./ Dirección Nacional de Vialidad* [National Highway Authority] , *June 12, 2007)*[17].

5. 16.    In this same sense, the Commercial Chamber has recently stated that *"as indicated by the National Supreme Court, the arbitration jurisdiction exercised in each case implies no further entitlement but that of judging legally and reasonably, within the terms of the dispute; and that even though the consideration of the facts and the regular application of the law are the arbitrator's functions, illegality or non-reasonability incurred when passing judgment can still be challenged* (cf. *National Supreme Court of Justice, Judgments 292: 223, "Cooperativa Eléctrica y Anexos de General Acha Limitada"), especially focusing on the fact that arbitrators, as well as judges, exercise a jurisdictional function in nature, although a conventional one by reason of origin* (cf. *National Supreme Court of Justice, Judgments 320: 2379, November 11, 1997, "Yacimientos Carboníferos Fiscales about Arbitration Court"),which leads to the conclusion that the burden of appropriate grounds demanded from judicial courts' decisions must be also demanded from arbitration courts in law for issuing awards"*[18].

**C. Admissibility of the Appeal for Annulment by reason of incurring in essential procedural fault, of arbitrators' ruling on non-agreed upon points, and of occurrence of a serious event from the institutional point of view**

5. 17.    According to the grounds to be expounded upon in Chapters XI and XII, this Appeal for Annulment finds support in Article 760 of the CPCCN, since the arbitrators ruled on non-agreed upon points and an essential procedural fault is present in the case. Additionally, as explained in Chapter XIII, an event extraordinarily serious from the institutional point of view is present.

**VI.        RELEVANT BACKGROUND FACTS TO THE DISPUTE**

---

[16] National Supreme Court of Justice, *"Cooperativa Eléctrica y Anexos de General Acha Ltda.* about *Administrative File # 12.663/67 by the Ministry of Labor", July* 7, 1975. Judgments: 292:223.

[17] CNContAdmFed [National Court of Appeals in Administrative Federal Matters], July 3, 2007, *"Procuración del Tesoro* [Treasury's Legal Council and Solicitor's Office] *vs. / Cámara de Comercio Internacional* [International Chamber of Commerce]*"*, published at www.laleyonline.com.ar.

[18] National Chamber of Commerce "D". October 10, 2007, *"Ruberto Guillermo Miguel vs/Atanor S. A. about Equitative Shares of Stock Price"* (unpublished).

10

6. 1.        Due to expositive methodology reasons, the most relevant background facts of the dispute that gave rise to the arbitration hereof will be enunciated in this document without, obviously, intending to relate each and every fact, since that would exhaust the Court and divert us from the essential sense of this Appeal.

## A.        EDFI, ENDESA, and ASTRA acquire EDENOR's Control

6. 2.        Within the framework of the privatization process of the public electricity distribution services in the metropolitan area of the city of Buenos Aires that took place in the 1990's, EDFI, ENDESA, and ASTRA Compañía Argentina de Petróleo SA ("ASTRA") acquired control of EDENOR and EASA in 1992.

## B.        By decision of the National (Federal) State, ENDESA is forced to dispose of its indirect share of interest in EDENOR

6. 3.        Taking into consideration what is of interest in connection with these presents, in 1999 ENDESA acquired the control of the Chilean company ENERSIS, a corporation controlling "EDESUR" (Empresa Distribuidora y Comercializadora de Electricidad Sur S. A.).

6. 4.        In such a situation of simultaneous control of both EDENOR and EDESUR, the ENRE (Spanish acronym for Argentine "National Electricity Regulatory Authority") demanded from ENDESA the obligatory disposal of its shares of stock: it could control either EDENOR or EDESUR, but not both[19].

6. 5.        ENDESA decided, then, to sell its participation in EASA and EDENOR. A similar decision was taken by ASTRA, later on taken over by YPF SA ("YPF") by merger[20].

## C.        The Memorandum of Understanding

6. 6.        On February 21, 2001 ENDESA and ASTRA, on the one hand, and the Plaintiff, on the other hand, signed a "Memorandum of Understanding" or "MOU", by which they set forth the basic terms that would rule the sale of the shares of stock of EASA and EDENOR, owned by ENDESA and ASTRA, to EDFI (See copy attached as Annex IV).

6. 7.        The MOU established -among other conventional provisions- that the sales operations would be subject to the obtaining of the Ministry of Finance of the French Republic's authorization for such transactions.

## D.        EASA/EDENOR's Shares of Stock Sales Contract Applicable Law and Jurisdiction Expansion

---

[19] **ENRE's Resolution # 480/00, August 10, 2000**

[20] In March 2001 the National Securities Commission expressed its conformity on the takeover merger agreed upon by YPF and ASTRA, and on April 4, 2001, the final merger agreement was filed with the Corporate Records Office, reason by which ASTRA was dissolved without liquidation and taken over by YPF (Business Associations Law, Article 83 and concordant sections).

11

6.8. Although the authorization of the operation on behalf of the Government of France was yet pending, after the approval of the respective board of directors, the parts subscribed the trading contract of the said shares[21] (a copy is enclosed as Annex V). This happened on March 30, 2001.

6.9. The price was agreed in US$ 930,333,248. ENDESA received US$ 735,437,282 and ASTRA US$ 194,895,966 [22]

6.10. The parties agreed that (a) the contract would be " ... *governed* and *interpreted in accordance with the laws of the Republic of Argentina*[3] and (b) in case of controversies not solved by means of negotiation, the parties might submit " ... *to international commercial arbitration ... (that) shall be subject to the Regulation of Arbitration of the International Chamber of Commerce (ICC) ..., (the arbitrators shall have to pronounce judgment)* **in accordance with** *the substantive law of the Republic of Argentina ... "* (highlighted emphasis is ours) [24].

**E. The Ministry of Finance of the French Republic conditioned its approval, which was essential to carry out the operation, on the following: the parties had to agree on a compensation for EDFI, based on the hypothesis that, for some reason, the exchange parity of the Convertibility Law might lose its effect.**

6.11. The above mentioned Ministry required the parties, on condition for the approval of the trading operation, that a mechanism to compensate EDFI to certain extent should be agreed upon, due to the worry generated by a possible abandonment of the exchange rate contemplated in article 1 of the Law 23928[25].

**F. The Letter of Agreement, dated March 31, 2001, but that was signed on April 27, 2001, fulfills the requirements of the government of France**

6.12. The parties negotiated the terms of an instrument intended to overcome the requirement of the French Ministry of Finance. Thus, on April 27, 2001, the parties subscribed a *Letter of Agreement (*hereinafter the *"Letter of Agreement",* the copy of which is enclosed as Annex VI)[26] *but which was pre-*dated to March 31, 2001.

---

[21] The object of the contract was the transference of: (II Shares of EASA sold by ENDESA: a) 43,636,244 Ordinary Shares Class "B". (b) 50% (fifty per cent) Undivided of the only Ordinary Share Class "D", (c) 12,986,855 Preferred Shares Class "A", represented by 2,597,371 ADSs (American Depositary Shares) issued by Morgan Guaranty Trust Company of New York, and (d) 8,734,505 Preferred Shares Class "B": (ii) Shares of EDENOR sold by ENDESA: 162,163,989 Ordinary Shares Class "C"; and (III) Shares of EASA sold by ASTRA: (a) 32,757,511 Ordinary Shares Class "C", and (b) 6,553,280 Privileged Shares Class "B" (see article 1.2. of the contract).

[22]Clause 2.1 of the contract.

[23]Clause 7.6 of the contract.

[24]Clause 7.7 of the contract.

[25]Award, paragraph 89 and infra paragraph 9.9 of this proceeding. It is necessary to remember that the worry generated in April, 2001 was mainly originated by the announcement made by Minister Cavallo regarding the bill modifying article 1 of the Convertibility Law for the exchange parity to include the quotation of the euro. This bill would later become Law 25445.

[26]The negotiations were carried out between the parties via phone conversations and written communications sent via fax and e-mail, between April 19 and 27, 2001. The above mentioned were attached to the testimonial declaration submitted as Document R-24 of the Legal Grounds of the Answer to

6.13.  The conflict between the parties lies in the *Letter Agreement.*

6.14.  The agreement is as follows:

−   That the price paid by EDFI "…*shall be submitted to a review if the Contingency provided in paragraph second of this letter occurs **until December 31, 2001"*** (emphasis added by us.)

−   That *"for purposes of this letter the Contingency is understood as **the unlinking of the official exchange rate between the Argentine peso and the US dollar, regardless of the cause of same***" (emphasis is ours).

−   That "*in the event the Contingency occurs ... the sellers shall repay to (EDFI) ... in the event there is a **decrease in the official peso-US dollar exchange rate,** or ... (EDFI) to seller in the event of an increase in the official peso-US dollar exchange rate, an amount in United States dollars ... which shall be calculated in the form established in the Appendix ...*[21]*(using) as base for the calculation ... the average of the **official quote for the Argentine peso against the U.S. dollar during the period from the date when the first change in the peso/dollar parity occurred and December 31, 2001"*** (emphasis added by us).

−   That *"The resulting amounts shall be paid, in the event of the occurrence of the contingency, and paid without interest prior to January 15, 2002."*

**G.  The compensatory claim of EDFI based on the alleged occurrence of the Contingency prior to December 31, 2002.**

6.15.  On December 31, 2001 EDFI sent various notes to ENDESA and ASTRA in which it stated:  "*We have received information from Argentina that by decision of the monetary authority of that country, exchange operations have not been possible for various days.  Based on this, we hereby inform you that we are analyzing the situation in order to make a decision with regard to the occurrence of*

---

[21] As can be seen in the Attachment to the *Letter Agreement,* a table is included to quantify the amount payable, in the event of the occurrence e of the *Contingency* foreseen by the parties, **according to the level of devaluation of the *official exchange rate* for the Argentine peso against the dollar.**

*the contingency foreseen in the letter agreement of March 31, 2001 signed by ENDESA, ASTRA and EDFI based on the purchase/sale agreement for shares of EDENOR/EASA ..."*

6.16.  Later, on April 5, 2002, i.e. two months after the date agreed on for liquidation of the price adjustment if the *Contingency* were to occur, EDFI sent various letters to ENDSA and to YPF (as acquirer of ASTRA) in which it stated that *"... in our opinion, the contingency(that is, the 'unlinking of the official exchange rate between the Argentine peso and the US dollar, regardless of the cause for same') as provided in the letter of March 31, 2001 referring to the purchase/sale agreement for shares of Electricidad Argentina S.A. and Empresa Distribuidora Norte S.A. executed on March 30, 2001 which caused a review of the price paid by EDFI, occurred prior to 12.31.01. Consequently we request that you initiate the negotiations with regard to the matter stated above."*

**H.   The rejection of that claim by ENDESA and YPF.   Positions of the parties in the arbitral proceeding.**

6.17.  On April 19, 2002 ENDESA and YPF communicated their rejection of the EDFI proposal, considering that ***the Contingency* had not occurred prior to December 31, 2001.**

6.18.  In light of this rejection EDFI filed an arbitration proceeding with the Secretary of the International Court of Arbitration of the ICC against REPSOL YPF SA, as controller of YPF, and against YPF and ENDESA demanding the payment of US$ 325,000,000.  The claim contemplated the equal distribution of the economic impact of the alleged alteration of the *official Argentine exchange rate* prior to December 31, 2001.  Despite this, EDFI later amplified its claim to US$ 516,000,000, holding that the defendants should bear the entire impact of the alleged alteration of said exchange rate.

6.19.  In synthesis EDFI argued that the linking referred to in the *Letter Agreement* when it mentions "*the unlinking of the official Argentine peso-US dollar exchange rate*" originated in the *Convertibility Regimen* and is the exchange rate of one peso as equal to one US dollar.  It added that the parties chose to use broad concepts in the *Letter Agreement,* and the "*unlinking*" covered the greatest number of causes possible, **without restricting itself to an exclusively normative cause.**  And in that sense, it held that the beginning of the exchange holiday on December 21, 2001 meant the disappearance of the *Convertibility Regimen* inasmuch as it carried with it the **violation of the two "*essential premises*"** of said Regimen:  free disposition of currencies and the obligation of the Argentina Central Bank to sell the dollars required at the rate of one peso per one dollar.

14

6.20.   EDFI held that December 21, 2001, beginning of the exchange holiday, was the date of the rupture of the link that tied the exchange peso per dollar exchange rate; and for effects of the exchange holiday, from December 21, 2001 until January 10, 2002 there was no official exchange rate.  It emphasized that for this reason the calculation of the compensation requested, which – according to the *Letter Agreement* – should be calculated based on the average **official quote** for the Argentine peso against the US dollar during the period extending from the date on which the first change to the peso-dollar parity occurred and December 31, 2001, should be adjusted to the circumstances of the case, using the exchange rate that is most similar to the one alluded to by the parties, such as the one corresponding to operations performed on the **Free market** (sic) of Exchanges at the termination of the exchange holiday, which value – again according to the Plaintiff – was US$ 1 to $1.70.

6.21.   Finally EDFI argued that the *unlinking of the official exchange rate* for the Argentine Peso to the US dollar, i.e. the *Contingency,* occurred on December 21, 2001 with the declaration by the Argentina Central Bank of an exchange holiday which remain in effect until January 10, 2002.

6.22.   YPF and ENDESA requested that the arbitral complaint be rejected, and further filed a counterclaim against EDFI under the terms arising from their presentations; the counterclaim was admitted in the Award, which decision our clients agree with and therefore do not challenge in this Appeal.

6.23.   **In summary, the defense of ENDESA and YPF is based on an unarguable point:  that the *unlinking* of the *official exchange rate* of the Argentine peso to the US dollars did not occur prior to December 31, 2001; rather it occurred upon the repeal of Article 1 of Law 23,928 on January 6, 2002 (law 25,561); i.e., after the deadline agreed on.**

6.24.   Our party alleged that an *unlinking* logically presupposes a *linking* and that the only *linking* of the exchange rate between the Argentine peso with the US dollar that existed on April 27, 2001, when the *Letter Agreement* was signed, was the *legal link* established in Article 1 of Law 23,928, which was the only that the parties could reasonably call the *"official exchange rate"*.  As such the occurrence of the *Contingency* ineludibly insists that the so-called *legal link* would have disappeared prior to **December 31, 2001;** which evidently did not happen.  That official exchange parity **was repealed after that date,** in Law 25,561.

6.25.   ENDESA and YPF explained that the text of the *Letter Agreement* itself decisively encourages that conclusion, inasmuch as in order for any of the parties to have the right to review the price it was always necessary that there be a decrease or increase in the *official peso-dollar exchange rate* prior to the end of 2001.  That is, "*a first alteration of the peso-dollar parity*" established in Article 1 of Law 23,928.  That **did not happen until**

<u>January 10, 2002,</u> when Decree No. 71/02 established **an Official Exchange Market.**[22]

6.26.    This brief summary attempts to express the central core of the defense of our party, but does not exhaust the arguments which are numerous and convincing, which were stated to form the conviction of the Arbitral Tribunal of the error of the claim by the plaintiff due to the inexistence of positive and factual bases for what it could hold.

## VII.  <u>THE ARBITRAL AWARD</u>

### A.  <u>The decision requested to be annulled</u>

7.1.    The Arbitral Tribunal issued an award which – by the majority – declared that EDFI had the right – based on its complaint – to a payment of US$ 187,000,000 as capital, with US$ 147,000,000 to be paid by ENDESA and US$ 40,000,000   to be paid by YPF.   However inasmuch as the Tribunal also admitted the counterclaim filed by our clients, the net amount of the decision was set at a total of US$ 129,691,725, of which ENDESA was ordered to pay  US$ 100,757,875 and YPF was ordered to pay US$ 28,933,850 plus interest.

7.2.    On the other hand **the dissenting vote proposed the dismissal of the complaint and expressly considered that the majority vote did not comply with its duty to resolve the controversy according to Argentine law, constituting this as manifestly arbitrary.**

### B.  <u>The majority vote: its inadmissible and arbitrary foundations, which only have the appearance as such</u>

7.3.    The majority vote basically was founded on the following:

- The parties had agreed on the *Contingency* in broad and general terms, concerned with the 1 peso per 1 dollar parity, without focusing on the convertibility exchange rate established in Article 1 of Law 23,928, but rather on the exchange rate in the markets legally recognized in Argentina (paragraphs 641 to 665 and 686).
- The conservation of said parity depended on the effective functioning of the convertibility regime as a whole, which makes relevant the different aspects of the regimen (paragraph 686).

---

[22] That Decree (B.O. of 1.10.02) provided that "*purchase and sale operations of AMERICAN DOLLARS made by the CENTRAL BANK OF THE REPUBLIC OF ARGENTINA in the official exchange market, shall be at the exchange rate of ONE PESO WITH FORTH CENTS ($1.40) for each DOLLAR OF THE UNITED STATES OF AMERICA, thus establishing the exchange rate between the peso and said foreign currency.*"

- For the convertibility regimen to work and achieve its objective of maintaining the peso-dollar parity, the Central Bank of Argentina had the obligation to observe and effectively carry out the essential premises of the Convertibility Law, in particular its Articles 2 and 4; that is (a) sell dollars at an equivalence of $1 = US$ 1, without limit; (b) maintain an adequate level of reserves in that entity; and (c) guarantee the freedom to exchange and transform funds (paragraphs 686 and 687).

- On December 21, 2001 the exchange rate established by the Convertibility Law would have been for all purposes modified or unlinked as a result of the declaration of the exchange holiday by the Central Bank of the Republic of Argentina (paragraph 690).

- **Although the Convertibility Law and the exchange rate established in its Article 1 remained legal and officially in effect until January 6, 2002, they would not have remained effective in "*practical and economic*" terms,** and would never have returned to being so after December 21, 2001 (paragraph 690 to 702).

- The *Letter Agreement* would not have required a modification of the official exchange rate as an element constituting the *Contingency*. An increase or decrease in the exchange rate would have dealt only with the calculation of any amount payable. As such the alleged impossibility or difficulty in determining the *official exchange rate* prior to December 31, 2001 would have been irrelevant for purposes of determining if the *Contingency* occurred (paragraphs 703 and 704).

- Given the supposed inexistence of an official *exchange rate* other than the 1 to 1 parity from the Convertibility Law between December 21, 2001 and December 31, 2001, the solution generally adopted would have been to take the first exchange rate available at the conclusion of the bank holiday (paragraph 711).

- The first exchange rate available after the bank holiday would have been the rate of January 11, 2002 when there was an *"Official Exchange Market"* at the rate of $1.40 per dollar (Decree No. 71/02),and a free exchange market where the currency was quoted at $1.70 per dollar. Even when the parties used the word *"official"* in the expression *"official exchange rate"* and *"official quote"* in the *Letter Agreement,* the *official exchange rate* or the *official quote* of the "Official Exchange Market" ($1.40) should be discarded, because the free market dollar ($1.70) would be the one that best reflected the intention of the parties. As such the average difference with the peso per dollar parity current until December 21, 2001 should be taken, resulting in a value of $1.35 per dollar (paragraphs 712 to 731).

- In turn, the compensation should be calculated considering a value of $1.175 as a consequence of the agreement of the parties to divide the impact of the change in the exchange rate, into equal parts (paragraph 731).

**C. The dissenting opinion puts everything in place:  foundations**

7.4.   The dissenting vote on the other hand is clear and decisive.  A reading of same is sufficient to conclude that the majority vote is arbitrary and that it must be annulled with regard to the order for damages entered against ENDESA and YPF, as illegal, unreasonable, and unconstitutional.

7.5.   That vote held that:

- The Arbitral Tribunal should have resolved the conflict based on the laws of the Republic of Argentina. That duty was not met with regard to its resolution in favor of a supposed equal distribution between the parties of the misfortune of the Argentine economy which, inasmuch as it was not allowed to the arbitrators, constituted a decision which was not reconcilable with substantive Argentine law, with the contract stipulations and with the uses referred to in Article 17.2 of the ICC Arbitration Regulation (points 1 and 2).

- The arbitrariness resides in the interpretation of the *Contingency,* in the determination of its occurrence on December 21, 2001 and in the decision to order ENDESA and YPF to pay, respectively, 147 and 40 million dollars.  Consequently it does not deal with a difference of legal perspectives between the majority decision and the dissenting vote, but rather with the fact that the majority has surpassed the boundaries of applicable law (points 3 and 4).

- The complaint should have been dismissed inasmuch as the *Letter Agreement* of March 31, 2001 stated the "*official exchange rate*" as equal to what in Argentine exchange terminology is known as "*convertibility rate*", or the rate of one peso for each American dollar established in Art. 1 of the Convertibility Law.  This is because the parities could reasonably only refer to this *exchange rate*.  As such the ***Contingency* required that the exchange rate of Article 1 of la 23,928 be repealed before December 31, 2001 and, before that date, a different *official exchange rate* be verified** (points 5 and 7).

- Despite this, the majority of the Tribunal denied the premises mentioned above, holding the following theses:  (a) that "*official exchange rate*" should be understood as the exchange rate of the currency market legally established and recognized in Argentina (different from the exchange rate of parallel or

Black markets), (b) that *"unlinking"* of said *"official exchange rate"* should be understood as the rupture or disappearance of the essential elements of the convertibility regimen (freedom to transfer funds abroad, unrestricted power to exchange pesos per dollars at the rate of 1 to 1 and maintaining an adequate level of reserves) and (c) that since no official exchange rate was in existence beginning on December 21, 2001, the exchange rate of 1.7 pesos per dollar, which was the rate of the Free Exchange Market on January 11, 2002, should be used. All these theses lack sufficient foundation and in some cases reach the extreme of being completely contrary to the material offered as proofs (points 6 to 8).

- Evidence existing in the file shows that the parties – and in particular EDFI – took into account the convertibility rate of the peso to the dollar ("ratio de convertibilite de l'USD et du peso argentin"), an expression very close to that used in the Convertibility Law, which constituted the basis for negotiation of the *letter Agreement*. The economic expert witness for EDFI, who did not know this background, admitted, once they were revealed by the defendants, that if the extremes mentioned were assumed, then the *Contingency* would not have occurred in 2001. The legal expert of EDFI also affirmed in a legal work written by him that "official Rate" would have been understood as that established by the Convertibility Law (point 9).

- In terms of what the Award (majority vote) calls *"the exchange rate of legally established markets"* to operate in the Republic of Argentina, there is no evidence that the exchange rates used by all market operators in the year 2001 were always equivalent to the exchange parity established by the Convertibility Law. Moreover, the evidence shows the contrary, inasmuch as it has been proven that prior to the date when the majority vote considered the *Contingency* to have occurred exchange rates were used in the market which paid more than one peso for each US dollar (point 9).

- The interpretation made by the majority of the term *"unlinking"* lacks meaning and probatory support; it is difficult to think that the parties wanted to refer to something so complex and undetermined as the rupture of the effective functioning of the bases of the *convertibility regimen* (constituted by the obligation of the BCRA to sell dollars at a 1 to 1 parity, to maintain an adequate level of reserves and for the effectiveness of the freedom to exchange transfers of funds) if none of the parties was a specialist in the *convertibility regimen,* as the majority vote itself reminds us. And this would be even more so if both parties intend, as has been accredited, that the *Contingency* was an

Objective parameter, and that that *regimen* was not referred to by them in any of the drafts of the *Letter Agreement* nor in its final text (point 10).

- The majority attributed the same meaning to the word *"unlinking"* and to the expression *"regardless of its cause"* as that which officers of EDFI say was agreed on with ENDESA and YPF in an alleged meeting held in Madrid. This reveals a notable partiality because ENDESA and YPF declare that those supposed agreements and that supposed meeting in Madrid are **"roundly denied as false"**, and despite the request made by the Tribunal, EDFI did not present any evidence which would have effectively shown that said meeting did in fact occur. *"The gravity of this last has been broadly obviated, almost forgotten, in the award"*. (point 10).

- The evidences arising from the file also indicate that none of the three elements of the convertibility regimen – which the majority consider to be essential – were no longer complied with on December 21, 2001 (point 10).

- There is no basis for the affirmation that beginning December 21, 2001 there was no *"official exchange rate"* in Argentina, and as such even after that date, exchange operations were carried out at the official exchange rate, i.e. the rate established by the Convertibility Law, which could not be modified by the Central Bank of Argentina (point 11).

- It is also incorrect to hold that the parties could not have foreseen a situation where there was no *official exchange rate* as the result of a bank holiday. It is also incorrect that the Award would have covered that fictitious contractual gap by recurring to the exchange rate of $1.7 is equal to US$ 1, which ruled in the Free Exchange Market beginning January 11, 2002. The method agreed on by the parties to calculate any payment in the event the *Contingency* were to occur, was a clear, concrete and specific method based on the decrease or increase to the *official exchange rate* for the US dollar, since said rate would not have suffered the first change until December 31, 2001. This is not a mere expectation by the parties. It is an agreement that the Arbitral Tribunal is required to respect according to the provisions of Article 1197 of the Civil Code and therefore only a decrease or increase in the *official exchange rate* for the peso to the dollar, in the year 2001, could lead to a payment. Neither Argentine law nor UNIDROIT principles support the unfounded decision of the majority to calculate a payment, thus breaching the agreement of the parties (point 12).

- All the above reveals the unsustainable thesis of the Award (majority vote) that the Convertibility Law virtually ceased to be

Effective December 21, 2001 because the expression *"regardless of the cause"* used in the definition of the *Contingency* included practical events of the Argentine economy. It is clear that there would multiple events that could have caused the unlinking of the official exchange rate, **however none of the events of 2001 could have been an efficient cause for it because none of them was an act of law that would leave the 1 to 1 exchange rate without effect** (points 13 and 14).

Based on the foregoing, Argentine law is not found in the decision of the Award (point 15). The inconsistency of the Award is such that even if the majority of the Tribunal had been coherent with its reasoning, it would have concluded that the unlinking occurred prior to December 21, 2001 (installation of the *Corralito*, or December 11 when the dollar was quoted at $1.30). This would have required that the exchange rates between December 1 and 20 be considered, which in turn would have meant that ENDESA and YPF would not have had to pay anything or, at most, an amount significantly less than the amount of the award (point 16).

### VIII. THE DECISION WAS UNCONSTITUTIONAL, ILLEGAL AND UNREASONABLE. THEREFORE, IT IS ARBITRARY AND IT MUST BE DECLARED VOID

#### A. Preliminary comment about the remarkable length of the Award and its lack of any legal ground. The relevant part is only 40 pages long

8.1. The Honorable Chamber may notice that the Award has an unusual extension.

8.2. A preliminary and superficial weighting of this fact might drive to the primary and erroneous conclusion that the Award is sufficiently founded, not requiring any specific analysis of the arguments on which it is sustained.

8.3. But this is not the case.

8.4. As you can appreciate in the following points, beyond the mere reading of the previous description the Honorable Chamber should already been convinced. In relation to the arbitrariness of the Award; the Arbitral Tribunal used most of its 256 pages in a tedious and unnecessary story, and in an apparent analytical dismemberment of every term of the contractual text whose scope is controversial between the parties.

8.5. Nevertheless, the apparent foundation on which the decision {finding defendant liable} lays is only a succession of affirmations lacking any juridical base, which do not constitute a *reasoned* derivation of the current law and which occupy only **40 pages,** approximately, of the Award.

8.6    In this case, length of the Award does not imply that there is a basis in law. Such a basis simply **does not exist.**

8.7    A second conclusion that might be made about the length of the Award lies in the complexity of the matter. But the matter is absolutely not complex.

8.8    The question is to determine whether the Convertibility Law was or was not in effect on December 31, 2001. Nothing more than that.

B.    **The Award is manifestly arbitrary because Argentine law was not applied and public policy was violated. By having rendered an award based on their individual concept of fairness, instead of following the legal bases agreed by the parties, the Arbitration Panel exceeded its functions and moved away from the first point agreed upon [by the parties]: settling the dispute according to the law of the Argentine Republic.**

8.9    The Award did not apply current law and violated the norms of public policy, but, although it is only a fiction, it stated that the solution adopted would have a legal basis. By any reckoning, that is clearly a contradiction because insofar as no jurisdictional court obligated to apply Argentine substantive law is empowered to violate the norms of public policy unless it states as a principle on a party's request that the norm in question is unconstitutional.

8.10    Law 23.928 was, in the repealed part, and is in the part still in effect, public policy (Article 13 of Law 23.928 and the provisions of Act 25.561). Note that "in accordance with the traditional point of view, that is still generally accepted today, public policy laws would be those which immediately and directly interest the peace and security of society, good customs, a primary sense of justice, and morality; in other words, the fundamental and basic laws that form the nucleus upon which social organization is structured." Also remember that "a matter pertains to public policy if it is of general, collective interest as opposed to matters of a private nature, in which only individual interest comes into play… (for which reason) public policy laws are inalienable and imperative."[29]

---

[29] Borda, Guillermo, *Tratado de Derecho Civil – Parte General* [Treatise on Civil Law – General], Vol. 1; Ed. Perrot; Buenos Aires, 1991, p. 75 ff. The author also pointed out that a norm is public policy "…because each time a norm is legislated as obligatory and the persons affected are prohibited from diverging from it, it is because compliance with it is considered to be for the good of society; in other words, because it is a public policy act or law" and he emphasized that "…for the Code, therefore, there are two types or kinds of norms this point refers to: norms than can be ignored by the parties, that are the so-called supplemental, interpretive or permissive norms, and norms that cannot, norms that the Code calls public policy norms and that are precisely imperative norms, since the character of imperative norms is that the parties cannot fail to follow them." In the same line of thinking, it has been pointed out that public policy is the name given "to the set of social, political, moral, economic, sometimes even religious ideas to which society believes its very existence is related" (Baudry-Lacantinerie, cited by Belluscio, Augusto C. and Zannoni, Eduardo A. in *Código Civil y Leyes Complementarias, Comentado, Anotado y Concordado* [Civil Code and Supplemental Laws, with Comments, Annotations and Concordance], v. 1, Astrea, Buenos Aires, 1978, p. 104). It has also been stated that public policy laws are those that reflect those higher order principles that determine the direction of legislation in a country (Belluscio and Zannoni, op. cit., p. 106). Public policy is thus enacted, in general, as a limitation on human acts (Vanossi, Jorge Reinaldo, *Teoría Constitucional, Supremacia y Control de Constitucionalidad* [Constitutional Theory, Supremacy and Control of Constitutionality], v. II, Depalma, Buenos Aires, p. 42) and in particular, as a limitation on the autonomy of private will (Belluscio and Zannoni, op. cit., p. 107). Along the same lines, it has been maintained that public policy is

8.11    Next it will be shown that because the official exchange rate established in Article 1 of Law 23.928 was ignored in determining the occurrence of the *Contingency*, the Award was clearly arbitrary and the solution led to a result that gravely and irreparably harmed the basic constitutional rights of the defendants, also generating an unusually serious institutional situation.

8.12    In this regard, note that "the [Supreme] Court... has created a general concept of an arbitrary decision, saying that it is one that is not a 'reasoned derivation of current law applied to the proven circumstances of the case,' a criterion constantly repeated...(Fallos [Decisions] 323:192...; 323:212...)."[30]

**8.13    We point out that the present motion is not a mere disagreement with the decision of the majority of the arbitrators. Even less is it dissent with their juridical interpretation or their interpretation of the prior facts in the dispute or over the elements added to the case.**

**8.14    On the contrary, this is an Award <u>issued by arbitrators who should have given the award according to law</u>, but they decided, with no legitimate argument or justification of any kind, not to apply current law and Argentine public policy that is imperative in nature. Even more: they flagrantly violated it, causing serious harm to the petitioners and generating a most dangerous precedent of incontrovertible institutional gravity.**[31]

8.15    In fact

        *a) The arbitrators were under the inexcusable obligation to apply Argentine law.*

8.16    As said before, the parties agreed that the contract would be governed and interpreted under the laws of the Argentine Republic.[32] Also,

by agreeing that any dispute that could not be settled amiably by the parties would be resolved by arbitration, the parties established that the arbitrators should make their award *"in accordance with the substantive law of the Argentine Republic."*[33] That agreement was ratified in the Mission document when

---

"a higher concept that limits the autonomy of the parties' wills when the bases upon which the society is organized are compromised, and it is substantially related to the state of equilibrium, social peace and justice, to which laws and individual acts must conform" (CNCom D, 23.8.82, "Automóviles Saavedra, S.A. vs Administración de Grupos Cerrados, S.A.," published in Act 1998-E, 195).

[30] Bianchi, Alberto, "El recurso extraordinario ha perdido los límites de su actuación" [The special recourse has lost its limitations of scope], published on Mar 26, 03 in the special number of *Lexis Nexis – Jurisprudencia Argentina* [Argentine case law] entitled "Recurso extraordinario federal" [Federal special recourse].

[31] It cannot be validly maintained that the Tribunal made a valid interpretation, in that "a criterion of ...interpretation of the applicable norms cannot be allowed if it leads to an understanding of the law equivalent to ignoring its terms" (CSJN, 29 Nov 88, Morganti, Inés Mercedes s/ reconocimiento de servicios" [on recognition of services], Fallos [Decisions]: 311:2435).

[32] Clause 7.6 in the contract

[33] Clause 7.7 in the contract

it was stipulated that "the law applicable to the basis of the dispute" would be the "law of the Argentine Republic."[34]

8.17    Thus the parties explicitly submitted to **arbitration under the law** and the arbitrators should have made the award strictly by Argentine law.[35] As stated in the dissenting vote (point 4), that was the limitation that could not be exceeded in arbitration, a limit that has been completely violated by the decision of the majority.

8.18    Certainly they had no power to issue an award according to their belief and understanding, or what they —without any positive basis— could themselves consider to be the right decision. Remember that Article 17(3) in the Regulations provides that "an arbitration panel will have the power to settle the case or decide equitably and justly **only if the parties by mutual agreement have granted them such power**" (emphasis is ours). Certainly, that never happened.

8.19    And even if the arbitrators had been given the power to act as *amiables compositeurs,* **in no case could they violate public policy,** as happened in the case even though it was a case of arbitration based on the law.[36]

8.20    The Court of Appeals that will have to hear the resolution of this petition shares the reasoning given. In a recent pronouncement falling within the arbitration process, the court eloquently affirmed that *"as Tito Carnacini explained, **not even in equity cases can the arbitrators ignore the juridical norms of public policy** or the norms that constitute the foundation of the various institutions (see Carnacini, T., Arbitraje [Arbitration], p. 143, translated by S. Sentís Melendo, Buenos Aires, 1961); and along those lines, it is indisputable that an arbitration award made by law, even though the criterion of equity is applied, should have sufficient foundation in the sense that it should be reasonably derived from current law adapted to the circumstances that have been proven in the case."[37]

        b) *The arbitrators did not apply Argentine law. Quite the opposite, they flagrantly and unjustifiably violated it.*

---

[34] Point 11 in the Mission Document.

[35] More precisely, Argentine law in its entirety, without reserves or conditions, including its supplemental norms and its imperative norms. This is so to the point that in the Mission Document it is clearly stipulated that "participation in the Mission document and its signing by the defendants cannot be interpreted as suggesting or implying any less than complete application of said laws nor, much less, a waiver of application of the laws of the Argentine Republic" (Mission Document, point 4.2.3).

[36] With respect to this, it has been said that "it is certain that the limitations on the discretion of the *amiables compositeurs* to apply or not to apply the norms of positive law shall be given regarding those that can objectively be considered to be public policy, the observance of which is *exigible erga omnes* [can be demanded of everyone]. The *amiables compositeurs* may not shelter themselves under their status as extra-judicial judges so as not to apply a provision of this nature. If the order prohibits even the parties themselves from the possibility, using particular conventions, of ignoring the lawful norms that public policy is interested in observing (Article 21 of the Civil Code), it is logical to suppose that arbitrators cannot ignore them either." Caivano, Roque J., *Arbitraje* [Arbitration], p. 255, Ed. Ad Hoc, Buenos Aires, 2000).

[37] CNCom D, decision of 3 Oct 07 in the case Ruberto Guillermo Miguel vs Atanor S.A. on fair price of shares (unpublished).

8.21    The duty to apply Argentine law, as the dissenting vote pristinely advised, was *"sacrificed in the award in favor of a fair distribution between the parties of the Argentine economic misfortune, which besides the arbitrators not being allowed to do, in my opinion constitutes **a decision that could not likely be reconciled with Argentine substantive law and with the stipulations in the contract** and the usage referred to in Article 17.2 in the Arbitrations Rules of the ICC"* (point 2, emphasis ours).

8.22    Apart from policy, social, macro-economic and interpretative pseudo-psychological considerations, that is, based on meta-judicial considerations, the challenged Award concluded that on December 21, 2001 the official exchange rate required by Article 1 of the Convertibility Law was unlinked, when on that date the juridical norm had not be repealed.

8.23    As is publicly and notoriously known, the norm was repealed as recently as **January 6, 2002** (Law 25.561).

8.24    Note that the repeal —an event that was not known or certain until it actually occurred— could not legally produce an effect in the days prior to the approval of Law 25.561. Coming to the opposite conclusion would lead to a transgression --certainly inadmissibly— of the essential principles of our juridical system. Especially, when the text of Act 25.561 does not provide for the retroactive application of any of its provisions (which, obviously could occur within the limits imposed by the National Constitution), and could not well have occurred through implementing the regulations of said law.

8.25    In addition to that, any retroactive application of that legal corpus, especially with regard to repealing the official exchange rate that Article 1 of Law 23.928 had established many years before, would have irremediably collided with rights acquired and protected by the National Constitution (Civil Code, Article 3).[38]

---

[38] Article 3 in the Civil Code provides that "when they become effective, the laws will still apply to the consequences of existing legal relationships and situations. They will have no retroactive effect, whether or not of public policy, unless otherwise provided. Retroactivity established by law can in no case affect rights protected by constitutional guaranties. The new implementing laws are not applicable to contracts being performed." It has been pointed out about this norm that "in orders in which there is a constitutional guarantee of property, as for us, legislation projected to the past stops when it meets the constitutional guarantee of property… The… text clearly states that the law is not retroactive when it says that it 'has no retroactive effect.' The retroactiveness of the new law implies extracting from acts or actions already juridically completed, different consequences from those that might be contemplated by applying the old law. That is, past acts that have exhausted their virtuality cannot be touched by the new law, in accordance with the notion of 'juridical consumption,' and if it affected them it would incur in retroactiveness… After establishing the principle of irretroactiveness, the text qualifies it with the 'contrary provision,' that is, if juridical consumption has not occurred, after which legislation could not reestablish rights already extinguished… (But naturally) the principle of irretroactiveness is no longer a mere interpretive criterion and becomes a constitutional requirement in two cases: 1) if the retroactive application of the law results in harming individual property; 2) if it is a case under criminal law. This requirement has been unnecessarily marked in the text—'retroactiveness established by the law can in no case affect rights protected by constitutional guarantees'—because legislators do not have constitutional attributes to ignore rights guaranteed by the National Constitution. Therefore, if any retroactive or irretroactive law were passed that harmed those rights, it would be declared unconstitutional by the Judicial Power… Finally, deleting Article 5 and

8.26    Next we shall show in detail that not a single one of the arguments in the majority vote for the Award is sustained by law and that their decision is even based on false evidence.

### IX    THE ARBITRATION TRIBUNAL'S CONCLUSION THAT ON DECEMBER 21, 2001 THE OFFICIAL EXCHANGE RATE FROM THE CONVERTIBILITY LAW NO LONGER GOVERNED AND ON THAT DATE THE CONTINGENCY AGREED BY THE PARTIES OCCURRED IS ARBITRARY.

#### A.    The agreement by the parties on the Contingency

9.1    The parties agreed that the price paid by EDFI "…would be subject to review in the event of the Contingency stipulated in paragraph second of this letter **up to December 31 of the year 2001**" (emphasis ours). And they agreed that "for the purposes of this letter, Contingency means **the unlinking of the official exchange rate of the Argentine peso from the US dollar, regardless of the cause producing it**" (emphasis ours).

9.2    The **official exchange rate** was modified after December 31, 2001. That is an objective and indisputable fact of the country's economic and juridical reality. There was no unlinking whatsoever of the exchange rate until that date.

9.3    In the words of the Supreme Court, "unlike other norms that replace the national currency with another sign of different denomination… Law 23.928 created a new monetary unit, in that **it declared the convertibility of local currency, the austral, to the American dollar, starting 1 April 1991 'at a ratio of ten thousand australs for each dollar for sale' (Article 1st), a ratio that became one to one starting January 1, 1992,** with the new peso created by Decree 2128/91. **That act was in effect until Law 25.561 was issued**—called public emergency and exchange system reform—**that repealed** the prior convertibility and **exchange rate**"[39] (emphasis ours).

9.4    That fact of law —indubitably admitted by the Supreme Court— could not be validly ignored by the arbitration panel majority. The reality of the law speaks with one voice and cannot be twisted by unfounded inferences in the alleged psychological intent of the parties or the political and economic sustainability that, in December 2001, the convertibility policy had — aspects that we shall expand further on.

------------------------

expressly establishing in this law that laws "have no retroactive effect regardless of being public policy, unless otherwise provided," eliminated the possibility that an interpreter could retroactively apply a public policy law if the legislation omitted giving it that scope. Thus a dual system is produced, the old and the new, in spite of the fact that the new is based on eminent values, to which is related the worthy subsistence of society. In theory, continuation of the prior system is not justified if it contradicts public policy principles" (Llambías, Jorge J., *Código Civil Anotado* [Annotated Civil Code ], v. 1, Ed. Abeledo Perrot, Buenos Aires, 1978, p. 17-9).

[39] CSJN, 28/Oct 2004, "Bustos, Alberto R. et al. vs The People et al. on *amparo*" [protection], concurring vote by Dr. Elena Highton de Nolasco, cons. 13, *Fallos* [Decisions]: 327:4495.

### B. Clarity and precision of the agreement

9.5     The expression "rate of exchange" is not a free creation by the parties to which they could have given a certain content to govern their relations in a specific case. On the contrary, it is a clear-cut concept, objective and predetermined. The official rate of exchange is, and can only be, as its name indicates, the rate established in an act by a public agency since the National Constitution reserves to Congress the exclusive power to "mint money, **set its value and the value of foreign currencies…**" (Article 75, section 11; our emphasis).

9.6     Article 1 of Law 23.928 and its implementing supplements and regulations **very well describe the official exchange rate instituted by that lawful body,** with no need to have recourse to the spirit of the law, analogous laws and acts or other interpretative principles. **For the more than 10 years that this act was in effect there was no other official exchange rate in Argentina.**

9.7     Thus the sole official exchange rate referred to precisely and clearly in the Letter of Agreement was the rate established by Law 23.928.

9.8     Any other reading, such as the reading given by the challenged Award, is wishful thinking and lacks rationality.

9.9     That is demonstrated in the second written sworn statement by Mr. Didier Lamèthe, Director of the International Projects Department at EDFI at the time the Contract was signed, and its appendix,[40] who explained that the reason for the review of the price earlier agreed was that in the opinion of the French Ministry of Finance, said review was appropriate if "for any reason **the exchange rate between the peso and the dollar stopped being 1 to 1**" (see point 5, emphasis ours).

9.10    The witness did not mention the *convertibility system* or *convertibility assumptions*, or anything similar; on the contrary, he was very precise: **what was relevant was the exchange rate of 1 peso for 1 dollar.** And it is indisputable that that rate of exchange was set by Law 23.928.

### C.     **What was agreed was imperative in the light of Article 1197 in the Civil Code.**

9.11    The terms of the Letter of Agreement were imperative and obligatory for the parties (Civil Code, Article 1197): a review of the price was only viable because the co-contractors so agreed, if the Contingency occurred before December 31,  2001. And the contingency consisted in the fact that eventually, before that date, the official exchange rate established by Law 23.928 might be repealed and replaced by another law.

---

[40] Both documents were submitted by EDFI as Document C-173 in its Answer, attached hereto as Appendix VIII.

9.12 Thus the Award, in deviating from what was expressly agreed by the parties, violated Article 1197 of the Civil Code. Or, from another point of view, it allowed the plaintiff to violate the obligation assumed in the Letter of Agreement in spite of the fact that the lawful rule required it to respect its obligations and the rights of its opponent and the law itself.

   D. **The Letter of Agreement —interpreted, as required by law, according to the milestones provided in Argentine legislation— presents no doubts and unequivocally excludes the possibility to rely on other principles to settle the dispute. The interpretation in the Award is not reasonably derived from current law.**

   9.13    This is a trade dispute that should be judged strictly by what was mutually clearly agreed by the parties (Civil Code, Article 1197).

   9.14    As the dissident vote rightly asserted, the indicated duty was not done by the arbitration panel. This conclusion is not changed by the fact that the Award rhetorically mentioned articles 217 and 218 of the Commercial Code.

   9.15    Article 217 establishes that "the words of contracts and agreements should be understood in the sense given them by general usage, even if the obligated party claims to have understood them otherwise." Article 218 provides that "if the wording is ambiguous, it is the parties' mutual interest that must be sought rather than the literal sense of the terms…" (section 1st) and that "ambiguous or equivocal clauses should be interpreted in the clear and precise terms used in other parts of the same document, taking care to give them not so much the meaning that generally might suit them but the meaning that fits the general context."

   9.16    It is important to point out that there is no ambiguity whatsoever in the terms used in the Letter of Agreement. Consequently, these norms, contrary to what was judged in the Award, are not applicable to this case.

   9.17    Even supposing that those rules might be applicable to the case —which possibility the appellants vigorously deny— it is certain that the Award, in applying said norms, is also completely wrong, unreasonable and illegal.

   9.18    A brief analysis of the text of the Letter of Agreement will show that in the first part it was agreed that the price paid by EDFI "…will be subject to review if the Contingency stipulated in paragraph second of this agreement occurs up **until 31 December of the year 2001**"; that in the second part it was specified that the Contingency would occur after "the **unlinking of the official exchange rate of the Argentine peso from the US dollar,** regardless of the cause"; and in the third part it stated that "if the Contingency should occur, …the sellers… or…

EDFI (as applicable) should pay back… in case of a **drop** …or in case of an **increase** in th**e official rate of exchange with the dollar** a sum in US dollars… that will be calculated as established in the appendix…, (taking) as the calculation basis… t**he average of the official quote for the Argentine peso against the US dollar during the period between the date [when] the first change in peso/dollar parity should occur and December 31, 2001**" (emphasis ours).

    9.19 The text, agreed to by professional businessmen who knew the Argentine market well, can give rise to no doubt whatsoever.[41]

    9.20 However, the Award stepped all over them and resorted to wishful interpretations in open contradiction to the letter of the agreement.

    9.21     What did the Award "interpret?"

    9.22     It "interpreted" that "…**unlinking the official exchange rate of the Argentine peso…" is not the same as modifying the official rate of exchange** (paragraph 703) established in Article 1 of the Convertibility Law but is the same as an allocation **of the "essential postulate of the Convertibility System"** (paragraphs 686 and 687 **(SIC!!!).**

    9.23     For this purpose, the panel centered its efforts on trying to puzzle out just what, in the second half of 2001, the economic or sustainability prospects were that were so ostensibly different from the expression "official rate of exchange," such as, for example, the Banco Central's obligation to maintain an adequate level of reserves, sell unlimited amounts of dollars or guarantee the right to exchange and transfer funds. That is, **the panel was interested in unrelated facts, rather than in the only one they should have focused on:** whether there was an increase or decrease in the official rate of exchange.

    9.24     The majority of the arbitration panel did all this with the excuse —because it can't be anything other than an "excuse"— in the turn of phrase "…whatever the cause…" used in the Letter of Agreement, as if said phrase were isolated or out of a specific context. Then the Award quantified the award using an **unofficial** rate of exchange, **subsequent** to the deadline agreed for the Contingency (December 31, 2001) and to the repeal of Article 1 of Law 23.928.

---

[41] It is important to remember that the contract of sale that gave rise to the arbitration was not the first of EDFI's investments in Argentina. Quite the contrary, as reflected in Article 5.3 in the contract, its participation in EDENOR dated from 1992, that is, it had a consolidated presence in Argentina with many years—all governed by Law 23.928— of experience and knowledge of the political, economic and legal environment in the country. Because of the above and the obligation of the administrators and commercial company representatives to operate with the diligence of an experienced and reasonable businessman (Article 59 in the Commercial Companies Law No. 19.550), it should be concluded that EDFI had perfect knowledge that the currency and exchange system was a matter of public policy and formed part of the country's sovereign powers and that the official exchange rate between the peso and the dollar could not be other than what Congress established or, at most, by delegation to the Executive Branch (Article 75, section 11 in the National Constitution), this power having been exercised under Article 1 of Law 23.928.

9.25    Such an interpretation **is not reasonably derived from the current law nor does it respond to the mandate of logic**. As the dissident vote stated, the Award reached arbitrary conclusions; therefore all the hypotheses assumed in the majority vote "lack sufficient foundation, and some of them contradict the evidence head on…" (point 8). The clarity of the text of the agreement is incontrovertible; there is no ambiguity, vagueness or any kind of emptiness in the agreement, that might require "interpretation."

9.26    Concerning as it does an official rate of exchange, set by a national law in compliance with the provisions of Article 75, section 11 in the Constitution, **in the Argentine legal system this rate of exchange can only be unlinked, set aside, invalidated, or however expressed, by a national law, a decree by the National Executive Branch with express power to do so,** or by declaring the act to be unconstitutional. On this point it has been said that "setting the parity and supplementary regulations in an act sanctioned by the National Congress helps strengthen the exchange system, **since any 'devaluation' or ''lowering the value of'' the national currency will of necessity depend on approval of a new law that changes the parity stipulated in Article 1 of Law 23.928.** Thus compliance with the constitutional precept in Article 67, section 10 [currently Article 75, section 11] of the National Constitution will be achieved; the Constitution establishes that Congress has the power "to mint money, set its value and the value of foreign currencies" (emphasis ours).[42]

9.27    None of that happened until after December 31, 2001.

9.28    The second part of the text of the Letter of Agreement transcribed earlier —which the Award appears to have forgotten, but which is essential to interpret the text of this document— corroborates that occurrence of the Contingency of necessity requires that the official rate of exchange established in Article 1 of Law 23.928 be repealed before December 31, 2001. Otherwise it would be inexplicable why the Letter of Agreement, at the end, provided that quantification of the price review should be made according "to the average of **the official quote for the Argentine peso against the US dollar** for the period of time between the date the first change in peso/dollar parity occurs and **December 31, 2001.''**

9.29    **The parties' intent was more than evident:** up until December 31, 2001. And only up until that date would the price be reviewed if for any reason the exchange rate lawfully established for a decade by the Convertibility Law were unlinked, we repeat, before December 31, 2001. **And that unlinking -- which should be understood as an increase or a drop in the 1 to 1 parity -- did not happen before December 31, 2001.**

9.30    Further comments on this item would be superfluous.

---

[42] Villegas, Carlos Gilberto, "Convertibilidad y Desindexación—su aplicación a la actividad bancaria" [Convertibility and Deindexing—its application to the banking business], *Actividad Práctica Bancaria,* No. 4, pp. 57,58 ff., Carlos G. Villegas, Director, Ed. Depalma, Buenos Aires, 1991.

9.31      Article 1197 in the Civil Code and articles 217 and 218 in the Commercial Code and repealed Article 1 of Law 23.928 all lead to the conclusion —with decisive effects—that on December 31, 2001 the rate of exchange established by the latter law was in full effect. Therefore, it was improper to have additional recourse to general principles of law in the terms of articles 16 and related articles in the Civil Code if, as in this case, the norms listed at the beginning of this paragraph are sufficient by themselves to right the injustice.


**E.      The only "*official exchange rate*" in the Argentine Republic during all of December 2001 was the rate imposed by Law 23.928. Failure to observe the deadline agreed by the parties for the occurrence of the Contingency makes the Award null because it is arbitrary and exceeds the points involved.**

9.32      As we said above, the only official exchange rate in the Argentine Republic in the month of December 2001 was the rate set by a public policy norm, Article 1 of Law 23.928.[43]


9.33      This norm was, it is true, repealed a few days after December 31, 2001, the fatal and inexorable deadline for considering that the Contingency could take place.

---

[43] This rate of exchange had been set in Article 1 in the Convertibility Law. In Argentina on April 27, 2001, when the price review was agreed, there was no other official rate of exchange except this one. This is such an evident and absolute truth that no one who had been familiar with the Argentine economy since the nineties—as in fact was EDFI—could dispute it. As will be remembered, in Article 1 the Convertibility Law established a fixed and official rate of exchange between American currency and Argentine currency at a ratio of 1 dollar to 10,000 australs. The convertible austral was considered to be a new currency, different from the previous unconvertible currency. Therefore, Article 12 in the Convertibility Law established that "given the different legal regimen applicable to the austral before and after convertibility, it was considered for all effects and purposes as a new currency. To facilitate the difference, the National Executive Branch was given the power in the future to replace the denomination and numerical expression of the austral, respecting the conversion ratio from Article First." In complying with the Convertibility Law, the National Executive Branch issued Decree No. 2128/91, which established the peso as the new currency to replace the austral. Article 3 stipulated that "the peso will be convertible with the United States dollar at a ratio of 1 peso for each dollar for sales under the conditions established in Law 23.928." The parity established in Article 3 of Decree No. 2121/91 thus taking the regulatory path to include what the National Congress ordered in Article 1 of the Convertibility Law when it established conversion of the local currency to the American dollar at a fixed and official rate. For that reason, it cannot be doubted that the official exchange rate referred to in paragraph 2 of the Letter of Agreement is the rate established by Article 1 in Law 23.928. Therefore, as long as Article 1 is in effect, the exchange rate established therein, and only that rate, would be the official rate of exchange for the parties. Under those conditions, it is indisputable that the contractual phrase "regardless of the cause," relating to the term "unlinking of the official rate of exchange," refers to the possibility that the linking reflected in the official rate of exchange at the time the Letter of Agreement was written might have been modified in other ways, but obviously, within constitutional mechanisms for invalidating preexisting legal norms. Note that the official rate of exchange established by the Convertibility Law could have been modified, for example, by the entry into effect of Law 25.445, which provided that after fulfilling the suspensive condition established therein, it could be said that when "the European Union's euro (E 1) was quoted at one US dollar (US$ 1) for sale on the London market, or exceeded that quote, "the peso would be "convertible for sale at a ratio of one peso (1 peso) per simple average of one American dollar (US$ 1) and one European Union euro (E 1)." The official rate of exchange could also have been modified by the national government setting a different parity between the peso and the dollar, as it did so recently in 2002 in Decree No. 71/02, or by freely floating the peso, implemented by Decree No. 260/02. In both cases the event clearly occurred after the expiration of the deadline established by the parties for the Contingency to occur. On the other hand, any other measure that, even changing the current economic conditions in the country would not alter the exchange ratio prescribed in the Convertibility Law, would lack sufficient virtuality to cause unlinking, that is, the Contingency. Even if the government in any juridical norm had generally prohibited exchange operations without special permission and had maintained the official rate of exchange at one peso for one dollar, unlinking would not have taken place. And also the dollarization at a ratio of 1 to 1 would not have altered the official rate of exchange current at the time the Contract was signed.

9.34    But that circumstance, as explained above, cannot cause the effects of the repeal to be retroactive to December 2001 (Civil Code, Article 3).

9.35    It appears that the panel thought that in some way it would be unfortunate that EDFI lost the chance to claim price compensation because of a few days difference. That led the panel to make use of forced and arbitrary ex post facto constructions to order ENDESA and YPF to pay compensation that they hadn't been obligated to pay.

9.36    However, that is not a suitable role for a panel of arbitration by law to take. The panel should issue its Award within the strict limitation of applicable law, as the dissenting vote properly advocates (point 4). By operating the way it did, the majority of the arbitration panel exceeded the disputed points, **making the Award null** as to the matter of this recourse (CPCCN, Article 760).

9.37    In the Letter of Agreement the parties agreed on a strict, ample and long deadline, from April 1, 2001 to December 31, 2001. No fact or emergency authorized broadening and extending it beyond expiration until January of the following year, regardless of the subjective opinion of the members of the panel on the reasonableness of the solution adopted by the parties at the time of entering into their contract.

9.38    Fully exercising their free will, **the parties had already agreed <u>that it was reasonable and fair to limit the Contingency to December 31, 2001,</u>** so that if the official exchange rate ceased to be one peso to one dollar, for example on 29 December, the Contingency would be deemed to have occurred, whereas if the change took place on January 2, there would be no Contingency.

9.39    <u>**It was not the place of the panel to discover whether that solution was a good one; i**</u>t had already been decided by the parties, professional and experienced businessmen, nor whether it was reasonable for the parties to share the effects of the "unfortunate Argentine economy," as the dissident vote unsuccessfully noted (point 2).

9.40    The panel should have limited itself to determining whether, up to December 31, 2001 there actually was, as required in the Letter of Agreement, any <u>***"increase… or decrease in the official rate of exchange between the peso and the dollar."***</u> Surprisingly and lamentably, the panel majority refused to carry out what the parties trusted them to do.

F.     **The arbitrary interpretation given by the Award to the specific contractual clause relating to the official rate of exchange, citing that the parity of 1 peso for 1 dollar was not in the Convertibility Law but was the rate established in the markets, has no contractual, legal, factual or logical basis, and violates Argentine public policy.**

9.41     To try to distract attention from the fact that the official rate of exchange in the Convertibility Law was maintained without alteration until the agreed deadline, the Award stated that *"it is much more probable that both parties intended simply to refer to the exchange rate on the lawfully established currency market recognized in Argentina, unlike parallel or black markets, when they signed the contract and the Letter of Agreement"* (paragraph 662).

9.42     The dogmatism and arbitrariness of such a statement can be seen by merely reading it. These are simply the panel's suppositions, based on nothing more than imagination.

9.43     In making such a statement, the panel argues that this is inferred from the statements of the experts designated by EDFI and from the fact that Mr. Källstrand, an EDFI officer, in his fax dated April 20, 2001, had rejected any reference to the Convertibility Law (paragraphs 657, 658, 660 and 662).[44]

9.44     Neither argument is true.

9.45     EDFI's expert witnesses admitted that among the meanings of the phrase "official rate of exchange" was included the parity of one peso for one dollar for sale as established in Article 1 of the Convertibility Law (paragraphs 659 and 660 in the Award).

9.46     In addition, it was proved that in EDFI's internal communications, that are the basis upon which EDFI negotiated the Letter of Agreement of March 31, 2001, the *Contingency* was defined as a *"change in the **convertibility** ratio of the US dollar and the Argentine peso"* (point 9, paragraph 1 in the dissenting vote).[45]

9.47     EDFI's economic expert, Mr. Mario Vicens, prepared his expert report without being aware of the documentation mentioned in the preceding paragraph.

9.48     Nevertheless, during the hearings, the content of that documentation was revealed by ENDESA, when asked about the definition adopted by EDFI to negotiate.

9.49     As seen in the dissenting vote (point 9, paragraph 2), the response of Licenciado Vicens on what constituted EDFI's bases for negotiation leaves no room for doubt: if **the phrase** *"change in the convertibility ratio of the US dollar and the Argentine peso,"* used by EDFI in Mr. Lamèthe's communication of April19,

---

[44] See Mr. Källstrand's fax in the documentation attached to the statement by Mr. Alfonso Llorente Legaz, a copy of which is attached hereto as Appendix VII.

[45] See also EDFI's internal communication dated 19 April 2001, attached to the witness statement of Mr. Didier Lamèthe, a copy of which is attached hereto as Appendix VIII.

2001 as the basis of negotiations to define the Contingency **is interpreted as** *"convertibility exchange rate,"* in the opinion of Mr. Vicens, *"the convertibility exchange rate on December 31, 2001 would not have changed, and therefore the contingency would not have occurred."*[46]

9.50    It is of particular interest to point out that EDFI's own legal expert, who was cited in the Award to deny the identity between "official exchange rate" and the provisions in Article 1 of the Convertibility Law, wrote in his own book entitled *Legislación de Emergencia* [Emergency Legislation], that, "official rate," should be understood as the one established in the Convertibility Law (point 9, paragraph 3 in the dissenting vote). In that work Dr. **Carlos G. Gerscovich** repeatedly maintains that the official rate of exchange and fixed rate of exchange was the one established by a public policy act, such as Law 23.928 (article 1).[47]

9.51    Even some authors who are highly critical of the so-called convertibility system state that the exchange rate set by that act governed from April  1, 1991 *until January  6, 2002*, with the effects of the Convertibility Law…"[48]

9.52    What has just been laid out demonstrates from that point of view also that the arbitration panel incurred in serious contradiction and arbitrariness in their Award.

9.53    As for the rest, it is no more certain, as the Award implies, that Mr. Källstrand, in his fax dated April 20, 2001, did not take the Convertibility Law as the reference exchange rate. It is manifestly absurd and contrary to the most elemental guidelines of common sense that the majority vote should try to give the fax sufficient entity to support EDFI's assertion, shortly after saying paradoxically that Mr. Källstrand's fax was not submitted by the plaintiff but rather by the defendants as irrefutable proof that the exchange rate taken into account was the 1 peso for 1 dollar rate and that this arithmetic parity was not given and that is why the exchange markets were established, where fluctuations could occur

---

[46] See "Hearing for the Deposition of Mr. Vicens," TR 20 October 05, p. 20, lines 12-19, where it reads: "Witness: If, Mr. Chairman, we suppose that the paragraph where it says "change in the convertibility ratio" were interpreted as "convertibility exchange rate," and omitting the dates, true, because we are speaking of November 30, 2001" [It is necessary to clarify that the reservation made by the expert with regard to the date was because in Mr. Lamèthe's letter the deadline of November 30 was still being considered, a deadline that later was extended to December 31, as finally reflected in the Letter of Agreement].
"Mr. Pantaleón: Naturally you are right."
"Witness: And if the date had been set at December 31, 2001 [as it actually was], the convertibility exchange rate on December 31, 2001 would not have changed, and therefore, the contingency would not have occurred."

[47] Gerscovich, Carlos G., *Legislación de Emergencia,* Ed. Lexis Nexis, Depalma, Buenos Aires, 2002, p. 237 (Document R-58 attached to the First ENDESA and YPF Conclusions Document). In this work, the EDFI expert states that "Official rate is the rate established by an act of an authority. Either the authority would change or the PEN [National Executive Branch], by delegation, if it has the legal power to do so; or Parliament, as happened with the maximum rate for sale, that we call "legal" and that was established by Convertibility Law 23.928."

[48] Mosset Iturraspe, Jorge; Falcon, Enrique M; Piedecasas, Miguel A; *Contratos—de la Convertibilidad a la Pesificación* [Contracts—From Convertibility to Pesification], Ed. Rubinzal—Culzoni Editores, Buenos Aires, 2002, pp. 15, 16 ff.

around this exchange rate, as in reality did occur, but because of the provisions in Article 1 of the Convertibility Law.[49]

9.54     Thus this is not a difference in interpretation of the evidence, but of the fact that the Award (paragraph 662) gave Mr. Källstrand's fax of April 20, 2001 content that it did not possess. As easily seen in the dissenting vote (paragraph 10, sections 2 and 3), said document does not say that the parties had in mind the rate of exchange in markets legally recognized in Argentina nor the "Convertibility System, comprising three aspects that the Award says are the essential aspects of the system." The dogmatic and therefore arbitrary conclusion of the Award is corroborated by the fact that in the drafts of the agreement subsequent to Mr. Källstrand's fax the need arose to add the word "***official***" to the phrase "***exchange rate***" to avoid any doubt on its identity with what the law says. And furthermore, and so as not to unnecessarily exhaust the Honorable Court with superfluous repetitions, we refer to paragraphs 9.80 to 9.103 in this document on what the real sentiment was in Mr. Källstrand's expressions.

9.55     Finally, the arbitrariness of the majority in identifying the phrase ***"official rate of exchange"*** with the ***"rate of exchange in the lawfully established currency market"*** is not only based on the circumstances described above, but also because it is clearly ___intrinsically inconsistent___.

9.56     This inconsistency was pointed out in the dissident vote (point 9) when it noted that if the majority criterion were correct, there would not have been only one exchange rate during 2001, but as many "official" rates as exchange operations that banks and authorized agencies could carry out. Furthermore, there is no evidence that in all those cases the exchange operations would have been made at the parity of 1 peso for 1 dollar that the parties took into account; it is even proved that in some cases, the quote was more than 1 peso for 1 dollar.

9.57     The **conclusion of the dissent** in this aspect makes further comments unnecessary. "Before these two truths, the fact that exchange rates on the Argentine currency market in 2001 could be different and the fact that in addition, those rates actually were different, the Award decision to construct a mutual intent by the parties for the phrase "official rate of exchange" to mean "the rate or quote on the currency market officially or legally recognized in Argentina" (paragraph 663), assuming that there could only be one, in my opinion is a patent mistake. **With evidence in hand, the only official link between the peso and the dollar that was the one and only link and that existed in the Argentine Republic in 2001, and the only one to which therefore the parties could reasonably refer when speaking of the "unlinking of the official rate of exchange" in the definition of the**

_____

[49] Mr. Källstrand's fax was submitted as an appendix to the statement by Mr. Alfonso Llorente Legaz, a copy of which is attached hereto as Appendix VII.

*Contingency, was the exchange rate established in the Convertibility Law, also known as the "convertibility exchange rate"* (point 9, paragraph 4; emphasis ours).

9.58    The transgression on Argentine public policy that the solution given by the challenged Award presents is evident and manifest.

9.59    As has been repeated again and again, the Award considered that the Contingency occurred on December 21, 2001 with the declaration of the bank holiday ordered by the Banco Central of the Argentine Republic; that conclusion violates Argentine public law insofar as it matters that a current public policy act was not applied, Law 23.928 (especially, in this case, Article 1),

9.60    As we have said, the phrase "official rate of exchange" could only be interpreted, under Argentine law, as referring to the rate imperatively established by the lawful order. This is not a question that can be subject to free interpretation by the parties to a private contract or by a court settling a dispute based on its interpretation.

9.61    When the parties adopted as a parameter the official rate of exchange, they could only be referring to an act by a public agency, for the National Constitution, article 75, section 11, expressly gives the National Congress the power to "mint currency, *fix its value and the value of foreign currencies…*"

9.62    By including the concept of State sovereignty that cannot be delegated, regulation of the monetary system is placed in the area of public policy by reason of the matter regulated.[50] That is how it was understood by the Supreme Court of Justice of the Nation when it decided that making coins or paper bills and making their value legal currency belongs to public law and enters in the domain of public policy" (Fallos [Decisions]: 327:4495).

9.63    The challenged Award completely ignored those concepts and principles, which constitute the pillars of our juridical system.

9.64    The provisions of the Convertibility Law were not only public policy in that their purpose was to regulate monetary matters,[51] but also because in that way it was expressly ratified in Article 13, that provided that *"the present act is an act of public policy. No person may allege irrevocably acquired rights against it. Any other provision that is contrary to what it contains is repealed."*

---

[50] Trigo Represas, Félix, A., *El Austral y el Desagio* [The Austral and Devaluation], p. 39, Ed. Depalma, Buenos Aires, 1985; Busso, Eduardo B., *Código Civil Anotado* [Annotated Civil Code], E. Ediar, Buenos Aires, 1951.

[51] Alterini, Atilio A., Desindexación. *El retorno al nominalismo. Análisis de la ley n° 23.928 de convertibilidad del austral* [Deindexation. Return to nominalism. Analysis of Act no. 23.928 on convertibility of the austral], Ed. Abeledo Perrot, Buenos Aires, 1991, p. 39; and Mosset Iturraspe, Jorge, "Autonomía Privada y Orden Público Monetario" [Private Autonomy and Public Monetary Policy], in *Revista de Derecho Privado y Comunitario* [Private and Community Law Review], Ed. Rubinzal Culzoni, Buenos Aires, 2001-2002.

9.65    The arbitration panel was then prohibited from deviating from the official rate of exchange stipulated in Article 1 in the Convertibility Law, that is, parity would change from one peso equal to one dollar.

9.66    It is important to point out that the National Supreme Court of Justice "has repeatedly decided that issuing currency and fixing its value are exclusive acts of the national government and they are an attribute of sovereignty (Fallos [Decisions]: 225:135) and it is not proper that it be subject to judicial review as to whether it is correct or incorrect, convenient or inconvenient (Fallos: 305:1045). It is no impediment that there are prior agreements between private parties governed by private law…, since there is no doubt that they…cannot affect attributes belonging to the government authorities, such as economic powers (Fallos: 267:247)[52]

9.67    However, in deeming that the official rate of exchange was unlinked in practical reality on December 21, 2001, the Award is leaning on meta-judicial appreciations on whether it is right or wrong, convenient or not convenient for Article 1 in the Convertibility Law to reflect the actual value of currency at that time; this value judgment is absolutely inadmissible in our legal system; it would send any reasonable derivation of current law out of orbit.

9.68    For all of the above reasons, adopting parameters different from those in Article 1 of the Convertibility Law (e.g., economics, presumed intention of the parties, preservation of the value of EDENOR's shares, etc) to interpret what the official rate of exchange is and to fix its value, clearly and plainly violated the provisions of public policy, which must be imperatively applied, which inexorably determines the nullity of the challenged Award.

G.    **Arbitrariness of the scope given by the majority vote to the phrase _"unlinking of the official rate of exchange"_ because (i) it is incompatible and incongruent with the actual terms of the clause and with the intention of the parties as shown in the other clauses of the Agreement, (ii) it oversteps the meaning of the term _"unlinking,"_ and (iii) it violates public and constitutional policy.**

9.69    Since the Contingency stipulated in the Letter of Agreement did **not** occur, because there was no other official rate of exchange until December 31, 2001 except the one established in Article 1 of Law 23.923, the challenged Award **deviated from what was expressly agreed by the parties** and, in an inexplicable leap of logic, transgressing public policy provisions, concluded that _"the definition contained in the final version of the Letter of Agreement does not require a change in the official rate of exchange or any proof thereof as a constituent element of the Contingency,"_ at the same time that it affirmed that _"Articles 1 and 2 in the Letter of Agreement_

---

[52] CSJN, 15 August 1995, "Revestek S.A. c/ Banco Central de la República Argentina y ot. s/ ordinario" [Revestek S.A. vs Banco Central de la República Argentina et al. on regular], Fallos[Decisions]: 318:1531, dissents by Drs. Eduardo Moliné O'Connor and Guillermo A.F. López. See also, among others, CSJN, 1 April 1997, "Bossano S.A. c/Banco Central de la República Argentina [Bossano S.A. vs Banco Central de la República Argentina], Fallos: 320:406, dissents by Drs. Antonio Boggiano, Eduardo Moliné O'Connor and Guillermo A.F. López.

*contain the definition of the Contingency: the occurrence, before December 31, 2001 of the unlinking of the official rate of exchange of the Argentine peso with the US dollar, regardless of the cause,"* whereas *"articles 3 to 5 in the Letter of Agreement deal with the consequences of the occurrence of the Contingency,"* that is, the calculation of the compensation (paragraph 703).

9.70    As said, the Award interprets the different clauses in the Letter of Agreement in isolation, incongruently and arbitrarily, as if they were water-tight compartments with no relationship to one another.

9.71    When it says that *"unlinking the official rate of exchange"*[53] has no relationship with the *"increase or decrease in the official rate of exchange of the peso with respect to the dollar"*[54] the Award is not respecting the agreement between the parties (Article 1197 in the Civil Code), because ***"only a decrease or increase in the official rate of exchange of the peso with respect to the dollar in the year 2001 could give rise to a payment"*** (dissenting vote, point 12, paragraph 3).

9.72    It is supported by this **dogmatic deduction** that the panel majority concludes that the Contingency occurred because the essential bases for the entire convertibility system were not maintained. That is, the Central Bank would have sold dollars under the terms of Law 23.928, that there was an adequate level of reserves and that the freedom to exchange and transfer funds abroad actually existed.

9.73    This particular construction of the Award **also does not constitute a reasoned derivation of the law** current in the country on December 31, 2001.

9.74    In the negotiations over the text finally adopted in the Letter of Agreement, the parties first analyzed the possibility of defining the Contingency as the repeal or modification of the Convertibility Law exclusively.

9.75    But since that Law contained various provisions, the initial idea was discarded to avoid the possibility that any partial changes in the Law might be irrelevant to the effects of the Contingency; for example, a change that did not alter the text of Article 1 of the Convertibility Law or that changed it without altering the official exchange rate of one peso for one dollar fixed in the regulation.[55]

9.76    So the word "*unlinking*" was selected to define precisely and clearly the intention of the parties, who conceived of the Contingency as any modification in the *official rate of exchange* as provided in that norm.

_____

[53] Letter of Agreement, point 2.

[54] Letter of Agreement, point 3.

[55] The possibility that Law 23.928 might be partially modified was demonstrated by the facts. Although Article 1 was made ineffective by Act 25.561, the same is not true for the other provisions of the legal corpus, for example, the clause that provides and is still in effect for the prohibition of indexing. Thus nothing would have prevented the assumption that this provision might be lawfully repealed, or any others in said act, while only the official rate of exchange established in Article 1 might have remained in effect.

9.77    To demonstrate the clarity and precision of the term, it is useful to look at the International Monetary Fund Glossary,[56] which contains the most common terms used in monetary, financial and economic matters, in English French and Spanish. For example, the English "currency peg" is in French "determination du taux de change par référence à une monnaie" and in Spanish, "vínculo con una moneda."[57] Similarly, "peg (a currency) to" is "fixer le taux de change par rapport à" or "rattacher une monnaie à" and in Spanish, "vincular (una moneda) a";[58] a "single (currency) peg" is "établissement du taux de change par rapport à une seule monnaie" and "vínculo a una sola moneda,[59] and "unicurrency pegging" is "rattachement à une seule monnaie" and "vinculación a una sola moneda."[60]

9.78    There are other definitions or similar concepts in the IMF glossary, based on "to peg" in English, that correspond to "vincular" in Spanish. The basic concept of "to peg" a currency to another or to a precious metal or a basket of currencies is expressed as "vincular" in Spanish. Thus, the definition of "to peg" is "to fix the value of goods, especially currency, in relation to another, that may be gold or a foreign currency."[61] Or, "**to peg something to something; the peso is pegged to the dollar: the peso is linked to the dollar.**"[62]

9.79    In the end, there is a clear and precise concept in specific economic, financial and monetary language as in normal language, in English, which is "peg," and that is defined in general and special, legal or economic dictionaries as mentioned. "Vincular" in Spanish clearly corresponds to this concept. And although there is no other term in French with such a restricted meaning, "lier," "accrocher" and "rattacher" are equivalent terms.

9.80    The term used by Mr. Källstrand in his fax dated April 20, 2001, to Mr. Llorente in ENDESA, subscribes to the above explanation when he refers three times to the " décrochage du peso argentin par rapport a l'US dollar."[63] This "décrochage" corresponds exactly to the break in the "lien" or "rattachement" or

---

[56] International Monetary Fund, "IMF Glossary – English-French-Spanish," Washington, D.C., 1986.

[57] Ibid., p. 36

[58] Ibid., p. 111

[59] Ibid., p. 135

[60] Ibid., p. 154

[61] *Diccionario Jurídico*, Guillermo Cabanellas de las Cuevas and Eleanor Hoague, Hellasta, Buenos Aires.

[62] *The Oxford Spanish Dictionary, Spanish-English, English-Spanish,* Thumb Index Edition, Oxford University Press, 1994, p. 1415. Similarly, "to peg" is "to fix the price of something, as, the government may stabilize the price of gold by offering to buy all the gold offered at a stated price" (*Black's Law Dictionary,* 6th edition, 1991, p. 1132). Or "In foreign exchange, the process by which a government ties the value of its own currency to the currency of another country, usually the currency of its strongest trading partner, or a basket of currencies" (*Dictionary of Banking Terms,* Thomas Fitch, Barron's, 1990, p. 457). In French "lier" corresponds to "atar, amarrar, juntar, trabar, **vincular**, enlazar, ligar" (Larousse, *Grand Dictionnaire Espanol-Francés Francés-Espagnol,* Larousse-Bordas, 1996, p. 356). And "décrocher," "accrocher" correspond respectively to the meaning of "desenganchar" and "enganchar." "Rattacher" corresponds to "atar de nuevo," "unir," " vincular" (see both Larousse dictionaries cited above, pp. 1573 and 511, respectively). Also keep in mind that "rattacher" in French corresponds to "vincular" in Spanish (*Dictionnaire Juridique,* Olivier Merlin Walch, 4th edition, LGDJ, p. 1143).

[63] This phrase, translated, says the following: "(**desvinculación**) unlinking the Argentine peso from the US dollar." Mr. Källstrand's fax was attached to the sworn statement by Mr. Alfredo Llorente Legaz and a copy, duly translated, is attached hereto as Appendix VII.

"accrochement" or "peg" or "vínculo," that Article 1 in the Convertibility Law established at a 1 to 1 ratio between the US dollar and the peso, **that is, to the unlinking of the official rate of exchange of the Argentine peso from the American dollar.**

9.81    Thus, as arises from, among other elements, the written communications attached to the statement from Mr. Alfredo Llorente,[64] the sense of the definition of Contingency implied **necessarily and solely the abandonment of the official rate of exchange established in Article 1 of Law 23.928.**

9.82    In this regard, it is emphasized that in the draft of the Letter of Agreement sent by fax on April 19, 2001 by Mr. Alfredo Llorente, of ENDESA, to Mr. Bo Källstrand, of EDFI, it can be seen, regarding what we are interested in pointing out here, that the Contingency had two assumptions: "For the purposes of this Letter, Contingency means the modification of the current Convertibility Law in the Argentine Republic, which assumes an unlinking of the parity of the Argentine peso from the US dollar (first assumption), and in addition, it assumes a devaluation of the Argentine peso with respect to the dollar (second assumption)."

9.83    Also supporting the above is the attachment to the communication circulated internally at EDFI by Mr. Lamèthe on April 19, 2001 (together with his second sworn statement),[65] that, as Mr. Lamèthe stated in the record, c**ontained EDFI's legal understanding** ("the juridical principles") of the Letter of Agreement and, furthermore, served as the basis for EDFI's representatives in negotiations with ENDESA.

9.84    In that communication EDFI said that they agreed that the acquisition price would be revised downwards in the following cases: official devaluation of the Argentine peso by government or parliamentary or Banco Central de Argentina decision, and that it would have a negative effect on the exchange value of the US dollar in Argentina; **change in the convertibility ratio of the US dollar and Argentine peso** that negatively affected the exchange rate of the Argentine peso against the US dollar even though there was or was not an official devaluation of the Argentine peso,[66] and added that "the sellers and the buyer admit that in the cases described above, changes would have 100% impact on the EASA and EDENOR values and the sellers and the buyer agree to distribute the negative financial consequences for the buyer up to November 20, 2001, inclusive, with no power to make any extension of the initial period"[67] (emphasis ours).

---

[64] See preceding footnote.

[65] See appendix VIII.

[66] The original in French reads as follows: "Il est convenu que le prix d'acquisition sera révisé a la baisse dans les cas suivants: dévaluation officielle du peso argentin par une décision gouvernementale ou parlementaire ou de la Banque centrale d'Argentine et ayant un effet négatif par rapport à la contre-valeur de l'USD en Argentine; changement du ratio de convertibilité de l'USD et du peso argentin affectant négativement la contre-valeur du peso argentin par rapport à l'USD, qu'il y ait ou non dévaluation officielle du peso argentin."

[67] The original in French reads: "Les vendeurs et l'acheteur admettent que, dans les cas décrits ci-dessus, l'évolution se répercute à 100 % sur la valorisation d'EASA et d'EDENOR et que les vendeurs et l'acheteur accep-

9.85.  EDFI agrees, then, that the Contingency could consist of an alteration of the official exchange rate directly and immediately provoked by a devaluation through the act of a public authority or by a change **in the convertibility ratio,** although there was no official devaluation, the latter in clear reference to the assumption that it is governed by the convergence factor based on a basket of currencies (euro and dollar) which, by that time, the Minister of Economy Domingo F. Cavallo had announced.[68]

9.86.  The following day, April 20, Mr. Källstrand sent Mr. Llorente a fax in which he stated: "I acknowledge receipt of the draft that you propose that translates the preliminary agreement between Messrs. Rafael Miranda and Loic Caperan concerning the possible untying of the Argentine peso's parity with respect to the United States dollar. [69] In line with the idea that an amendment of the Convertibility Law was necessary, but might not be sufficient, to alter the parity between the peso and dollar established by the convertibility exchange rate, Mr. Källstrand made his reservations clear in limiting the Contingency to this latter circumstance.  He continued in his fax: "*I cannot accept paragraph number 2 as drafted.  To my mind, what you call the "contingency" that triggers the compensation __is simply the existence, on December 1, 2001, of the difference between the value of one United States dollar and one Argentine peso, since the peso is worth less than the dollar.__  Any reference to the Convertibility Law and the euro seems unacceptable to me.*[70]  (Emphasis added).

9.87.  Accordingly, **it is not correct, as the award states, that Mr. Källstrand's fax shows that the parties did not wish to refer to the exchange rate under the Convertibility Law**.  Otherwise, their insistence that what was relevant was the "difference between the value of the United States dollar and the Argentine peso," the parity that had been established by that law, would not have made sense, nor would the parties' subsequent efforts to eliminate any doubt that the exchange rate to be used as the parameter was the "official" exchange rate and not the exchange rate of the recognized or parallel markets.

9.88.  As noted by the dissenting vote (Point 10, end of section 2) the parties' subsequent negotiations left no doubt that the insertion of the phrase "official exchange rate" in the Letter Agreement was intended to remove any doubt concerning its association with the exchange rate under the

---

tent le partage des conséquences financières négatives pour l'acheteur jusqu'au 30 novembre 2001 inclus, sans faculté de prorogation éventuelle du délai initial."

68 The repercussions produced by the announcement of the proposed law amending article 1 of the Convertibility Law (*Ley de Convertibilidad*) to incorporate a basket of currencies that would include the euro is public and well-known and requires no further documentary demonstration, beyond the fact that the documents incorporated in the record sufficiently demonstrate this.  For further clarification, see the newspaper Clarin of April 15, 2001, "Cavallo submits a law to make convertibility more flexible"; Ambito Financiero of April 16, 2001, "The triviality of Cavallo: to the successful current convertibility he announced theoretical future parity, mixture of dollar with the euro" ; La Nación of April 17, 2001, "Cavallo obtained support but confusion persists"; among others.

69 See Annex VII.  The original French reads: "I acknowledge receipt of the draft (*Borrador*) that you propose, translating the agreement in principle between Messrs. Rafael Miranda and Loic Caperan concerning the possible untying of the Argentine peso from the US dollar."

70 The original French reads: "I cannot accept the drafting of paragraph number 2.  To me, what you call the "contingency" which triggers the compensation is simply the existence, on December 1, 2001, of the difference between the value of one US dollar and one Argentine peso, the peso being worth less than the dollar.  Any reference to the Convertibility Law and the euro would appear unacceptable to me."

Convertibility Law.  In fact, a fax from Mr. Källstrand was followed by additional telephone conversations, in which they agreed that Mr. Källstrand's idea concerning the Contingency was too imprecise, despite noting that the definition proposed in the draft could prove to be too limited.  The ENDESA representatives agreed, then, that the Contingency be drafted such that it would not only contemplate an amendment of the Convertibility Law by Congress, but also by delegated decision of the executive branch, or by the free play of supply and demand of pesos and dollars, the latter in the event that, after the Convertibility Law had been repealed or amended, a free-floating system would be adopted.

9.89.  As we have noted, in all the scenarios examined by the parties in negotiating the Letter Agreement, it was necessary, although not sufficient, that the exchange rate established in article 1 of the Convertibility Law be repealed or amended.

9.90.  The EDFI representatives agreed that the document also contemplated that a Contingency could be the situation of a possible revaluation of the peso with respect to the US dollar; in which case it would be EDFI that would compensate the sellers.

9.91.  It was also agreed that the quantification of the potential price revision would be based on an average of the _**official peso exchange rate**_ with respect to the US dollar during the period running from the first alteration of the peso/dollar parity until **December 1, 2001** (the first deadline negotiated by the parties).  Such that the time limit for the calculation would be **that** alone.

9.92.  Then, on April 25, 2001, Mr. Alfonso Arias of ENDESA sent an e-mail to Mr. Källstrand stating, "Following the instructions of Mr. Alfredo Llorente, I am enclosing a draft of the letter to be signed once EDFI International has received the authorization from the French government to which the purchase agreement refers." [71]

9.93.  In this draft of April 25, 2001:

- The date of December 1, 2001 was maintained as the final date for the Contingency to occur, and the date of December 15, 2001 to make payment without interest.

- The Contingency was defined as "the untying of the Argentine peso's parity with the US dollar, whether through a devaluation or a revaluation of the Argentine peso with respect to the dollar."  This eliminated the requirement that a devaluation (or revaluation) of the peso with respect to the dollar occurred only as a direct, immediate result of an amendment to the Convertibility Law, but the fundamental requirement remained that an

[71] Document attached to the declaration of Mr. Llorente Legaz, see Annex VII.

"untying of the Argentine peso's parity with respect to the dollar" occur.  **This implied that article 1 of the Convertibility Law was no longer legally in force.**

- The parties confirmed that the quantity of dollars to be paid would be calculated "*by applying to the price received by the sellers half of the percentage variation in the Argentine peso's parity with respect to the dollar,*" but added: "*for calculation of which the average official exchange rate for the Argentine peso with respect to the US dollar will be used during the period from the date when the first alteration in the peso/dollar parity occurred and November 30, 2001.*"

9.94.  In view of which, the EDFI representatives raised a new concern.

9.95.  The parties had considered the terms "devaluation" and "revaluation" until that time without taking account of the fact that, in their technical sense, they defined a modification of the official exchange rate directly established by decision of a public authority, which could exclude the circumstance – previously agreed – that the peso would depreciate (or appreciate) with respect to the dollar, not as a result of a new official exchange rate, but through the free supply and demand of currencies in the event a free-floating system were adopted after repeal of the exchange parity provided in article 1 of the Convertibility Law.  According to this reasoning, a possible judicial declaration of the law's unconstitutionality could even be excluded and to leave [sic] doubt as to the consequences of a law which, without repealing it, established some limitation, for example, by also establishing various different **official** exchange rates. [72]

9.96.  Therefore, EDFI demanded that the specific reference to the devaluation and revaluation be replaced by reference to any cause that resulted in an increase or decrease of the Argentine peso's exchange rate with the dollar.

9.97.  The ENDESA representatives agreed to the new sentence proposed by EDFI; but to ensure that this sentence ("*regardless of the cause that produces it*") could not be misinterpreted and give rise to any uncertainty and discussion of purely factual data, **they demanded that it be very clear that in order for the Contingency to occur, it would be required at all times that the tying of the exchange rate established in article 1 of the Convertibility Law be eliminated.**

9.98.  To this end, they agreed that the words **"untying of the Argentine peso's parity with the USA dollar"** be replaced by the words

---

[72] Throughout Argentina's economic history, different official exchange rates for different operations have coexisted on numerous occasions.  It suffices to recall, during the presidency of Raul R. Alfonsin, in its last phase, the actions of Minister of Economy Jesus Rodriguez.

"untying of the **official exchange rate** of the Argentine peso with the USA dollar" (emphasis added).

9.99.  Such being the case, on April 27, 2001, Mr. Arias sent Mr. Källstrand an e-mail that stated: "as instructed by Mr. Llorente, I am attaching a new version of the document which includes the minor changes discussed"; attaching a new draft in which the Contingency already appeared defined as it appears in section 2 of the Letter Agreement, that is to say: "*for purposes of this letter, Contingency shall mean the untying of the* **official** *exchange rate between the Argentine peso and the US dollar, regardless of the cause that produces it*" (emphasis added).

9.100.  Nevertheless, the EDFI representatives immediately raised two new demands: an extension of the period of the possible occurrence of the Contingency until December 31, 2001, and that the calculation of the amount that would potentially have to be paid be carried out according to the model set forth in an annex to the Letter Agreement.

9.101.  The ENDESA representatives also agreed to these requirements.

9.102.  Nevertheless, they requested that the adjective "official" be added to the term "exchange rate" in the phrases "*decrease in the exchange rate*" and "*increase in the exchange rate*" contained in section 3 of the Letter Agreement. This was two prevent "black market" or "parallel" (unofficial) exchange rates, or any others that were not "official" exchange rates of the Argentine Republic, from being considered in determining whether a decrease or increase in the official exchange rate under Law 23.928 had occurred.

9.103.  This suggestion by ENDESA was accepted without discussion by EDFI.  It reveals *per se* that the parties' **intent was unquestionably to define the Contingency as a function of any isolated, specific alteration,** regardless of the direction, **in the official exchange rate under Law 23.928** (article 1).

9.104.  **Accordingly, the basis of the challenged award is clearly unlawful.**

9.105.  **The untying of the** *official exchange rate* **would require, as the effective and primary cause, any of the following causes: the enactment of a law that modifies or sets aside the official exchange rate under Law 23.928, or, as the case may be, the provisions of a decree subject to the authority delegated by the Legislative Branch to the Executive Branch, or, alternatively, a potential declaration of unconstitutionality by the Judicial Branch (article 31 of the National Constitution).**  These and these alone are the only possible criteria for interpretation of the phrase "*regardless of the cause that produces it,*" in relation to the untying of the official exchange rate.

9.106.  Yet none of the causes mentioned previously took place prior to the time limit provided in the price revision mechanism agreed by the parties, that is to say, prior to December 31, 2001.

9.107.  It is contrary to constitutional principles to assume, as did the challenged award, that as the parties agreed that the untying could occur "*regardless of the cause*"; a law could be derogated by a declaration of a bank holiday decreed by the Central Bank of the Argentine Republic.

9.108.  As the dissenting vote aptly notes, "**the Central Bank of the Argentine Republic has no authority** *to modify the peso to dollar exchange rate, nor the exchange rate for any other currency, because* **only the Congress and the National Executive Branch of the Argentine Republic, the latter by legislative delegation, have the power to establish the exchange ratio between the peso and foreign currencies**" (Point 11, emphasis added).

9.109.  In fact, neither that Central Bank, the market, nor the economy have sufficient virtuality in Argentina to derogate or modify a law, as is completely obvious.

9.110.  If the parties had wished to provide simply [for] a change in the market exchange rate – with foreknowledge of what would happen with the *official exchange rate* imposed by article 1 of Law 23.928 - they could have used to any of the formulas developed thereafter and reiterated during the years of exchange-rate instability in Argentina. Particularly in the case of professionalized companies who were entering into numerous contracts in Argentina at that time. [73]

9.111.  But they did not do so.

9.112.  On the contrary, the parties expressly referred to the *untying of the official exchange rate*.  They explicitly mention **that** official exchange rate for the purpose of determining the amount of the price revision that could occur in the event of the Contingency.  And this is the controlling element in this conflict: the parties intended [or claimed] - and they expressed this with total precision and clarity after analyzing it very carefully for days - that an agreement would be framed in reference to any alteration in the *official exchange rate* established imperatively by Law 23.928. And they established, with total freedom and awareness, a time limit for that Contingency.  The reference to "*any cause that produces it*" could be none other than the formal repeal or modification of

---

[73] For example, in case of repeal of convertibility or modification of exchange-rate parity established in the respective law, the dollar exchange rate on the free currency market could have been used to calculate the purchase price and that, failing this, the value of the peso derived from the sale of Bonex or other public securities on the Montevideo or New York market could have been used. Finally, in the Annex to the Letter Agreement of March 31, 2001, as in all its antecedents, it was clear that the compensation to be paid would not be equivalent to 100% of the difference in the "official exchange rate" agreed as the reference, but only half, that is to say, 50%, in order to share the risk equally among the parties.  Therefore, in the example provided in the Annex - which refers to the situation of an "average devaluation of 20%" - it provides that only 10% would be paid.

article 1 of Law 23.928 by a national law or delegated decree, or a declaration that that law was unconstitutional..  But the breadth of the expression, ultimately, did no more than reflect that the parties' intent was to cover any circumstance of modification of that legal rule, in a country that already exhibited weakness in its institutional and economic framework on the date the contract was entered into.

9.113.    Accordingly, to argue, as the award does, that that Contingency occurred because the bases of the Convertibility Law were no longer realized, in practical reality, is so openly contrary to the law that it leads to the conclusion, certainly inadmissible, that any **magistrate could set aside the application of any public policy provision not repealed, dogmatically maintaining that it lost its legal force because the bases that gave rise to its sanction were extinguished or denatured.**

9.114.  If following this anti-legal reasoning were to be admitted, for example, that the prohibition on indexation contained in Law 25.561 - a provision that is also a matter of public policy -  had currently lost its legal force, in view of the significant indices of inflation experienced since its enactment.  Or even worse: if it were admitted that the parity under the Convertibility Law *was untied* in economic terms on December 21, 2001, all the subsequent laws that converted obligations in foreign currency to pesos on January 6, 2002 (Decree 214/02 and supplemental provisions) would be considered without value.

9.115.  Under these circumstances, all the references made by the Arbitration Tribunal to the aspects of the *economic reality* of December 2001 -- such as the decline of the Argentine economy, the reduction of both levels of deposits and monetary reserves of the Central Bank of the Argentine Republic, the restrictions imposed by the "Corralito," the emergence of parallel currency exchange markets, the massive, violent demonstrations against the government's economic policies and the foreign exchange moratorium ordered in response to the political crisis that culminated with the resignation of the President of the Nation and the succession of several replacements within the space of days (paragraphs 674 to 680 and 690 to 696) -- lack relevance in resolving the controversy when there are clear and precise legal and contractual provisions to resolve it.   **None of these circumstances was sufficient to replace, modify or derogate a national law that, in the exercise of constitutional authority under article 75, section 11 of the National Constitution, had established the value of the currency.**

9.116.  As the dissenting vote observes, all of the foregoing "*reveals furthermore the discretionary nature of the award in concluding that the phrase 'regardless of the cause' is sufficiently broad to include, as possible causes of the Contingency, what it calls 'practical occurrences in the economy or Argentine foreign exchange market' (paragraph 654)... It is clear that there were multiple causes that could have produced 'the untying of the official exchange rate between the Argentine peso and the US dollar,' but none of the occurrences of the year 2001 could be one of these causes because none of them was a legislative act*

*as a result of which the 1-1 exchange rate under article 1 of the Convertibility Law was no longer in effect*" (Point 14, emphasis added).

**H.  The award contains a gross self-contradiction: it first maintains that parties that are not specialists in the convertibility regime could not be expected to have made reference to the official exchange rate under the Convertibility Law; to later state that, to agree on the Contingency, the parties took into account the sophisticated aspects of the economic and exchange policies established in the Convertibility Law**.

9.117.  The award contains self-contradictory statements that confirm the defects mentioned previously.

9.118.  In fact, to avoid the fact that the Convertibility Law, in the exercise of constitutional authority to establish the currency value, had established the *official exchange rate* in article 1 thereof, the award states that ENDESA, YPF and EDFI "*simply had in mind the parity of one peso per dollar,*" and noted that "*of the parties, who were not specialists in the convertibility regime and admitted not having reviewed the terms of the Convertibility Law in any detail, could not be expected to have identified specific provisions of the Convertibility Law,*" and therefore "*it was not the mechanism to obtain the parity between the peso and the dollar that the parties were interested in, but the practical reality of a one to one exchange rate*" (paragraph 661, emphasis added).

9.119.  But at the same time, **in clear contradiction** with the foregoing, to arbitrarily state that the Contingency occurred prior to December 30 1, 2001, **the award considered that the parties had taken into account the sophisticated instruments of economic and financial policy of articles 2 and 4 of the Convertibility Law** on which the conversion regime relied.  And that it was those instrumental foundations of convertibility that had disappeared before the law was repealed on January 6, 2002.

9.120.  To this end it dogmatically maintains that of particular relevance were "*... the obligations of the Central Bank of the Argentine Republic (BCRA) set forth in articles 2 and 4 of the Convertibility Law.  While article 1 of the Convertibility Law, with the corresponding amendments, established the parity of one peso to one US dollar for sales of dollars by the BCRA, the essential postulate of the convertibility regime was the obligation and effective performance of the BCRA's obligations with respect to the unlimited sale of dollars at that rate.*"  (paragraph 686).  It added that "*the other requirements of the BCRA [that] consisted of maintaining adequate reserves and the freedom to exchange and transfer funds were also essential factors of the convertibility regime*" (paragraph 686).  It added that "*in order for the regime to operate and achieve its objective of maintaining parity between the peso and the dollar, the BCRA had the obligation to observe and effectively perform the obligations established in the Convertibility Law... [because]*"

*otherwise the convertibility rate established in article 1 of the Law would have been of little interest*" (paragraph 687). It considered that "*each of those obligations, especially the obligation to sell as many dollars as required at the rate of one peso to one dollar, contributed to the functioning of the Convertibility Regime and pegging of the official peso exchange rate to the dollar*" (paragraph 687). And it noted that "*the linking of the official peso exchange rate to the dollar consisted of the effective functioning of the convertibility regime in which the convertibility rate was one of its elements*" (paragraph 687).

9.121.   **The self-contradiction is as evident as it is insurmountable.**

9.122.   The award cannot validly maintain that the parties were not experts in the convertibility regime and that the only thing that mattered to them was that "*the one to one parity of the official exchange rate continue unchanged*" and at the same time state that in order to define the Contingency they decided to subject themselves to what would occur with very complex economic, bank, and financial aspects - such as those derived from articles 2 and 4 of Law 23.928 - - the analysis of which, certainly, was highly subjective and a matter for experts in the subject.

9.123.   In other words, the **award draws the curious, contradictory, and therefore arbitrary conclusion that the parties were not specialists in the Convertibility Law for purposes of article 1 thereof, and that, at the same time, they were specialists in that law for purposes of articles 2 and 4 thereof (!!!)**

9.124.   It is impossible to assume, as the dissenting vote observes (Point 10), that the parties would have arduously negotiated the drafting of a clause to conclude in a text whose interpretation would be subject to obvious subjectivities and foreseeable discussions, for example, concerning whether the level of reserves was adequate, or whether the Central Bank was effectively performing its monetary and foreign exchange functions [sic].

9.125.   If we were to follow this erroneous line of thinking, it would be incomprehensible that the parties would have defined the Contingency as the "*untying of the official exchange rate*" and not as "*the abandonment of the essential postulates of the convertibility regime.*" If the latter had been the intent of the parties, business professionals, as those involved, certainly this would have been reflected in the language of the Letter Agreement.

9.126.   But this does not emerge, nor is it even indicated, from the negotiation of the Letter Agreement or the language expressly agreed by the parties in that document.

9.127.   **The mere comparison between what the Contingency described in the Letter Agreement says** ("*untying of the official exchange rate for the Argentine peso and the US dollar,*" such that if a "*decrease or ... increase in the official exchange rate of the peso with respect to the dollar*" occurs) **and what the Tribunal says it says** ("*effective functioning and continuity of the convertibility regime as a whole*") **is sufficient basis for the Highest Chamber**

**to observe that the award inexplicably and arbitrarily departs from the contract entered into by the parties**.

9.128.   Accordingly, the reference to the *convertibility postulates* is no more than a fabrication of the plaintiff, on which the award decisively relies to rule against the defendants, which is not at all in keeping with what was agreed by the parties, and which directly and immediately results in a flagrant violation of Argentine public policy and the irreparable violation of rights protected by the National Constitution.

9.129.   The arbitrariness is obvious and manifest.

## I.   In defining the Contingency in a manner different from what is stated in the text, the award relied on false evidence

9.130.   As the dissenting vote observes (Point 10, section 4), the only possible explanation of the reason why the majority of the Tribunal ignored the clear language of the Letter Agreement is that **it relied on false evidence**, that is to say, on the lies of the EDFI witnesses.

9.131.   EDFI argued that the origin of the word "*untying*" and the expression "*for any reason*" lies in what was discussed at a purported meeting held in Madrid on an uncertain date, at which Mr. Didier Lamèthe, and EDFI official, had proposed their inclusion to the ENDESA and YPF representatives in order that it reflect "correctly the idea of the foreign exchange market reality" (document C-173, second written declaration of Mr. Dider Lamèthe, paragraphs 11 to 13). [74]

9.132.   But **the aforementioned meeting never occurred(!!!)**  It was categorically denied by ENDESA, by YPF and by their witnesses, and its existence could not be proved by the plaintiff, as noted by the dissenting vote (Point 10, section 4). [75]

9.133.   While the award admits surreptitiously in footnote 68 that it cannot conclude that the aforementioned meeting was held, what is clear is that it adopts the same meaning of "*untying*" and "*regardless of the cause that produces it*" that is attributed by the EDFI representatives at the false Madrid meeting to assert that the parties' intent was to refer to the economic and practical reality of the essential postulates of the convertibility regime (paragraphs 686, 687 and 690 to 696).

---

[74] See Annex VIII.

[75] During examination of the witnesses, both the ENDESA and YPF counsel and the Tribunal insistently asked the EDFI witnesses to provide specific evidence (agendas, airline tickets, etc.) to actually demonstrate that the Madrid meeting had occurred at which, according to them, the agreement was made to use the word "untying" with the scope accorded by EDFI, and subsequently, by the majority vote.  The EDFI witnesses could not provide a single piece of evidence to support this, at which point, in view of the vain requests, the president of the Tribunal stated: "No one at EDFI noted this on a calendar?  No one has airplane tickets?  What on earth!  How is it that the date of the meeting cannot be identified?  (See hearing of Mr. Patricio Meés, TR October 17, 2005, p. 68, lines 32/33).

9.134.  Ultimately, **it is of "***notable partiality, not only for Argentine law*** *(articles 1198 of the Civil Code and 218.4 of the Commercial Code)* *but also in the context of international arbitration before the ICC, the award's decision to attribute to the word* "*untying*" *and the phrase* "*regardless of the cause that produces it' meanings that are the same*" *as***, **according to the plaintiff,** **were agreed at a meeting which, it was proved, never existed** (dissenting vote, Point 10, section 4, emphasis added).

      **J.  The award's assertion that the contractual term "*untying*" did not refer to the official exchange rate but to the basic postulates of the convertibility regime, collides with the precision and clarity of the language agreed, and is devoid of all logical, legal and economic sense.  But even under this absurd and negated hypothesis, the award interpreted the matter in a manifestly arbitrary manner.**

9.135.  The regime under the Convertibility Law was substantially a monetary system. It was not a system of free exchange rates that granted the right to freely make transfers abroad without prior authorization.

9.136.  Convertibility was a fixed-exchange-rate monetary system in which Argentine currency -- the peso -- was "pegged" at a one to one ratio to the US dollar.  As such, it was similar to the gold standard that existed in the past in Argentina, or the so-called *Caja de Conversión* (in effect between 1884 and 1885, in 1890, from 1899 to 1914, etc.), or the so-called "currency board" systems that have existed in other countries (Hong Kong, for example).

9.137.  Moreover, the freedom to transfer dollars abroad did <u>not</u> constitute an essential, inherent element of the so-called convertibility regime, as the award incorrectly and dogmatically asserts.

9.138.  A monetary system is by definition different from an exchange control system.  The relationship between local currency may be linked to another currency or precious metal without this meaning that an exchange control regime must not exist.

9.139.  Habitually, countries establish prior authorizations for transfers abroad, to control the balance of payments, the country's foreign currency inflows from exports and the transfer value declared for them, expenditures and declared value of imports, service payments (insurance, technology transfer, royalties, etc.) interest and loan amortization, etc.

9.140.  But this does not prevent the existence of a convertibility monetary regime which links the country's currency, in a fixed exchange rate relationship, to another foreign currency or other parameter (gold standard or other parameter).

9.141.  In fact, as mentioned above, this occurred historically in Argentina at other times.  For example, the Conversion Law of 1899, no. 3871: the conversion (gold standard) continued until 1914, at which date it was suspended because of the first world war.  But during the suspension of the conversion, because of the emergency, and the prohibition on exporting gold continued respectively until October 1927 and 1925 (laws 9481, 9506, 9483 and authorities delegated to the executive branch), the conversion parity remained in effect.

9.142.  **It is therefore incorrect that the essential parameters of the linkage between the peso and the dollar had been "*completely modified*" over the course of December 2001, as stated in the award.**

9.143.  The claim maintains that the untying occurred **in two phases** (the award on the one hand fixed the Contingency at the exchange-rate moratorium but also maintained that the exchange control and decline of reserves broke with the "*essential postulates of the convertibility regime*").

9.144.  The first of these phases occurred on December 1, 2001, with the issuance of Decree 1570/01.

9.145.  That decree, in article 2, section (b) thereof, prohibited transfers abroad **with the exception** of those corresponding to foreign trade operations, payment of expenses or draw-downs made abroad through credit or debit cards issued in the country, **or the payment of financial operations or for other reasons, in the latter case, subject to authorization by the Central Bank of the Argentine Republic**. It also prohibited, in article 7, the export of foreign bills and currency and precious metals unless carried out through Argentine financial institutions supervised by the Central Bank, or for amounts less than US $1,000. In addition, article 8 provided that the Central Bank of the Argentine Republic would be the authority responsible for implementing the Decree.

9.146.  In reality, as has already been analyzed, **this decree did not result in the "*untying*" of the official exchange rate between the Argentine peso and the US dollar**, but simply established an exchange control regime with prior authorization by the Central Bank, similar to the regime existing in Argentina at other times, and in other countries as well.

9.147.  **But it did <u>not</u> mean that the 1 to 1 relationship of the peso to the US dollar was untied, nor did it repeal the Convertibility Law, nor devalue** [sic].

9.148.  In order to clearly understand this, it is useful and necessary to review other measures supplementing Decree 1570/01 issued by the executive branch and Argentine Central Bank during the month of December, **which continued to give form to the system of exchange controls and authorizations** by the Central Bank:

- Decree 1606/01 of December 5, 2001, published on December 6, 2001, established exceptions to the regime of article 2, section (b) of Decree 1570/01 and restricted the limitation of article 7 to the export of bills and precious metals, raising it to US $10,000. Also, article 5 of Decree 1606/01 repealed Decree 530/91 and reinstated article 1 of Decree 2581/64 and article 10 of Decree 1555/86. Article 1 of Decree 530 of March 27, 1991 had eliminated the requirement of repatriation and trading on the foreign currency market with respect to foreign currencies generated by the export of products, which had been provided by article 1 of Decree 2581/64. It also provided that it would apply to any amount in foreign currency earned by a resident of the Argentine Republic and to foreign currency received in payment for items such as freight, airfare, commissions, insurance and other similar items (article 2). It also struck down article 10 of Decree 1555/86, which required repatriation and trading of foreign currency to access the tax refund system (article 4). It is noted, from the preamble of Decree 530/91 and the text itself, that there is no direct relationship or reference to the Convertibility Law. We repeat, convertibility as a monetary system can operate both in a regime of absolute freedom of foreign transfers and in regimes of greater or lesser exchange control. Article 1 of Decree 2581/64 provides that the equivalent value in foreign currency of exports of national products, up to the FOB or CIF value, as the case may be, must be repatriated and traded on the sole foreign exchange market within the time periods established by the relevant regulations.

- Decree 1638/01 of December 11, 2001 continued regulating the exchange control regime. Article 1 thereof provided that the repatriation and trading of foreign currencies provided in article 1 of Decree 2581/64, and the trading thereof provided in article 10 of Decree 1555/86, would be considered effected by the repatriation of the corresponding foreign currency and deposit thereof in an account of the exporter opened with an entity subject to the Central Bank's Superintendency of Financial and Exchange Entities, without need of trading on the foreign exchange market or a conversion to any other national or foreign currency. Then, in article 2, it regulated other aspects of the exchange control regime, ordering the Central Bank to exempt exporters' foreign currency from repatriation when it is applied to the payment of obligations contracted abroad for the financing of investment projects, pre-financing of exports, arrangement of structured loans, collateralization or guarantee of financial operations or fulfillment of

exporters' financial commitments.  Article 3, in turn, established that activities receiving a special exemption by law, by contract with the national government, or by decrees dating prior to that decree were not required to repatriate foreign currency to the extent of such exemption. This is the case, for example, for the mining promotion regime under Law 24.196, or the regime of unrestricted availability of foreign currency for hydrocarbons approved by Decree 1589/89. Finally, the Federal Administration of Public Revenue and the Ministry of Commerce were authorized to grant exemptions from repatriation of foreign currency by joint resolution, and the Ministry of Commerce and Central Bank, within the scope of their authority, were designated as the implementing authorities, with authorization to issue rules and interpretations (articles 4 and 5).

- The Central Bank promulgated regulations under the exchange control regime, defining excluded operations, exceptions, procedures, etc., as well as for the new legal framework for the banking system, which drastically limited to cash draw-downs [_**or**_ withdrawals] provided by article 2, section (a) of Decree 1570/01. For example, Communication "A" 3372 and Press Communiqué 42.059 issued on December 1, in keeping with the aforementioned decree, confirmed that "*in accordance with the provisions of the Convertibility Law, exchange operations between peso bills and dollars may continue to be realized under the same modalities currently in effect.*"  They added that "*loans made beginning this coming Monday, December 3, including renewals of financing previously arranged, may only be evidenced in dollars.  Loans in current pesos at that date may be converted to dollars at the parity of 1 peso = US $1, provided that the client gives his consent.*"  And they specified that "*operations from pesos to dollars and vice versa shall not be subject to payment of fees and shall be carried out at the aforementioned rate, provided that they are transacted through accounts opened with financial institutions*" (Press Communiqué 42.059).

- Central Bank Communication "A" 3377 of December 5, 2001 established the ability to convert current pesos on December 2, 2001 to United States dollars at the value of one peso per dollar, with the consent of the debtor (p. 1). It also provided that the holders of fixed term deposits, term investments, acceptances, reverse repos (*pases pasivos*) and stock-exchange repos (*cauciones y pases bursátiles pasivos*) in effect on December 3, and balances in special current accounts for juridical persons, placements in investment funds and other demand deposits, may demand their conversion to United States dollars at the value of one peso per dollar, at maturity, without commissions.

9.149    All these norms were in effect and applied in December 2001, **although it cannot be stated that they were legally capable of** *unlinking* **the exchange rate included in Art. 1 of the Convertibility Law.**

9.150 As noted by the dissenting vote, evidence existing in the motions also indicates that qualified national and international institutions[23] consider that ***"technically it can be shown that at December 31, 2001 the National Government was complying with the Law of Convertibility"*** and the ***"official rate*** [of exchange] ***was linked to the U.S. dollar until January 6, 2002"***[24] (point 10, Paragraphs 7 and 8, the emphasis is ours.)

9.151 It is a well-known and public fact that **during that month numerous bank placements, mostly by telephone or electronically, were converted from pesos to dollars or from dollars to pesos according to the Convertibility Law, including on non-business days or exchange holidays.**

9.152 Without going further, on December 5, 2001 Communication "A" 3378 was issued, fining down and amplifying the exceptions of Article 2 Incise b) of Decree No. 1570/01 for foreign trade operations through financial entities, including the import of goods and services associated to their acquisition, shipping, insurance and other duties, interest on financing, etc. associated with imports or exports. Transfers abroad ordered by diplomatic or consular offices, international organizations, etc. were also excluded, the role of control for intervening financial entities was established and it was clarified that transfer abroad made by companies administering credit cards were included in the exception of Article 2 incise b), in order to deal with consumption and withdrawals made abroad. Communication "A" 3382 of the 7th of that same month regulated the regimen of the prior authorization required for transfers abroad, indicating the foreign trade transfers not excluded from prior authorization, financial transfer with automatic authorization and those requiring prior authorization. Communication "A" 3394 of December 13 incorporated to Com. "A" 3382 the exceptions to the currency income regimen established by Decree No. 1638/01.

9.153 As such beginning in December, a regimen was established to control exchanges and prior authorizations from the Central Bank of Argentina for certain transfers abroad, excluding foreign trade and numerous financial operations. **However there was** <u>**no**</u> *unlinking* **of the 1 to 1 peso to US dollar ratio established by the Convertibility Law.**

---

[23] See Argentine Chamber of Corporations, note of January 9, 2002 presented to the National Securities Commission, included in arbitral motions as Document R-53.

[24]See International Monetary Fund publication *International Financial Statistics,*

9.154. **That link was on the contrary reinforced and simplified, particularly in terms of the conversion of bank operations.**

9.155. Article 9 of Decree No. 1570/01 established that it would remain in effect until midnight the day following the close of public credit operations provided in Article 24 of Decree No. 1387/01, which was precisely the debt restructuring referred to by us. However all government acts that provided said measures and others related to same, **ratified the full effect of the 1 to 1 link between the peso and the US dollar which was established in the Convertibility law;** including, for example, the findings and considerations of Decree No. 1570/01 and regulatory standards of the Central Bank of Argentina previously analyzed by us.

9.156. The second stage of the *unlinking* would have occurred, insofar as the Award is concerned, on December 20, 2001 when the Central Bank of Argentina ordered – in its Communication "A" 3409 – a bank holiday for exchange operations.

9.157. Nevertheless **said exchange holidays did not constitute an** *unlinking*. Much to the contrary, **like the purpose pursued with the "Corralito" measures, it was accredited in the arbitral acts and admitted by EDFI that** *"the desire declared by the Central Bank of Argentina by declaring those holidays was to protect the base of reserves"* (dissenting vote, point 11).

9.158. In that respect we must first place the situation in a more precise perspective:

- The exchange holidays ordered up until December 31, 2001 strictly correspond to **six banking days** (including Saturdays and Sundays and December 24 and 31 which are traditionally bank holidays in Argentina).

- Said holidays were not absolute inasmuch as certain operations were authorized (Point 2 of Com. "A" 3409). Communication "A" 3413 of December 24, 2001 extended the holiday until the 26th, but allowed the performance of a series of operations, including the transfer of accounts in US dollars to accounts in pesos for a single client or the purchase of dollars made by credit or debit cards, at the 1 to 1 rate. Communication "A" 3416 of December 26 which extended the holiday added that, without prejudice to same, transfers from accounts in US dollars to accounts in pesos and accreditation of transfers from abroad would be allowed.

9.159 As such, even during those few days, the exchange holiday was not absolute and transfer operations could be performed from abroad which were converted at the *official exchange rate* obligatorily set by the Convertibility Law. And this arises from the Telephone Communiqué of the BCRA to Financial Entities No. 5897 on December 27, 2001 (confirmed in Communication "C" 33616 of January 3, 2002) and Telephone Communiqué No. 5898 of the same date (confirmed in Communication "C" 33617) which allowed determined operations at the exchange rate of one peso per one US dollar.

9.160 The above demonstrates that far from reflecting mere discrepancies with the foundations of the Award, the grievances alleged constitute irrefutable proof of the serious defects incurred by it. **The Arbitral Tribunal simply failed to apply Argentine law (in effect it failed to apply any law) and resolved against the facts accredited in the proceeding.**

9.161. The majority vote not just ignored the points agreed on by considering that the Contingency consisted of a rupture of the basic principles of the regimen of convertibility or in a "*practical event of the economy"*, but rather **as pointed out by the dissenting vote with utmost clarity, the statements of the preceding paragraphs demonstrate that** *"the conclusion of the award that beginning December 21, 2001 there was no "official exchange rate" in Argentina, is arbitrary* (point 11, added emphasis is ours).

**K. The Award challenged, issued by arbitrators who should have acted as arbitrators of law, was supported on an "interpretation" that was flagrantly contrary to the literal nature of the agreements by the parties, to their intention evidence in all the history of the case, Argentine public order and including two basic Constitutional principles. That interpretation was based only on speculations and conjectures over the economic reality, totally erroneous and improper for any jurisdictional decision. The Award contains, not even tangentially, any reasoned derivation from current law.**

**9.**162. As stated by us above, the point agreed in arbitration is limited to verifying if the *Contingency* had occurred; i.e. if there had been an increase or decrease, as of December 31, 2001, to the *official exchange rate,* which would imply an unlinking from the 1 to 1 peso:dollar parity.

**9.**163. The majority of the tribunal did not comply with that duty. **The Award does not say that there had been official exchange rate other than the rate of 1 peso per 1 dollar in the period from December 21, 200 and the end of that year.** The dissenting vote underlines this (point 16).

**9.**164. Instead of fulfilling its legal obligation, the majority of the tribunal opted to analyze the bases for sustainability of the economic system (paragraphs 684

56

and 691) and **conjectured on whether the economic and political events that had occurred in Argentina during December 2001 were sufficient to lead to the disappearance of convertibility and devaluation of the peso.**

9.165. In effect the Award speculated on the efficiency of the economic measures adopted by the Argentine government in its affirmation that *"the declaration and implementation of the exchange holiday on December 21, 2001 occurred as the result of an economic and socio-political crisis without precede3nt in Argentina <u>which made obvious that the economic and exchange measures previously taken by the Argentine authorities were inadequate …"</u>* (paragraph 691, the emphasis is ours). It further conjectured on what could have occurred in the country in December 2001, in its affirmation that *<u>"all the proofs available indicate that in the absence of the prohibition and suspension of all exchange activities, the value of the peso would have decreased significantly"</u>* (paragraph 695, emphasis is ours). Moreover, the Award judged the sufficiency of the attempts by the Argentine government to combat the economic crisis to prevent the repeal of the convertibility law, affirming that *"in his acceptance speech as Provisional President on December 22, 2001, President Rodriguez Saa indicated that the course to take to resolve the current economic and social crisis would be to implement a third currency <u>to prevent the negative consequences of the dollarization or devaluation of the peso. He mentioned the difficulties that the "real exchange rate"</u> had caused to Argentina's commercial relations and that those problems would be specifically faced. President Rodriguez Saa resigned a few days later, and on January 2, 2002 Eduardo Duhalde assumed the presidency of Argentina. Two days later, the Bill for the Economic Emergency Act … was sent to Congress, and was approved as law on January 6, 2002" (*Paragraph 696; the emphasis is ours).

9.166. These affirmatives are clearly **not allowable.** And they would have been if expressed as an *obiter dictum* and are even more so **when dealing with the central axis on which the basis of the challenged Award is based.**

9.167. The mission of the Tribunal in this arbitration if in December 2001 the conditions existed to continue the economic policy known as the "convertibility regimen", or if the economic conditions existing at that time were sufficient to maintain in the future, the 1 to 1 parity.

9.168. The Tribunal should have applied Argentine law to resolve the dispute, and not recur to conjectures and speculations which are not proper for founding its decision. That is, the Tribunal should have determinedly only if an *unlinking from the official exchange rate* had occurred, resulting in an increase or decrease to the 1 to 1 peso-dollar parity prior to December 31, and if so, to specifically identify the value of the new official exchange rate at the date of the first change and at December 31 to calculate any possible compensation.

9.169. The Award on the contrary virtually judged the Law of Convertibility which was in effect in December 2001 as inapplicable to the case, based on meta-juridical reasons, without declaring it as unconstitutional and ignoring what the parties had agreed on in the text of the contract.

9.170. Finally it is evident that the **concern of the majority arbitrators** to analyze the lamentable political and economic events suffered by Argentine in December 2001 and the future perspectives **were destined,** as noted correctly by the dissident vote (point 2), **to award as amiables compositeurs and not as judges of law,** distributing at their own whim the consequences of the Argentine economic misfortune.

L. **To go further, the abuse of the Award opposed even lead to the consideration of Art. 218 Incise 7 of the Commercial Code as inapplicable.**

9.171 As expressed by the dissenting vote, the terms of the Letter Agreement – and in particular the word *"unlinking"* and the expression *"official exchange right"* – are undoubted, and this led without fail to the rejection of the complaint (points 5 and 8).

9.172. However if hypothetically it is concluded that those terms are doubtful, then the principle of *favor debitoris* is legally applied, both in terms of the effectiveness of the *Contingency* as well as with regard to its definition and the calculations made.[25]

9.173. What the Tribunal cannot validly do is *"create"* terms and expressions that are grossly different from the ones used by the parties, and consider them sufficiently clear as to obviate the application of the principle cited.

**X. The unreasonableness and lack of all legal and economic logic of what the award states when quantifying the liability. Separating itself from the agreement, violating Argentine public order and unduly affecting the basic constitutional rights of the defendants.**

A. ***Arbitrariness for not applying the method agreed upon by the parties: the average*** official quote ***for the peso against the dollar between the date of the first alteration and the 31 of December of 2001. If the method selected by the parties had been applied, the decision would have been equal to "0".***

---

[25] In this sense doctrine has shown that *"the rules establishing the article commented by us can be classified as classic, inasmuch as they have been taken from Roman texts or ancient laws or authors which have copied and explained them. Their foundation is fully evident and not argued in doctrine"* (Fernandez, *"Commercial Code",* T.1, Amorrortu, 1957, p. 343). Malagarriga also states that the principle *"is a consequence of the principle of common law which states that there is no obligation without cause or, in other words, nobody should feel an obligation that does not arise from an obligation of law or a contract in which the person has participated. The rule is freedom, the lack of obligation. As such, logic would, in case of doubt, be for freedom". ("Treatise on Commercial Law",* T.11, Commercial Contracts, p. 13, TEA, 1963).

58

10.1 As stated the Award abandoned the text of the *Letter Agreement* and Argentine law when it considered that the *Contingency* occurred despite the lack of verification of any *unlinking* from the *official Argentine exchange rate* in effect at December 31, 2001.

10.2. The Tribunal then and in order to quantify the amount of the sentence to be imposed on ENDESA and YPF should have explained the unexplainable: that is, **what the** official **peso-dollar exchange rates were from December 21-31, 2001, which were not the 1 to 1 parity from the Convertibility Law which was effective and obligatory until January 6, 2002.**[26] However the Award did not say that there was a different exchange rate during that period, as was so eloquently pointed out in the dissent (point 16).

10.3. Of course this was not done because it was impossible, since the legal framework and reality indicate that the *"official exchange rate"* continued to be provided, and obligatory, under the Convertibility Law, until after December 31, 2001.

10.4. Under these conditions it is evident that if the Award had respected the calculation method agreed on by the parties[27], the ***amount payable would necessarily have been equal to "0" (zero), inasmuch as the average official exchange rate or quote***[28]***during the six business days which transpired between December 21 and 31, 2001 was equal to 1.***

10.5. But what did the Award do?

10.6. Once again it abandoned what had been expressly agreed by the parties and created *ex nihilo* a new method of calculation, with no basis on the positive law which should have applied. We refer to this below.

**B. Abuse of the powers entrusted to the Tribunal when it adopted, following its own capricious will, an exchange rate and dates of reference which were different from those specifically agreed by the parties.**

10.7. The ward also incurs in a manifest capriciousness by adopting as the calculation base for the amount ordered, an exchange rate that is **different and after** (that of 1.11.02) the deadline for the *Contingency* provided in the contract

---

[26] The Award considered that *"during the Exchange holiday currency market operations were suspended and no Exchange was performed inasmuch as these were forbidden. As a result, neither the BCRA nor the Argentina State Bank published the official daily exchange rate for the Argentine peso: US dollar. Under these circumstances, the Tribunal has determined that there was no "official exchange rate" according to the definition of the parties in the context of the Letter Agreement. As such it is difficult to calculate any compensation that would be appropriate in accordance with Article 4 of the Letter Agreement, according to which the calculations would be based on the average official Argentine peso-US dollar exchange rate during the period from the date of the first alteration of the peso/dollar parity and December 31, 2001"* (paragraph 707).

[27] We remember once again that the parties agreed that compensation would be calculated based on *"the average of the **official exchange rate** for the Argentine peso to the US dollar during the period from the date of occurrence of the **first change in the peso/dollar parity** and **December 31, 2001"***, (point 4 of the *Letter Agreement).*

[28] The Award admits that the parties used the expressions *"official exchange rate"* and *"official quote"* to refer to same (paragraph 726).

(that of 12-31-01)[29]. The simple proof of the statement makes evident that the law of the parties has been violated (Art. 1197 of the Civil Code).

10.8. Application of that supposed *official exchange rate* (**which is not even "official"**) after the temporary limit freely agreed on by the parties to quantify the scope of the price review under the terms of the *Letter Agreement,* is an additional, and very convincing demonstration of the incongruities incurred in by the Award.

10.9. That notable inconsistency is even more serious, inasmuch as the Award itself had previously noted that the risk covered by the *Contingency* was that "*A modification would be created in the peso-dollar exchange rate **within a period to be agreed by the parties**"* (paragraph 624; added emphasis is ours). That period was **essential**, and as recognized by the Award, during that time **there was no change to the official exchange rate of 1 peso per 1 dollar.**

10.10. In short, it is evident that the majority of the Tribunal **invented** that the exchange rate of $1.7 per dollar was the best adapted to the intention of the parties.

10.11. As such the Award falls into a new arbitrariness when it affirms that as the parties could not have foreseen the lack of any official exchange rate, that fictitious gap must be filled with the UNIDROIT principles and with what is assumed to be Argentine practice of referring to the free exchange markets on the first business day following any operation with exchanges. However **if there had been no other official exchange rate on December 31, 2001,** what was simply verified is that the **Contingency did not occur.** Suppose that given the absence of that different exchange rate one must recur to another after the expiration of the temporary period agreed on, this would ostensibly and arbitrarily modify the letter and meaning of the mechanism of review for the price agreed upon.

10.12. The Tribunal **was charged with applying the stipulations in the Agreed order,** nothing more and nothing less. **It was not entrusted with going beyond this and filling a supposed contractual gap** – which in reality did not exist, as the dissent notes – **creating *ex post facto* a complete different method of calculation.**

10.13 This arbitrariness was marked by the dissenting vote when it decides that the agreement entered into by the parties was a **"*clear, concrete and restrictive method based on the decrease or increase in the official peso to dollar exchange rate** (Article 3 of the Letter Agreement) **since that exchange was first altered until December 31, 2001** (Article 4 of the Letter Agreement)"*. This was not a mere expectation, but rather **an agreement under the terms of Art. 1197 of the Civil Code,** and as such **"*neither Argentine law nor the***

---

[29] In calculating the amount ordered, the majority of the Tribunal adopted the free Exchange rate of $1.70 per US dollar corresponding to January 11, 2002 (paragraph 728 of the Award).

***Principles of UNIDROIT, also cited by the Award*** *(paragraph 711)* **protect the unfounded decision of the award to calculate a payment by reaching the agreement made by the parties in the Letter Agreement"**(point 12, added emphasis is ours).

10.14. And if that is not sufficient, it is **not** true that Argentine law allows the adoption of the list rate effective immediately after an exchange holiday in cases such as the one at hand.

10.15. That is an alternative only used when operations are open in which the amount of the debt is previously determined, for purposes of paying the obligation in a different currency. And as such that alternative must be expressly agreed on by the parties.

10.16. Neither of these situations occurred in the case at hand.

10.17. This case does not deal with an obligation for a determined amount that must be liquidated at an exchange rate to be established. On the contrary, the **existence of an official rate other than the parity provided in the Convertibility Law was the essential element for the birth, or not, of the obligation to pay.**

10.18. Neither had the modality imagined by the Award been agreed on by the parties, although the practice mentioned by the Tribunal did exist at the time the *Letter Agreement* was signed. This ratifies that its absence, far from being in response to the unforeseeable nature of the events of December 2001, is due to the fact that it is not nor was considered an apt tool to determine the obligation of the parties.

10.19. The arbitrariness of the Award is ratified even more simply by noting that not even the official exchange rate of the Official Exchange Market, documented in Decree No. 71/02 ($1.40 per dollar) was adopted, since the text of the *Letter Agreement* in question does not present any doubt in terms of the exchange rate that should be used: ***the official exchange rate.***

10.20. In addition the Award affirmed, although erroneously, that the relevant part of the *Contingency* was the price at which the Central Bank of Argentina would sell dollars (paragraphs 66 and 687). However when that entity sells and buys dollars **at an official exchange rate** ($1.40 per dollar) in accordance with the order of a public authority (Decree No. 71/02, dictated pursuant to the legislative delegation allowed by law 25,561), the Award interpreted that that was **not** the exchange rate that *"best reflects the intentions of the parties"* (paragraph 728).

10.21. As such in the broad range of possibilities that opened as a result from leaving the strict legal frameworks, **the Award adopted the worst extremes possible to increase the amount ordered against the defendants** (point 16 of the dissenting vote).

10.22. **Given the magnitude of this unreasonableness, illegality and unconstitutionality, nothing could be more arbitrary.**

**C. Arbitrariness because the Award chooses the worst hypotheses to increase as much as possible the amount of the compensation, which itself is unallowable.**

10.23. The dissenting vote advises that the Tribunal was not satisfied with resolving the issue by ignoring the agreement made by the parties and the provisions of Argentine law, but rather once it had arbitrarily abandoned those strict legal limits and discussed a variety of economic and political events of various natures and with a subjective interpretation (for example the level of reserves, restrictions on exchange freedom and transfer of funds, Corralito, etc.), **it chose, at its own discretion, the worst parameters** to calculate the greatest compensation possible.

10.24. In this way extending even beyond the primary arbitrariness (abandoning Argentine law and the arbitral commitment) the Award incurs in a new cause of arbitrariness. **If the Tribunal had been consistent with its own logic, the compensation would have been null or at least substantially less.**

10.25. Below we analyze the principles supposedly possible, assuming as a negative hypothesis, that they were the bases of the argument used by the Award.

*a) Result of a first supposition: the unlinking occurs as a consequence of the sanction of Law 25,445, which modified the Convertibility Law by introducing a basket of currencies with the Euro.*

10.26. If it were true, as the Award states, that the parties wanted to define the *Contingency* as maintaining the essential principles of the regimen of convertibility (although they did not), then there can be no doubt that the sanction of Law 225,445 of June 22, 2001 (paragraph 108 of the Award) would have been the first unlinking from the official exchange rate, inasmuch as it modified the Convertibility Law to make the peso convertible "*at a rate of one peso ($1) per simple average of one United States dollar (US$ 1), and one Euro of the European Union.*" In fact, it was the announcement of Minister Cavallo that this bill had been prepared at the time that the parties negotiated the terms of the *Letter Agreement*, which led to the inclusion of the phrase "*whatever the cause producing it.*"

10.27. As such, once the *Contingency* had occurred and continuing with the logic of the Award, there is no doubt that the parity between the dollar and the peso was maintained at the rate of 1 to 1 until December 20, 2001 ("*The rate of one peso for one dollars represents the last official exchange rate of the peso to the dollar available at December 20, 2001*", paragraph 717 of the Award). As such, 113 business days

had transpired since June 22 and only 6 business days since the declaration of the bank holiday until December 31, 2001.

10.28. Inasmuch as the Awarded had concluded that it must be assumed that the value of the dollar at December 31 was $1.35 and given the conjecture made by the Tribunal, it is impossible to know how it could have evolved incrementally since December 21, we assume the worst hypothesis possible. This would be that the exchange rate was held stable at $1.35 from December 21 to 31, although it would actually be reasonable to assume that the increase from the 1 to 1 rate occurred slowly. In this way, the compensation would have been calculated, after the rate had been averaged and the effect of the change distributed equally[30], as follows:

---

Quote from 6/22/01 to 12/20/01 = $1 per dollar

Quote from 12/21/01 to 12/31/01 = $1.35 per dollar

Number of days $1 per dollar = 113

Number of days $1.35 per dollar = 6

Average quote between 6/22/01 and 12/31/01: $1.0176 per dollar

Distribution of the risk at 50%: $1.0088 per dollar

**Amount of order against ENDESA (US$): 8.50 million vs. 147 million (Award)**

**Amount of order against YPF (US$): 2.69 million vs. 40 million (Award)**

---

10.29. As a result of the acceptance of the counterclaim in this first supposition, the result **should have been**: **order EDFI to pay** US$ 37.74 million to ENDESA and US$ 8.37 million to YPF.

   *b) Result of a second supposition: the unlinking occurred as the consequence of the fall in the level of Central Bank reserves.*

10.30. If it were true, as affirmed by the Award, that in order for the *Contingency* to occur it was essential that the BCRA comply with the obligation established in Article 4 of the Convertibility Law to maintain international reserves equivalent to at least 100% of the monetary base (Paragraph 686), then doubtless the unlinking would have occurred maximum at mid-August 2001 when the level of serves fell to 82% (paragraph 110 of the Award). As in the previous case, we assume the least convenient hypothesis for ENDESA and YPF, since even according to the economic expert of EDFI the failure to comply with the level of reserves was verified in July 2001 (see point 10, section 6 of the dissenting vote).

---

[30] See calculation in Appendix IX.

10.31. Thus, following the same methodology used in the above supposition, we would have to consider that 89 business days transpired from August 15 until December 20, 2001, at the parity of 1 to 1 for purposes of obtaining the official quote[31]. The result would be as follows:

---

Quote from 8/15/01 to 12/20/01 = $1 per dollar

Quote from 12/21/01 to 12/31/01 = $1.35 per dollar

Number of days $1 per dollar = 89

Number of days $1.35 per dollar = 6

Average quote between 8/15/01 and 12/31/01: $1.022 per dollar

Distribution of the risk at 50%: $1.011 per dollar

**Amount of order against ENDESA (US$): 10.62 million vs. 147 million (Award)**

**Amount of order against YPF (US$): 3.27 million vs. 40 million (Award)**

---

10.32. As a consequence of accepting the counterclaim in the second supposition, the result **should have been**: **order EDFI to pay** US$ 35.62 million to ENDESA and US$ 7.79 million to YPF.

*c) Result of the third supposition: the unlinking occurred as the consequence of implementation of the Corralito.*

10.33. If this were true, as affirmed by the Award, that for the *Contingency* to occur it was essential for the freedom to exchange and transfer funds to be guaranteed, neither can it be doubted that as noted by the dissenting vote (point 10, section 6) the unlinking would have occurred on December 1, 2001 when a series of restrictions of that nature were imposed by Decree No. 1570/01 (paragraph 117 of the Award).

10.34. For this supposition we would have to consider that 14 business days transpired from December 1 until December 20, 2001 at the 1 to 1 parity, in order to obtain the average official quote[32]. The result is as follows:

---

[31] See calculation in Appendix X.
[32] See calculation in Appendix XI.

> Quote from 12/1/01 to 12/20/01 = $1 per dollar
>
> Quote from 12/21/01 to 12/31/01 = $1.35 per dollar
>
> Number of days $1 per dollar = 14
>
> Number of days $1.35 per dollar = 6
>
> Average quote between 8/15/01 and 12/31/01: $1.105 per dollar
>
> Distribution of the risk at 50%: $1.0525 per dollar
>
> **Amount of order against ENDESA (US$): 49.13 million vs. 147 million (Award)**
>
> **Amount of order against YPF (US$): 13.61 million vs. 40 million (Award)**

10.35. As a result of accepting the counterclaim in the third supposition, the result **should have been** ordering ENDESA to pay US$ 2.89 million and YPF to pay US$ 2.55 million respectively, to EDFI.

10.36. The mere comparison of the order entered against ENDESA (100 million dollars before deducting the amount of the counterclaim) and YPF (29 million dollars before deducting the amount of the counterclaim) with the results shown reveals the degree of arbitrariness with which the Tribunal intentionally calculated the greatest compensation possible[33].

10.37. Under these conditions, the Award cannot be considered as a valid legal act inasmuch as it is arbitrary, unreasonable and illegal pursuant to the terminology of our Supreme Court.

## XI. THE ARBITRARINESS IS SUCH THAT IT CONSTITUTES A SENTENCE BY THE TRIBUNAL ON NON-ARBITRABLE ISSUES: THE TRIBUNAL DID NOT APPLY THE LAW, AS IT WAS AGREED, BUT ACTED AS AMIABLE COMPOSITEUR, WHICH WAS FORBIDDEN TO IT. DOCTRINE OF THE INTERNATIONAL ARBITRATION COURTS AND THE SUPREME COURT.

11.1. Article 760 of the CPCCN provides that ordering *"on non-arbitral points"* is grounds for the annulment of arbitral awards.

---

[33] Including if we take the official Exchange rate established in Decree 71/02 of $1.40 per dollar (official quote in effect on January 11, 2002) and follow the same method of calculation adopted by the Award, the result of the net award against ENDESA would have been US$ 43.40 million (instead of US$ 100 million ordered by the Award) and against YPF would have been US$ 13.32 million (instead of US$ 29 million ordered by the Award), thus confirming the complete and absolute arbitrariness of the Award.

11.2. The first point agreed in this proceeding was **that the arbitration was of law, with Argentine law applicable to the case.**

11.3. Nevertheless, as has been accredited in preceding chapters, to condemn ENDESA and YPF the Award omitted to apply Argentine law, including its public order. In effect, it failed to apply any law.

11.4. Based on the meta-juridical interpretations on the supposed intention of the parties and the considerations of a political and economic nature and in terms of equity, the majority resolved in the Award that the unlinking of the exchange rate which specified that one peso was equal to one dollar which had been consecrated in Article 1 of the Convertibility Law occurred on December 21, 2001, inasmuch as this law had lost any practical and economic effect during December 2001 upon the disappearance of its essential foundations. In addition, it calculated the compensation by recurring to criteria which in its personal opinion it considered reasonable, despite openly abandoning those expressly contemplated by the parties in the *Letter Agreement.*

11.5. The dissenting vote in this regard states, "***I fail to see [the application of] Argentine law in the decision of the Award interpreting the Letter Agreement as was done and finding ENDESA and YPF guilty as it has.***" (Point 15, added emphasis is ours.)

11.6. The Tribunal however did not stop with abandoning current law. The decision to invent the intentions of the parties as something real can be conceived of only in the arbitrary vision of the arbitrators, in order to abandon the express text of the *Letter Agreement* and substantive Argentine law.

11.7. There is no doubt that an awarded dictated based on criteria other than the legal foundation applicable to the case can only eventually be valid in an arbitration of "amiable compositeurs". However this would mean **the exercise of a discretion not granted in this case by the parties by fixing the points of the arbitral compromise, nor by current law.**

11.8. On the contrary, in arbitrations of law, such as the case at hand, the arbitrators must resolve the controversy brought before them in the same, identical way as would a state judge.[34] The arbitrators must bind themselves to current norms, either those stated by the parties in their arbitral compromise – as occurs in the case at hand – or those of law which are applicable to supplement the agreements of the parties.

11.9. It is precisely this condition that differentiates this class of arbitrations from those called "*of amiables compositeurs",* in which the arbitrators order according to their knowledge and understanding, and with the ability to introduce valuations outside of what is strictly juridical, as well as those related to economic, political or social criteria.

---

[34] Calvano, *"Arbitration",* ob. Cit. Page 72

11.10 This difference was clearly laid out by the Honorable Chamber when it decided that "*according to the principles applied by the party deciding the controversy, the arbitrators are distinguished from the amiables compositeurs.* **The first, like judges, must apply current law; the latter shall use their knowledge and understanding and 'proceed unbound to legal forms'** *(Art. 769, Cpr.); that is, they shall decide the matter 'according to equity' (Art. 766 parr. 2nd, Cpr.; conf. Fenochietto-Arazi, "Code of Procedures ...' T. 3 p. 471/2, Ed. Astrea, Buenos Aires, 1993)"*(added emphasis is ours)[35].

11.11. The doctrine was pronounced concordantly. Thus, it was stated that, "*the arbitrators or legal arbitrators of the amiables compositeurs, for the form and way in which they must found and decided the matters submitted to arbitration ... The first resolve founded on law, the latter according to their knowledge and understating."*[36]

11.12. A decision which – as has occurred in this case – has wandered from current law would be equally grave.

11.13. As has been so correctly stated, if the parties have agreed on the law applicable to resolving the controversy, then the arbitral tribunal must not evaluate if the choice of law is well founded or related to the matter object of the dispute, but rather limit itself to respecting that choice.[37]

11.14. And that is precisely what the majority has not done in this case. **By affirming that what is important is the "*practical and economic reality*"** (paragraphs 661 and 685), **The Tribunal has not respected the choice of the parties to define the *Contingency* as a strict and concrete legal act, which should be judged according to Argentine law and its provisions of public order.**

11.15. However the arbitrariness with which this case has been handled is so serious that it is not enough to consider that there is a vice in the proceeding for failure to apply a standard. In the case examined, **The Tribunal has failed to apply all legal norms that are applicable and relevant for resolving this case**, replacing them with metajuridical considerations. This requires the conclusion, without hesitation, that there has been a manifest extralimitation of powers of the Tribunal, i.e. a declaration on points not involved under the terms of Art. 760 of the CPCCN.

11.16. As Boggiano explains, "*The problem of knowing if an arbitrator has exceeded his functions is presented if he acts by granting an awarded as an amiable compositeur when he was not granted that power, and can resolve only as an arbitrator juris. In this*

---

[35] National Chamber of Commercial Appeals, Court B, 3/19/01, "Importadora Mediterranea S.A. vs. Honda Motor Company Ltd. Et al / complaint", elDial.com AA7F1.
[36] Fassi, Santiago C., "*Code of Civil and Commercial Procedures"*, T. III, Ed. Astrea, Buenos Aires, 1973, p. 469.
[37] Derains and Schwartz, Ob. Cit. P. 220.

*case an incongruence could be complained of in the award **for having exceeded the terms of the agreement***" (added emphasis is ours).[38]

11.17. In the same sense, qualified international arbitral jurisprudence has said that "*The cause of manifest overreaching of powers is not circumscribed to jurisdictional error; it is established that **the complete omission of applying the law to which the tribunal is subject (…) can constitute a manifest overreaching of powers, as a decision dictated ex aequo et bono also is; that6 is, in under a general discretion not granted by applicable law – which is not authorized by the parties** …*"(the added emphasis is ours).[39]

11.18. In a similar manner it has been held that "*The dispensing by the tribunal with the standards of law agreed would constitute a repeal of the terms of reference which include the terms under which the tribunal has been authorized to function. **Examples of this repeal** include the applications of various legal standards agreed by the parties, **or a decision based on no legal standard** but if the parties have agreed on a decision ex aequo et bono. If the repeal is manifest, then this implies **a manifest excess of power".**(added emphasis is ours).[40]

11.19. Our Supreme Court has adopted an identical view by declaring the annulment of an arbitral award founded on the "*dispensing of objective standards, in principle applicable, without justifying same with any foundation, making the decision exclusively based on personal criteria and **inasmuch as "the arbitrator was de jure to resolve all the matters submitted (…) an essential task of his decision was to found same on current law"***(the emphasis is ours).[41]

11.20. Based on the foregoing, there is no doubt that the Hon. Chamber should declare the partial annulment of the Award because the grievances of our clients are based on the objective proof of the failure to apply the law agreed on by the parties – the law specified by the parties in the Letter Agreement, the Convertibility Law, the Civil Code, the Commercial Code and the National Constitution – which was current in Argentina on December 31, 2001, and in its place the Tribunal has resolved this matter based on outside considerations, many of them metajuridical, therefore presenting **a clear case of ordering over points not in discussion.**

## XII. THE CHALLENGED AWARD IS ALSO NULL BECAUSE IT IS IMPAIRED BY AN ESSENTIAL FAULT IN PROCEDURE

---

[38] Boggiano, Antonio, *"Lex Mercatoria non est lex",* in the Revista de Derecho Comercial y de las Obligaciones, Buenos Aires, No. 226, September/October 2007 p. 425.

[39] "*MTD Equity Sdn. Bhd. & MTD Chile S.A. vs. Republic of Chile",* Case CIADI No. ARB/01/07, Decision to Annul of March 21, 2007 (www.investmentclaims.com).

[40] "*Maritime International Nominees Establishment v. Republic of Guinea",* Case CIADI Nol. ARB/84/4, Decision to Annul of December 22, 1989, 4 ICSID Reports 79, 87.

[41] CSJN, "*Yacimientos Petroliferos Fiscales c. Sargo S.A: Arg. Oil and gas pipeline projects without arbitration",* sentence of December 27, 974; decisión: 290:458.

12.1. Although the statements made in the above chapters are sufficient to declare the challenged Awarded as annulled, we also point out the essential lack in the proceeding incurred in these proceedings and which, based on the CPCCN Art. 760 also leads to the declaration of annulment requested.

12.2. The essential faults of the proceeding can be conceptualized generically as those which imply a serious and unequivocal breach of the Constitutional guarantee of a defense at trial. This guarantee is integrated and indivisible from the concept of due legal process, which "covers various specific guarantees destined to provide the individuals with the protection necessary to safeguard their rights".[42]

A. . A **lack of independence or impartiality in the arbitrator appointed by EDFI. Failure by ICC to open arbitration confirmation proceedings to guarantee the equality of the parties in the process and the defendants' right to defense. The lack of grounds for the rejection of the challenge to the arbitrator and vice-president of the ICC**

12.3. ENDESA and YPF have been forced to litigate in the arbitral proceeding with the clear prejudice to their right to a defense as a consequence of the existence of objective and founded doubts on the lack of impartiality and independence of the arbitrator appointed at the proposal of the plaintiff, Mr. Jean Paul Beraudo.

12.4. As is known, the opportunity to appeal arbitral awards is very restricted. As such the qualities and performance of the arbitrators – in terms of their suitability, technical solvency, independence and impartiality – are of the maximum relevance.[43]

---

[42] Badeni, Gregorio, "*Treatise on Constitutional Law*", Volume II, The Law, Buenos Aires, 2004, page 804. Consecrates the inviolability of the "*defense of the individual and rights at hearing*" in Article 18 of the national Constitution, which becomes effective in the process through the principal of contradiction which provides the litigants with the real opportunity to be heard, state their defenses and produce evidence before an impartial and independent judge. However these guarantees do not culminate with the mere act of providing the litigants with a formal opportunity which can be exercised by them, but rather is complemented with the need to be reflected congruently in the decision which ends the dispute, which must also be reasonable and respect the order of priority of the norms (28 and 33). The American Convention on Human Rights (Pact of San Jose de Costa Rica) similarly provides in its Article 8.1 that "*every person has the right to be heard, with due guarantees and within a reasonable period, by a competent judge or court, which is independent and impartial, previously established by the law, in the substantiation of any criminal accusation formulated against them, or to determine their rights and obligations in civil, labor, fiscal or any other kind of proceedings.*" The foregoing statements allows that the existence of vices which may be noted in the proceeding that violate the guarantee to defense and due process constitute an undue abandonment of constitutional principles which are obligatorily applied. In agreement with this, the Supreme Court has declared that due process and the right to a defense form part of Argentine public order, so that the elimination of said in a sentence determines it as impossible to execute (15, 10, 96, "*Riopar S.R.L. c/ Transporte Fluviales Argenrio*", Decisions: 319:2411).
[43] Impartiality and Independence of the arbitrators are universally recognized principles (Redfern, Alan and Hunger, Martin, "*Law and practice of international arbitration*", Sweet and Maxwell, London, 1999, pg. 210; Gaillard, Emmanuel and Savage, John, "*Fouchard, Gaillard, Goldman on international commercial arbitration*", Kluwer Law, Boston, 1999 pg 561).

12.5. Impartiality is related to the neutrality of the person who must decide a conflict with regard to the parties and independence is linked to the autonomy of the arbitrators with regard to said parties, in terms of commercial, professional, personal and financial relationships.

12.6. Impartiality is an essential quality required of a judge. Inasmuch as it can only rarely be accredited, the independence of an arbitrator, which is a question of fact and therefore more easily verifiable, in principle constitutes a guarantee of the autonomy of his will.

12.7. The principles of impartiality and independence of the arbitrators are contained in the Regulation application to the case (Articles 7.1 and 15.2)[44] and in the generality of the regulations for arbitral proceedings[45]. Mr. Didier Lamethe, Legal Director of EDFI in a seminar coordinated with the outside counsel of the company and shared with one of the members of the arbitral tribunal – Mr. Jean Paul Beraudo – eloquently referred to these requirements when he stated that "*The qualities of absolute independence and objective impartiality*

---

[44] In this case, ENDESA and YPF were especially aware upon agreeing to the arbitral compromise, that the ICC International Arbitration Court, as announced on the back page of its Regulation (See Appendix XII) is *"recognized worldwide for its impartiality and efficacy"*.

[45] In a similar sense the Regulation for the United Nations International Mercantile Law Arbitration Commission (the "UNCITRAL Regulation") establishes that the authority responsible for appointing the arbitrators must take the steps necessary to guarantee the appointment of independent and impartial arbitrators (see articles 6 and 7). The Regulation of the *London Court of International Arbitration* ("LCIA Regulation") provides that *"all arbitrators instructing an arbitration under this Regulation shall be and at all times remain impartial and independent from the parties"* (Article 5.2). In the same sense the Code of Ethics for Arbitrators of Commercial Disputes of the *American Bar Association* (The ABA Code) establishes in its Canon I, Section B that an arbitrator shall accept an appointment only if he is completely sure that he can act impartially and independently.

There is no doubt that the confidence of the parties in the form in which the arbitrators resolve the dispute acquires a decisive importance for the efficacy and viability of an arbitral proceeding. In this sense, inclusion of the requirement for independence contained in the ICC Regulation is designed to preserve the confidence of the "atmosphere of trust" in carrying out an arbitration, in order to prevent disruptions in the development of the proceeding and challenges to the award based on the partiality of the arbitrators (Derains and Schwartz, ob. Cit., pg 110).

As such, Article 7.1 of the ICC Regulation provides that "*all arbitrators must be and remain independent of the parties in the arbitration*" (added emphasis is ours), thus imposing a limit on the freedom of choice of the parties to select the arbitrators, since even the arbitrators appointed at their proposal must be and remain independent.

Based on the difficulty involved in accrediting compliance with these requirements, the obligation of the arbitrators to reveal to the parties all information which may affect the independence and impartiality of the arbitrators assumes a decisive relevance in the arbitration proceeding and is instrumental in guaranteeing the preservation of the trust mentioned above.

As a result, the fact in itself of the arbitrator's failure to reveal is understood to transform into a key element to consider the requirement for independence and impartiality to have been violated (Redfern and Hunter, ob. Cit., p. 216).

In this sense, the ICC Regulation provides that whoever is proposed as arbitrator *"must sign a declaration of independence and reveal any facts or circumstances which may, from the point of view of the parties, place his independence in doubt"* (Article 7.2). Furthermore this obligation extends to the entire time that the arbitration lasts, ordering that the arbitrator "*immediately reveal, in writing, both to the Secretary as well as to the parties, any facts or circumstances of a similar nature that could arise during the arbitration*" (Article 7.3, the underlining is ours).

The UNCITRAL Regulation for its part sets the duty for any person proposed as an arbitrator to "*reveal to those investigating his possible appointment, all circumstances that could lead to justified doubts with regard to his impartiality and independence. Once named or elected, the arbitrator shall reveal said circumstances, unless they have already been informed of same*" (Article 10).

The LCIA Regulation stipulates that prior to his appointment, *"each arbitrator shall provide to the Secretary a written summary of his professional activities, past and present (…) and sign a declaration stating there to his knowledge there are no circumstances that could cause reasonable doubt over his impartiality or independence, other than those already revealed by the arbitrator in his declaration. Furthermore each arbitrator shall assume the permanent commitment to reveal to the LCIA Court, other members of the Arbitral Court and all the parties, of any other similar circumstances which may occur after the declaration has been made and prior to the conclusion of the arbitration*" (Article 5.3). The ABA Code also states that an arbitrator must reveal – prior to and during the arbitration – any interest or relation which may affect his impartiality or cause an appearance of impartiality (Canon II, A).

*constitute the common denominators, truly incomparable premises and become consubstantial to the function of the arbitrator"*[46]

12.8. The principle of the arbitrator's independence and impartiality must b e analyzed based on two essential aspects of the arbitration: (i) a conventional or contractual element presided by the principle of the freedom of the parties; and (ii) a jurisdictional element assumed by the fact that the judgment of a conflict is final and binding. In terms of the first, it must be considered that international commercial arbitration is a process for resolving disputes that is characterized by the possibility of the parties to select for themselves, as part of the decision to submit the matter to arbitration, the rules that will govern the process, the law which will apply and – in cases such as arbitration under the rules of the ICC – the possibility of determining the selection and form of appointment of the arbitrators.[47]

12.9. In the case at hand, the parties agreed that *"the number of arbitrators will be three, one appointed by the SELLERS, another appointed by the PURCHASER and the third by the two arbitrators named by the PARTIES.*

12.10. If one of the arbitrators is not independent or is partial, then the ICC shall not confirm him and the parties can challenge him.

12.11. The opening of a procedure for confirmation and recusal of an arbitration is appropriate not just in the case where specifics facts are verified that indubitably denote the violation of the principles of independence and impartiality required, but also in the event that circumstances are accredited that **cause reasonable doubts** with regard to the lack of independence and impartiality of an arbitrator.

12.12. ENDESA and YPF requested that the ICC open a confirmation proceeding for Jean Paul Beraudo, arbitrator proposed by the plaintiff, and later rejected him, under the terms of Article 11.1 of the Regulation.

12.13. This was caused by the fact that, long after the beginning of the arbitration proceeding, ENDESA and YPF became aware of the appointment of Jean Paul Beraudo as one of the vice presidents of the ICC International Court of Arbitration.

12.14. Despite his inexcusable duty to reveal same, Mr. Beraudo never informed the defendants of said appointment; which omission confirmed the suspicion of partiality of Mr. Beraudo that arose from the issue of his dissenting opinion in the Preliminary Award on jurisdiction on February 11, 2005. On that occasion, without providing any legal argument founded on Argentine law, Mr. Beraudo proposed allowing the position of EDFI.

---

[46] Lamethe, Didier, "*Portraits de groupe darbitres internationaux"* in "Les Arbitres Internationaux", Speech of February 4, 2005, AAVV (Rosell, Jose, Coordinator), Societe de Legislation Comparee, Paris, 2005.
[47] Gaillard and Savage, ob. Cit. Page 11.

12.15. Given this circumstance, our clients repeatedly expressed their surprise and protect to the ICC Court, requesting that a confirmation proceeding be opened for Mr. Beraudo in order to present in that sphere the comments and requests to defend their interests.[48]

12.16. In their letter of October 19, 2007a the representatives of ENDESA and YPF thoroughly founded their reasons of facts and law that justified the reigning need for the ICC Court to open a confirmation proceeding. The stated that, "…*although it is true and Section1 of Article 2 of the International Regulation of the Court does not forbid its Vice presidents (unlike what occurs with the President) to be arbitrators in matters submitted to ICCC arbitration, expressly allowing this in section 2 of the same which are proposed to carry out the function by one of the parties, it is equally true and the repeated section 2 terminates with the words "**subject to confirmation**", and Mr. Beraudo was not yet Vice President of the ICC International Court of Arbitration when he was appointed as arbitrator*" (the emphasis is ours).

12.17. Perhaps with an unconscious, but in any case erroneous sense of corporate self-protection, the ICC ignored the serious foundations that justified the request of the defendants and in its response of October 27, 2006 simply stated that although a vice president of Court could be proposed to carry out the function of arbitrator subject to a confirmation proceeding, said proceeding was not expressly provided for the analogous case of people who were acting as arbitrators at the time they received an appointment as member of the ICC Court.

12.18. As noted, the ICC adopted a formalist and restrictive criteria, isolated from the remaining applicable provisions which emphasis the need to preserve the absence of any doubt over the independence and impartiality of the arbitrators. Basing itself solely on normative silence and without even explaining the reasons that could hypothetically justify – from the juridical, axiological or finalist point of view – the different forms of treatment between the two situations described therein, the ICC adopted the less protective criteria in view of the risk – certain and objective – to the impartiality of Mr. Beraudo and refused to open the confirmation proceeding expressly provided for cases in which a conflict of interest arises between the role of the member of the Court and the role of arbitrator in an ICC proceeding.

12.19. In these conditions, our clients were forced to repeat their request to open a confirmation proceeding, in a letter dated November 3, 2006. At that time ENDESA and YPF brought to the attention of the ICC the fact that the fundamental question to be explained – given the normative silence alleged by the ICC – was if this silence was due to a conscious decision by the authors of ICC norms, or on the contrary if it was a simple gap in the regulation. Beyond what

---

[48] In this regard see the letters of October 19 and November 3, 2006 presented by the representatives of ENDESA and YPF, as well as the refusals of the ICC to open the confirmation proceedings of October 27 and November 10, 2006.

our clients are convinced this last supposition deals with, they pointed out that that in any event, in case of doubt, reason of logic and the element principle of prevention of sensitive situations required the opening of a new confirmation process for Mr. Beraudo based on his appointment as Vice President of the ICC, where all parts would be heard and especially the party who had not proposed him as arbitrator, in order to protect the equality of the parties in the proceeding.[49]

12.20. Lamentably in its letter of November 10, 2006 the ICC refused without foundation to grant the request mentioned, laconically referring to its previous letter of October 27, 2006.

12.21. This forced ENDESA and YPF to formally challenge Mr. Beraudo.[50] The main reasons that confirmed the loss of trust in the independence and impartiality of the arbitrator proposed EDFI included: the immediate hierarchical proximity of the position of vice president of the Court with that of the president, who is expressly forbidden from acting as arbitrator; the greater immediacy of Mr. Beraudo with the Court with regard to the other vice presidents, as he is the only French vice president (nationality of the plaintiff) and the Court has a seat in Paris, France; the inexistence of Argentine or Spanish V vice Presidents of the Court; the decision of the Court at the beginning of this arbitration (because of the opposition of EDFI) to not confirm the arbitrator originally designated by ENDESA and YPF; and the joint participation during the course of this arbitration by Mr. Beraudo with the legal representative of EDIF and with the Legal Director of the Grupo EDFI – witness in the proceeding at the request of EDFI – in activities outside of the arbitral proceeding.

---

[49] Upon address the ICC again on November 3, 2006, the representatives of ENDESA and YPF emphasized, "*I must state with the greatest respect but with equal firmness, our deep discrepancy with the content of your response. We did not fail to note at the appropriate time, nor do we fail to note now that the Regulation for the Court has not provided for a confirmation hearing for a person who, while acting as arbitrator in an ICC arbitration, is named as Vice president of the Court. However the fundamental question is obviously if this silence is in response to a conscious decision of the authors of that Regulation or, on the contrary if it is a gap in the regulation.*
*This party is reasonably convinced that the latter is actually the case. And if there is any doubt in this regard, we think it is sure that good logic (and an elemental principle of caution to prevent sensitive situations for the valuable prestige of the Court) would require that it be thus assumed, and maintain the need for a new confirmation hearing after the appointment of an arbitrator as Vice President. We understand that the possible failure to confirm said arbitrator could cause a serious problem for the arbitration in process. However that problem would not in any case be greater than that which would be created if an arbitrator in an ICC arbitration in process were appointed President of the Court; and we do not believe that any can hold the least doubt that in this hypothesis, he would have to immediately cease his actions as arbitrator. Of course it would be natural, and in defense of the necessary equality between the parties that must reign in the proceeding, to start from the healthy principle that those acting as arbitrators in ICC arbitrations are not named, while members of the Court of Arbitration.*
*To not hold to such an, in our opinion, elemental principle – as has occurred in this case – must, minimum, open a confirmation proceeding, hearing the parties and especially the party that did not propose as arbitrator the person later appointed as a high executive of the Court. As such, this party continues to hope that this will be done with respect to Jean-Paul Beraudo, allowing us the opportunity to state the reasons for which in our opinion his confirmation is not advisable.*"
[50] Article 11.1 of the Regulation allows founding the recusal "*on an allegation of lack of independence or any other motive*". The UNCITRAl regulation for its part provides, in its Article 10l1, that "*an arbitrator can be challenged if there are circumstances of a nature that lead to justified doubts with regard to his impartiality or independence.*" The LCIA Regulation establishes that "*an arbitrator can be challenged by any of the parties if there are circumstances that cause reasonable doubts on his impartiality or his independence. One party can only challenge the arbitrator appointed by itself – or in whose appointment it has participated ñ- based on motives learned after his appointment.*" (Cfr. Article 10.3).

12.22 It is interesting to point out in this regard that ENDESA and YPF casually learned – without Mr. Beraudo informing the parties in any way – that in February 2005 Mr. Beraudo participated together with the EDFI attorney, Jose Rosell and EDFI Legal Director and witness in the matter Didier Lamethe, in a talk coordinated by Mr. Rosell that later led to the book entitled "*Les Arbitres Internationaux*", edited by the *Societe de Legislation Comparee* in 2005. This was an additional element to the partiality already insinuated in the *preliminary award* and in the failure to reveal his appointment as Vice President of the Court, accrediting the existence of repeated contacts and flows between the arbitrator appointed at the proposal of EDFI, officers of EDFI (who acted as witnesses in the proceeding to be resolved by Mr. Beraudo) and its attorneys which at the very least should have been revealed in a timely manner by Mr. Beraudo.

12.23. It is therefore evident that in light of the provisions of Articles 7.2 and 7.3 of the ICC Regulation – which provides that arbitrators must reveal ***"any facts or circumstances which from the point of view of the parties may place their independence in doubt"*** – the contacts between an officer of one of the companies party to the proceeding (witness in the matter), its attorney and a member of the arbitral tribunal, should have been revealed to ENDESA and YPF without delay.

12.24 The absence of any revelation about these contacts can only result to the detriment of that "atmosphere of trust" which is indispensable to preserve an effective and valid arbitration proceeding.

12.25. For the rest ENDESA and YPF explained in their challenge that (i) if Mr. Beraudo had been vice president of the Court when EDFI appointment him as arbitrator and this had been reflected in his *declaration of independence,* they would not have agreed inasmuch as this would have violated the principle of equality of the parties; (ii) ENDESA and YPF accepted submitting their controversy with EDFI to ICC arbitration under the conviction that the parties would receive a neutral treatment, as equals. This conviction given the facts mentioned has been severely weakened; and (iii) if the challenge presented is not allowed, then ENDESA and YPF will be forced to litigate and to accept an award with the suspicion and fear that the position held by Mr. Beraudo with the Court would have been able to condition the actions of the Court, ICC officials involved in the case or to in some way violate the freedom of choice of the other members of the arbitral tribunal.

12.26. In order for the Hon. Chamber to be able to clearly appreciate the gravity of the situation presented, it is appropriate to point out the implications that the double actions of Mr. Beraudo would have, within the framework of an ICC arbitration, as arbitrator and vice president of the Court.

12.27. The court has various relevant functions with regard to arbitration proceedings governed by its rules. Among the most important are those regarding the preliminary examination made by the Court, both with regard to the award as well as

74

the corrections or interpretations decided on by the Arbitral Tribunal (Articles 27 and 29, sections 1 and 2 of the Regulation) and the function of assigning the costs of the arbitration, including fees and costs of the arbitrators (Article 30, section 2 and 31, section 2).

12.28 Considering the statements made and even though Article 2, Sections 4 and 5 of Appendix II of the Regulation – "Internal Regulation of the ICC International Court of Arbitration" – provides that when the President, any Vice President or any other member of the Court or the Secretary is involved in a proceeding pending before the Court, said person shall abstain from any participation in the debates and from making decisions of the Court related to said proceeding, there could be a certain conditioning or effect on the freedom of who should deal with the case in the Court, or even on the other arbitrators which, even in a minimal amount, would be sufficient to generate reasonable doubts with regard to independence and impartiality.

12.29. In addition it must be remembered that in accordance with the provisions of Articles 7.4, 8.2, 8.3, 8.4 and 9 of the ICC Regulation, the Court has the power to confirm or reject the appointment of arbitrators proposed by the parties for a controversy and to directly appoint the arbitrators when the parties do not reach an agreement to do so and when they abstain from doing so for other reasons.

12.30. In this context it is noted that the double role of arbitrator and vice president of the body that confirms and appoints the arbitrators could clearly affect the independence of the other members of the arbitral tribunal, conditioning them to share their integration with a person that exercises high executive functions and undeniable influence with the body responsible, for example of their possible future designations as arbitrators in other arbitration proceedings.

12.31. **The infinite influence that could be exercised by the Vice President of the ICC, Mr. Beraudo, over the other arbitrators,** is therefore evident.

12.32. As we have stated, the right to be judged by an impartial and independent court constitutes one of the basic elements on which rests the trust of a judicial system, and its respect transforms into an essential part of the right to due process. This has been expressly recognized in Argentine legislation.

12.33. This is noted in Article 8 Incise 1st of the American Convention on Human Rights (Pact of San Jose Costa Rica) – part of the Argentine law with Constitutional hierarchy by virtue of the provisions of the National Constitution, Art. 75, Inc. 22 – that *"every person has the right to be heard (…) by a competent Court, __independent and impartial__ (…) to determine their civil rights (…) or any other kind"* (the emphasis is ours). Art. 30 of the CPCC assigns judges, for their part, the duty to excuse themselves when their personal situation could lead them to not maintain that impartiality, and

therefore to create inequalities between the parties. In concordance with this jurisprudence has repeated on various occasions that **the impartiality of the judger is a necessary condition to guarantee due process.**[51] The violation of the guarantee of impartiality has also been recognized as an objective vice of the proceeding and not a bad subjective or personal quality of the judge.[52]

12.34. Compliance with these duties is therefore fully applicable in the arbitral sphere. This was pointed out by our Supreme Court of Justice of Nation in its reaffirmation of the free choice of arbitrators and their impartiality as characteristics appropriate to the arbitration, on November 5, 2002, in the case "*Meller Comunicaciones S.A. U.T.E. vs. Empresa Nacional de Telecomunicaciones*", (dissenting Judges Carlos S. Fayt and Enrique Santiago Petracchi; Decision: 325:2893).

12.35. Despite this, the challenge presented was rejected without foundation.

12.36. The Award was thus issued by a court integrated by a member whose impartiality and independence had been challenged, with founded suspicions (later confirmed by the manifest lack of knowledge of the law applicable in favor of EDFI) and the grave violation of the guarantee of defense held by ENDESA and YPF, leading to an Award that has not duly complied with its purpose given the existence of a vice in the proceeding found in Art. 760 of the CPCCN.

**B. Lack of foundations for the Award**

12.37. From the statements made in Chapters VIII, IX and X of this document, it is seen that the Award lacks legal foundation.

12.38. This lack transforms into an essential vice of the proceeding which *per se* causes the annulment of the document, inasmuch as it constitutes an *essential fault in the proceeding* under the terms of Art. 760 of the CPCCN.

12.39. Art. 34, Inc. 4 of the CPCCN establishes that "*the duties of the judges are ... to found all final or interlocutory sentences, under penalty of annulment, respecting the hierarchy of current norms and the principle of congruence*". Art. 163, Inc. 5 in turn provides that "*the final trial court sentence must contain ... the foundations and application of the law ...*".

---

[51] Among many others, CSJN, 11.7.06, "*Pontoriero, Ruben A. s/incident of challenge to federal judge Leopoldo Rago Gallo – Case No. 13,670*, P. 1187.XL.RHE; CSJN, 17.5.05, "*Llrena, Horacio L. s/abuse of arms and assault/ Arts. 104 and 89 C.Pen/Case 3221*, L.486.XXXVI.

[52] CSJN, 10/04/03, "*Banco Nacion Argentina s/summary investigation of fraud*", Dissenting vote by Judge Belluscio, Decision: 326:1106). "*It is decisive to establish if, either from the point of view of the external (objective) circumstances, if there are elements that authorize covering doubts with regard to the impartiality with which the judge must act, ignoring his internal thoughts*", (CJN, 23.12.04, "*Quiroga, Edgard Oscar s/Case No. 4302*", Decisions 327:5863).
Doctrine has also spoken similarly by holding that the independent and impartial exercise of the administration of justice "*is one of the elements integrating the guarantees of due process, recognized in Articles 16, 18, 28 and 33 of the National Constitution*" and in international treaties (Highton and Arean, ob. Cit., Volume 1, page 408, underlining is ours).

12.40. The legal rules partially transcribed in the above paragraph regulate in this jurisdiction, with regard to civil and commercial proceedings – in which this arbitral proceeding is subsumed – basic Constitutional precepts of our legal system: "*…no inhabitant can be deprived … (of) ownership … except by virtue of a decision <u>founded in the law</u>…*" (Art. 17); "*no inhabitant …can be sentence without prior hearing <u>founded on the law</u>*…" (Art. 18); and *this Constitution, the laws of the Nation consequently dictated by the Congress and treaties with foreign powers are the supreme law of the Nation …*" (Art. 31).

12.41. Those norms are binding on all judges and arbitrators who issue sentence according to *law* (as those who entered the order challenged in this recourse). And this includes arbitrators who enter orders as amiables compositeurs, when dealing with rules of public order (as in the case at hand).

12.42. This is true to such a degree that the standards that regulate the activity of the magistrates expressly contemplate the conditions and effects of abandon legal standards. For example, the *Law of the Council of Magistrates* provides that "*... the repeated failure to comply with procedural standards ...*"[53] constitutes a disciplinary fault on the part of the magistrates.

12.43. It is therefore incontrovertible that the Award challenged, by abandon the application of law which it is required to apply and including flagrantly violating some of the standards of public order, has caused an *essential fault of the proceeding* which must inevitably lead to its declaration as null.

12.44. We must remember that "*the lack of motivation, due to its effects, is equivalent to giving to the decision the role of legislator. On the other hand, to eliminate the legal text without any plausible explanation of any kind; to apply a standard that has been repealed or is no longer in effect; to use as foundation rules with excessive latitude and to base the decision on dogmatic affirmations or to provide a foundation that is only apparent (Alvarado Velloso, The Judge, his duties and powers, p. 209), in the jurisprudence of the CSJN, represents a cause of arbitrariness. On the other hand, in successive decisions the CSJN has ordered that the obligation incumbent on judges is to found their decisions as inseparable part of their condition as bodies which apply current law, not just because the citizens can feel better judged, nor because this helps to maintain the prestige of the Courts, but because this requirement has been prescribed by law. The republican form of justice demands that decisions be founded because this last is the application of their motivations (CSJN, 28/4/92, The Law, 1992-D-648 No. 8220)".*[54]

---

[53] Law 24,937 Art. 14, Inc. A), Ap. 5 (T.O. Decree No. 816/99).

[54] Fenocchietto, Carlos E., "*Code of Civil and Commercial Proceedings of the Nation"*, T.1, p. 132 and 133, Ed. Astrea, Bs. As., 1999. The same author states that "*the purpose of the jurisdictional function of the State is to declare the law in the concrete case, so that the application of the legal norm, or the general principles of law, become an indispensable requirement in the activity of the judge for pronouncing sentence.*" He adds that "*within the legal system, the judge will found his decision on the express text of the law, through which he acts, deeming or rejecting all or part of the pretensions and defenses of the items for judgment. All final or interlocutory decisions that violate this essential duty <u>fall under the sanction of annulment.</u>*" He specifies that "*the just must inexcusably declare the law in the particular case judged, in accordance with the facts affirmed and proven at hearing …(and that) it is necessary to remember that the correct application of law by the judge, as says the aphorism, must necessarily result from the facts affirmed by the parties, as within the CPN regimen of ruling formation of the material know in the hearing constitutes a load for the parties and conditions the actions of the judge, as he cannot in his decisions refer to other facts than those alleged by the parties.*"

12.45. Along the same lines he explains that, "... *jurisprudence has held that the duty to found is a condition for validity of the decisions (Rey v. Rocha, Decisions: 274::260, 283:86: 295:95, among others); in order not to be arbitrary he must state the law applicable in each specific case (Decisions: 244:521; 259:55); and any that lacks all motivation, or those with motivation which is apparent or unsubstantial, are unconstitutional."* This is because *"in our country, the obligation to give foundation originates in the Constitution, although this is neither explicit nor direct. Only the expression "sentence founded on law" is mentioned in Article 17 (right to ownership), and later in Art. 18 (due process) which alludes to "prior hearing founded on law". Thus "the sentence founded on law typified by Art. 17 of the National Constitution, as well as assure the duty to found judicial decisions, can also act as a complement of the principle of legal security."*[55]

12.46 To this is added that *"the principle of normative hierarchy taught by Constitutional supremacy cannot be removed by erroneous or ambivalent interpretations, so that the strict application of the duty to reason each jurisdictional act is not postponed by legalistic caprice"*; and that *"one of the guarantees of due process consists of the limit held by the judicature to not introduce allegations or matters of fact as a surprise, so that the parties have not been able to exercise a full and timely defense".*[56]

12.47. We do not discuss her if the Award is fair or not, if it is equitable or not, if it is correct or not.

12.48. What is questioned here is that **the Award lacks legal foundation in our law**, flagrantly violates our public order and unduly affects express Constitutional guarantees of the defendants. Moreover, the Tribunal has issued its award based on <u>false</u> proof.

12.49. The Award has incurred in an *essential fault of the proceeding* in that the arbitrators have failed to apply basic rules inherent to their jurisdictional function, affecting the Constitutional right to defense at trial: ENDESA and YPF never postponed the competition to settle a conflict with the plaintiff on the understanding that the intervening arbitral tribunal which should have issued its award according to substantive Argentine law – would resolve a conflict according to its whim and without legal foundation.[57]

---

[55] Gozaini, Osvaldo A., "*Code of Civil and Commercial Procedures of the Nation*", T 1, p. 88/9, Ed. La Ley, Bs. As., 2002.
[56] Gozaini, ob. Cit, p. 89 and ss.
[57] See regarding this matter Caivano, "*Arbitration*,", ob. Cit., Ed. Ad Hod, Bs. As., 2000, p. 291.

12.50. Consequently the Award is also null from the perspective developed on this point.

### XIII. <u>INSTITUTIONAL GRAVITY OF THE DECISION ADOPTED.</u>

13.1. The Award without justification and arbitrarily abandoned applicable law, thus violating Argentine public order with a grave effect on the rights of the defendants protected by the National Constitution. The Award has resolved that in practice, Law 23,928 (regarding public order) and especially its Article 1 were not in effect as of December 21, 2001, and has refused to apply same.

13.2. If the decision question is not annulled, then the jurisdictional decision – issued by a Court **of law**, will be confirmed which, with no presentation or decision intervening regarding its unconstitutionality, can only finish violating Argentine public order, in violation of the prescription of the Constitution in its Art. 31 and concordant standards, affecting basic Constitutional rights such as those of *due process* (Art. 18) and *property* (Art. 17).

13.3. The standard of public order whose application the majority vote decided to ignore is not, granted, irrelevant or indirectly applicable to this case. This is the standard over which the convertibility regimen and a good part of the legal relations between April 1991 and January 2002 were based.

13.4. It is event that the confirmation of an arbitral decision that (i) declares that at December 31, 2001 the Convertibility Law was not in effect and which (ii) ignores the effective date of Law 25,561, can cause an unlimited number of litigious situations in the Republic of Argentina and abroad, with the consequent impact on legal relationships consolidated under that regimen.

13.5. Under that criteria, innumerable legal acts – civil, commercial, administrative, etc. – executed under strict compliance with Article 1 of Law 23,928 until the day of its repeal could be subject to review and lead to situations of genuine legal scandal, with a serious affect on essential principles of any legal system such as those of legal security and stability.

13.6. It is publicly known that the repeal of the convertibility regimen ordering the 1 to 1 parity between Argentine and American currencies has led to a litigiousness without precedent in the Argentine Republic, to the extent of placing our judicial system virtually in a system of collapse. And moreover, the drastic effects of said measures on social coexistence and peace continue to appear today in various sectors of the community that do not consider their claims to have been satisfied.

13.7. It is sufficient to note that despite the diversity of the criteria adopted by the courts which have intervened in conflicts related to the repeal of the Convertibility Law, none of the decisions handed down by the Maximum Tribunal

of Argentine justice destined to put an end to these general conflicts has reached the extreme of deciding that the official exchange rate of $1 per US$ 1 then in effect as established in the Convertibility Law, was not in effect until the last day of 2001.

13.8. It is chilling to even imagine the degree of litigiousness that would again be caused in those cases in which obligations at January 6, 2002 were stated in pesos (cfr. Decree No. 214/02), given that that was the date that the Convertibility Law was repealed, if the doctrine of the Award is consolidated in the sense that the exchange rate lost value to the dollar and the Convertibility Law lost effect long before that date. It is sufficient to simply remember the numerous judicial decisions that deemed the "peso-ization" (conversion into pesos), required by Law 25,561 and Decree No. 214/02, for obligations that were delinquent prior to January 6, 2002, to be inapplicable.

13.9. Consequently the mere risk that the order challenged could become a precedent that would, more than 6 years from its repeal, reopen the discussion on the effective period of the Convertibility Law and its effects on juridical relations born under it constitutes a typical supposition of institutional gravity *"for possible future projections arising from the decision which finally enters".[58]*

13.10. As such the concerns manifested by the Supreme Court of Justice of the Nation in its decision on the Constitutionality of Law 25,561 are fully applicable, when it resolved that *"an interpretation contrary to this fundamental rule of economic functioning, made **three years after establishment**, would have extremely grave institutional consequences which would be contrary to the interpretative canon that requires the weighing of the consequences deriving from judicial decisions (Decisions: 312:156)"* (added emphasis is ours).[59]

13.11. More recently in the *Massa* case,[60] the Court ratified this line of jurisprudence by pointing out the social transcendence born by ending the generalized litigious situation which arose upon the abandonment of the convertibility regimen on January 6, 2002.

13.12. In that new opportunity our Highest Court reminded that the *"institutional response, to be adopted in this present sentence, is the fruit of a consensual decision among the ministers comprising this Court. Obtaining this consensus in view of the elevated intent to place an end to a litigation of indubitable institutional and social transcendence, determines that those subscribing do so without prejudice to the appreciations formulated in precedents known regarding determined aspects of the matters debated"* (consideration 10th of the

---

[58] CSJN, 13/04/1973, "*Treviranus, Monica Alejandra re/adoption*"; Decisions:285:279.
[59] CSJN, 05/04/05, "*Galli, Hugo Gabriel et al v. PEN – Law 25,561 – docs. 1570/01 and 214/02 re.protection of Law 25,561*", Concurrent vote of Attys. Zaffaroni and Lorenzetti, Decisions: 328:690.
[60] CSJN, 27/12/06, "*Massa, Juan Agustin v. National Executive Branch – doc. 1570/01 and other re protection law 16,986*", M.27771.XLI.

Majority vote and Consideration 10th of the vote of Justice Fayt; underlining is added by us) and that **"the reasons of institutional gravity** *related by the majority and which in the general lines I shared become prudent, to the degree possible, in order to arrive at a solution which beyond the differences on the foundation, allows reaching a sentence that, while unanimous in the economic result puts an end to the great quantity of claims pending solution"* (consideration 11th of the vote of Justice Argibay).

13.13. The foregoing shows that, even in the denied hypothesis that the Hon. Chamber considers that the procedural limits existing in the recourse filed by ENDESA and YPF constitute an obstacle to declaring the annulment requested – which, due to the existence of the causes manifested in that sense, we propose solely for the purpose of exhausting arguments -, the presence in the case of alleged elements of institutional gravity- following the doctrine set by the Supreme Court for many years – requires that this recourse be allowed, and would further eventually justify the allowance of the federal remedy before the Maximum Court.

13.14. In effect, the purpose of the doctrine mentioned is to prevent that questions of procedural order constitute an obstacle for the issuance of a decision according to law, when the *"institutional order"*, or *"the foundation of national institutions"* or *"the basic institutions of the Nation"* or *"the basis of the legal institute of the conflict"* is affected. As such those matters that exceed *"the interest of the parties and which affect the community"* have been understood to bear *"institutional gravity"* , and therefore the full exer4cise of the jurisdiction function is justified in order to safeguard in each case *"the supremacy of the National Constitution respecting the basic institutions of our law (or the nation, and keeping in sight the general interests of the collective (or the community) or the "community conscience".*<sup>61</sup>

13.15. And as stated by precedence, there is no doubt that the case examined bears institutional gravity inasmuch as it exceeds beyond the thresholds of the individual interests of the parties to this proceeding. It deals with an arbitral resolution that has a directly impact on basic pillars of our legal system /such as public order, normative supremacy provided in the Constitution and legal security), with the consequent affect on the interests of the community in general.

XIV. <u>CONCLUSION</u>

It can therefore be concluded that:

➢ The notable and unnecessary extension of the Award could lead to the false conclusion that it has numerous foundations that

---

<sup>61</sup> Barrancos y Vedia, Fernando. *"Extraordinary Recourse and Institutional Gravity"*, Abeledo-Perrot, Buenos Aires, 1991, p. 51 and 231/233.

the appellants disagree with and that turns the matter very complex. Neither of these is true. The Award lacks absolutely any legal and even economic foundations, it is totally arbitrary and resolves *contra legem* a matter as simple as this: whether or not on December 31, 2001 Article 1 of law 23,928 which set, as a matter of public order, the *official exchange rate* in the Republic of Argentina.

➢ The Award concluded that on December 31, 2001 that *official exchange rate* was not in effect in practice (when Law 23,928 had neither been repealed nor declared unconstitutional), thus violating public order and gravely affecting the rights, guarantees and organizational norms of the State established in the National Constitution.

➢ The arbitrators, who should be and act as of law, were required to apply Argentine law; especially its standards of public order. Nevertheless they did not do so, rather the flagrant violation affected basic Constitutional rights of the defendants.

➢ The parties clearly and precisely agreed on the *Contingency* and set a time limit for its occurrence. That pact was imperative and binding on them pursuant to Art. 1197 of the Civil Code. The Award completely abandoned the terms agreed on and the legal norms unequivocally referred to by the parties, to adopt a capricious solution which is void of any legal foundation and fact, as is demonstrated by the statements in the above points.

➢ The efforts made by the majority of the Tribunal arguing the abandonment of the agreement of the parties and Argentine law is not sufficient to hide the inconsistencies and contradictions in which it inevitably falls, upon attempting to ignore the facts proven of the case and current law.

➢ Where the *Letter Agreement* stated that the *official exchange rate* (i.e. Art. 1 of the Convertibility Law) would be taken into account, the majority stated that the exchange rate of officially recognized markets should have been taken into account, because it could only be presumed that the parties could not refer to the *official exchange rate* of Art. 1 of the Convertibility Law inasmuch as **they were not experts on that law.**

➢ Where the *Letter Agreement* said that there should have been an unlinking from the *official exchange rate,* that is, there was an increase or decrease in its value, the majority interpreted this to mean, contrary to the above, that the parties had taken into account the most complex technical aspects of the convertibility regimen – **appropriate for**

**experts in these matters**- such as Articles 2 and 4 of the Convertibility Law.

➢ Where the *Letter Agreement* said that the increase or decrease in the *official exchange rate* should not have occurred until December 31, 2001, the majority said that the official exchange rate remained unchanged during that period – which should have led to a sentence for damages equal to "0" (zero) – however that that was not important for production of the *Contingency*.

➢ Where the *Letter Agreement* said that the compensation should have been calculated using the *official quote* of the *official exchange rate* on December 31,2001, the majority said that it was more appropriate to use the *free exchange rate* of January 11, 2002.

➢ Although the majority arbitrarily said that the relevant part of the *Contingency* was to consider the essential premises of the convertibility regimen, the decision adopted was finally incongruent with its own logic and adopted the worst forms of calculation. It completely ignored the first statements that, in the logic of the Award, affected said regimen (sanction of Law 25,445, drop in the level of reserves, installment of Corralito) and would have resulted – in the context of the arbitrary reasoning of the Tribunal – in a substantially lower award.

➢ It is not easy for ENDESA and YPF to reveal the deep concern resulting from the thought that one of the causes of the serious and invalidating juridical errors narrated has resided in the lack of impartiality or independence of Mr. Beraudo, preceded and aggravated by the Decision of the ICC to name him vice president of the Court during the course of the arbitration and to refuse to open a confirmation hearing as a result of same, despite its unarguable implications.

➢ Finally the Award is null and void inasmuch as it is arbitrary and violates public order, as the arbitrators have exceeded the points discussed, due to essential faults in the procedure, in this way creating a situation of unusual institutional gravity.

## XV. JUDICIAL INTEREST OF ENDESA AND YPF IN DECLARING THE CHALLENGED AWARD AS PARTIALLY ANNULLED

15.1. To declare the annulment of a procedural document such as the decision challenged, as minimum the specific harm suffered by the appellant must be accredited (CPCCN, Art. 172). The annulment cannot be allowed simply for annulment, rather there must be a practical purpose involved in invalidating the incorrect act.

15.2. The harm in this case is evident: A totally arbitrary award, lacking of any factual and legal foundation, has condemned our clients to pay multimillion amounts, ignoring the repeated calls made to the arbitrators with regard to the need to apply Argentine law to the case at hand in accordance with the agreement made by the parties and in accordance with the legal nature of this arbitral proceeding.

## XVI. COMPLEMENTARY REFERENCES OF INEXCUSABLE KNOWLEDGE BY THE TRIBUNAL AD QUEM. CLAIMANT'S RISKY BEHAVIOR AS FAR AS THE AMOUNT OF THE DEMAND TO WHICH, SUPPOSEDLY, CLAIMANT BELIEVED IT WAS ENTITLED.

16.1 The procedural behavior shown by the plaintiff in the arbitration imposes on us the need to formulate some considerations, before concluding this brief, knowledge of which will illustrate the Tribunal at the time of resolving this appeal.

16.2. The analysis of these events reveals the procedural behavior of the plaintiff which with regard to quantification of its claim, cannot be reconciled with the duty for good faith which is required of any litigant and which can furthermore be conceptually found within the rules provided in Art. 163, Inc. 5th, *in fine* of the CPCCN.

16.3. Said misbehavior is clearly demonstrated as soon as one reads the so-called *brief founding the complaint.*

16.4. At the time the complaint was filed, the plaintiff claimed the collection of US$ 325,000,000.

16.5. Notably at the time of presenting the above referred to *brief founding the complaint,* the plaintiff, based on a puerile and inconsistent explanation, raised the amount of its pretension to the amount of US$ 516,000,000.[62]

16.6. To hold, as did EDFI, that (a) the attitude of the plaintiffs in rejecting any negotiation and (b) bad faith on the part of REPSOL in refusing to participate in the arbitration allowed the plaintiffs to increase the amount of the claim[63] constitutes a proceeding that is fought with the procedural behavior which is required of all litigants.

16.7. This ambivalent attitude and the significant difference in the amounts evidences that the arbitral complaint lacked from the beginning, the seriousness and solidity expected of a litigant in good faith who is convinced of his right.

16.8. Finally this arbitration has been an adventure. An adventure based only on an alleged understanding over the meaning of the Letter Agreement

---

[62] To raise the amount of the complaint EDFI held that ENDESA and YPF should pay 100% of the impact of the devaluation of the peso and not just 50% of this effect, pursuant to the attachment to the *Letter Agreement.*
[63] See Award Paragraph 235.

entered by the parties in a meeting in Madrid **which never existed** and which the majority of the Arbitral Tribunal took on **despite its manifest falseness** (point 10, section 4 of the dissenting vote).

## XVII. DOCUMENTS.

In order to facilitate the work of the tribunal, the following documentation has been attached:

(i) Copy of the Award of October 22, 2007 as Attachment III;

(ii) Copy of the Memorandum of Understanding as Attachment IV;

(iii) Copy of the Share Purchase/Sale Agreement between EDENOR and EASA as Attachment V;

(iv) Copy of the Letter Agreement as Attachment VI;

(v) Copy of the testimony of Alfredo Llorente Legaz and written communications attached to same between the parties during the negotiation of the *Letter Agreement* (presented as Document R-24 to the Brief Founding the Answer to the Complaint filed by ENDESA and YPF), attached as Attachment VII;

(vi) Copy of the testimony of Didier Lamethe (attached as Document C-173 to the Brief for the Response filed by EDFI) as Attachment VIII;

(vii) Calculation of the first amount mentioned in Chapter X, paragraph C), section a) , as Attachment IX;

(viii) Calculation of the second amount mentioned in Chapter X, paragraph C), sectin B) as Attachment X;

(ix) Calculation of the third amount mentioned in Chapter X, paragraph C), section c) as Attachment XI; and

(x) Copy of the Arbitration Regulation of the International Chamber of Commerce as Attachment XII.


## XVIII. INTRODUCTION OF THE FEDERAL MATTER

18.1. In the hypothetical and improbable event that this Hon. National Chamber of Commercial Appeals does not order the annulment of the award as requested, we propose and as of this point introduce the federal question in order to appear before the Supreme Court of Justice of the Nation as provided in Article 14 of Law 48, for the reason that such a decision could only be issued by ignoring the application of standards of public order, thus violating the principles of supremacy of the laws (Art. 31 of the N.C.) and separation of powers appropriate to a republican form of government adopted by Argentina (Art. 1of the N.C.). This would therefore signify a serious diminishing of the principles, rights and guarantees consecrated in the Constitution, including those of legality, guarantees of due process, inviolability of defense of individuals and rights and the right to ownership at hearing, consecrated in Arts. 14, 17, 18, 19, 28 and 31 of the N.C.

18.2. Furthermore a hypothetical and improbable decision validating the award would constitute a circumstance that in itself would affect the "*good progress of the institutions*", as it would be manifestly contrary to the principles and standards of public order. This would doubtless transcend the concrete case and individual interests of the parties, inasmuch as it would present an irremediable harm to legal security, the supremacy of the laws and the principle of legality, so that this situation and its maintenance over time would consume a situation that justifies access to the extraordinary level before the Supreme Court of the Nation under the terms of the doctrine of **institutional gravity,** set in praetorian form by the highest court of the Nation in Decisions: 248:184, 257:134; 256:263 and 491, 260:24,. 300:417, 326:4087, 316:1930, among many others.

## XIX. <u>AUTHORIZATIONS.</u>

We expressly authorize our legal sponsors and Attorneys Leandro Javier Caputo, Monica Laura Rothenberg, Osvaldo Perez Sammartino, Martin Torres Girotti, Maria del Carmen Kupsch Araneo, Paula de la Serna, Felipe Eduardo Zabalzo, Maria Gabriela Casanova, Cecilia Elena Lasmartres and Romina Laura Papel to review the court file, obtain copies, present documents, serve notices and documents, request the file on loan, extract photocopies, remove copies, documents, testimonies and original documentation, to make breakdowns, leave notes on style and perform any other act appropriate to these proceedings.

## XX. <u>WARNING ON THE RESTRICTED POWERS OF THE ARBITRAL TRIBUNAL AFTER HAVING RENDERED THE AWARD. REMISSION TO THE COURT OF APPEALS WITHOUT PROCEEDINGS AND NEW AWARD BY THE ARBITRAL TRIBUNAL</u>

20.1. In accordance with the arguments stated in the foregoing paragraphs, the appeal is formally allowable. It must be granted and resolved in a timely manner by the competent Tribunal, **without further proceedings.**

20.2. That is, the Arbitral Tribunal is responsible only for remitting the case, with no further process, to this Hon. Chamber. The recourse should not be tried with the counterpart – by express imposition of the CPCCN, Art. 760 in fine - [64] under penalty of annulment.

20.3. Given the filing of the appeal for annulment, the Arbitral Tribunal must circumscribe its actions to order formal aspects, and is **forbidden** to declare again – under penalty of annulment – on foundations or affirmations linked to the matters debated and decided in the case (object of this recourse).[65]

20.4. In this respect it has been decided that "*the complaint filed is allowed by virtue of the denial of an appeal for annulment deduced against a arbitral award dictated by the general arbitration court of the Buenos Aires Chamber of Commerce when, as in the case, it arises that said body was the one that dealt with and denied same, even though said denial was outside of its jurisdiction inasmuch as it had heard the foundation of same to later dismiss it, and it only had jurisdiction to verify the formal compliance of same with current norms in order to hear or deny it.*"[66]

## XXI. PETITION

1. Based on the above statements, we respectfully request that the Arbitral Tribunal:

a) Accept the undersigned as presented in the legal standing invoked and as constituted at the new procedural address;

b) Accept this appeal for the partial annulment of the Final Award issued October 22, 2007, as filed in legal time and form;

c) Accept the introduction of the federal matter formulated; and

d) Without any substantiation and without hearing, grant the appeal for annulment requested, remitting said recourse and the arbitral actions to the Honorable National Chamber of Appeals for Commerce in the Federal Capital, located at Av. Roque Saenz Peña 1211, Planta Baja, in the City of Buenos Aires, Argentina.

2. We request that the Honorable Chamber of Appeals:

---

[64] That norm does not allow the substantiation of the recourse in any forum.

[65] Among many other precedents we note that the CNCom C has judged that "*the causes invoked, provided in Arts. 760 and 761 of the ritual law, justify the treatment of annulment denied. For this it is sufficient to decide the harm alleged. This form of the guarantee of defense at hearing and judicial control that must rule in all controversies is in this way assured, although it is submitted to the decision of arbitrators and the parties, as in the case, voluntarily limit same, upon agreeing that the award cannot be appealed …*" "*Cortesfilms Argentina SA v. Seb Argentina SA*", 21.12.01, LL2002-A, 632).

[66] CNCom A, 15.3.01, "*Industrial e Inversiones Orin SA v. Arcor SA re complaint*".

a) Accept the documents attached hereto for purposes of greater order of presentation and for the only purpose of facilitating the work of the Tribunal;

b) Request that the International Court of Arbitration of the International Chamber of Commerce, located at 38 Cours Albert 1er, 75008 Paris, France, remit the entire arbitration file, including the presentations made by the parties and other acts completed during said proceeding, or duly certified copies of same. As such we request that a subpoena be sent to the Tribunal with commercial jurisdiction in the City of Paris, France under the terms of Art. 132 of the CPCCN for processing by diplomatic channel; we therefore request that the pertinent document be provided to the Ministry of Foreign Affairs and Culture or, as determined, the Ambassador of Argentina in France or the Consul of Argentina in Paris, pursuant to the terms of Art. 38 of the Regulation for National Justice. Said instruments shall certify that they are indistinctly authorized to act as notice of the document and the subpoena of the legal representatives and sponsors subscribing this document, with express power to substitute other professionals, and especially attorneys registered with and/or admitted to practice before the Tribunals of Paris. Alternatively, that said request be made by issuance of a document duly legalized and with apostille or legalized by other means apt to achieve this result;

c) That it accept the introduction of the federal matter formulated;

d) That it allow the authorizations conferred; and

e) That it dictate timely sentence declaring the partial annulment of the Final Award of October 22, 2007, annulling and leaving without effect the award imposed on ENDESA and YPF, and order the payment of costs.

To accept the statements made and to agree to them, there

**WILL BE JUSTICE.**

[signed]
RAFAEL MARIANO MANOVIL
ATTORNEY
C.S. T. 6 – F.599
C.A.S.I. T. XI – F. 132
CUIT: 20-04431095-4

[signed]
ROGELIO DRIOLLET LASPIUR
T.9 – F.204
C.A.S.I. T. XI – F. 198


[signed]
[illegible] GUTIERREZ
[illegible]

[signed]
MAXIMO LUIS BOMCHIL
ATTORNEY
C.S.J.N. Vol 17 – PAGE 18


[signed]
9522.v5.fg
ALFREDO J. DI IORIO
ATTORNEY
VOL 35 – PAGE 284


[signed]
CARLOS MARIA ROTMAN
ATTORNEY
VOLUME 30 PAGE 544

CARLOS MARIA TOMBEUR
ATTORNEY
V. 20 – P.107
HUGO PEDRO LAFALCE
ATTORNEY
C.P.A.C.F. Vol 17 Page 356
C.N.P.T.A. 3.286.

# EXHIBIT 7

el encargo. Y siempre que un alguacil u oficial ejecutor presente una orden escrita de un juez o tribunal nacional para ejecutar una prisión o embargo, las autoridades provinciales y personas particulares estarán obligadas a prestar el auxilio que él les requiera para el cumplimiento de su comisión.

**14.**— Una vez radicado un juicio ante los tribunales de provincia, será sentenciado y fenecido en la jurisdicción provincial, y sólo podrá apelarse a la Corte Suprema de las sentencias definitivas pronunciadas por los tribunales superiores de provincia en los casos siguientes:

1) cuando en el pleito se haya puesto en cuestión la validez de un tratado, de una ley del Congreso, o de una autoridad ejercida en nombre de la Nación, y la decisión haya sido contra su validez:

2) cuando la validez de una ley, decreto o autoridad de provincia se haya puesto en cuestión bajo la pretensión de ser repugnante a la Constitución Nacional, a los tratados o leyes del Congreso, y la decisión haya sido en favor de la validez de la ley o autoridad de provincia:

3) cuando la inteligencia de alguna cláusula de la Constitución, o de un tratado o ley del Congreso, o una comisión ejercida en nombre de la autoridad nacional haya sido cuestionada y la decisión sea contra la validez del título, derecho, privilegio o exención que se funda en dicha cláusula y sea materia de litigio.

**15.**— Cuando se entable el recurso de apelación que autoriza el artículo anterior deberá deducirse la queja con arreglo a lo prescripto en él, de tal modo que su fundamento aparezca de los autos y tenga una relación directa e inmediata a las cuestiones de validez de los artículos de la Constitución, leyes, tratados o comisiones en disputa, quedando entendido que la interpretación o aplicación que los tribunales de provincia hicieren de los códigos Civil, Penal, Comercial y de Minería, no dará ocasión a este recurso por el hecho de ser leyes del Congreso, en virtud de lo dispuesto en el inciso 11, artículo 67 (hoy; inc. 12, art. 75) de la Constitución.

**16.**— En los recursos de que tratan los dos artículos anteriores, cuando la Corte Suprema revoque, hará una declaratoria sobre el punto disputado, y devolverá la causa para que sea nuevamente juzgada; o bien resolverá sobre el fondo, y aun podrá ordenar la ejecución especialmente si la causa hubiese sido una vez devuelta por idéntica razón.

**17.**— La Corte Suprema decidirá las competencias que se susciten a instancia de parte, sobre jurisdicción de los jueces nacionales. (Véase dec.-ley 1285/58, art. 24, inc. 7°).

**18.**— La Corte Suprema podrá establecer los reglamentos necesarios para la ordenada tramita-

ción de los pleitos, con tal que no sean repugnantes a las prescripciones de la ley de procedimientos.

**19.**— (Sustituido por dec.-ley 1285/58, arts. 16, 17 y 18).

**20.**— (Derogado por ley 23.098, art. 28).

**21.**— Los tribunales y jueces nacionales en el ejercicio de sus funciones procederán aplicando la Constitución como ley suprema de la Nación, las leyes que haya sancionado o sancione el Congreso, los tratados con naciones extranjeras, las leyes particulares de las provincias, las leyes generales que han regido anteriormente a la Nación y los principios del derecho de gentes, según lo exijan respectivamente los casos que se sujeten a su conocimiento, en el orden de prelación que va establecido.

**22.**— Las causas que se hallen pendientes ante los tribunales de provincia a la promulgación de esta ley, serán terminadas y fenecidas en los mismos tribunales, aunque por su materia o por las personas interesadas en ellas pudieran pertenecer a la jurisdicción nacional.

**23.**— * La presente ley será considerada como adicional y correctiva de la del 16 de octubre de 1862.

**24.**— Comuníquese, etcétera.

### §3. ORGANIZACIÓN DE LOS TRIBUNALES DE LA CAPITAL

#### LEY 1893

*Sancionada: 2-XI-1886*
*Promulgada: 12-XI-1886*
*R.N.: 1885-1886, pág. 532*

**Artículo 1.**— La administración de justicia en la capital de la República será desempeñada por las autoridades siguientes: (Véase dec.-ley 1285/58, art. 32).

#### TÍTULO I

**2 a 47.**— (Derogados por ley 11.924, art. 7°).

#### TÍTULO II

#### De los jueces de mercado

**48 a 59.**— (Derogados por ley 21.750).

#### TÍTULO III

#### De los jueces de primera instancia

#### CAPÍTULO I

#### De los jueces de lo civil

**60.**— (Sustituido por dec.-ley 1285/58, art. 43).

---

\* Se refiere a la ley 27.

# EXHIBIT 8



TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Katharine Perekslis, hereby certify that the following document is to the best of my

knowledge and belief, a true and accurate translation, of the Law Number 48, Section

14  from Spanish into English.

Katharine Perekslis
Signature

Sworn to before me this
July 11, 2008

Signature, Notary Public

Pamela Boyle
Notary Public, State of New York
No. 01BO6181278
Qualified in NEW YORK County
Commission Expires  Jan 28, 2012

Stamp, Notary Public

# I. JUDICIAL ORGANIZATION

**14.—** Once a trial has been commenced in the provincial courts, it shall be adjudged and completed in the provincial jurisdiction, and only final judgments pronounced by the provincial superior courts in the following cases may be appealed to the Supreme Court:

1) when the validity of a treaty, that of a law enacted by the Congress, or that of an authority exercised in the name of the Nation is at issue in the litigation, and the decision was against its validity.

2) when the validity of a provincial law, decree, or authority is at issue, on the grounds of its inconsistency with the National Constitution, treaties, or laws enacted by the Congress, and the decision was in favor of the validity of said provincial law or authority;

3) when the meaning of any clause of the Constitution, or that of a treaty or a law enacted by the Congress, or that of a commission exercised in the name of the national authority, was questioned and the decision was against the validity of the title, right, privilege, or exemption based on said clause, which was the issue in the litigation.

# EXHIBIT 9

*Poder Judicial de la Nación*

"EDF INTERNATIONAL S.A. C/ ENDESA INTERNACIONAL
(ESPAÑA) Y OTROS S/ Arbitraje"

Expediente N° 8767.08

Buenos Aires, 22 de abril de 2008.

Y VISTOS:

I.- Agréguese el escrito reservado.

II. Las codemandadas solicitaron en fs. 19/25 que el tribunal dicte una resolución que señale que el recurso de nulidad por ellas interpuesto tiene carácter suspensivo y subsidiariamente, en caso de no considerar apropiado asignar ese efecto al recurso, disponga el tribunal una medida cautelar que impida la ejecución del laudo recurrido.

La demandada pretende, pues, una declaración expresa del tribunal en la que se indique que el recurso por ella interpuesto con base en el art. 760 del Código Procesal, tiene efectos suspensivos respecto del laudo recurrido.

Cabe señalar que, en el caso, el recurso se interpuso contra un arbitraje de derecho; tipo de proceso en que es posible corregir y enmendar la decisión del laudo de los árbitros de juris, por medio de un recurso ordinario de nulidad ( Morello y otros, "Código Procesal en lo Civil y Comercial de la Provincia de Buenos Aires y La Nación", T IX-B, pág.47, Buenos Aires, 1999; Alsina, "Derecho Procesal", T VII, pág.84, Bueno Aires, 1980).

Ahora bien, en materia de apelación, el efecto suspensivo es la regla y sólo excepcionalmente - por disposición de la ley-, el recurso se concede con efecto devolutivo. En ese sentido se ha resuelto que en tanto el art. 760 del Código Procesal no dispuso expresamente el efecto con el que debía concederse el recurso de apelación, rige en el caso el principio general antes mencionado (Cn Com, Sala B, 5.8.03, en "Flosa SACIFI c/ Kriscaldis SCS s/ desalojo s/ queja" y sus citas).

Corresponde examinar si tal criterio, como sostuvieron los recurrentes, es aplicable, sea por analogía o por implicación - en la medida que el recurso de apelación abarcaría virtualmente el de nulidad (art. 253 del Código Procesal)-, al planteo de nulidad de que se trata en



*Poder Judicial de la Nación*

autos. También en este aspecto la ley guarda silencio.

Sin embargo, hay un indicador sobre el cual llama la atención Lino Palacio (Tratado de Derecho Procesal Civil, T IX, pág. 170 nr° 466, Abeledo Perrot, Buenos Aires, 1988), que se desprende del art.762, 2° párrafo, en tanto sujeta el destino de la multa que las partes hubiesen fijado de conformidad con el art.741 inciso 4° del Código Procesal, a la decisión que se adopte sobre el recurso de nulidad. Ese matiz permite inferir que el diferimiento de la ejecución del laudo en la medida que medie impugnación de su validez, lejos de resultar extraña, aparece compatible con el trámite del recurso de nulidad.

Pero en el caso concurre además un extremo decisivo para admitir la petición que se trata. En efecto, también media recurso de nulidad interpuesto por la parte actora contra el laudo en cuestión, lo que abona aún más la tesis aquí propiciada.

En consecuencia, corresponde declarar que el recurso interpuesto tiene efecto suspensivo, de modo que resulta inoficioso adoptar pronunciamiento sobre la medida precautoria subsidiariamente peticionada. Sin costas, dada la falta de contradictor.

III. En atención a lo solicitado en fs. 36, supéndanse los términos y concédase a las partes vista de la documentación; asimismo autorízaselas a extraer copia de la documentación remitida por el tribunal arbitral

Aclárase que no se conferirá vista de la documentación relativa a los recursos interpuestos por las partes, habida cuenta que media oposición de la parte demandada, con fundamento en el art. 760 del Código Procesal y un planteo de inconstitucionalidad deducido por la actora respecto de la citada norma legal.Con el resultado de la vista a la Sra Fiscal General se proveerá lo que corresponda.

IV. Notifíquese por Ujiería.

El Dr. Juan Manuel Ojea Quintana actúa conforme lo dispuesto en la resolución N° 542/06 del Consejo de la Magistratura y Acuerdo del 15/11/06 de esta Cámara de Apelaciones.

El Señor Juez de Cámara Dr. José Luis Monti no interviene en la presente resolución por encontrarse en uso de licencia

*Poder Judicial de la Nación*

(art. 109 del Reglamento para la Justicia Nacional).

BINDO/B CAVIGLIONE FRAGA

JUAN MANUEL OJEA QUINTANA

JORGE A. JUÁREZ
SECRETARIO

Nota: en el día de la fecha se dió cumplimiento a lo ordenado en el punto
I, agregándose a partir de la fs. 4/26 el escrito reservado en Sala.-.
Buenos Aires, 22 de abril de 2008.

JORGE A. JUÁREZ
SECRETARIO

# EXHIBIT 10



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Katharine Perekslis, hereby certify that the following document is to the best of my knowledge and belief, a true and accurate translation, of the Order of the Court of Appeal in Commercial Matters, dated April 22, 2008, in the matter of EDF International S.A. vs. ENDESA Internacional (Spain) et al re: Arbitration (File No. 8767.08) from Spanish into English.

Katharine Perekslis
Signature

Sworn to before me this
July 11, 2008

Signature, Notary Public

Pamela Boyle
Notary Public, State of New York
No. 01BO6181278
Qualified in NEW YORK County
Commission Expires Jan 28,

Stamp, Notary Public

[illegible stamp]

***Judicial Branch of the Nation***

[stamp:] COURTROOM C

**"EDF INTERNATIONAL S.A. vs. ENDESA INTERNACIONAL (SPAIN) ET AL   RE: Arbitration"**

File No. **8767.08**

Buenos Aires, April *22,* 2008.

ORDERED:

I.       File the document reserved.

II.      Co-defendants requested at pages 19/25 that the Court enter an order stating that the recourse for annulment filed by them stays execution of the appealed order; and in the event that said effect is not assigned to the recourse, then it requests that the Court issue an injunction staying execution of the appealed order.

The Defendant therefore basically intends that the Court expressly declare that the recourse filed by Defendant based on Art. 760 of the Code of Procedures, suspends the appealed order.

In the case at hand the recourse was filed against an arbitration de jure, a kind of proceeding in which the decision made by the de juris arbitrators can be corrected and amended through an ordinary appeal for annulment (Morello et al, "Code of Commercial and Civil Procedures for the Province of Buenos Aires and the Nation", T IX-B, page 47, Buenos Aires, 1999; Alsina, "Procedural Law", V[olume] VII, page 84, Buenos Aires, 1980).

Now then with regard to appeals, its suspensive effect is the [general] rule and can – as allowed by law – be granted only exceptionally with a returnable effect [i.e. when it does not stay execution].  Accordingly, it has been previously decided that, inasmuch as Art. 760 of the Code of Procedures did not expressly rule on the effect to be granted to the appeal, the general principle cited above governs (Cn. Com., Courtroom B, 8.5.03, "Flosa SACIFI vs. Kriscaldis SCS re/ eviction re/ complaint" and its cites.)

This criterion should then be examined to confirm if it is applicable, as the appellants contended, either by analogy or by implication, given that the appeal (Art. 253 of the Code of Procedures) would virtually cover the petition for annulment discussed in

[illegible stamp]

*Judicial Branch of the Nation*

this proceeding. The law also remains silent in this regard.

However, there is an indicator pointed out by Lino Palacio (Treatise on Civil Procedural Law, V[olume] IX, page 170 no. 466, Abeledo Perrot, Buenos Aires, 1988), that follows from Art. 762, 2nd paragraph, which subjects the allocation of the fine that the parties would have set pursuant to Art. 741 incise 4th of the Code of Procedures to the decision adopted on the appeal for annulment. From this perspective it could be inferred that the stay of execution of the order while its validity is challenged, far from strange, would appear to be compatible with the process of recourse for annulment.

However, the case at hand also presents a decisive point which would allow the petition. In effect, the Plaintiff has also filed a petition for annulment against the order in question, which provides only further support for the thesis presented here.

Consequently, the appeal filed must be declared to be suspensive in nature, and the subsidiary request regarding preventive measures declared without effect. Without payment of costs given the lack of a contradicting party.

III. In accordance with the petition filed at page 36, suspend the terms and grant the parties access to the documentation; furthermore, authorize that copies of the documents provided by the Arbitral Tribunal be obtained.

It's important to clarify that access to documentation related to the appeals filed by the parties shall not be granted in accordance with the opposition placed by the defendant, pursuant to Art. 760 of the Code of Procedures and an allegation of unconstitutionality brought forth by plaintiff with regard to said legal norm. The corresponding order shall be handed down with the result of the appearance of the Attorney General.

IV.     Notify by process server.

Dr. Manuel Ojea Quintana is acting in accordance with the provisions of Order No. 542/06 of the Board of Judges and Order of 11/15/06 of this Court of Appeals.

The Judge for the Court, Jose Luis Monti, does not appear in this order inasmuch as he is on leave

[illegible stamp]

***Judicial Branch of the Nation***

from the Court (Art. 109 of the Regulation for National Justice).


[Signature]
BINDOS CAVIGLIONE FRAGA


[Signature]
JUAN MANUEL OJEA QUINTANA


[Signature]
JORGE A. JUAREZ
SECRETARY


Note: The orders contained in Point I were complied with on this date, with the document reserved in the Court filed beginning at pages 4/26. Buenos Aires, *22* of April 2008.


[Signature]
JORGE A. JUAREZ
SECRETARY